# EXHIBIT 1

Dockets.Justia.com

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

**of**

**CONNECTU, LLC**

Dated as of April 6, 2004

CONFIDENTIAL
INFORMATION

C011285

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT

## OF

## CONNECTU, LLC

A Delaware Limited Liability Company

This LIMITED LIABILITY COMPANY OPERATING AGREEMENT, intended to be effective as of April 6, 2004, (the "Operating Agreement" or the "Agreement") of CONNECTU, LLC (hereinafter referred to as "ConnectU" or the "Company") by and among Cameron Winklevoss, an individual residing at _____ _____ (herein "Cameron"), Tyler Winklevoss, an individual residing at _____ (herein "Tyler"), Howard Winklevoss, an individual with an office address of 500 W. Putnam Avenue, Greenwich, CT 06830 (herein "Howard"), and Divya Narendra, an individual residing at _____ (herein "Divya").

## WITNESSETH:

WHEREAS, the parties to this Agreement have reached an understanding concerning the form and various other aspects of their business relationship with each other, as well as the organization and operation of the Company and its business and affairs; and intend for this Agreement to govern and control, to the extent stated or fairly implied herein, the business and affairs of the Company, including the Company's governance structure, tax status, and the Company's dissolution, winding up and termination;

WHEREAS, the Company was formed by Articles of Organization filed on April 6, 2004 with the Delaware Secretary of State;

WHEREAS, the Company was formed for the purpose of developing certain internet business concepts; and

WHEREAS, the parties hereto have agreed to operate the Company in accordance with the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, and such other good and valuable consideration as may be set forth below, the receipt and sufficiency of which the parties hereto acknowledge, the Members hereto agree as follows:

CONFIDENTIAL
INFORMATION

C011286

# ARTICLE I.
## DEFINITIONS

As used in this Agreement, the following terms have the meanings set forth below. Certain other terms used in this Agreement are defined elsewhere in this Agreement. For purposes of this Agreement, a defined term has its defined meaning throughout this Agreement and in each exhibit, attachment, and schedule to this Agreement, regardless of whether it appears before or after the place where it is defined.

"Act" means the Delaware Limited Liability Company Act (Section 18-101 through 18-1109 of the Delaware Laws), as amended from time to time.

"Adjusted Capital Account" of a Member at any time means the Capital Account of such Member at such time, increased by any deficit restoration obligation of such Member (including, without limitation, any Capital Contribution which such Member is unconditionally required to make after such time but on or before the end of the Fiscal Year in which such Member's Interest is liquidated (or, if later, ninety (90) days after the date of such liquidation) and any amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulation §1.704-2(g)(1) or (i)(5)), and decreased by any adjustments described in Treasury Regulation §1.704-1(b)(ii)(d)(4), (5) or (6).

"Affiliate" means a Person that directly or indirectly through one or more intermediary's controls or is controlled by or is under common control with such Person as hereinafter defined. The term "control" (including the terms "controlling," "controlled by' and "under common control," etc.) means the possession directly or indirectly of the power to direct or cause the direction of the management and policies of a business entity or other Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" means Limited Liability Company Operating Agreement, as it may be amended or restated from time to time in accordance with the terms hereof.

"Agreement Date" has the meaning set forth in the preamble.

"Appraisal", except as otherwise set forth herein, in the event that a determination of the fair market value of the Company's assets is required for purposes of this Agreement, such value, if not otherwise agreed upon by an 80% Majority-In-Interest of the Members, shall be determined by a firm of recognized standing in appraising chosen by the Company's regularly engaged accountants. The decision of said accountants shall be final and binding.

"Appraised Value" means the value of the Company as determined by Appraisal.

"Assignee" means a Person who is the transferee of a Member's Interest, provided such person is in compliance with all of the requirements of the Act, the Certificate of

3

CONFIDENTIAL
INFORMATION

C011287

Formation of the Company, and this Agreement and that has not been admitted as a Member.

"Available Cash" means the aggregate amount of cash on hand or in bank, money market or similar accounts of the Company as of the end of each fiscal quarter derived from any source (other than Capital Contributions and Liquidation Proceeds) less a reasonable amount of Reserves.

"Bankruptcy", with respect to any Person, means the assignment for benefit of creditors, filing of a voluntary petition in bankruptcy, reorganization or similar proceedings, adjudication as bankrupt or insolvent, or the seeking or consents to appointment of a receiver or liquidator of all or substantially all of the Person's assets

"Board" or "Board of Managers" has the meanings set forth in Section 8.1.

"Business Day" (whether such term is capitalized or not) means any day, excluding Saturdays and Sundays, that is not a federal or religious holiday.

"Business of the Company" means any and all significant commercial activities whether currently conducted or reasonably planned or anticipated to be conducted in the future, by the Company, which currently involve consulting, researching, developing, designing, manufacturing, distributing or marketing one or more products in any applicable industry.

"Capital Account" means, with respect to any Member, the capital account established and maintained for such Member pursuant to Section 6.2. The Capital Accounts of the Members as of the close of business on the Agreement Date shall be as set forth on Schedule A hereto.

"Capital Asset" means any equipment or other asset of the Company that under generally accepted accounting principles is treated as a capital asset.

"Capital Contribution" means, with respect to any Member, the aggregate amount of cash, and the agreed upon net value of any services and/or property, other than money, contributed by such Member (or his predecessor in interest) to the capital of the Company pursuant to Article VI hereof with respect to such Member's Units.

