# EXHIBIT 3

Dockets.Justia.com

1  JAMES E. BURNS, JR. (State Bar No. 53250)
   PENELOPE A. GRABOYS (State Bar No. 214742)
2  KENNETH P. HERZINGER (State Bar No. 209688)
   JUSTIN MYER LICHTERMAN (State Bar No. 225734)
3  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
4  405 Howard Street
   San Francisco, California 94105
5  Telephone:     (415) 773-5700
   Facsimile:      (415) 773-5759
6
   Attorneys for Plaintiffs
7  Facebook, Inc., thefacebook, LLC and
   Mark E. Zuckerberg

Clark Sakai

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                CITY AND COUNTY OF SANTA CLARA

10                    UNLIMITED JURISDICTION

11

12  FACEBOOK, INC., a Delaware              CASE NO. 105 CV-039867
    Corporation, THEFACEBOOK, LLC, a
13  Florida limited liability company, and   SECOND AMENDED COMPLAINT FOR:
    MARK E. ZUCKERBERG, an individual,       (1) DECLARATORY RELIEF;
14                                           (2) MISAPPROPRIATION OF TRADE
                  Plaintiffs,                    SECRETS;
15                                           (3) TORTIOUS INTERFERENCE WITH
         v.                                      PROSPECTIVE ECONOMIC ADVANTAGE;
16                                           (4) CONVERSION; AND
    EDUARDO SAVERIN, an individual,           (5) BREACH OF FIDUCIARY DUTY.
17
                  Defendant.
18                                           JURY TRIAL DEMANDED
19

20

21

22

23

24

25

26

27

28

                      SECOND AMENDED COMPLAINT

DOCSSF1:867514.1
16069-3 J3W/J3W

1    Plaintiffs Facebook, Inc. ("Facebook" or the "Company"), thefacebook, LLC (the

2    "LLC") and Mark E. Zuckerberg ("Zuckerberg") (collectively, "Plaintiffs") hereby allege for their

3    Amended Complaint against Defendant Eduardo Saverin ("Saverin" or "Defendant"), on personal

4    knowledge as to their own actions and on information and belief as to the actions of others, as

5    follows:

6    ## SUMMARY OF THE ACTION

7    1.    This is an action for declaratory, injunctive and monetary relief arising out of

8    various improper acts perpetrated by the Defendant.  Plaintiffs hereby bring this suit against Saverin

9    for, among other things, improperly seizing business funds when they were gravely needed, twice

10   holding the business hostage and insisting on receiving a 30% stake in the business,

11   misappropriating trade secrets, intentionally interfering with the growth of the business, usurping

12   corporate opportunities, diverting sales from the business' customers to a competing company,

13   placing unauthorized advertisements on the business' website and breaching his fiduciary duties.

14   2.    While Zuckerberg, Dustin Moskovitz ("Moskovitz") and others at the

15   Company spent thousands of hours working on and growing the business into a success, Saverin

16   refused to contribute any sought after or meaningful efforts towards the business.  Instead, he

17   attempted to derail the business while it was seeking its first round of financing by demanding 30%

18   of the business.  Eventually, Saverin voluntarily gave up his role in the management of the business

19   and agreed to forgo his voting rights for shares in the newly-formed Company.  However, this

20   apparently did not satisfy Saverin, because now that the Company has had some publicized

21   successes, he again seeks to extort from it some undeserved personal benefit.  Furthermore,

22   Defendant has misappropriated the business' trade secrets, including its valuable customer lists, and

23   provided them to one of its competitors.

24   ## PARTIES

25   3.    Plaintiff Facebook is a Delaware corporation with its principal place of

26   business in Palo Alto, California.  The Company operates an online directory that connects people

27   through social networks at colleges and universities.

28

1
SECOND AMENDED COMPLAINT

1          4.    Plaintiff LLC is a Florida limited liability company that was acquired by

2    Facebook.

3          5.    Plaintiff Zuckerberg is an individual who resides in Menlo Park, California.

4    Zuckerberg is, and at all relevant times has been, the inventor, co-founder, Chief Executive Officer

5    and majority shareholder of the Company.  Zuckerberg was also listed as a managing member of the

6    LLC in its Articles of Organization and was the majority holder of the LLC's interests.

7          6.    Defendant Saverin is an individual, who, on information and belief, resides in

8    Boston, Massachusetts.  Saverin is also a shareholder of the Company.  Saverin was listed as a

9    managing member of the LLC in its Articles of Organization and, at all relevant times, held himself

10   out as the Chief Financial Officer of the business.

11   **VENUE AND JURISDICTION**

12         7.    Venue is proper, pursuant to California Code of Civil Procedure section 395

13   because: (1) the contracts that are the subject of this action were entered into in Palo Alto,

14   California; (2) the Defendant consented to venue in Santa Clara County in the contracts that are the

15   subject of this action; (3) Plaintiff Facebook has its principal place of business in Palo Alto,

16   California and Zuckerberg resides in Menlo Park, California; (4) the injuries to the Plaintiffs arose

17   and/or were suffered in Palo Alto, California; and (5) some or all of the wrongful conduct

18   complained of herein took place in Santa Clara County, California.  Additionally, this Court has

19   personal jurisdiction over Defendant.  In the contracts that are the subject of this action, which are

20   attached hereto as Exhibits A through D, Defendant expressly agreed that Santa Clara County,

21   California would be the exclusive jurisdiction for any disputes concerning such contract and

22   consented to personal jurisdiction here.

23   **FACTUAL BACKGROUND**

24         8.    In or about January 2004, Zuckerberg, while a college student, conceived the

25   idea of an online directory that connects people through social networks at colleges and universities

26   and planned to turn his idea into a business.  Zuckerberg approached Saverin, a college classmate, in

27   January 2004 regarding his new idea.  Zuckerberg and Saverin each orally agreed to invest $1,000 to

28   start the business.  The business was not initially organized as any specific legal entity, but the

2
SECOND AMENDED COMPLAINT

1  parties *did* come to an oral agreement about the parties' respective ownership interests in the

2  business and management responsibilities. The parties agreed that Zuckerberg would serve as CEO

3  and run the technical side of the business—designing and running the website, creating new web

4  content, and building and maintaining hardware to operate the site—and Saverin would serve as

5  CFO and take care of the finance aspects of the business. Zuckerberg and Saverin also agreed to

6  divide the ownership rights as follows: 67% held by Zuckerberg and 33% by Saverin.

7        9.    Zuckerberg and Saverin launched the business' website,

8  www.thefacebook.com, in February 2004 and quickly realized that they needed assistance to run the

9  business. As a result, they recruited Zuckerberg's college roommate, Moskovitz, to work on the

10  business. The principals informally restructured the equity ownership as follows: Zuckerberg =

11  65%; Saverin = 30%; and Moskovitz = 5%. Up until this point, the business was being run as an

12  unincorporated association or informal partnership.

13        10.    On April 13, 2004, the business was organized as a limited liability company

14  under Florida law. Zuckerberg, Moskovitz and Saverin are each listed as members and managers of

15  the LLC in the Articles of Organization.

