**EXHIBIT 58**

## CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

| | |
|---|---|
| FRANKFURT  MUSCAT | |
| HOUSTON    PARIS | |
| LONDON     STAMFORD | |
| MEXICO CITY  WASHINGTON, D.C. | |
| MILAN | |

ATTORNEYS AND COUNSELLORS AT LAW
101 PARK AVENUE
NEW YORK, NEW YORK 10178-0061

TELEPHONE 212-696-6000
FACSIMILE 212-697-1559
VOICE MAIL 212-696-6028
E-MAIL INFO@CM-P.COM
INTERNET WWW.CM-P.COM

WRITER'S DIRECT:
TELEPHONE 212-696-8878
E-MAIL EStenshoel@CM-P.COM

July 1, 2004

John F. Hornick, Esq.
Finnegan, Henderson, Farabow, Garret & Dunner LLP
1300 I Street, NW
Washington, DC 2005-3315

Re: ConnectU Website

Dear Mr. Hornick:

We have received your letter dated June 24, 2004 regarding the claims made by ConnectU against our client, Mark Zuckerberg. We have discussed these claims with our client and have reviewed the e-mail correspondence referred to in your letter and have concluded that the claims are totally groundless. In fact, if anyone has been misused in this episode, it is Mr. Zuckerberg.

Mr. Zuckerberg first publicly demonstrated his technical prowess in the fall of 2003, when he built and launched a website with a database of student information in a few days (facemash.com). After he took this database down, he was contacted by Divya Narendra, who asked him to help 'finish' an on-line dating service for Harvard students. When Mr. Zuckerberg asked your clients what the project entailed in terms of future business, Mr. Zuckerberg was told that the site was intended just for fun and not profit and that it would be kept very small, limited to students from no more than 10 or 15 elite schools.

As the third in a string of programmers, Mr. Zuckerberg was told that the project required only six to 10 hours of coding. He met with Victor Gao, the previous programmer, and devoted 10 to 15 hours to the project, completing the technical programming that he had agreed to do. In the process, however, he found that there were serious deficiencies in the design of the site, including the unlicensed use of copyrighted graphics and a cumbersome registration process. He shared his views with your clients, who proceeded to make further requests for his assistance. He tried to accommodate them but became increasingly frustrated as the escalating demands conflicted with his academic schedule. At no time during this period was Mr. Zuckerberg employed by your clients, nor was he given an interest in the project, paid for his time or efforts, or told that he would be remunerated for his creative services. Despite the

CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
ATTORNEYS AND COUNSELLORS AT LAW

Page 2

John F. Hornick, Esq.
July 1, 2004

expanding demands placed on him by your clients, there was never any recognition of Mr. Zuckerberg's rights in ideas for the project or in newly created code. In effect, it appears that ConnectU was attempting to exploit Mr. Zuckerberg's technical expertise by taking advantage of his good-natured willingness to help his fellow students, having initially misled him about the nature and scope of the project.

Given this background, it is quite outrageous to suggest that, by agreeing to help out Cameron and Tyler Winklevoss without any promise of compensation, Mr. Zuckerberg somehow gave up the right to work on his own projects, using code that he created independently. Mr. Zuckerberg created his current website without using or referring to any code he saw or created while assisting your clients. His site is not a dating site and has a completely different look and feel. The e-mail correspondence between the parties does not include any disclosures of confidential information and supports our client's understanding that he was just helping out his fellow students by providing technical advice and assistance regarding a dating site.

In the end, ConnectU's complaint boils down to a claim that it had a protectable interest in the idea of a database designed to facilitate social and professional connections and aimed at a college student audience. But Mr. Zuckerberg's previous web creation had demonstrated the possibility of an on-line database of student information before your clients ever contacted Mr. Zuckerberg. Moreover, this concept was not novel even then. Other sites that have exploited this concept include www.thesquare.com (since 1997) and collegester.com (since August, 2003), along with numerous sites that have sprung up at specific schools.

Under these circumstances, we are forced to conclude that ConnectU is hoping that it can increase its business by raising and publicizing baseless allegations about our client in order to hamper the development of his site. At the same time, your clients show no compunctions about lifting concepts from Mr. Zuckerberg's site, most recently the summer activities feature first incorporated on thefacebook. Our client recognizes that ideas of this sort are generally not protectable and does not intend to make an issue of your client's adoption of this feature, even if the idea originated on his site. But even the name chosen by your clients for their site looks as if it may have been recycled from a now inactive site called UConnections, which was described as "The Internet College Collection" and provided products and services for college students and alumni. We would advise your clients to focus on developing original improvements to their site rather than making false claims and casting aspersions on the activities of others.

Sincerely,

*Eric Stenshoel*

Eric Stenshoel

cc: M. Zuckerberg
    P. Kalat. Esq.

**RECEIVED**

JUL 0 6 2004

Finnegan, Henderson, Farabow,
Garrett & Dunner, L.L.P.

2012616v3