"Capital Gain" means, for any Fiscal Year, the Company's net taxable gain, if any, for such year from a Capital Transaction, as computed for federal income tax purposes, but using Gross Asset Value instead of adjusted tax basis, after reduction for expenses directly attributable to such a Capital Transaction (whether or not such amounts are treated as capital gain for federal income tax purposes).

"Capital Transaction" means the sale or other disposition (including, without limitation, a condemnation or liquidation of the Company) of all or substantially all of the assets of the Company.

CONFIDENTIAL
INFORMATION

C011288

"Cause" means, with respect to any person, the occurrence of any of the following:

(a)    at any time exceeding his actual authority by attempting to legally bind or commit the Company to any obligation or liability in excess of such authority or knowingly misrepresenting to any person his actual authority;

(b)    the exhibition of willful gross nonperformance, negligence or misconduct that in any case results (or could reasonably result), as determined by the Board in good faith and regardless of whether such actions were carried out by such person in good faith, in material harm to the Company or any of its Affiliates;

(c)    misappropriation of assets or engaging in activities or undertaking or planning any actions that can be reasonably construed as otherwise defrauding the Company or any of its Affiliates; or

(d)    any material breach of any provision of this Agreement or any other agreement between such person and the Company or any of its Affiliates.

"Certificate" means the Certificate of Formation of the Company, as amended to date and as it may be further amended in accordance with this Agreement.

"Class" means the Class A Members, the Class B Members, the Class C Members, if any, or the Members of any other class subsequently created pursuant to the provisions of this Agreement, as appropriate.

"Code" means the Internal Revenue Code of 1986, as amended from time to time and any applicable regulations promulgated thereunder.

"Company" shall mean ConnectU, LLC.

"Company Minimum Gain" with respsect to a Fiscal Year has the meaning of "partnership minimum gain" set forth in Treasury Regulation §§1.704-2(b)(2) and 1.704-2(d).

"Confidential Information" means all non-public information regarding the Company and its business, operations, know-how, members, managers, officers and employees, including but not limited to, Trade Secrets (as defined below) and proprietary information; business plans; new or changed products before public introduction; marketing, branding and/or advertising plans or strategies; design and engineering information; formulas; manufacturing processes and capacities; tooling; product and test data; programs (including computer software programs); procedures and manuals; confidential reports and communications; technical information; customer, vendor, supplier and employee data, including but not limited to names and addresses of same; methodologies; price strategies, costs and quantities sold; and internal information

CONFIDENTIAL
INFORMATION

C011289

regarding personnel skills, compensation, and organization charts, budgets or costs of individual departments.

"Control" of a Person means the power (whether or not exercised) to direct the policies, operations or activities of such Person by or through the ownership of, or right to vote, or to direct the manner of voting of, securities of such Person, or pursuant to law or agreement, or otherwise.

"Covered Person" means any past or present Member, any successors or heirs of a past or present Member, any past or present Affiliate of a past or present Member, or any past or present officers, member of the Board of Managers, employees, consultants, representatives or agents of the Company, a past or present Member or their respective Affiliates, or any past or present employee, consultant, representative or agent of the Company or any of its Affiliates, or any past or present officer or advisor of the Company.

"Credits" means all investment tax or similar credits allowed by the Code with respect to activities of the Company or the Property or the activities of the Company.

"Damages" has the meaning given that term in Section ____ hereof.

"Depreciation" for any Fiscal Year, means an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes as of the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

"Disability" or "Disabled" means

(a)    the occurrence of a disability, such that for a period of six (6) months in any twelve-month period, the person in question is incapable of substantially fulfilling the duties set forth in this Agreement or assigned or contemplated to be assigned by the Board or an individual Manager because of physical, mental or emotional incapacity resulting from injury, sickness or disease as determined by an independent physician mutually acceptable to the inflicted person and the Company; or

(b)    the occurrence of incompetency such that a legal proceeding has been instituted seeking the appointment of a guardian over the personal affairs of the person in question.

"Dissociation" means any action which causes a person to cease to be a member.

6

CONFIDENTIAL
INFORMATION

C011290

"Distributions" means distributions by the Company to the Members of Available Cash or Liquidation Proceeds or other amounts, but not Tax Payment Distributions.

"Equity Unit" means Class A Voting Units.

"Executive" means a member of the Executive Committee.

"Executive Committee" means the group that is designated pursuant to Section _____ hereof.

"Family" or "Member of a Family" means, as applied to any individual, any parent, spouse, child, spouse of a child, brother, sister, uncle, aunt or cousin of such individual, and any trust created for the benefit of any such Persons and each custodian of any property of any of such Persons.

"Fiscal Year" means any calendar year of the Company commencing on January 1 (or, for 2004, the filing date of the Certificate) and ending on December 31, or any portion of such period for which the Company is required to allocate items of Company income, gain, loss or deduction.

"Founding Members" means those Members who are Members as of October 1, 2004 and identified on Schedule A to this Agreement.

"GAAP" means United States generally accepted accounting principles consistently applied in accordance with past practices.

"Governmental Authority" (whether such term is capitalized or not) means any United States (federal, state or local) or foreign government, or governmental, regulatory or administrative authority, agency or commission.

"Gross Asset Value" with respect to any asset, means the asset's adjusted basis for federal income tax purposes, except as follows:

(a)     the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the Manager;

(b)     the Gross Asset Values of all Company assets may be adjusted to equal their respective gross fair market values, as determined by the Manager, only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

CONFIDENTIAL
INFORMATION

C011291

(c)    the Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the distributee and the Manager;

(d)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulation §1.704-1(b)(2)(iv)(m), subsection (f) of the definition of Profit and Loss, and Section _____ hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this subsection (d) to the extent the Manager determines that an adjustment pursuant to subsection (b) hereof is necessary or approprirate in connection with a transaction that would otherwise result in an adjustment pursuant to this subsection (d); and

(e)    The Gross Asset Values of Company assets shall be adjusted in a manner similar to subsection (b) hereof at such other times as the Manager may determine in its sole discretion.