16        11.    In or about June 2004, Zuckerberg and Moskovitz decided to leave college

17  and move to California to work full time on the business. Up to this point, the three founders had

18  been running the business from Massachusetts while they attended college, but the business was

19  beginning to grow so Zuckerberg and Moskovitz moved to California to devote all their time and

20  energy to the business. Saverin chose not to leave school or to move to California with the other

21  founders. At or around this time, Zuckerberg was introduced to Sean Parker ("Parker") who began

22  doing some work for the business, and Zuckerberg and Saverin agreed to each invest $20,000 in the

23  business to fund future expenses.

24        12.    On or about July 15, 2004, Zuckerberg, Moskovitz and Parker were working

25  on new features for the website and trying to raise additional capital. Zuckerberg was in contact

26  with several angel investors and identified two who wanted to invest. However, before Zuckerberg

27  could execute a term sheet with the investors, Saverin sent Zuckerberg a letter asserting that the

28  parties had originally agreed that Saverin would have control over the business, and until he had

3

SECOND AMENDED COMPLAINT

1    written authority to do what he wanted with the business, he would obstruct the efforts of the other

2    shareholders and the advancement of the business itself. Saverin also stated that since he owned

3    30% of the business, he would make it impossible for the business to raise any financing until this

4    matter was resolved. Saverin's obstruction was disclosed to the angel investors who refused to sign

5    the term sheet. Eventually, the investors purchased equity in the business on or around September

6    27, 2004, but the disruption caused by Saverin delayed the business' ability to gain financing and the

7    value at which the angel investors were willing to invest was set with their knowledge of Saverin's

8    conduct and reflected that fact and was thus lower than it otherwise would have been.

9            13.    On or about July 28, 2004, Saverin attempted to hijack the business by seizing

10    its bank account and trying to wrest control of the business from Zuckerberg by forcing an operating

11    agreement on him. Saverin had opened a bank account for the business in the name of the business

12    and made himself the sole signatory on the account. On or about July 28, 2004, Saverin froze the

13    bank account and refused to release any of the funds unless he was given greater control over the

14    business. The business desperately needed these funds to pay basic expenses, pay employees and to

15    purchase new servers and other equipment which were necessary to operate and grow the business.

16    Consequently, Zuckerberg was forced to invest an additional $85,000 of his own personal funds,

17    including $28,000 on 25 new servers, in order to keep the business going. The funds invested by

18    Zuckerberg were originally earmarked for his college tuition.

19            14.    On about July 28, 2004, Saverin also requested that Zuckerberg sign a limited

20    liability operating agreement that he had prepared. Saverin informed Zuckerberg that he would only

21    allow Zuckerberg to see the agreement if Zuckerberg agreed to sign it without showing it to his

22    lawyers or personal advisors. Zuckerberg refused, but attempted to resolve the situation by having

23    the parties' oral agreement about the parties' respective ownership interests and management

24    responsibilities memorialized in an operating agreement. However, Saverin refused to sign the

25    agreement.

26            15.    At this point, in an attempt to clean up the affairs of the business and to be

27    more attractive to potential investors, Zuckerberg and Moskovitz decided to incorporate in Delaware

28    and assign all of their intellectual property rights in the business and their membership interests in

4
SECOND AMENDED COMPLAINT

1    the LLC to the Company. The Company was incorporated under Delaware law on July 29, 2004.

2    Both Zuckerberg's and Moskovitz's shares in the Company were subject to a vesting schedule,

3    contingent upon their continuing employment with the company. Saverin was informed that he

4    would be permitted to exchange his LLC interests for an equal percentage of the Company and to

5    buy additional shares in the Company. However, Zuckerberg explained that because Saverin was

6    offered the opportunity but refused to relocate to California to work as a full-time employee and had

7    failed to execute the tasks that he had agreed to perform for the business, he would not be asked to

8    be an employee or part of the management team of the Company going forward. Because Saverin

9    would not be part of the management team, Saverin was also informed that, unlike Zuckerberg and

10    Moskovitz, his shares in the Company would not be subject to vesting but would, of course, be

11    subject to additional dilution as existing and future employees of the Company received additional

12    equity as their employment continued or began and as new investors purchased shares. Zuckerberg

13    further explained that Zuckerberg, Moskovitz and the Company's potential investors did not want

14    Saverin to have any managerial or other control over the Company. Zuckerberg made it clear to

15    Saverin that this meant that Saverin's percentage interest in the Company would decline over time,

16    while Zuckerberg's, Moskovitz's and other existing employees would likely receive additional

17    equity as the Company grew. On information and belief, Saverin stated that he understood this, and

18    was willing to execute documents reflecting and relating to his equity ownership, lack of continuing

19    employment, vesting obligations and lack of voting rights.

20           16.    On October 31, 2004, Saverin entered into a number of agreements with the

21    Company regarding the exchange of his LLC interests and purchase of ownership interests in the

22    Company. Specifically, Saverin entered into a Common Stock Purchase Agreement ("Purchase

23    Agreement I") wherein he agreed to purchase 1,250,000 shares of the Company's common stock for

24    a purchase price of $10,750. Saverin also agreed pursuant to Purchase Agreement I to assign all of

25    his intellectual property rights (if any) and all information, rights and interest that he obtained or

26    created while working on the business, including customer lists, to the Company and to keep such

27    information confidential. A copy of the Purchase Agreement I is attached hereto as Exhibit A and is

28    incorporated herein by this reference. Defendant also entered into a second Common Stock

5

SECOND AMENDED COMPLAINT

1   Purchase Agreement ("Purchase Agreement II") in which he agreed to purchase 78,334 shares of

2   common stock of the Company for a price of $673.68. A copy of the Purchase Agreement II is

3   attached hereto as Exhibit B and is incorporated herein by this reference. That same day, Defendant,

4   along with Moskowitz and Zuckerberg, executed an Exchange Agreement, whereby each agreed to

5   exchange their interests in the LLC for shares in the newly-incorporated Company. A copy of the

6   Exchange Agreement is attached hereto as Exhibit C and is incorporated herein by this reference.

7   As a result of the exchange, the following shares of common stock in the Company were issued:

8   Zuckerberg = 169,273; Saverin = 78,334; Moskovitz = 13,056. As a result of these agreements, the

9   Company acquired all right, title and interest in the LLC and all membership interests therein.

10  Accordingly, the Company became the sole member of the LLC. Each of these agreements

11  contained a full release of all known or unknown claims that Saverin had against the Company and

12  its officers, directors, board members and stockholders as of the date of those agreements. On

13  October 31, 2004, Defendant also entered into a Holder Voting Agreement, in which Defendant

14  agreed to relinquish voting rights over his common stock and to vote in various, specified ways. A

15  copy of the Holder Voting Agreement is attached hereto as Exhibit D and is incorporated herein by

16  this reference.

17          17.    In the fall of 2004, the Company hired a new sales representative to officially

18  replace Saverin because Saverin was no longer an employee of the Company. Effective as of the

19  signing of the October 31, 2004 agreements referenced above in paragraph 16, Saverin agreed that

20  he would no longer work for the Company and would immediately transition all matters to the

21  Company's new sales representative, including all of his knowledge about the Company's

22  customers, advertising and the systems that the Company had in place. On information and belief,

23  Saverin never followed through with this assignment. Instead, Saverin kept communicating directly

24  with advertising customers. Saverin also continued to do consulting work on some small projects for

25  the Company and the Company offered to pay Saverin as a consultant for this work. However,

26  Saverin failed to execute the consulting agreement that the Company offered to him and never

27  submitted any timecards or requests for payment, even though Zuckerberg had repeatedly asked him

28  to do so.