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subsection (a), (b), (d) or (e) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profit, Capital Gain and Loss.

"Income" and "Loss" mean, respectively, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a), except that for this purpose (i) all items of income, gain, deduction or loss required to be separately stated by Code Section 703(a)(1) shall be included in taxable income or loss; (ii) tax exempt income shall be added to taxable income or loss; (iii) any expenditures described in Code Section 705(a)(2)(B) (or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation § 1.704-1 (b)(2)(iv) (i)(2)) which are not properly chargeable to capital account and not otherwise taken into account in computing taxable income or loss shall be subtracted; and (iv) taxable income or loss shall be adjusted to reflect any item of income or loss specifically allocated in Section 4, Allocations and Distributions.

"Indebtedness" means, as applied to any person, (i) all indebtedness for borrowed money, whether current or funded, or secured or unsecured, (ii) all indebtedness for the deferred purchase price of property or services represented by a note or other security, (iii) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (iv) all indebtedness secured by a purchase money mortgage or other lien to secure all or part of the purchase price of property subject to such mortgage or lien, (v) all obligations under leases which shall have been or must be, in accordance with generally accepted accounting principles, recorded as capital leases in respect of

CONFIDENTIAL
INFORMATION

C011292

which such person is liable as lessee, (vi) any liability in respect of banker's acceptances or letters of credit, and (vii) all indebtedness referred to in clauses (i), (ii), (iii), (iv), (v) or (vi) which is directly or indirectly guaranteed by or which such person has agreed (contingently or otherwise) to purchase or otherwise acquire or in respect of which it has otherwise assured a creditor against loss.

"Indemnified Party" means any person entitled to seek indemnification pursuant to the provisions of Article XIII.

"Indemnifying Party" means any person against whom indemnification may be sought pursuant to the provisions of Article XIII.

"Intellectual Property" means (1) inventions, discoveries, and designs, (2) patents and patent applications, any patents issuing on the applications or continuations, continuations-in-part, or divisions thereof, reissues, reexaminations, or extensions or improvements of such patents, and any invention disclosures, (3) copyright registrations and applications, copyrighted works of authorship (as defined in 17 U.S.C. § 102) covered by such registrations and applications, and all other works of authorship, whether registered or not, and all renewals, extensions, and Derivative Works thereof, (4) Confidential Information, Trade Secrets, know-how, and other proprietary information, and all tangible and intangible embodiments thereof, and (5) trade marks, service marks, trade names, domain names, and applications and registrations thereof, and all associated goodwill.

"Interest" of a Member means all rights, powers, duties and obligations of such Member in and with respect to the Company as provided herein or by applicable law, including, without limitation, the right of a Member to be allocated a fractional share of Profit, Capital Gain, Loss and special allocations, to receive distributions from the Company and to participate in the management of the Company in accordance with this Agreement.

"Interest Rate" means the interest rate equal to prime or reference rate of J.P. Morgan Chase & Co. as listed from time to time in the Wall Street Journal plus five (5) percentage points, compounded annually.

"Involuntarily Transfer" means any transaction, proceeding or action by or in which any Member shall be deprived or divested involuntarily of any right, title or interest in or to any of his common interest, including without limiting the generality of the foregoing death, disability, seizure under levy of attachment or execution, transfer in connection with bankruptcy or other court proceeding to a trustee in bankruptcy or receiver or other office or agency, transfers occasioned by dissolution of marriage or separation, whether pursuant to voluntary settlement or court order, any transfer upon, or occasioned, by, dissolution of a Company or other entity, or any transfer to a state or to a public officer or agency pursuant to any statute pertaining to escheat of abandoned property.

CONFIDENTIAL
INFORMATION

C011293

"Liquidation Proceeds" means the proceeds from the sale of all or substantially all of the Company's Property at the time of liquidation of the Company and all proceeds thereof, including, without limitation, the receipt of a note or other instrument providing for payments in installments.

"Liquidating Trustee" means the Manager or, if there is no Manager or the Manager does not have the capacity to act, the Person(s) appointed by the Executive Committee to windup and liquidate the Company pursuant to Article ___ hereof.

"Majority-In-Interest" means Members holding an aggregate of Eighty Percent (80%) of the Percentage Interests held by all Members, except that in those instances where a Member is excluded from a vote or consent such as described in Section 12.1, the "Majority-In-Interest" shall mean Members holding an aggregate of Eighty Percent (80%) of the Equity Units held by the Members entitled to vote or consent.

"Manager" means a member, individually, of the Board of Managers and Managers means the members, collectively, of the Board of Managers.

"Member" means each of the persons who have executed this Agreement and admitted as a member to the Company hereunder.

"Member or Membership Interest" means an undivided equity interest in the Company.

"Member Nonrecourse Debt" has the meaning of "partner nonrecourse debt" set forth in Treasury Regulation §1.704-2(b)(4).

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulation §1.704-2(i)(3).

"Member Nonrecourse Deductions" has the meaning of "partner nonrecourse deductions" set forth in Treasury Regulation §§1.704-2(i)(1) and 1.704-2(i)(2).