6
SECOND AMENDED COMPLAINT

18.    After the Company's new sales representative took over all of the advertising accounts, the Company received 20-30 emails from customers stating that they were pleased that someone new was taking over the accounts because Saverin had been difficult to work with and was hard to get in touch with. These advertising customers said that Saverin never answered his phone, his voicemail was always full and he rarely returned emails, even on days when advertising campaigns were scheduled to go live. Not surprisingly, individuals in contact with Saverin said that he did very little work on Facebook's business during this period, but he claimed to still be doing 80 hours of work a week even after he was directed to cease all such activity.

19.    On or around February 2005, Saverin and a few of his friends launched a "job networking" website for college students called "Joboozle," which is remarkably similar to www.thefacebook.com. On information and belief, despite Saverin's obligation to maintain the confidentiality of Facebook's intellectual property rights and trade secrets, including customer lists, pursuant to Purchase Agreement I, Saverin misappropriated the Company's trade secrets and provided them to Joboozle. Not surprisingly, many, if not all of Joboozle's advertisers during the relevant period were advertising customers of Facebook. In addition, at or about this time, Saverin placed unauthorized advertisements for Joboozle and other personal projects on Facebook's website. When the Company learned that Saverin was misappropriating advertising space on its website, it instructed him to cease immediately. However, on information and belief, Saverin continued to place unauthorized advertisements on the Company's website until the Company was able to block his ability to access its servers. In total, Saverin misappropriated thousands of dollars in free advertising from the Company.

20.    In or about April 2005, the Company sought investments from various venture capital firms. When Saverin learned of this, he used the information to try to hold the Company hostage once again—implying that he would not allow the Company to move forward with any financing without some special compensation for him. On April 20, 2005, Saverin sent a letter to the Company, through his attorney, stating, *inter alia*, that he challenged the validity of the October 2004 agreements attached hereto as Exhibits A through D. In response, the Company informed Saverin on April 20, 2005 that he was not an employee of the Company, had no responsibilities with

7

SECOND AMENDED COMPLAINT

1   the Company and should cease all communications with the Company's advertising customers

2   immediately. Despite Saverin's conduct, which was disclosed to the investor, the venture capital

3   round of financing was completed, but the ultimate transaction value reflected Saverin's conduct.

4   **FIRST CAUSE OF ACTION FOR DECLARATORY RELIEF BY PLAINTIFFS**

5   **ZUCKERBERG, FACEBOOK, INC. AND THEFACEBOOK, LLC AGAINST DEFENDANT**

6   **SAVERIN**

7         21.   Plaintiffs incorporate herein all the allegations contained in paragraphs 1

8   through 20 of this Amended Complaint.

9         22.   An actual controversy has arisen and now exists between Plaintiffs and

10   Defendant regarding the validity and enforceability of the various contracts entered into by

11   Defendant and the parties' respective ownership pursuant to such agreements. Defendant contends

12   that the agreements referenced in Paragraph 16 are not valid and that he should be given a 30%

13   equity stake in the Company. Plaintiffs on the other hand contend that the agreements are valid,

14   binding, and establish Saverin's equity interest in the Company.

15         23.   Plaintiffs request a judicial determination that the foregoing contracts are valid

16   and enforceable and establish Defendant's ownership interests in the Company. Plaintiffs further

17   seek a judicial determination that Defendant is not entitled to any additional equity ownership

18   interests in the Company.

19   **SECOND CAUSE OF ACTION FOR MISAPPROPRIATION OF TRADE SECRETS BY**

20   **PLAINTIFFS FACEBOOK, INC. AND THEFACEBOOK, LLC AGAINST DEFENDANT**

21   **SAVERIN**

22         24.   Plaintiffs incorporate herein all the allegations contained in paragraphs 1

23   through 23 of this Amended Complaint.

24         25.   Facebook provided Saverin access to confidential business and technical

25   information, which were trade secrets, including confidential customer lists, subject to certain

26   confidentiality obligations so that Saverin could perform work for Facebook. Facebook took

27   reasonable steps in order to maintain the confidentiality of that trade secret information.

28

8<br>SECOND AMENDED COMPLAINT

DOCSSF1:867514.1
16069-3 J3W/J3W

26. Facebook's trade secret information has substantial, independent economic value from not being known to the public or other persons who could obtain economic value from not being known to the public or to other persons who could obtain economic value from their disclosure or use.

27. On information and belief, despite Saverin's obligation to maintain the confidentiality of all intellectual property rights and trade secrets, including customer lists, pursuant to Purchase Agreement I, Saverin has misappropriated the Company's confidential business and technical information, which are trade secrets. Specifically, on information and belief, Saverin provided confidential information constituting trade secrets to a competing website, Joboozle.

28. Saverin's acts constitute misappropriation of trade secrets under the Uniform Trade Secrets Act, §§ 3426, et seq. of the California Civil Code.

29. As a direct and proximate result of Saverin's misappropriation of trade secrets, Plaintiffs have been damaged in an amount to be proven at trial.

### THIRD CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE BY PLAINTIFFS ZUCKERBERG, FACEBOOK, INC. AND THEFACEBOOK, LLC AGAINST DEFENDANT SAVERIN

30. Plaintiffs incorporate herein all the allegations contained in paragraphs 1 through 29 of this Amended Complaint.

31. Facebook's advertising customers constitute specific economic relationships having present economic benefits to Facebook and the probability of future economic benefit to Facebook.

32. Saverin knew and knows of the existence of the relationships between Facebook and its advertising customers. Indeed, because he was doing sales and marketing on behalf of Facebook, Saverin had broad access to Facebook's confidential business and technical information and customer lists, which constitute trade secrets to be used solely for the benefit of Facebook.

33. Upon information and belief, Saverin engaged in intentional acts designed to disrupt the relationships between Facebook and its customers, including damaging Facebook's

9
SECOND AMENDED COMPLAINT

1  relationship with its customers by influencing the Company's customers to purchase advertising

2  space on Joboozle in derogation to Facebook.  On information and belief, Saverin placed

3  unauthorized advertisements on the Company's website for Joboozle, failed to transition his sales

4  and marketing duties to the Company's new sales representative, purposely ignored requests from

5  advertising customers even on days when advertising campaigns were scheduled to go live thereby

6  harming the Company's reputation and ability to attract and maintain customers, continued to

7  contact advertising customers after he was ordered to cease all communications with the Company's

8  advertisers, and used confidential information, including customer lists, to divert business from

9  Facebook to Joboozle, a competing website.  Moreover, on information and belief, Saverin engaged

10 in intentional acts designed to disrupt the Company's relationship with potential investors and its

11 ability to raise capital on two separate occasions.

12         34.     As a direct and proximate result of Saverin's intentional interference with

13 Plaintiffs' prospective economic advantage, Plaintiffs have been damaged in an amount to be proven

14 at trial, including lost advertising sales, a decrease in the Company's market value and investment

15 capital.

16         35.     Plaintiffs are informed and believe, and on that basis allege, that Saverin's

17 tortious interference was willful, malicious, oppressive and in furtherance of an effort to injure

18 Facebook, and Plaintiffs therefore are entitled to an award of punitive or exemplary damages to

19 punish Defendant's wrongful conduct and to make an example of it.