"Net Cash Flow" means, for any Fiscal Year, the amount by which the sum of (a) the gross cash receipts of the Company during such Fiscal Year and (b) the amount of any reduction in the Reserves for the prior Fiscal Year exceeds the sum of (c) the gross cash expenditures of the Company during such Fiscal Year (including, without limitation, amounts paid pursuant to required repurchases of Interests under Section ____ or otherwise), (d) the amount of any increase in the Reserves for the prior Fiscal Year and (e) any required distributions pursuant to Section ____ hereof and any prior distributions pursuant to Section ____ during such Fiscal Year.

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulation §1.704-2(b)(1).

10

CONFIDENTIAL
INFORMATION

C011294

"Nonrecourse Liability" has the meaning set forth in Treasury Regulation §1.704-2(b)(3).

"Net Profits" and "Net Losses" means the income, gain, loss, deductions and credits of the Company in the aggregate or separately stated, as appropriate, determined for federal income tax purposes in accordance with the method of accounting selected by the Managers, as required herein.

"Option Period" has the meaning set forth in Section 11.2.

"Optioned Units" has the meaning set forth in Section 11.2(b).

"Percentage Interest", with respect to a Member, means the number of Units owned by such Member divided by the total number of Units owned by all of the Members.

"Permitted Transfer" has the meaning set forth in Section 10.3.

"Person" (whether or not capitalized) means an individual, corporation, partnership, limited partnership, limited liability company, syndicate, person (including a "person" as defined in Section 13(d)(3) of the Exchange Act), trust, association or entity or government, political subdivision, agency or instrumentality of a government.

"Profit" or "Loss" means, for any Fiscal Year, the Company's taxable income or loss, respectively, for such Fiscal Year as computed for federal income tax purposes (including, without limitation, all items required to be separately stated pursuant to Code Section 703(a)(1), with the following adjustments:

Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profit or Loss shall be added to such taxable income or loss;

(a)    any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations §1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profit or Loss shall be subtracted from such taxable income or loss;

(b)    in the event the Gross Asset Value of any Company asset is adjusted pursuant to subsection (b), (c) or (e) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profit or Loss;

(c)    gain or loss resulting from any disposition of any Company asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

11

CONFIDENTIAL
INFORMATION

C011295

(d)    in lieu of depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year;

(e)    to the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulation §1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profit or Loss; and

(f)    notwithstanding any other provision hereof, any amount of Capital Gain and any items which are specially allocated pursuant to Section ___ or ____ hereof shall not be taken into account in computing Profit or Loss. However, any net loss realized upon a Capital Transaction that does not result in a positive amount of Capital Gain in a Fiscal Year shall be taken into account in computing Profit or Loss for such Fiscal Year.

The amounts of Capital Gain and the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section ___ and ___ hereof shall be determined by applying rules analogous to those set forth in subsections (a) through (f) herein.

"Profits Interest" means a profits interest in the Company (within the meaning of Treasury Regulation §1.721-1(b) and Revenue Procedure 93-27), which shall be subject to the allocations set forth in this Agreement, including, without limitation, Section ____.

"Property" means all properties and assets, whether tangible or intangible, that the Company may own or otherwise have an interest in from time to time.

"Protective Period" has the meaning set forth in Section 13.1.

"Reserves" means amounts set aside from time to time by the Managers pursuant to Section 9.5.

"Revaluation" shall mean the occurrence of any event described in Section 6.2, Capital Accounts, in which the book basis of Property is adjusted to its fair market value.

"Substitute Member" means an assignee who has been admitted to all of the rights of membership pursuant to this Agreement.

"Tax" means, with respect to a Fiscal Year, the federal, state and local income tax that would be paid by a hypothetical individual member of the Company who is a citizen of

CONFIDENTIAL
INFORMATION

C011296

the United States residing in the State of Connecticut on (a) the portion of the Profit, Capital Gain and net income and gain specially allocated by the Company pursuant to this Agreement for such Fiscal Year that is treated as capital gain for federal income tax purposes, computed by assuming that all such amounts are allocable solely to Connecticut and that the individual is in maximum marginal tax bracket with respect to such type of capital gain as set froth in the applicable tax rate schedule for such Fiscal Year (without regard to phase-outs, alternative taxes and the like and without regard to any other tax attribute of the individual), and (b) the balance of the Profit, Capital Gain and net income and gain specially allocated by the Company pursuant to this Agreement for such Fiscal Year, computed by assuming that all such amounts area allocable solely to Connecticut and that the individual is in the maximum marginal ordinary income tax bracket as set forth in the applicable tax rate schedule for such period (without regard to phase outs, alternative taxes and the like and without regard to any other tax attribute of the individual).

"Tax Matters Member" has the meaning set forth in Section 9.7.

"Tax-Payment Distributions" means cash distributions to Members by the Managers required pursuant to Section 7.1 with respect to each Member's respective income tax liability determined on the basis of their respective shares of taxable income of the Company calculated on a cumulative basis for all taxable years (or portions thereof) during which such person is a Member, offsetting taxable income with prior taxable losses, pursuant to Section 7.1.

"Termination of Affiliation" means any failure of a holder of Incentive Units to be employed by the Company or otherwise engaged in the management and affairs of the Company for any reason, including as a result of resignation, termination, death or Disability, as determined by the Board of Managers.

"Trade Secrets" mean any information or know-how, whether currently existing or developed in the future, including but not limited to formulas, processes or methods that (i) derives independent economic value, actual or potential, from not being generally known to or readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of reasonable efforts by the Company to maintain its secrecy.  Trade Secrets shall also include all other information or data that qualifies as a trade secret under applicable law

"Transfer" means any sale, assignment, encumbrance, hypothecation, pledge, conveyance in trust, gift, transfer by request, devise or descent, or other transfer or disposition of any kind, including, but not limited to, transfers to receivers, levying creditors, trustees or receivers in bankruptcy proceedings or general assignees for the benefit of creditors, whether voluntary or by operation of law, directly or indirectly, of any Member Units.