20 **FOURTH CAUSE OF ACTION FOR CONVERSION BY PLAINTIFFS ZUCKERBERG**

21         **AND THEFACEBOOK, LLC AGAINST DEFENDANT SAVERIN**

22         36.     Plaintiffs Zuckerberg and the LLC incorporate herein all the allegations

23 contained in paragraphs 1 through 35 of this Amended Complaint.

24         37.     Saverin opened a bank account for the LLC and made himself the sole

25 signatory on the account.

26         38.     Saverin converted and refused to allow the LLC or Zuckerberg to withdraw its

27 funds from its bank account.

28

10
SECOND AMENDED COMPLAINT

39.    As a direct and proximate result of Saverin's conversion, the LLC and Zuckerberg have been damaged in an amount to be proven at trial, including lost profits from the business' loss of the use of the capital that Saverin refused to release, the diminution in the business' market value caused by the business' inability to grow the business by purchasing servers and other necessary equipment with the funds at that time, and interest from the date of the conversion until the date that Saverin released the funds.

40.    Plaintiffs Zuckerberg and the LLC are informed and believe, and on that basis allege, that Saverin's conversion was willful, malicious, oppressive and in furtherance of an effort to injure the business, and Plaintiffs Zuckerberg and the LLC therefore are entitled to an award of punitive or exemplary damages to punish Defendant's wrongful conduct and to make an example of it.

## FIFTH CAUSE OF ACTION FOR BREACH OF FIDICIARY DUTY BY PLAINTIFFS ZUCKERBERG AND THEFACEBOOK, LLC

41.    Plaintiffs Zuckerberg and the LLC incorporate herein all the allegations contained in paragraphs 1 through 40 of this Amended Complaint.

42.    Saverin owed fiduciary duties to Plaintiffs Zuckerberg and the LLC as a partner in a common law partnership, managing member of the LLC and an officer of the business.

43.    In total disregard of and contrary to his fiduciary duties, as alleged above, Saverin, among other things, improperly seized business funds of the LLC when they were gravely needed, twice held the business hostage and insisted on receiving a 30% stake in the business, misappropriated trade secrets, intentionally interfered with the growth of the business, usurped corporate opportunities, placed unauthorized advertisements for Joboozle and other personal projects on the business' website  and diverted sales from the business' customers to a competing business.

44.    As a direct and proximate result of Saverin's breach of his fiduciary duties, Plaintiffs Zuckerberg and the LLC have been damaged in an amount to be proven at trial, including a decrease in the value of the business, including the LLC's subsequent market value and investment capital.

DOCSSF1:867514.1
16069-3 J3W/J3W

1      45.    Plaintiffs Zuckerberg and the LLC are informed and believe, and on that basis

2  allege, that Saverin's breach of fiduciary duty was willful, malicious, oppressive and in furtherance

3  of an effort to injure the business, and Plaintiffs therefore are entitled to an award of punitive or

4  exemplary damages to punish Defendant's wrongful conduct and to make an example of it.

5  **PRAYER FOR RELIEF**

6      WHEREFORE, the Plaintiffs pray for the following relief:

7      1.    For a declaration that Purchase Agreement I, Purchase Agreement II,

8  Exchange Agreement, and Holder Voting Agreement are valid and enforceable;

9      2.    For a declaration that the Purchase Agreement I, Purchase Agreement II,

10  Exchange Agreement, and Holder Voting Agreement set forth Defendant's ownership interests in

11  the Company;

12      3.    For a declaration that Defendant is not entitled to any additional equity

13  ownership interests in the Company;

14      4.    For an award of damages in an amount to be proven at trial;

15      5.    For recovery for unjust enrichment as a result of Saverin's misappropriation

16  of trade secrets, as well as damages and other relief provided for in the Uniform Trade Secrets Act,

17  section 3426.3 of the California Civil Code;

18      6.    For an order enjoining Saverin preliminarily and permanently from further use

19  of Facebook's trade secrets under the Uniform Trade Secrets Act, section 3426.2 of the California

20  Civil Code;

21      7.    For punitive damages to the extent authorized by law;

22      8.    For an award of reasonable attorneys' fees and costs (including those provided

23  in the Uniform Trade Secrets Act, section 3426.4 of the California Civil Code); and

24      9.    For such other and further relief as the Court deems just and proper.

25

26

27

28

12
SECOND AMENDED COMPLAINT

DOCSSF1:867514.1
16069-3 J3W/J3W

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: March 7, 2005

                        Respectfully submitted,

                        JAMES E. BURNS
                        PENELOPE A. GRABOYS
                        ORRICK, HERRINGTON & SUTCLIFFE LLP

                        James Burns, (by Justin Lichterman)
                        _____
                                James E. Burns, Jr.
                               Attorneys for Plaintiffs
                        Facebook, Inc., thefacebook, LLC
                             and Mark E. Zuckerberg

13
SECOND AMENDED COMPLAINT

# EXHIBIT A

# THEFACEBOOK, INC.

## COMMON STOCK PURCHASE AGREEMENT

This Common Stock Purchase Agreement (the "Agreement") is made as of October 31, 2004, by and between TheFacebook, Inc., a Delaware corporation (the "Company"), and Eduardo Saverin ("Purchaser").

1. **Sale of Stock.** Subject to the terms and conditions of this Agreement, on the Purchase Date (as defined below) the Company will issue and sell to Purchaser, and Purchaser agrees to purchase from the Company, 1,250,000 shares of the Company's Common Stock (the "Shares") at a purchase price of $0.0086 per Share for a total purchase price of $10,750. The term "Shares" refers to the purchased Shares and all securities received in replacement of or in connection with the Shares pursuant to stock dividends or splits, all securities received in replacement of the Shares in a recapitalization, merger, reorganization, exchange or the like, and all new, substituted or additional securities or other properties to which Purchaser is entitled by reason of Purchaser's ownership of the Shares.

2. **Purchase.** The purchase and sale of the Shares under this Agreement shall occur at the principal office of the Company simultaneously with the execution of this Agreement by the parties or on such other date as the Company and Purchaser shall agree (the "Purchase Date"). On the Purchase Date, the Company will deliver to Purchaser a certificate representing the Shares to be purchased by Purchaser (which shall be issued in Purchaser's name) against payment of the purchase price therefor by (a) a check for $125, and (b) an assignment of certain assets as set forth in the Bill of Sale and Instrument of Assignment in the form attached to this Agreement as Exhibit A.

3. **Limitations on Transfer.** In addition to any other limitation on transfer created by applicable securities laws, Purchaser shall not assign, encumber or dispose of any interest in the Shares except in compliance with the provisions below and applicable securities laws.

    (a) **Right of First Refusal.** Before any Shares held by Purchaser or any transferee of Purchaser (either being sometimes referred to herein as the "Holder") may be sold or otherwise transferred (including transfer by gift or operation of law), the Company or its assignee(s) shall have a right of first refusal to purchase the Shares on the terms and conditions set forth in this Section 3(a) (the "Right of First Refusal").