CONFIDENTIAL
INFORMATION                                                    C011297

"Treasury Regulations" means the permanent and temporary income tax regulations promulgated under the Code, as may be amended from time to time (including corresponding provisions of successor Treasury Regulations).

"Unit" means generically either an Equity Unit or a Non-Equity Unit.

14

CONFIDENTIAL
INFORMATION

C011298

## ARTICLE II
## ORGANIZATION OF THE COMPANY

2.1    Formation. The Company is a limited liability company organized under the provisions of the Delaware Act. The Certificate has been filed with the Secretary of State of the State of Delaware. The parties to this Agreement are all of the Members of the Company. A Member's Member Interest in the Company shall be personal property for all purposes. All real and other property owned by the Company shall be deemed owned by the Company as an entity and no Member, individually, shall have any ownership of such property by reason of its Member Interest.

2.2    Name. The name of the Company is, and the business of the Company shall be conducted under the name of, " *ConnectU LLC*." The name of the Company may be changed from time to time by amendment of the Certificate in accordance with this Agreement. The Company may transact business under an assumed name by filing an assumed name certificate in the manner prescribed by applicable law.

2.3    Continuation and Term. The Company was formed under the name "ConnectU, LLC" upon the filing on April 6, 2004 of the Certificate with the Secretary of State of the State of Delaware pursuant to the Delaware Act. The Members hereby agree that this Operating Agreement shall be the Company's limited liability company agreement to continue the Company as a limited liability company pursuant to the provisions of the Delaware Act and to set forth the rights and obligations of the Members and certain matters related thereto. The Company shall have perpetual existence unless terminated pursuant to the provisions of this Agreement.

2.4    Offices. The registered office of the Company in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate in the manner provided by law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate in the manner provided by law. The principal office of the Company shall be at 500 W. Putnam Avenue, c/o Winlevoss Consultants, Greenwich, CT 06830, or at such other place as the Board may designate, which need not be in the State of Delaware. The Company may have such other offices as the Board may designate.

2.5    Admission of Members. By executing this Agreement, each Person who is a party hereto (as the same may be amended from time to time) is being admitted as a Member of the Company in the Class set forth above such Person's name on Schedule A, all upon the terms and subject to the conditions set forth in this Agreement.

CONFIDENTIAL
INFORMATION

C011299

## ARTICLE III
## BUSINESS PURPOSES AND POWERS

3.1    Business Purpose. The Company was organized in the State of Delaware to carry on any lawful business, purpose or activity under the Act, or the laws of any jurisdiction in which the Company is authorized to do business.

3.2    Powers of the Company. The Company's purpose set forth in Section 3.1 may be accomplished by taking any action that is permitted under the Act.

## ARTICLE IV.
## MEMBERSHIP

4.1.    Member Status. There shall be at least one Member.  The name and address of each Member, the numbers and types of Units owned by such Member as of the date hereof, and such Member's Capital Account as of the date of this Agreement, are as set forth on Schedule A hereto.  In the event of any change with respect to the information stated on Schedule A hereto pursuant to or in accordance with the provisions hereof, the Board shall promptly cause (a) Schedule A to be amended to reflect such change and (b) a copy of the revised Schedule A to be provided to each of the Members. In case of any Member that is a corporation, trust or other entity, such designee shall be an officer, director, trustee or other individual of similar authority with respect to such Member.

4.2.    Founding Members.  The Founding or initial Members of the Company shall be those persons who have signed this Agreement.

4.3.    Additional Members.  Additional Members may be admitted to membership upon eighty percent (80%) consent of the current members.  Any such admission shall be effective only after the new Member has executed and delivered to the Board a document including the new Member's notice address and an agreement to be bound by this Agreement substantially in the form of Exhibit A hereto.

4.4.    Withdrawal. Except following the transfer of its Member Interest as provided in Article X and the admission of its transferee as a Member pursuant to Section 4.3 or 11.1(a), a Member may not withdraw from the Company.

4.5.    Lack of Authority. No Member shall have the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company, except for a Member that is acting in the capacity of Manager in accordance with Article VIII, or in the capacity of an officer pursuant to authorization by the Board in accordance with Section 8.8.

4.6.    Membership Book and Members of Record. The Board shall cause to be maintained, among other records, a membership book containing records evidencing the

16

CONFIDENTIAL
INFORMATION

C011300

Member Interests, the names and addresses of the holders of all issued Member Interests of the Company, the numbers and types of Member Interests held by each such holder, the date of issuance of such Member Interests, and whether or not such Member Interests originate from original issue or transfer. Names and addresses of Members as they appear on such book shall be the official list of Members of record of the Company for all purposes except as otherwise provided herein. The Company shall keep this record of Members at its registered office or principal place of business, or at the office of its transfer agent or registrar. The Company shall be entitled to treat the holder of record of any Member Interest as the owner thereof for all purposes, and shall not be bound to recognize any equitable or other claim to, or interest in, such Member Interest or any rights deriving from such Member Interest on the part of any other person, including a purchaser, assignee, or transferee, unless and until such other person becomes the holder of record of such Member Interest, regardless of whether the Company has either actual or constructive notice of the Member Interest of such other person.

4.7.   Change of Name or Address. Each Member shall promptly notify the Board, by written notice sent by certified mail, return receipt requested, of any change in name or address of the Member from that as it appears upon the official list of Members of record of the Company. The Board shall cause to be entered such changes into all affected Company records, including the official list of Members of record.