    (i) **Notice of Proposed Transfer.** The Holder of the Shares shall deliver to the Company a written notice (the "Notice") stating: (A) the Holder's bona fide intention to sell or otherwise transfer such Shares; (B) the name of each proposed purchaser or other transferee ("Proposed Transferee"); (C) the number of Shares to be transferred to each Proposed Transferee; and (D) the terms and conditions of each proposed sale or transfer. The Holder shall offer the Shares at the same price (the "Offered Price") and upon the same terms (or terms as similar as reasonably possible) to the Company or its assignee(s).

0096191.09



(ii)     **Exercise of Right of First Refusal**.  At any time within 30 days after receipt of the Notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the purchase price determined in accordance with subsection (iii) below.

(iii)     **Purchase Price**.  The purchase price ("Purchase Price") for the Shares purchased by the Company or its assignee(s) under this Section 3(a) shall be the Offered Price.  If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board of Directors of the Company in good faith.

(iv)     **Payment**.  Payment of the Purchase Price shall be made, at the option of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness, or by any combination thereof within 30 days after receipt of the Notice or in the manner and at the times set forth in the Notice.

(v)     **Holder's Right to Transfer**.  If all of the Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this Section 3(a), then the Holder may sell or otherwise transfer such Shares to that Proposed Transferee at the Offered Price or at a higher price, provided that such sale or other transfer is consummated within 60 days after the date of the Notice and provided further that any such sale or other transfer is effected in accordance with any applicable securities laws and the Proposed Transferee agrees in writing that the provisions of this Section 3 shall continue to apply to the Shares in the hands of such Proposed Transferee.  If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, or if the Holder proposes to change the price or other terms to make them more favorable to the Proposed Transferee, a new Notice shall be given to the Company, and the Company and/or its assignees shall again be offered the Right of First Refusal before any Shares held by the Holder may be sold or otherwise transferred.



(vi)     **Exception for Certain Family Transfers**.  Anything to the contrary contained in this Section 3(a) notwithstanding, the transfer of any or all of the Shares during Purchaser's lifetime or on Purchaser's death by will or intestacy to Purchaser's Immediate Family or a trust for the benefit of Purchaser or Purchaser's Immediate Family shall be exempt from the provisions of this Section 3(a).  "Immediate Family" as used herein shall mean any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, former spouse, sibling, niece, nephew, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law, including adoptive relationships, or any person sharing the Purchaser's household (other than a tenant or an employee).  In such case, the transferee or other recipient shall receive and hold the Shares so transferred subject to the provisions of this Section 3, and there shall be no further transfer of such Shares except in accordance with the terms of this Section 3.

0096191.09

-2-



(b)     **Involuntary Transfer.**

(i)     **Company's Right to Purchase upon Involuntary Transfer.** In the event, at any time after the date of this Agreement, of any transfer by operation of law or other involuntary transfer (including divorce or death, but excluding in the event of death a transfer to Immediate Family as set forth in Section 3(a)(vi) above) of all or a portion of the Shares by the record holder thereof, the Company shall have the right to purchase all of the Shares transferred at the greater of the purchase price paid by Purchaser pursuant to this Agreement or the fair market value of the Shares on the date of transfer. Upon such a transfer, the person acquiring the Shares shall promptly notify the Secretary of the Company of such transfer. The right to purchase such Shares shall be provided to the Company for a period of 30 days following receipt by the Company of written notice by the person acquiring the Shares.

(ii)     **Price for Involuntary Transfer.** With respect to any stock to be transferred pursuant to Section 3(b)(i), the price per Share shall be a price set by the Board of Directors of the Company that will reflect the current value of the stock in terms of present earnings and future prospects of the Company. The Company shall notify Purchaser or his or her executor of the price so determined within 30 days after receipt by it of written notice of the transfer or proposed transfer of Shares.. However, if Purchaser does not agree with the valuation as determined by the Board of Directors of the Company, Purchaser shall be entitled to have the valuation determined by an independent appraiser to be mutually agreed upon by the Company and Purchaser and whose fees shall be borne equally by the Company and Purchaser.



(c)     **Assignment.** The right of the Company to purchase any part of the Shares may be assigned in whole or in part to any stockholder or stockholders of the Company or other persons or organizations.

(d)     **Restrictions Binding on Transferees.** All transferees of Shares or any interest therein will receive and hold such Shares or interest subject to the provisions of this Agreement. Any sale or transfer of the Shares shall be void unless the provisions of this Agreement are satisfied.

(e)     **Termination of Rights.** The Right of First Refusal and the Company's right to repurchase the Shares in the event of an involuntary transfer pursuant to Section 3(b) above shall terminate upon the first sale of Common Stock of the Company to the general public pursuant to a registration statement filed with and declared effective by the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act").

(f)     **Lock-up Agreement.** In connection with the initial public offering of the Company's securities and upon request of the Company or the underwriters managing such offering of the Company's securities, Purchaser agrees not to sell, make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any securities of the Company (other than those included in the registration) without the prior written consent of the Company or such underwriters, as the case may be, for such period of time (not to exceed 180 days) from the effective date of such registration as may be requested by the Company or such managing



underwriters and to execute an agreement reflecting the foregoing as may be requested by the underwriters at the time of the Company's initial public offering.

4.    **Investment and Taxation Representations.** In connection with the purchase of the Shares, Purchaser represents to the Company the following:

(a)    Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Shares. Purchaser is purchasing the Shares for investment for his or her own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act.

(b)    Purchaser understands that the Shares have not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed herein.

(c)    Purchaser understands that the Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, Purchaser must hold the Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. Purchaser acknowledges that the Company has no obligation to register or qualify the Shares for resale. Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Shares, and requirements relating to the Company which are outside of the Purchaser's control, and which the Company is under no obligation and may not be able to satisfy.



(d)    Purchaser understands that Purchaser may suffer adverse tax consequences as a result of Purchaser's purchase or disposition of the Shares. Purchaser represents that Purchaser has consulted any tax consultants Purchaser deems advisable in connection with the purchase or disposition of the Shares and that Purchaser is not relying on the Company for any tax advice.

5.    **Restrictive Legends and Stop-Transfer Orders.**

(a)    **Legends.** The certificate or certificates representing the Shares shall bear the following legends (as well as any legends required by applicable state and federal corporate and securities laws):

(i)    THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN

EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.

(ii)    THE SHARES REPRESENTED BY THIS CERTIFICATE MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY.

(iii)    Any legend required to be placed thereon by the California Commissioner of Corporations.

(b)    **Stop-Transfer Notices.** Purchaser agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c)    **Refusal to Transfer.** The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

(d)    **Removal of Legend.** When all of the following events have occurred, the Shares then held by Purchaser will no longer be subject to the legend referred to in Section 5(a)(ii): (i) the termination of the Right of First Refusal; and (ii) the expiration or termination of the market standoff provisions of Section 3(f) (and of any agreement entered pursuant to Section 3(f)). After such time, and upon Purchaser's request, a new certificate or certificates representing the Shares not repurchased shall be issued without the legend referred to in Section 5(a)(ii), and delivered to Purchaser.

6.    **No Employment Rights.** Nothing in this Agreement shall affect in any manner whatsoever the right or power of the Company, or a parent or subsidiary of the Company, to terminate Purchaser's employment or consulting relationship, for any reason, with or without cause.