4.8   Representations and Warranties. Each Member, and in the case of an organization, the Person(s) executing this Agreement on behalf of the organization, hereby represents and warrants to the Company and each other member that:

(a)   if that Member is an organization, that it is duly organized, validly existing, and in good standing or legal existence under the laws of its state of organization and that it has full power to execute and agree to obligations of this Agreement and to perform such Member's obligations hereunder;

(b)   that the Member is acquiring its interest in the Company for the Member's own account as an investment and without an intent to distribute the interest;

(c)   that there will not be any public market for the interests; and

(d)   that the execution and delivery of this Agreement and consummation of the transactions contemplated hereby do not breach or result in a default under any contract or agreement by which the Member is bound.

## ARTICLE V
## CAPITAL STRUCTURE AND UNIT ISSUANCE AND TRANSFERABILITY

5.1   Capital Structure Generally. The Company shall have the authority to issue an unlimited number of Units representing Equity or Non-Equity Units, whether or not any such Units may be limited or restricted, solely by way of example, with respect to voting on one or more Company matters or entitlement to the Company's profits or

17

CONFIDENTIAL
INFORMATION

C011301

capital upon allocation or distribution of the same; provided, however, that at all times relevant under the Act, if required, at least one (1) Unit (however designated in name) representing an equity interest in the Company's capital and profits and entitling the holder to general voting rights and the ability to receive the net assets of the Corporation upon dissolution, shall at all times be issued and remain outstanding prior to the Termination of the Company.

5.2     Initial Designation of Classes or Series of Units [**correct as appropriate**]. The Company hereby initially designates for issuance one (1) class or series of Units, to be known as "Voting Units", the respective rights, benefits, privileges and other attributes of which are listed on Schedule "C" (attached hereto and made a part hereof).

5.3     Additional Units of Existing Classes or Series/Designation of Additional Classes or Series of Units. Through resolution adopted in accordance with the manner prescribed herein, the Members shall hereinafter have the exclusive authority to issue any Unit(s) from any existing designation of Unit(s) set forth in Schedule "C" and/or to create for issuance or designate a new series or class of any Unit(s) or any other security of the Company, which, to the extent not inconsistent with any tax election currently in effect by the Company, may contain any of the following:

(a)     The number of Units which will constitute such series and the designation of such series;

(b)     The voting powers, full or limited, of such class or series or that such class or series shall have no voting power;

(c)     The rate of distributions or returns payable on such series, the time(s) when such will be payable, the preference to, or any relation to, the payment of such to any other class or series of Units;

(d)     Whether the Units of such class or series shall be redeemable and, if redeemable, whether such Units shall be redeemable at the option of the Company or the holder of such Units upon the happening of a specified event, the rate(s) or price(s) at which redemption shall take place with such adjustment as shall be provided and any other terms or conditions of any redemption; (v) Whether there shall be a sinking or similar fund for the redemption or purchase of Units and, if so, the terms and provisions which will govern such a fund;

(e)     The rights of the holders of Units to participate in the capital of the Company upon the liquidation, dissolution or any distribution of the assets or properties of the Company;

(f)     The rights, if any, of holders of the Units, to convert such Units into, or to exchange such Units for, Units or securities of any other class(es) or other series of the same or other class(es) of capital or financial interests of the Corporation, the price(s) or rate(s) of exchange with such adjustments as shall be provided at which such

CONFIDENTIAL
INFORMATION

C011302

shares shall be convertible or exchangeable, whether such rights of conversion or exchange shall be exercisable at the option of the holders of the Units or the Company or upon the happening of a specified event, and any other terms or conditions of such conversion or exchange; and

(g)    Any other preferences, powers and relative, participating, optional or other special rights, and qualifications, limitations or restrictions of such Units.

When designated, the rights, limitations, privileges and benefits shall be summarized and attached as a supplemental exhibit to Exhibit "C".

5.4    Issuance of Units. The Board shall determine when and for what consideration the Company shall issue Units pursuant to Section 5.5.

5.5    Preemptive Rights. In the event the Board determines to cause the Company to authorize and issue additional Units, pursuant to Section 8.11, the following shall apply:

(a)    The Board shall cause the Company to submit to all Members a written notice stating the number of additional Units desired to be issued, and the price, payment terms and other conditions of the proposed issue of additional Units.

(b)    Each Member shall have the right for a period of seven (7) days from date of such notice to agree (by written notice to the Company) to purchase on the terms and conditions set forth in the Company's written notice up to that number of Units which shall equal the result of the formula:

Number of Units owned by such purchasing Member, including any unvested shares, where the purchasing Member's total Units amount to the same percent of Units owned by the Member prior to the offering, which is the Member's "pro rata portion".

(c)    In the event any Member does not exercise his right to purchase his entire pro rata portion of the Units, each Member that has exercised such right shall have the right for an additional seven (7) days to agree (by written notice to the Company) to purchase all but not less than that number of the unpurchased Units which shall equal the result of the formula:

Number of Units owned by such Member exercising his rights under this subsection (c). The total unpurchased Units apportioned by the Number of Units owned by all Members exercising such rights.

(d)    If some or all of the Members agree to purchase any of the additional Units then the Company shall close the purchase upon the terms of the written notice within thirty-one (31) days after such first notice is given or at such other time and place as may be mutually agreed upon with the additional Units to be allocated among the

CONFIDENTIAL
INFORMATION

C011303

Members first to each of them up to the amount of their pro rata portion and any excess among the Members agreeing to purchase such excess in accordance with the commitments in their written notices tendered in accordance with this subsection 5.5.