7.    **Release of Claims.** Purchaser agrees that being permitted to purchase the Shares hereunder represents settlement in full of all outstanding obligations owed to Purchaser by the Company and its officers, board members, stockholders, managers, supervisors, affiliates, agents, employees and subsidiaries (including but not limited to TheFacebook, LLC). Purchaser on his own behalf, and on behalf of his agents, heirs, family members, executors, and assigns, hereby fully and forever releases the Company and its officers, directors, employees, agents, investors,

0096191.09                                -5-

stockholders, administrators, affiliates, divisions, subsidiaries (including but not limited to TheFacebook, LLC), predecessor and successor corporations, and assigns (the "Releasees"), from, and agree not to sue concerning, any claim, duty, obligation or cause of action relating to any matters of any kind, whether presently known or unknown, suspected or unsuspected, matured or unmatured, that Purchaser may possess arising from any omissions, acts, facts or circumstances that have occurred up until and including the date of this Agreement including, without limitation:

(a)    any and all claims relating to or arising from Purchaser's employment relationship with the Company or TheFacebook, LLC (together, "TFB"), if any, and the termination of that relationship;

(b)    any and all claims relating to, or arising from, Purchaser's right to purchase, or actual purchase of, or holding of, any shares of capital stock of any nature of the TFB, including, without limitation, any claims for fraud, misrepresentation, breach of fiduciary duty, breach of duty under applicable state corporate law, and securities fraud under any state or federal law;

(c)    any and all claims under the law of any jurisdiction including, but not limited to, wrongful discharge of employment; constructive discharge from employment; termination in violation of public policy; discrimination; breach of contract, both express and implied; breach of a covenant of good faith and fair dealing, both express and implied; promissory estoppel; negligent or intentional infliction of emotional distress; negligent or intentional misrepresentation; negligent or intentional interference with contract or prospective economic advantage; unfair business practices; defamation; libel; slander; negligence; personal injury; assault; battery; invasion of privacy; false imprisonment; and conversion;

(d)    any and all claims for violation of any federal, state or municipal statute, including, but not limited to, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Age Discrimination in Employment Act of 1967, the Americans with Disabilities Act of 1990, the Fair Labor Standards Act, the Employee Retirement Income Security Act of 1974, the Worker Adjustment and Retraining Notification Act, the Older Workers Benefit Protection Act, and the Family and Medical Leave Act;

(e)    any and all claims for violation of the federal, or any state, constitution;

(f)    any and all claims arising out of any other laws and regulations relating to employment or employment discrimination;

(g)    any claim for any loss, cost, damage, or expense arising out of any dispute over the non-withholding or other tax treatment of any of the proceeds received by Purchaser as a result of this Agreement; and

(h)    any and all claims for attorneys' fees and costs.



The Company and Purchaser agree that the release set forth in this section shall be and remain in effect in all respects as a complete general release as to the matters released. This release does not extend to any obligations incurred under this Agreement.

Purchaser represents that he is not aware of any claim by him other than the claims that are released by this Agreement. Purchaser acknowledges that he has had the opportunity to be advised by legal counsel and is aware of and familiar with the provisions of California Civil Code Section 1542, which provides as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

Although such code section may not be generally applicable in the state of Purchaser's residence, there may be similar or comparable provisions of such state's or other similar or comparable applicable laws, rules, principles or regulations. Purchaser, being aware of said code section and being aware that other comparable or similar provisions of Purchaser's state or other applicable laws may exist, hereby expressly waives any rights he may have under such code section or under any comparable or similar applicable law or rule, as well as under any other statute or common law principles of similar effect.

8.    **Miscellaneous.**

(a)    **Governing Law; Jurisdiction; Venue.** This Agreement shall be construed, interpreted, governed, and enforced in accordance with the laws of the State of California, without regard to choice-of-law provisions. Purchaser hereby consents to personal and exclusive jurisdiction and venue in the County of Santa Clara in the State of California. Purchaser agrees that the prevailing party in any legal action shall be awarded its reasonable attorneys' fees and costs.

(b)    **Entire Agreement; Enforcement of Rights.** This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and merges all prior discussions between them. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement. The failure by either party to enforce any rights under this Agreement shall not be construed as a waiver of any rights of such party.

(c)    **Severability.** If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(d)    **Construction.** This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly,



this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

   (e) **Notices.** Any notice required or permitted by this Agreement shall be in writing and shall be deemed sufficient when delivered personally or sent by fax or 48 hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid, and addressed to the party to be notified at such party's address or fax number as set forth below or as subsequently modified by written notice.

   (f) **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

   (g) **Successors and Assigns.** The rights and benefits of this Agreement shall inure to the benefit of, and be enforceable by the Company's successors and assigns. The rights and obligations of Purchaser under this Agreement may only be assigned with the prior written consent of the Company.



   (h) **California Corporate Securities Law.** THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF THE SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO THE QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON THE QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

   (i) **Counsel to the Company.** Each party to this agreement acknowledges and agrees that Heller Ehrman White & McAuliffe, LLP is acting as counsel solely to the Company and does not represent the Purchaser in connection with this Agreement or any other agreement. Each party to this agreement has had the opportunity and has been encouraged to consult with their own independent counsel.

[Signature Page Follows]

The parties have executed this Agreement as of the date first set forth above.

THEFACEBOOK, INC.

By: ~~~~~~~~

Title: CEO

Address:
879 La Jennifer Way
Palo Alto, CA 94036

PURCHASER:

EDUARDO SAVERIN

_____
(Signature)

Address:


If the Purchaser is married:

I, _____, spouse of Eduardo Saverin, have read and hereby approve the foregoing Agreement.  In consideration of the Company's granting my spouse the right to purchase the Shares as set forth in the Agreement, I hereby agree to be irrevocably bound by the Agreement and further agree that any community property or similar interest that I may have in the Shares shall be similarly bound by the Agreement.  I hereby appoint my spouse as my attorney-in-fact with respect to any amendment or exercise of any rights under the Agreement.


_____
Spouse of Eduardo Saverin


0096191.09                              -9-



The parties have executed this Agreement as of the date first set forth above.

**THEFACEBOOK, INC.**

By: _____

Title: _____

Address:
819 La Jennifer Way
Palo Alto, CA 94036

**PURCHASER:**

**EDUARDO SAVERIN**

*Eduardo Saverin*
(Signature)

Address:    13691 DEERING BAY DR. Apt. 402
CORAL GABLES, FL 33158

If the Purchaser is married:

I, _____, spouse of Eduardo Saverin, have read and hereby
approve the foregoing Agreement. In consideration of the Company's granting my spouse the
right to purchase the Shares as set forth in the Agreement, I hereby agree to be irrevocably bound
by the Agreement and further agree that any community property or similar interest that I may
have in the Shares shall be similarly bound by the Agreement. I hereby appoint my spouse as my
attorney-in-fact with respect to any amendment or exercise of any rights under the Agreement.

_____
Spouse of Eduardo Saverin

## EXHIBIT A

### BILL OF SALE

Eduardo Saverin (the "Transferor"), for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, hereby sells, transfers, assigns and conveys to TheFacebook, Inc. and its successors and assigns ("Transferee"), all of the assets listed on Attachment A hereto (the "Assets").