      (e)    The Company shall be entitled to issue and sell any additional Units not subscribed for and sold in accordance with this Section 5.5 so long as (i) the price, payment and other terms are not more favorable to the subscribers then those offered to the Members and (ii) purchaser agrees to be bound by all terms of this Agreement.

      (f)    Additional Units available for issuance hereunder shall be rounded to the nearest whole Unit as determined by the Manager in its sole discretion. The Company shall not be required to issue fractional Units to give effect to the provisions of this Section 5.5.

      (g)    For each issuance of any Units, the Company's books and records shall state the original value and nature of the contribution received by the Company and the number of Units received in return by each holder.

      (h)    The Company may not issue any certificates of Units, but will, upon the written request of a Member or the owner or holder of any Unit, provide certified statements of Units owned or held, stating the number and nature shown on the Company's books and records as owned or held by the requestor as of the date that the statement is provided.

**ARTICLE VI**
**CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS**

    6.1    <u>Initial Capital Contributions of the Founding Members.</u> On or prior to the date of this Agreement, each of the Members has made a Capital Contribution to the Company in exchange for its respective Equity Units. No Member shall be obligated to contribute any more than the amount set forth on Schedule A unless agreed to in writing by all of the members.

    6.2    <u>Capital Accounts.</u> A separate Capital Account shall be maintained at all times for each Member. Accordingly, without limiting the foregoing sentence, each Members Capital Account shall be

      (a)    increased by (i) the amount of money contributed by such Member, (ii) the fair market value of property contributed by such Member (net of liabilities secured by such contributed property), (iii) allocations of Company income or gain (or items thereof) to such Member, pursuant to Section 7.10, and (iv) to the extent not already netted out under clause (b)(ii), the amount of any Company liabilities assumed by the Member or which are secured by any property distributed to such Member; and

20

CONFIDENTIAL
INFORMATION

(b)    decreased by (i) the amount of money distributed to such Member, (ii) the fair market value of property distributed to such Member (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to), (iii) allocations to such Member of Company loss or deduction (or items thereof), pursuant to Section 7.10, and (iv) to the extent not already netted out under clause (a)(ii), the amount of any liabilities of the Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

In the event any Ownership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

6.3    Capital Withdrawal Rights, Interest and Priority.    Except as expressly provided in this Agreement, no Member shall be entitled to withdraw or reduce such Member's Capital Account or to receive any distributions from the Company, and no Member shall be entitled to demand or receive property other than cash in return for its Capital Contribution. No Member shall be entitled to receive or be credited with any interest on the balance in such Members Capital Account at any time.

Except as may be otherwise expressly provided herein, no Member shall have any priority over any other Member as to the return of the balance in such Members Capital Account.

6.4    Loans and Advances by Members.    Any Member  may make a loan or advance funds in excess of the capital contribution of such Member, act as a surety, guarantor or endorser for, guarantee or assume one or more obligations of, provide collateral for, and transact other business with the Company, and subject to applicable laws, has the same rights and obligations with respect to any such matter as a person who is not a member or manager on such amounts, at such times and on such terms and conditions as may be approved by an 80% Majority-In-Interest.  Loans or Advances by any Member to the Company shall not be considered as contributions to the capital of the Company and shall not in any respect increase such Member's interest in the Company.

6. 5    If the Manager at any time or from time to time determines that the Company requires additional Capital Contributions, then the Manager shall give notice to each Member of (i) the total amount of additional Capital Contributions required, (ii) the reason the additional Capital Contribution is required, (iii) each Member's proportionate share of the total additional Capital Contribution (determined in accordance with this Section), and (iv) the date each Member's additional Capital Contribution is due and payable, which date shall be no less than thirty (30) days after the notice has been given. The total additional Capital Contribution which the Manager may require the Members to contribute during the term of this Agreement shall not exceed $1 million ($1,000,000) in the aggregate. A Member's share of the total additional Capital Contribution shall be equal to the product obtained by multiplying the Member's Percentage Interest and the total additional Capital Contribution required. A Member's proportionate share shall be

21

CONFIDENTIAL
NFORMATION

C011305

payable in cash, by certified check, or by good personal or business check, subject to collection.

6.6    Except as provided in Section 6.5, no Member shall be required to contribute any additional capital to the Company, and no Member shall have any personal liability for any obligation of the Company.

6.7    If a Member fails to pay when due all or any portion of any Capital Contribution, the Manager shall request the non-defaulting Members to pay the unpaid amount of the defaulting Member's Capital Contribution (the "Unpaid Contribution"). To the extent the Unpaid Contribution is contributed by any other Member, the defaulting Member's Percentage shall be reduced and the Percentage of each Member who makes up the Unpaid Contribution shall be increased, so that each Member's Percentage is equal to a fraction, the numerator of which is that Member's total Capital Contribution and the denominator of which is the total Capital Contributions of all Interest Holders. The Manager shall amend Section _____ herein accordingly.  This remedy is in addition to any other remedies allowed by law or by this Agreement

## ARTICLE VII
## DISTRIBUTIONS AND ALLOCATIONS

7.1    <u>Distributions.</u>

(a)    In the sole discretion of the Managers, the Company may, but is not required to, distribute some portion or the entire amount, if any, of Available Cash to Members as Distributions in accordance with their respective Percentage Interests.