Transferor hereby appoints Transferee the attorney in fact of Transferor, with full power of substitution on behalf of Transferee to demand and receive any of the Assets and to give receipts and releases for the same, to institute and prosecute in the name of Transferor, but for the benefit of Transferee, any legal or equitable proceedings Transferee deems proper in order to enforce any rights in the Assets and to defend or compromise any legal or equitable proceedings relating to the Assets as Transferee shall deem advisable. Transferor hereby declares that the appointment made and powers granted hereby are coupled with an interest and shall be irrevocable by Transferor.

Transferor hereby agrees that Transferor and Transferor's successors and assigns will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered such further acts, documents, or instruments confirming the conveyance of any of the Assets to Transferee as Transferee shall reasonably deem necessary, provided that Transferee shall provide all necessary documentation to Transferor.

This Bill of Sale is executed and delivered in, and shall be construed and enforced in accordance with the laws of the State of California, and shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto.

Transferor has signed this instrument as of October 31, 2004.

_Eduardo Saverin_
Eduardo Saverin



## ATTACHMENT A TO BILL OF SALE

1.  All inventions, original works of authorship, developments, concepts, know-how, improvements, processes and formulae relating in any way to the web-site http://www.thefacebook.com (including but not limited to any such items that are not yet available on such web-site) (the "Technology"), whether or not patentable or registrable under copyright, trademark or similar laws.

2.  All intellectual property rights relating to the Technology, including without limitation all rights to patents, patent applications, utility models or certificates of invention, rights to trademarks, service marks, trade dress or logos, trade secret rights, copyright rights, moral rights, authors' rights, rights of publicity, contract and licensing rights, goodwill and all other intellectual property rights as may exist now or hereafter come into existence, regardless of whether such rights arise under the laws of the United States or any other state, country or jurisdiction or any international conventions.

3.  All debts and other liabilities that may be owed to Purchaser from the Company or TheFacebook, LLC.

4.  All business and marketing plans, worldwide marketing rights, software, customer and supplier lists, price lists, mailing lists, customer and supplier records and other confidential or proprietary information relating to the Technology.



0096191.09

## RECEIPT

TheFacebook, Inc. (the "Company") hereby acknowledges receipt of the assets described in the Bill of Sale attached as Exhibit A to the Common Stock Purchase Agreement dated October 31, 2004 between the Company and Eduardo Saverin as consideration for Certificate No. 10 for 1,250,000 shares of Common Stock of the Company.

Dated: _____

                                     TheFacebook, Inc.

                                     By:_____

                                     Title:_____



0096191.09

# EXHIBIT B

**THEFACEBOOK, INC.**

**COMMON STOCK PURCHASE AGREEMENT**

    This Common Stock Purchase Agreement (the "Agreement") is made as of October 31, 2004, by and between TheFacebook, Inc., a Delaware corporation (the "Company"), and Eduardo Saverin ("Purchaser").

    1.    <u>Sale of Stock.</u> Subject to the terms and conditions of this Agreement, on the Purchase Date (as defined below) the Company will issue and sell to Purchaser, and Purchaser agrees to purchase from the Company, 78,334 shares of the Company's Common Stock (the "Shares") at a purchase price of $0.0086 per Share for a total purchase price of $673.68. The term "Shares" refers to the purchased Shares and all securities received in replacement of or in connection with the Shares pursuant to stock dividends or splits, all securities received in replacement of the Shares in a recapitalization, merger, reorganization, exchange or the like, and all new, substituted or additional securities or other properties to which Purchaser is entitled by reason of Purchaser's ownership of the Shares.



    2.    <u>Purchase.</u> The purchase and sale of the Shares under this Agreement shall occur at the principal office of the Company simultaneously with the execution of this Agreement or at such other time and place as the Company and Purchaser shall agree (the "Purchase Date"). On the Purchase Date, the Company will issue the Shares to be purchased by Purchaser (which shall be issued in Purchaser's name) against payment of the purchase by an assignment of all of Purchaser's interest in TheFacebook, LLC, a Florida limited liability company, as set forth in the Exchange Agreement, dated October 31, 2004, between the Company, Mark Zuckerberg, Eduardo Saverin and Dustin Moskovitz (the "Exchange Agreement"), the value of which is at least equal to the Purchase Price.

    3.    <u>Limitations on Transfer.</u> In addition to any other limitation on transfer created by applicable securities laws, Purchaser shall not assign, encumber or dispose of any interest in the Shares except in compliance with the provisions below and applicable securities laws.

    (a)    <u>Right of First Refusal.</u> Before any Shares held by Purchaser or any transferee of Purchaser (either being sometimes referred to herein as the "Holder") may be sold or otherwise transferred (including transfer by gift or operation of law), the Company or its assignee(s) shall have a right of first refusal to purchase the Shares on the terms and conditions set forth in this Section 3(a) (the "Right of First Refusal").

    (i)    <u>Notice of Proposed Transfer.</u> The Holder of the Shares shall deliver to the Company a written notice (the "Notice") stating: (A) the Holder's bona fide intention to sell or otherwise transfer such Shares; (B) the name of each proposed purchaser or other transferee ("Proposed Transferee"); (C) the number of Shares to be transferred to each Proposed Transferee; and (D) the terms and conditions of each proposed sale or transfer. The Holder shall offer the Shares at the same price (the "Offered Price") and upon the same terms (or terms as similar as reasonably possible) to the Company or its assignee(s).

(ii)    **Exercise of Right of First Refusal.** At any time within 30 days after receipt of the Notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the purchase price determined in accordance with subsection (iii) below.

(iii)    **Purchase Price.** The purchase price ("Purchase Price") for the Shares purchased by the Company or its assignee(s) under this Section 3(a) shall be the Offered Price. If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board of Directors of the Company in good faith.

(iv)    **Payment.** Payment of the Purchase Price shall be made, at the option of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness, or by any combination thereof within 30 days after receipt of the Notice or in the manner and at the times set forth in the Notice.

(v)    **Holder's Right to Transfer.** If all of the Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this Section 3(a), then the Holder may sell or otherwise transfer such Shares to that Proposed Transferee at the Offered Price or at a higher price, provided that such sale or other transfer is consummated within 60 days after the date of the Notice and provided further that any such sale or other transfer is effected in accordance with any applicable securities laws and the Proposed Transferee agrees in writing that the provisions of this Section 3 shall continue to apply to the Shares in the hands of such Proposed Transferee. If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, or if the Holder proposes to change the price or other terms to make them more favorable to the Proposed Transferee, a new Notice shall be given to the Company, and the Company and/or its assignees shall again be offered the Right of First Refusal before any Shares held by the Holder may be sold or otherwise transferred.

(vi)    **Exception for Certain Family Transfers.** Anything to the contrary contained in this Section 3(a) notwithstanding, the transfer of any or all of the Shares during Purchaser's lifetime or on Purchaser's death by will or intestacy to Purchaser's Immediate Family or a trust for the benefit of Purchaser or Purchaser's Immediate Family shall be exempt from the provisions of this Section 3(a). "Immediate Family" as used herein shall mean any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, former spouse, sibling, niece, nephew, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law, including adoptive relationships, or any person sharing the Purchaser's household (other than a tenant or an employee). In such case, the transferee or other recipient shall receive and hold the Shares so transferred subject to the provisions of this Section 3, and there shall be no further transfer of such Shares except in accordance with the terms of this Section 3.