(b)    Notwithstanding the foregoing, with respect to any calendar year in which the Company has taxable income, the Company shall make a Tax Payment Distribution to each Member for such calendar tax year on or before March 15 of the following year in an amount equal to the product of (i) the taxable income allocated to such Member for such calendar year under Section 7.10, multiplied by (ii) the highest U.S. federal individual income tax rate in effect for such calendar year, but only to the extent that such amount has not been previously distributed to the Members and not to exceed forty-five (45%) percent of the taxable income. The Tax Payment Distribution required in the preceding sentence shall apply only to the extent that each Members allocable share of the Company's total cumulative taxable income for Federal income tax purposes during the taxable years (or portions thereof) that such person was a Member exceeds such Member's allocable share of total cumulative taxable losses for all previous taxable years.

7.2    <u>Minimum Tax Distribution.</u> Until otherwise agreed to by a Majority-in-Interest of Members, the Company shall distribute annually to each Member an amount at least equal to thirty-five (35%) of taxable income to the Company as allocated to each such Member for such fiscal period (the "Tax Distributions").

CONFIDENTIAL
INFORMATION

C011306

7.3     Composite Income Tax Returns.  In the Manager's sole discretion, the Company may file composite income tax returns and pay income tax for and on behalf of Members eligible for inclusion in such composite return in states and cities of the United States of America or other tax jurisdictions (collectively "tax jurisdictions') where the Company incurs income tax.  Notwithstanding Section 7.1 (a), the aggregate amount of payments on behalf of a Member pursuant to this Section 7.1 (b) need not equal the Member's Percentage Interest of payments made pursuant to this Section 7.1 (b) on behalf of all Members. No payments need be made to or on behalf of any Member that is not eligible for inclusion in a composite return.

7.4     Distributions in Kind.  In the Manager's sole discretion, the Company may make any Distributions in cash or in kind provided however any Distribution of assets in kind must be made pro-rata among all Members in proportion to their respective Percentage Interests.

7.5     Distributions Upon Dissociation.  In the Manager's sole discretion, upon the Dissociation of a Member, the Company may either:

(a)     pay or distribute to the terminated Member within a reasonable time (not to exceed one year from such termination) the fair value of the terminated Member's Ownership Interests owned at the date of such termination reduced by the aggregate amount of indebtedness, if any, of the Member to the Company ("Member Indebtedness') or

(b)     provide to the Member within such time period a statement of such fair value amount ("Termination Value") confirming that the terminated Member shall participate in all subsequent Distributions to Members on a pro rata basis in accordance with the terminated Member's pre-termination Percentage Interest, until the aggregate amount of all post-termination Distributions shall equal the Termination Value less any unpaid Member Indebtedness.

7.6     Liquidation Distributions.  Liquidation Proceeds shall be distributed in the following order of priority:

(a)     To the payment of debts and liabilities of the Company (including to Members to the extent otherwise permitted by law) and the expenses of liquidation; then

(b)     To the setting up of such reserves as the Managers or, in case of incapacity, withdrawal or unavailability of the Managers, as the Person required or authorized by law to wind up the Company's affairs may reasonably deem necessary or appropriate for any disputed, contingent or unforeseen liabilities or obligations of the Company, provided that any such reserves shall be paid over by such Person to an independent escrow agent, to be held by such agent or its successor for such period as such Person shall deem advisable for the purpose of applying such reserves to the

CONFIDENTIAL INFORMATION

C011307

payment of such liabilities or obligations and, at the expiration of such period, the balance of such reserves, if any, shall be distributed as hereinafter provided; then the remainder to the Members in accordance with and to the extent of their respective Capital Account balances after taking into account the allocation of all Income or Loss pursuant to this Agreement for the fiscal year(s) in which the Company is liquidated.

7.7    Income, Losses and Distributive Shares of Tax Items. The Company's net income or net loss, as the case may be, for each fiscal year of the Company, as determined in accordance with such method of accounting as may be adopted for the Company pursuant to Article IX , Accounting and Bank Accounts, hereof, shall be allocated to the Members for both financial accounting and income tax purposes as set forth in this Section 7.7 except as otherwise provided for herein or unless all Members agree otherwise.

7.8    Withholding of Distributions. Notwithstanding any other provision of this Agreement, the Manager (or any Person required or authorized by law to wind up the Company's affairs) may suspend, reduce or otherwise restrict Distributions of Available Cash and Liquidation Proceeds when, in its sole opinion, such action is in the best interests of the Company but in no event shall the Manager withhold Tax Payment Distributions required under Section 7.1 (b).

7.9    No Priority. Except as may be otherwise expressly provided herein, no Member shall have priority over any other Member as to Company income, gain, loss, credits and deductions or distributions.

7.10    Allocation of Income, Loss and Credits. Income, Profit or Loss and Credits for each fiscal year shall be allocated among the Members in accordance with their respective Percentage Interests. To the extent there is a change in the respective Percentage Interests of the Members during the year, Income, Loss and Credits shall be allocated among the pre-adjustment and post-adjustment periods as provided in Section 7.12.

7.11    Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Sections 1.7041 (b)(2)(ii)(d)(4), 1.704-1 (b)(2)(ii)(d)(5), or 1.704-1 (b)(2)(ii)(d)(6) that results in such Member having a negative Capital Account balance and such Member either is not obligated to restore the deficit balance in his Capital Account or is obligated to restore only a limited dollar amount of such deficit, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate to the extent required by the Treasury Regulation, the negative Capital Account balance of such Member as quickly as possible, provided that an allocation pursuant to this Section shall be made if any only to the extent that such Member would have negative Capital Account balance after all other allocations provided for in this Article VII have been tentatively made as if this Section 7.1 were not in the Agreement.

CONFIDENTIAL
INFORMATION

C011308