-2-



    (b)    **Involuntary Transfer.**

        (i)    **Company's Right to Purchase upon Involuntary Transfer.** In the event, at any time after the date of this Agreement, of any transfer by operation of law or other involuntary transfer (including divorce or death, but excluding in the event of death a transfer to Immediate Family as set forth in Section 3(a)(vi) above) of all or a portion of the Shares by the record holder thereof, the Company shall have the right to purchase all of the Shares transferred at the greater of the purchase price paid by Purchaser pursuant to this Agreement or the fair market value of the Shares on the date of transfer. Upon such a transfer, the person acquiring the Shares shall promptly notify the Secretary of the Company of such transfer. The right to purchase such Shares shall be provided to the Company for a period of 30 days following receipt by the Company of written notice by the person acquiring the Shares.

        (ii)    **Price for Involuntary Transfer.** With respect to any stock to be transferred pursuant to Section 3(b)(i), the price per Share shall be a price set by the Board of Directors of the Company that will reflect the current value of the stock in terms of present earnings and future prospects of the Company. The Company shall notify Purchaser or his or her executor of the price so determined within 30 days after receipt by it of written notice of the transfer or proposed transfer of Shares. However, if Purchaser does not agree with the valuation as determined by the Board of Directors of the Company, Purchaser shall be entitled to have the valuation determined by an independent appraiser to be mutually agreed upon by the Company and Purchaser and whose fees shall be borne equally by the Company and Purchaser.

    (c)    **Assignment.** The right of the Company to purchase any part of the Shares may be assigned in whole or in part to any stockholder or stockholders of the Company or other persons or organizations.

    (d)    **Restrictions Binding on Transferees.** All transferees of Shares or any interest therein will receive and hold such Shares or interest subject to the provisions of this Agreement. Any sale or transfer of the Shares shall be void unless the provisions of this Agreement are satisfied.

    (e)    **Termination of Rights.** The Right of First Refusal and the Company's right to repurchase the Shares in the event of an involuntary transfer pursuant to Section 3(b) above shall terminate upon the first sale of Common Stock of the Company to the general public pursuant to a registration statement filed with and declared effective by the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act").

    (f)    **Lock-up Agreement.** In connection with the initial public offering of the Company's securities and upon request of the Company or the underwriters managing such offering of the Company's securities, Purchaser agrees not to sell, make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any securities of the Company (other than those included in the registration) without the prior written consent of the Company or such underwriters, as the case may be, for such period of time (not to exceed 180 days) from the effective date of such registration as may be requested by the Company or such managing

-3-



underwriters and to execute an agreement reflecting the foregoing as may be requested by the underwriters at the time of the Company's initial public offering.

4.    **Investment and Taxation Representations.** In connection with the purchase of the Shares, Purchaser represents to the Company the following:

(a)    Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Shares. Purchaser is purchasing the Shares for investment for his or her own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act.

(b)    Purchaser understands that the Shares have not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed herein.

(c)    Purchaser understands that the Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, Purchaser must hold the Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. Purchaser acknowledges that the Company has no obligation to register or qualify the Shares for resale. Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Shares, and requirements relating to the Company which are outside of the Purchaser's control, and which the Company is under no obligation and may not be able to satisfy.

(d)    Purchaser understands that Purchaser may suffer adverse tax consequences as a result of Purchaser's purchase or disposition of the Shares. Purchaser represents that Purchaser has consulted any tax consultants Purchaser deems advisable in connection with the purchase or disposition of the Shares and that Purchaser is not relying on the Company for any tax advice.

5.    **Restrictive Legends and Stop-Transfer Orders.**

(a)    **Legends.** The certificate or certificates representing the Shares shall bear the following legends (as well as any legends required by applicable state and federal corporate and securities laws):

(i)    THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN

-4-





EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.

   (ii)   THE SHARES REPRESENTED BY THIS CERTIFICATE MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY.

   (iii)   Any legend required to be placed thereon by the California Commissioner of Corporations.

   (b)   **Stop-Transfer Notices.** Purchaser agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

   (c)   **Refusal to Transfer.** The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

   (d)   **Removal of Legend.** When all of the following events have occurred, the Shares then held by Purchaser will no longer be subject to the legend referred to in Section 5(a)(ii): (i) the termination of the Right of First Refusal; and (ii) the expiration or termination of the market standoff provisions of Section 3(f) (and of any agreement entered pursuant to Section 3(f)). After such time, and upon Purchaser's request, a new certificate or certificates representing the Shares not repurchased shall be issued without the legend referred to in Section 5(a)(ii), and delivered to Purchaser.

   6.   **No Employment Rights.** The Purchaser shall have no employment or consulting rights as a result of this Agreement.

   7.   **Miscellaneous.**

   (a)   **Governing Law; Jurisdiction; Venue.** This Agreement shall be construed, interpreted, governed, and enforced in accordance with the laws of the State of California, without regard to choice-of-law provisions. Purchaser hereby consents to personal and exclusive jurisdiction and venue in the County of Santa Clara in the State of California. Purchaser agrees that the prevailing party in any legal action shall be awarded its reasonable attorneys' fees and costs.

-5-

(b) **Entire Agreement; Enforcement of Rights.** This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and merges all prior discussions between them. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement. The failure by either party to enforce any rights under this Agreement shall not be construed as a waiver of any rights of such party.

(c) **Severability.** If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(d) **Construction.** This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

(e) **Notices.** Any notice required or permitted by this Agreement shall be in writing and shall be deemed sufficient when delivered personally or sent by fax or 48 hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid, and addressed to the party to be notified at such party's address or fax number as set forth below or as subsequently modified by written notice.



(f) **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

(g) **Successors and Assigns.** The rights and benefits of this Agreement shall inure to the benefit of, and be enforceable by the Company's successors and assigns. The rights and obligations of Purchaser under this Agreement may only be assigned with the prior written consent of the Company.

(h) **California Corporate Securities Law.** THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF THE SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO THE QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON THE QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

(i) **Counsel to the Company.** Each party to this agreement acknowledges and agrees that Heller Ehrman White & McAuliffe, LLP is acting as counsel solely to the



Company and does not represent the Purchaser in connection with this Agreement or any other agreement. Each party to this agreement has had the opportunity and has been encouraged to consult with their own independent counsel.

[Signature Page Follows]



SV 2069157 v1
LLC PURCHASE

Company and does not represent the Purchaser in connection with this Agreement or any other agreement. Each party to this agreement has had the opportunity and has been encouraged to consult with their own independent counsel.

[Signature Page Follows]

SV 2069157 v1
LLC PURCHASE

The parties have executed this Agreement as of the date first set forth above.

THEFACEBOOK, INC.

By: _____

Title: CFO _____

Address:
819 La Jennifer Way
Palo Alto, CA 94036

PURCHASER:

EDUARDO SAVERIN

_____
(Signature)

Address:

If the Purchaser is married:

I, _____, spouse of Eduardo Saverin, have read and hereby approve the foregoing Agreement. In consideration of the Company's granting my spouse the right to purchase the Shares as set forth in the Agreement, I hereby agree to be irrevocably bound by the Agreement and further agree that any community property or similar interest that I may have in the Shares shall be similarly bound by the Agreement. I hereby appoint my spouse as my attorney-in-fact with respect to any amendment or exercise of any rights under the Agreement.

_____
Spouse of Eduardo Saverin

SV 2069157 v1
LLC PURCHASE