# EXHIBIT A

Dockets.Justia.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CONNECTU, INC., CAMERON WINKLEVOSS, TYLER WINKLEVOSS, AND DIVYA NARENDRA, <br><br> Plaintiffs, <br><br> v. <br><br> FACEBOOK, INC., MARK ZUCKERBERG, EDUARDO SAVERIN, DUSTIN MOSKOVITZ, ANDREW MCCOLLUM, AND THEFACEBOOK LLC, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

CIVIL ACTION NO. 1:07-CV-10593-DPW

**JURY TRIAL DEMANDED**

### FIRST AMENDED COMPLAINT[1]

### FILED UNDER SEAL

# REDACTED VERSION
## September 21, 2007

---

[1] This Amended Complaint and some exhibits are filed under seal, pursuant to the Stipulated Protective Order entered in this action, because they contain Facebook Defendants' confidential information. ConnectU asked Facebook Defendants to consent to remove the confidentiality designation for documents containing such information, but such consent was not received before ConnectU needed to file this Amended Complaint and exhibits.

1.  Plaintiff ConnectU, Inc., f/k/a ConnectU LLC and/or Harvard Connection with respect to all counts set forth herein ("ConnectU"), and Plaintiffs Cameron Winklevoss, Tyler Winklevoss, and Divya Narendra with respect to Counts 3 (Fraud) and 5 (Breach of Fiduciary Duty), by their undersigned attorneys, allege as follows based on their own knowledge with respect to their own acts, and on information and belief as to all other allegations (references to "Plaintiff" in the singular are to ConnectU) (ConnectU has taken no depositions on the merits, pending Defendants' production of documents and things, which, until the parties reached agreement in July 2007, were subject to ConnectU's motions to compel described in the Joint Statement filed July 28, 2007 (Dkt. 65)).

## NATURE OF THE ACTION

2.  This Amended Complaint includes several counts, corresponding to the different legal theories under which the Defendants are liable.  Some of the counts and facts are pleaded in the alternative.  The breach of contract claim (Count 1) asserts that Defendant Zuckerberg agreed (among other things) to complete and deliver to ConnectU's predecessors a website, then called Harvard Connection, in return for an equal stake in the nascent venture to launch and operate the site, and that he breached that contract by, among other things, failing to deliver the finished website.  Count 2 asserts that Zuckerberg breached the implied covenant of good faith and fair dealing that is read into all contracts (including implied contracts), by launching a directly competitive website while obligated to ConnectU's predecessors to complete and help them launch their own website.  Count 3 asserts that Zuckerberg committed common law fraud in his dealings with ConnectU's predecessors, by developing and launching a competitive website while intentionally or recklessly leading ConnectU's predecessors to believe that he was acting in their best interest and completing their website.  Count 4 asserts that even if the parties'

2

dealings did not result in an actual or implied contract, Zuckerberg's various promises and actions induced ConnectU's reasonable detrimental reliance. Count 5 asserts that Zuckerberg owed a fiduciary duty to ConnectU's predecessors, based on his words and actions, and that he breached that duty by failing to complete the Harvard Connection website and launching his own directly competitive website. Count 6 asserts a claim for unjust enrichment against all Defendants, based on the immense value of their facebook.com website, gained unjustly at ConnectU's expense. Count 7 asserts a claim for copyright infringement, based on Zuckerberg's, Moskovitz's, and McCollum's copying of Harvard Connection code, or code Zuckerberg said he wrote for Harvard Connection, into thefacebook.com code. Count 8 asserts a claim for trade secret misappropriation against all Defendants, based on Zuckerberg's unauthorized disclosure and use of the Harvard Connection website idea, and his and his co-Defendants' incorporation of the Harvard Connection ideas into their own website. Count 9 asserts a claim for violation of M.G.L. ch. 93A, § 11, against all Defendants, based on Zuckerberg's unfair and deceptive words and acts, which furthered his scheme to compete unfairly with ConnectU's predecessors, and the other Defendants' participation in that scheme. This Amended Complaint also asserts that Facebook, Inc. and TheFacebook LLC are liable under all counts pursuant to the doctrine of successor liability.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter of this action pursuant to 17 U.S.C. § 501(b) and 28 U.S.C. § 1331. This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. Jurisdiction over the state and common law claims is

3

also appropriate under 28 U.S.C. § 1367(a), 1338(a) and (b), and principles of pendent jurisdiction.

4. This Court has personal jurisdiction over Defendants and venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a). A substantial part of the events or omissions giving rise to the claims occurred in this District and/or Defendants may be found in this District.

### THE PARTIES

5. Plaintiff ConnectU, Inc. ("ConnectU") is a corporation organized under the laws of the State of Connecticut, with a principal place of business at Two Greenwich Office Park, Greenwich, Connecticut, 06831. ConnectU, Inc. is registered to do business in the Commonwealth of Massachusetts. Prior to September 2, 2004, Cameron Winklevoss, Tyler Winklevoss, and Divya Narendra (referred to collectively as the "Founders") assigned to ConnectU LLC all of their rights, title, and interest in the harvardconnection.com website (described below), as well as all claims against all Defendants, including the right to sue them and recover damages with respect to any causes of action arising from the facts set forth in this Amended Complaint. Such assignment was confirmed and made retroactive to April 6, 2004 by ¶ 13.5 of ConnectU LLC's August 5, 2005 Operating Agreement. (Ex. 1, C011285-337). On September 2, 2004, ConnectU LLC sued all Defendants. The Founders intended that ConnectU LLC would own all of their rights, title, interests, and claims relating to Harvard Connection, the harvardconnection.com website, and the connectu.com website, including without limitation the Harvard Connection ideas and all intellectual property rights and other rights and claims. On May 23, 2006, ConnectU LLC merged into ConnectU, Inc., which succeeded to all such rights, title, and interest of ConnectU LLC. (Ex. 2, C0011593-597)

6.  Plaintiff Cameron Winklevoss is a citizen of the State of Connecticut.

7.  Plaintiff Tyler Winklevoss is a citizen of the State of Connecticut.

8.  Plaintiff Divya Narendra ("Narendra") is a citizen of the Commonwealth of Massachusetts.

9.  Defendant Mark Zuckerberg ("Zuckerberg") is a citizen of the State of California.

10. Defendant Eduardo Saverin ("Saverin") is a citizen of the State of Florida.

11. Defendant Dustin Moskovitz ("Moskovitz") is a citizen of the State of California.

12. Defendant Andrew McCollum ("McCollum") is a citizen of the State of Idaho.

13. In about mid-December 2003, Defendants Zuckerberg, Moskovitz, McCollum, and Saverin formed a *de facto* partnership or joint venture to develop and operate thefacebook.com website (referred to herein as the "Facebook.com *de facto* partnership"). (Ex. 3 at ¶9; Ex 4 at ¶11).

14. Defendant Facebook, Inc. is a corporation organized under the laws of the State of Delaware with a principal place of business in the State of California. Facebook, Inc. was formerly known as "Thefacebook, Inc." Defendants have capitalized Facebook, Inc. and Thefacebook, Inc. in various forms. The use of the name "Facebook, Inc." in this Complaint refers to Facebook, Inc. and Thefacebook, Inc., regardless of capitalization.

15. Defendant TheFacebook LLC is a limited liability company organized under the laws of the State of Florida. Its sole Member is Facebook, Inc., which is a citizen of Delaware and/or the State of California.

16. Under the doctrine of successor liability, Facebook, Inc. and TheFacebook LLC are liable for all of the wrongful acts of Zuckerberg, Moskovitz, McCollum, and Saverin.

17. The individual Defendants alleged in Affirmative Defense No. 23 set forth in the "Answer of All Defendants to First Amended Complaint, Counterclaims of Mark Zuckerberg and TheFacebook, Inc., and Jury Demand" in Civil Action No. 1:04-cv-11923 (DPW) (Dkt. 14) ("Answer and Counterclaims") that they acted in their capacity as employees, agents, or servants of TheFacebook, Inc. (now "Facebook, Inc.") and are therefore protected by the corporate shield. Facebook, Inc. assumed liability for any wrongful acts of Zuckerberg, McCollum, Moskovitz, and Saverin. Only appropriate discovery, which has not yet been provided by Defendants, can shed light on the contractual relationship between the company and Zuckerberg, McCollum, Moskovitz, and Saverin. (*See* Plaintiff's Motions to Compel the Production of Documents in Civil Action No. 1:04-cv-11923 (DPW) Dkt. 69 at 18-19; Dkt. 89 at 14). Defendants have recently promised to produce such documents.

18. Facebook Defendants' Supplemental Responses to Plaintiff's First Set of Interrogatories (Ex. 51), Supplemental Response to Interrogatory No. 18 states that "To the extent the individual defendants engaged in any conduct for which the plaintiff might ultimately establish a right to recover, their conduct was undertaken pursuant to his role in TheFacebook, Inc., and recovery would lie against TheFacebook and not against the individual defendants personally." Based on this express assumption of liability, Facebook, Inc. is liable for the acts of its predecessors, the individual Defendants named herein.

19. Even if there was no express transfer of liability, the individual Defendants expected the Facebook, Inc. to assume any such liabilities. TheFacebook LLC was formed by Zuckerberg, Moskovitz, and Saverin to operate thefacebook.com website, and partly to accept the transfer of liability and shield the individuals. Later TheFacebook, Inc. was formed and was owned by

Zuckerberg and Moskovitz to operate the website facebook.com, and partly to accept the transfer of liability and shield Zuckerberg and Moskovitz.

20. Alternatively, Zuckerberg, Saverin, and Moskovitz were operating facebook.com as an informal partnership in its first few months of operation. (Ex. 3 at ¶ 9). First, TheFacebook LLC acquired Zuckerberg's, Moskovitz's and Saverin's interest in thefacebook.com website. (*Id.* at ¶10). Later, Facebook, Inc. acquired Zuckerberg's and Moskovitz's interest in TheFacebook LLC and thefacebook.com website. (*Id.* at 16). Therefore, there was a continuation of management, personnel, physical location, assets, and general business operations from the *de facto* partnership to TheFacebook LLC and to Facebook, Inc., and this transfer should be viewed as a *de facto* merger of the partnership.

21. Alternatively, Facebook, Inc. is a mere continuation of the LLC and the informal partnership, which was a mere continuation of Zuckerberg developing thefacebook.com website as a sole proprietor. Between mid-December 2003 and at least April 2004, Zuckerberg, Moskovitz, and Saverin operated as TheFacebook.com partnership. During this time, they committed the unlawful acts ConnectU now seeks to rectify. They later formed TheFacebook LLC and then Facebook, Inc. TheFacebook LLC clearly was intended to continue the operations of TheFacebook.com partnership. Later, Facebook, Inc. clearly was intended to continue the operations of its predecessors, TheFacebook LLC and TheFacebook.com partnership.

22. Facebook, Inc. and TheFacebook LLC should be considered the same entity as TheFacebook.com partnership, liable for their actions and the actions of Zuckerberg, Moskovitz, McCollum, and Saverin. Therefore, under the doctrine of successor liability, Facebook, Inc. and TheFacebook LLC are liable for all of the wrongful acts of Zuckerberg, Moskovitz, McCollum, and Saverin.

**GENERAL FACTS**

23. ConnectU's predecessors, Cameron Winklevoss, Tyler Winklevoss, and Divya Narendra, were classmates who attended Harvard University together, graduating in June 2004.

24. As set forth more fully below, in December 2002 the Founders began to develop a business plan for a new type of website, originally to be called Harvard Connection and/or Harvardconnection.com, and later renamed connectu.com. The Founders formed and operated as a *de facto* partnership for purposes of this venture.

25. Under the Founders' business plan, the Harvard Connection website was to be the first niche social network for university students. It would allow students and alumni of a college or university to join a social network specific to their institution that would part of an overall social network that linked every institution. The website would give students and alumni a place to meet, exchange information, discuss employment prospects, and serve as an online directory and utility to establish connections with people of common interests. Initially, harvardconnection.com was to serve the Harvard University community. Once established at Harvard, the Founders planned to expand it to other colleges and universities, creating a larger umbrella social network that encompassed each individual school network, allowing users to interact not only with users in their own school network, but also with users from other school networks. The Harvard Connection business model, which was based in part on advertising revenue, had a significant chance of financial success because the users, well-educated students and alumni, are an attractive demographic for many advertisers.

26. As later proved by Defendants' improper success, the Founders observed a vacuum in the college/university community for a website utility with Harvard Connection's features. Their plan was to fill that vacuum before anyone else did so. Harvardconnection.com was going

to be the first niche social network for university students. Its success and expected viral growth depended on launching before any other similar website, which would guarantee its first-mover advantage. If the niche was already filled, it would have been virtually impossible to gain critical mass to sustain viral growth.

27. By November 2003, the Founders had made substantial progress in developing and implementing their business plan and website, which they intended to launch by the end of 2003. Already, the Founders' initial website programmers, Sanjay Mavinkurve and Victor Gao, had done much in developing the Harvard Connection website.

28. As set forth in more detail below, in November 2003 the Founders offered Zuckerberg the opportunity to become their partner on the Harvard Connection development team, in exchange for his agreement to complete the Harvard Connection website, including the computer program and database definitions for the site (such code and database definitions are referred to collectively herein as the "Harvard Connection Code."). Zuckerberg accepted the Founders' offer by his words, writings, and actions described in this Amended Complaint, and became part of the Harvard Connection *de facto* partnership.

29. At the time Zuckerberg joined the Harvard Connection development team, he had not conceived of a niche social network website for university students, and had not developed a business plan for such a website.

30. Upon becoming a partner, Zuckerberg was included in business planning and website design and development. As a partner, he was entrusted with the ideas of the Harvard Connection website, project, and enterprise, the website design and screens created to date, the Harvard Connection website user interface, the Harvard Connection Code, and the Harvard

9

Connection launch execution strategy. The website development project was secret, as were the details of the website.

31. The Founders told Zuckerberg that the project and ideas were secret, and he agreed to keep them confidential. Zuckerberg also had an obligation to keep such ideas and information confidential.

32. The Founders repeatedly stressed to Zuckerberg that the Harvard Connection website needed to be completed as soon as possible because they wanted to launch it in December 2003 and secure the first-mover advantage. This launch date was later pushed back to January 2004. Zuckerberg understood that it was important to the success of the Harvardconnection.com website to make it operational by late December 2003 or early January 2004, before any competitor did so. Zuckerberg assured the Founders that he was using his best efforts to complete the website and ready it for launch, and for market.

33. As explained in more detail below, Zuckerberg's pledges of commitment to the Founders, his acceptance of the Harvard Connection Code, his agreement to complete the website, his work on the website, his access to and acceptance of the Harvard Connection ideas, his participation as a member of the Harvard Connection development team, his understanding that he would obtain a beneficial interest in the website and share in the proceeds if and when the website was successful, and his ability to highlight his work on the site to fellow students and potential employers, created an actual or implied contract, a duty of good faith and fair dealing, a relationship of trust, a partnership, and/or a fiduciary relationship between Zuckerberg and the Founders.

34. The Founders were always respectful of Zuckerberg's time and alleged schoolwork. They never tried to force or coerce him to do anything against his will. Zuckerberg never

complained about demands on his time, never claimed that the work required to complete the website exceeded the amount of time he agreed to provide, and never requested monetary payment for his work on the Harvard Connection website.

35. No later than mid-December 2003, while Zuckerberg led the Founders to believe that he was part of the Harvard Connection team, he decided to steal their ideas and the business plan, and to launch his own website using the Founders' ideas. By December 22, 2003, he and Moskovitz were writing code for thefacebook.com website (later renamed facebook.com), but Zuckerberg kept his project secret from the Founders. In a December 18, 2003 meeting and in several later emails, Zuckerberg continued to lead the Founders to believe he was their partner and that he was diligently completing the Harvard Connection website for immediate launch. Important functionality of thefacebook.com website was working by late December 2003. On January 11, 2004, Zuckerberg registered the domain www.thefacebook.com. In his last meeting with the Founders, on January 14, 2004, Zuckerberg never mentioned his facebook project, but kept them on his hook by saying he would finish the Harvard Connection website while he bought time to launch his own. He even maintained the passwords to the Harvard Connection code and servers, and controlled if and when Harvard Connection would launch. By late January 2004, the Founders had exchanged at least fifty-two emails with Zuckerberg and had three team meetings with him to discuss the Harvard Connection website and business plan, and believed he was doing what he promised to do.

36. On February 4, 2004, Defendants Zuckerberg, Moskovitz, McCollum, and Saverin launched the thefacebook.com website, which was directly competitive to the Harvard Connection website under development. Thefacebook.com website incorporated the Harvard Connection ideas and usurped the Founders' valuable business opportunity. Specifically, such

Defendants incorporated the following Harvard Connection ideas, which the Founders disclosed to Zuckerberg, into the facebook.com website. Plaintiffs' trade secret is described in detail in Ex. 1a. In fact, the Founders only learned about thefacebook.com by reading about it in the Harvard *Crimson*. Just like almost every other student who read the Harvard *Crimson* that day, this was the fist time the Founders had ever heard of thefacebook.com.

37. Zuckerberg never told the Founders that he stopped working on the Harvard Connection website before he launched thefacebook.com website, and later admitted his silence to a friend. In fact, the Founders learned of thefacebook.com launch by reading about it in the Harvard *Crimson* student newspaper.

38. The Founders felt shocked and betrayed by Zuckerberg's launch of a competing website while working as a member of the Harvard Connection development team. On February 10, 2004, six days after thefacebook.com launched, Cameron Winklevoss sent Zuckerberg a cease and desist letter. The Founders then hired a programmer/website developer to complete the website, but they were unable to launch the connectu.com website until May 21, 2004, almost four months after the launch of thefacebook.com. By that time, it was too late. By May of 2004 thefacebook.com website counted almost the entire Harvard student body as members, and was rapidly spreading to schools around the country with explosive viral growth.

39. Zuckerberg shared the Harvard Connection ideas with Defendants Saverin, Moskovitz, and McCollum, who knowingly used them, and continue to use them, to develop, launch, and/or maintain the website facebook.com. Zuckerberg, Saverin, Moskovitz, and McCollum engaged in the wrongdoing described in this Amended Complaint and operated thefacebook.com website before TheFacebook LLC and/or Facebook, Inc. were formed, and independently thereof, before and after they were formed.

40. Defendants' wrongful knowledge and/or use of the Harvard Connection ideas enabled and allowed thefacebook.com website to come to market first, thereby obtaining press coverage, users/members, advertisers, investors, and the viral growth attributable to the network effect (which facebook.com has reaped), that would otherwise have benefited ConnectU's predecessors.

41. Defendants' market advantage, directly and proximately resulting from Defendants' wrongdoing described herein, usurped ConnectU's predecessors' potential market and related business opportunities.

## FIRST CLAIM FOR RELIEF
### Breach of Actual or Implied Contract Under Massachusetts Common Law
### Asserted by ConnectU, Inc. Against
### Zuckerberg, Facebook, Inc. and TheFacebook, LLC

42. Plaintiff repeats and realleges each and every allegation set forth in this Amended Complaint.

### Claim Against Defendant Zuckerberg

*Elements of the Claim*

43. To plead a claim for breach of actual contract under Massachusetts law, ConnectU must allege that: (1) an offer was made and accepted, (2) both parties gave up something of value, or promised to give up something of value, (3) defendant breached the agreement, and (4) plaintiff suffered damage proximately caused by the breach. As detailed below, ConnectU alleges facts sufficient to support each of these elements.

44. To plead a claim for breach of implied contract under Massachusetts law, ConnectU must allege: (1) that a course of dealing between the parties implies that an offer was made and accepted, (2) that both parties gave up something of value, or promised to give up something of value, (3) that defendant breached the agreement, and (4) that plaintiff suffered damage

13

proximately caused by the breach. As detailed below, ConnectU alleges facts sufficient to support each of these elements.

45. As described in detail below, Zuckerberg was offered the opportunity to join, and agreed to join, the Harvard Connection website team. Zuckerberg agreed to (1) complete the Harvard Connection website for a December 2003 or January 2004 launch by finishing the "Connect" side of the Harvard Connection Code, and otherwise completing the technical side of the website, including design of the user interface, and readying it for immediate launch, (2) participate in the management and control of the project, (3) suggest features, (4) launch the site, (5) help market the site to users and advertisers, (6) handle the technical requirements of the site, and (7) operate the site together with the Founders.

46. As described in detail below, in exchange for such performance, the Founders offered Zuckerberg the following consideration, which he accepted: (1) an equal interest in the Harvard Connection project, divided among four partners, (2) equal say in the management and control of the project, (3) the opportunity to highlight the project on his resume, and (4) the opportunity to rehabilitate his reputation. See ¶¶ 49-52, below. As evidenced by Zuckerberg's February 12, 2004 accusation that Narendra and the Winklevoss brothers breached the very agreement Zuckerberg is accused of breaching (see ¶¶ 67, 143, below), this was considered by all parties to constitute good and sufficient consideration in the context of a college-based, Internet start-up company with no certainty of financial success. Zuckerberg accepted this consideration.

47. This offer, acceptance, and consideration, as described in this claim, constitute an express meeting of the minds, and thus an actual contract.

48. Alternatively, the course of dealing between the parties, as detailed in this claim, resulted in a contract implied-in-fact.

***Zuckerberg's Reputation***

49. On or about November 1, 2003, Zuckerberg launched facemash.com, a website that displayed photographs of two Harvard students, side-by-side, and asked viewers to rate which student was better looking. Zuckerberg obtained the photographs by hacking into the Harvard dormitory Intranets. In addition to offending numerous students (such as the Association of Black Harvard Women (Ex. 5, FACE002516) and Fuerza Latina (Ex. 6, FACE002512)), the site was condemned by Harvard itself because Zuckerberg hacked into the school's computer to steal the photos for the website. (Ex. 8, TFB6974). The story of such hacking, told in Zuckerberg's own words, is set forth in Ex. 80, Zuckerberg's "facemash online journal," which is also referred to in the November 4, 2003 issue of the Harvard *Crimson* newspaper. (Ex. 7).

50. On or about November 20, 2003, as a result of the facemash.com debacle, the Harvard University Administrative Board placed Zuckerberg on disciplinary probation for improper social behavior and ordered him to attend counseling. (Ex. 8).

51. For these reasons, facemash.com tarnished Zuckerberg's reputation at Harvard.

52. At this time, the Founders heard that Zuckerberg was a talented programmer. They also heard of his troubles regarding facemash.com, which, though socially unacceptable, demonstrated Zuckerberg's ability to design and launch a website. The Founders believed that offering Zuckerberg a spot on the Harvard Connection team would benefit everyone. Zuckerberg could be a partner in a project that the Founders expected to be a very popular utility for the Harvard community, and thereby help to rehabilitate his tarnished reputation (this assumption has proven to be correct, as facebook.com has substantially benefited Zuckerberg's

reputation). The Founders would get a partner with demonstrated programming and website development and launch abilities. If successful, the website would also expand and benefit the Founders and Zuckerberg financially (this assumption has also proven itself, based on the phenomenal success of Zuckerberg's facebook.com website, the ideas for which he stole from the Founders; *see* ¶¶ 26, 36, 38, 40, 186-193, 273-292).

*Offer and Acceptance, and Disclosure of Harvard Connection Ideas*

53. On or about November 3, 2003, Divya Narendra obtained Zuckerberg's email address from a mutual friend and sent him an email offering him the opportunity to join the Harvard Connection website development team, which at that time was comprised of the three, Founders. Narendra wrote "me and my team need a web developer with php, sql, and hopefully java skills. We're very deep into developing a site **which we would like you to be part of** and a site which we know will make some waves on campus." (Emphasis added.) Narendra also wrote that Zuckerberg's participation "should be a really rewarding experience, especially if you have an entrepreneurial personality." (Ex. 9, C004632-33). This email demonstrates the Founders' intention that Zuckerberg would be an equal member of the Harvard Connection team, and that the Harvard Connection website would be a commercial enterprise.

54. Zuckerberg and his co-Defendants admitted in ¶ 10 of their Counterclaims contained in their Answer and Counterclaims that the Founders "requested that Zuckerberg participate in the development of the HC website."

55. Later on November 3, 2003, Zuckerberg expressed interest in Narendra's offer, responding by email that ". . . I need to deal with the aftermath of the facemash stuff today . . . . I'm definitely interested in hearing about your project," provided his cell phone number, and asked Narendra to call the next day. (Ex. 9, C004632-33).

56. On or about November 4, 2003, Cameron Winklevoss telephoned Zuckerberg, offered him the opportunity to be a partner in the Harvard Connection website development project, which he called a team member, told him the project was confidential, and talked with him about his role on the team, particularly about completing the Harvard Connection website. During that teleconference, Winklevoss suggested that Zuckerberg speak with Victor Gao, Harvard Connection's then-current programmer, to learn more about the site and the programming required.

57. On or about November 4, 2003, after Winklevoss spoke with Zuckerberg, Narendra sent another email to Zuckerberg, giving him Gao's contact information and emphasizing the resume-building aspect of the project, which is vital to college students. (Ex. 10, C004634). On or about November 8, 2003, Zuckerberg spoke with Gao, who explained what had been programmed to date. Zuckerberg agreed to become part of the team by completing the website, suggesting new functions, and preparing the site for launch. Based on such representations by Zuckerberg on November 9, 2003, Gao emailed to Zuckerberg the secret location of the code. (Ex. 11, FACE002618). Zuckerberg was able to assure that the Founders honored their agreement: he controlled the code, as well as when and if the Harvard Connection website would launch. Zuckerberg's acceptance of the code demonstrates assent to the express contract and/or a course of conduct from which a contract can be implied-in-fact.

58. On or about November 11, 2004, Zuckerberg met with Gao in person for several hours to discuss the project. Gao showed him the website in its then-current stage of development, and Zuckerberg repeated his agreement to become a member of the Harvard Connection team and provide a launch-ready website. Zuckerberg's meetings with Gao and

acceptance of the code demonstrate assent to the express contract and/or a course of conduct from which a contract can be implied-in-fact.

59.   On November 12, 2003, Narendra again emailed Zuckerberg, emphasizing the goal to complete the site quickly, writing "I heard things went well with Vic.  He said that you'd be working on the site tomorrow and Friday.  Let me know how it goes.  We're hoping to get rolling as soon as possible and hope the ad board's [Harvard Administrative Board] treating you well." (Ex. 12, C004837).  This email reinforces the parties' agreement, and/or demonstrates a course of conduct from which a contract can be implied-in-fact.

***Zuckerberg's Alleged Performance Under the Contract, and Further Disclosures***

60.   Between November 12, 2003 and November 22, 2003, Zuckerberg began the agreed-upon development work.  Zuckerberg's work on the website demonstrates his assent to the contract and shows performance consistent with the contract.

61.   On November 22, 2003, Zuckerberg sent an email to Gao, requesting the graphics for the site, explaining that if Gao could provide the graphics, Zuckerberg could "wrap this thing up for you tonight." (Ex. 13, FACE002724).  This email reinforces Zuckerberg's assent, the parties' agreement, and Zuckerberg's performance, and/or demonstrates a course of conduct from which a contract can be implied-in-fact.

62.   Two hours later, Zuckerberg again wrote to Gao, copying Narendra and saying the website was launch-ready: "I have most of the coding done, and I think that once I get the graphics, **we'll** be able to launch this thing. . . . I'll send you a link later tonight when it's in really good shape and you can check it out tomorrow morning." (Ex. 14,C004640) (emphasis added).  In this email, Zuckerberg, by using the term "we," expresses his understanding that he is part of the team, reiterates his assent and the parties' agreement, and represents that he has

substantially performed. It also demonstrates a course of conduct from which a contract can be implied-in-fact.

63. Two hours later, Narendra replied, complimenting Zuckerberg and detailing the non-coding work left to do, namely: "I was hoping you had some thoughts on design. Check out [third-party website]. I think this is the hottest front-end I've ever seen. If you're into design then let's talk about it at some point. . . . Yeah, I mean once the functionality is set, the rest is testing and design. The site looks fine right now but I was thinking **we** could go all out at put up something truly beautiful. **Let me know what you think.** Cheers. Divya. P.S. **me you [sic] and the other guys also have to sit down and discuss strategy in terms of roll out and marketing, etc**. Should be fun." (Ex. 15, C004839). This email exchange evidences the parties' agreement regarding the terms of the contract, that Zuckerberg was viewed, treated, and acted as an equal member of the team, shows the commercial nature of the site, and/or demonstrates a course of conduct from which a contract can be implied-in-fact.

64. On November 23, 2003, Cameron Winklevoss sent an email to the team (i.e., Tyler Winklevoss, Divya Narendra, and Mark Zuckerberg) detailing the work left to be done, suggesting who may do what, identifying a launch date, and setting up a principals meeting for the next day. (Ex. 16, C009578). Because this email contains information related to virtually all aspects of the site, it is evidence of the parties' agreement regarding the terms of the contract and/or demonstrates a course of conduct from which a contract can be implied-in-fact.

65. On November 25, 2003, the Winklevoss brothers (speaking for themselves and Narendra) and Zuckerberg held a meeting in Harvard's Kirkland dining hall for at least an hour to discuss the Harvard Connection project. Zuckerberg confirmed that he would help complete the Harvard Connection website for a December 2003 launch by finishing the "Connect" side of

the Harvard Connection Code and otherwise completing the technical side of the site, and that he would participate in the management and control of the website, including design of the user interface, suggesting features, launching the site, marketing the site to users and advertisers, and operating the site together with the Founders. Zuckerberg also said that he had already completed much of the programming required for the website to launch and that he would handle the technical side of the project. Cameron and Tyler Winklevoss, and Zuckerberg, agreed that in exchange for Zuckerberg's completion of the website and help launching, marketing, and operating the site, Zuckerberg would receive: (1) an equal interest in the Harvard Connection project, divided among the four team members, (2) equal say in the management and control of the project, (3) the opportunity to highlight the project on his resume, and (4) the opportunity to rehabilitate his reputation. Thus, the final meeting of the minds regarding the key terms of the agreement occurred during this conversation. This offer, acceptance, performance, and consideration constitute an express or implied contract.

    66. In response to a demand letter sent by Cameron Winklevoss on February 12, 2004, Zuckerberg wrote: "Originally, I was intrigued by the project and was asked to finish the Connect side of the website. **I did this**, and in doing so, I realized over time that my concept of the website was not as it had initially been portrayed by yourself and Divya. When we met in January, I expressed my doubts about the site (where it stood with graphics, how much programming was left that I had not anticipated, the lack of hardware we had to deal with site use, the lack of promotion that would go on to successfully launch the website, etc.) . . . . Finally, **I think I have as much of a reason to be disappointed with this arrangement as you do, since I worked with the expectation that I would be included in the overall development and control of the project** . . ." (Ex. 17, C008971) (emphasis added). Zuckerberg's response

to the demand letter confirms that he and the Founders had a meeting of minds, that he agreed to complete the website and represented that he performed, that Zuckerberg understood and agreed to be an equal partner in the Harvard Connection project, and that he performed as such. Before he wrote this email, Zuckerberg never complained that the Founders failed to include him in the overall development and control of the project.

67.    Furthering the November 25 meeting, on November 29, 2003 Cameron Winklevoss sent an email to the team detailing functionality ideas he had for the website, asking Zuckerberg if a beta version was available for testing, and underscoring that the team was looking to launch "next week." Zuckerberg replied as follows on November 30, 2003, "I still need to get the registration page up but I'll do that once I get back tomorrow (Sunday) evening so everything will be ready for testing by Monday," and that "I read over all of the stuff you sent and it seems like it shouldn't take too long to implement, so we can talk about that after I get all the basic functionality up tomorrow night. I had another idea for directing people to parties on campus, but I don't know how easily it can be incorporated into this project. We'll speak about it though. I'll shoot you an email late tomorrow evening when I get everything up on the server." (Ex. 18, C004588-89). This email demonstrates that Zuckerberg assented to be part of the Harvard Connection team, that he performed as such, that the others expected him to contribute accordingly, and that he represented having substantially performed. Thus, it is evidence of an express contract and/or shows a course of dealing giving rise to a contract implied-in-fact.

68.    On December 1, 2003, Zuckerberg sent an email to Cameron Winklevoss, stating that "I put together one of the two registration pages so I have everything working on my system now. I tried to upload everything to the main server and some things were not working perfectly so I'll take a look at them tomorrow. Do you want to meet up on Tuesday to go over everything

we have? . . . I'll keep you posted as I patch stuff up and it starts to become completely functional." (Ex. 19, C004590). This email demonstrates that Zuckerberg understood and agreed to be part of the Harvard Connection team, that the others expected him to contribute accordingly, and that he represented having substantially performed. Thus, it is evidence of an express contract and/or shows a course of dealing giving rise to a contract implied-in-fact.

69. On December 6, 2003, Cameron Winklevoss sent an email to Zuckerberg, copying the rest of the team, brainstorming functionality ideas, and asking Zuckerberg to provide any ideas he had to improve the site. (Ex. 20, C004595). This email demonstrates that the Founders treated Zuckerberg as an equal member of the Harvard Connection team and that they expected him to contribute accordingly. Thus, it is evidence of an express contract and/or shows a course of dealing giving rise to a contract implied-in-fact.

70. On December 9, 2003, Cameron Winklevoss suggested that the team meet to review and discuss the site. (Ex. 21, C004596). On December 10, 2003, Zuckerberg responded that he had too much homework, but that he was continuing to work on the site, and again promised to "keep you posted on what I'm working on though so you can see the latest versions of everything on the site." Cameron Winklevoss replied by stressing the urgency of the project and asking to meet before the start of the winter break. (Ex. 22, C004598). This email chain demonstrates that Zuckerberg understood and agreed to be part of the Harvard Connection team, and performed as such, and that everyone (including Zuckerberg) expected him to contribute accordingly. Also, Zuckerberg represented that he was substantially performing. Thus, it is evidence of an express contract and/or shows a course of dealing giving rise to a contract implied-in-fact.

*Zuckerberg's Breach Begins, While He Falsely Assures Further Performance*

71. On December 11, 2003, Zuckerberg sent himself an email detailing functionality ideas for the "Harvard bot," including ideas that were in the parties' earlier correspondence (e.g. course schedules, information on clubs, social network data, user information, etc.). (Ex. 23, FACE002496). This email demonstrates that Zuckerberg was working on the Facebook website at the time he was contractually obligated to be working with the Founders on the Harvard Connection website, and demonstrates Zuckerberg's breach of contract.

72. On December 18, 2003 at 11:00 a.m., Zuckerberg met for the second time with the Founders, in Zuckerberg's dorm room. Zuckerberg assured them that the Harvard Connection website was essentially complete but did not show them his work to date, despite their requests to see it. Zuckerberg's representations during this meeting demonstrate that he understood and agreed to be part of the Harvard Connection team, that he performed as such, that he had substantially performed, and that everyone (including Zuckerberg) expected him to contribute accordingly. Thus, it is evidence of an express contract and/or shows a course of dealing giving rise to a contract implied-in-fact.

73. On December 20, 2003, Cameron Winklevoss asked to hold a teleconference about the site, focusing on launch logistics, and asking Zuckerberg if he had any other ideas for the site. (Ex. 24, C004610). This email demonstrates that the Founders viwed and treated Zuckerberg as an equal member of the Harvard Connection team and that everyone expected him to contribute accordingly. Thus, it is evidence of an express contract or shows a course of dealing giving rise to a contract implied-in-fact.

74. On or about December 24, 2003, Cameron Winklevoss and Zuckerberg spoke by telephone regarding all aspects of the Harvard Connection website, including the status of the

website and launch logistics. Zuckerberg confirmed that he was still working on the website and completing it. This teleconference demonstrates that Zuckerberg understood and agreed to be part of the Harvard Connection team, that he performed as such, and that everyone (including Zuckerberg) expected him to contribute accordingly. Thus, it is evidence of an express contract and/or shows a course of dealing giving rise to a contract implied-in-fact.

75. On December 25, 2003, Cameron Winklevoss sent an email to Zuckerberg, summarizing their December 24, 2003 call, discussing new ideas for the site, and emphasizing the importance of an early January launch date. (Ex. 25, C004276). This email demonstrates that the Founders viwed and treated Zuckerberg as an equal member of the Harvard Connection team and that everyone expected him to contribute accordingly. Thus, it is evidence of an express contract and/or shows a course of dealing giving rise to a contract implied-in-fact.

76. On January 2 and January 4, 2004, Cameron Winklevoss forwarded to Zuckerberg the Harvard Connection website graphics. (Ex. 26, C004613-14). These emails demonstrates that the Founders viwed and treated Zuckerberg as an equal member of the Harvard Connection team and that everyone expected him to contribute accordingly. Thus, it is evidence of an express contract and/or shows a course of dealing giving rise to a contract implied-in-fact.

77. On January 6, 2004, Cameron Winklevoss sent an email to Zuckerberg asking to talk. On January 8, 2004, Zuckerberg replied as follows: "Sorry it's taken me a while [sic] to get back to you. I'm completely swamped with work this week. I have three programming projects and a final paper due by Monday, as well as a couple of problem sets due Friday. I'll be available to discuss the site again starting Tuesday. As far as the site goes for now, I've made some of the changes, although not all of them, and they seem to be working on my computer. I have not uploaded them to the live site yet though. I'll do this once I get everything done. I'm still a little

skeptical that **we** have enough functionality in the site to really draw the attention and gain the critical mass necessary to get a site like this to run. And in its current state, if the site does get the type of traffic **we're** looking for, I don't know if **we** have enough bandwidth from the ISP you're using to handle the load without some serious optimization, which will take a few more days to implement. Anyhow, we'll talk about it once I get everything else done." (Ex. 27, C004617) (emphasis added). This email demonstrates that Zuckerberg understood and agreed to be part of the Harvard Connection team, that he performed as such, and represented having substantially performed. Thus, it is evidence of an express contract and/or shows a course of dealing giving rise to a contract implied-in-fact.

78. On January 14, 2004, the Founders met with Zuckerberg for the third and final time. At this meeting, Zuckerberg noted that he had a lot of school work, but agreed to finish the Harvard Connection website, and never indicated that he would no longer participate in the management and control of the project. This meeting demonstrates that Zuckerberg understood and agreed to continue to be part of the Harvard Connection team and complete the website, and is evidence of an express contract and/or shows a course of dealing giving rise to a contract implied-in-fact.

79. Zuckerberg later confided to a friend: "Remember those guys I was supposed to be making that dating site for? Well, I stopped working on it but never really told them about it." (Ex. 28, FACE002567-68). This email demonstrates that Zuckerberg never repudiated the contract or otherwise suggested to the Founders that he could not or did not want to complete the work he agreed to do, or that he would no longer act as their partner. Rather, as the evidence detailed above shows, he frequently, continually, and consistently expressed his commitment to the project, in words and actions. The Founders had no reason to suspect or believe that he was

not still completing the website for immediate launch, acting as their partner, or otherwise honoring the contract.

### The Founders Learn of the Breaches, When Zuckerberg Launched Thefacebook.com

80. On February 4, 2004, Zuckerberg launched thefacebook.com website, which embodied the Founders' ideas for the Harvard Connection website, as described in Ex. 1a. For example: (1) the mandatory use of .edu email addresses by all users, (2) the focus on college-based social networking, (3) providing an on-line directory for each school, and (4) obtaining advertising to support the site, rather than charge user fees.

81. On February 10, 2004, the Cameron Winklevoss, on behalf of the Founders, sent Zuckerberg a cease and desist letter. (Ex. 29a, C004263).

82. Zuckerberg's actions as described above constitute breach of actual or implied contract under Massachusetts law.

83. The Founders fully performed all aspects of the agreement, by including Zuckerberg on the Harvard Connection development team, treating him as a partner, and by allowing him to control the completion of the technical aspects of the Harvard Connection website. If the site had launched and been successful, the Founders would have shared any profits equally with him.

84. Zuckerberg assured the Founders and led them to believe that he was using his best efforts to complete the project and ready the website for launch and for market. At all times Zuckerberg was able to perform, in fact represented that he had substantially performed, and did perform by participating in the design, development, management, and control of the Harvard Connection project. See ¶¶ 68-71, 73-75, 78-80, above.

85. Zuckerberg breached the contract in at least the following independent ways: (1) by representing that the Harvard Connection website was complete, when it was not, (2) by failing

to deliver the completed, functioning website for a December 2003 or January 2004 launch, or at all, as he agreed to do, (3) by using the Founders' ideas described in Ex. 1a for his own competing website and his own gain, (4) by using the Harvard Connection Code for his own gain, either by incorporating it into the website or deriving a head start from the ideas underlying it, (5) by using the code he said he wrote for Harvard Connection for his own website and his own gain, either by incorporating it into the website or deriving a head start from the ideas underlying it, or by not writing it at all, (6) by revealing the Founders' confidential ideas to unauthorized third parties, (7) by failing to act as a partner, (8) by failing to provide the Founders with the benefit of his ideas and expertise to improve the Harvard Connection website, and (9) by doing all of the above while purporting to be a Harvard Connection development team partner.

*Willfulness and Damages*

86. Each of Zuckerberg's breaches was knowing and willful, and as a result Zuckerberg obtained benefits at the expense of the Founders.

87. Zuckerberg's breaches caused severe damage to the Founders' ability to launch the Harvard Connection website, causing them to lose the first mover advantage. Zuckerberg admits that "there may be a first mover advantage with respect to certain websites." See Answer and Counterclaims, ¶ 16. The Founders and ConnectU were never able to recover from the loss of the first mover advantage caused by Zuckerberg's breaches. Such damages at least equal the value of the website facebook.com, which would not exist but for Zuckerberg's breaches.

<u>**Breach of Contract Claim Against Defendant Facebook, Inc.**</u>

88. Facebook, Inc. is liable for the breach of contract committed by Zuckerberg under the doctrine of successor liability, for the reasons set forth in ¶¶ 16-22.

### Breach of Contract Claim Against Defendant TheFacebook LLC

89. TheFacebook LLC is liable for the breach of contract committed by Zuckerberg under the doctrine of successor liability, for the reasons set forth in ¶¶ 16-22.

### SECOND CLAIM FOR RELIEF
**Breach of Covenant of Good Faith and Fair Dealing Under Massachusetts Common Law
Asserted by ConnectU, Inc. Against
Zuckerberg, Facebook, Inc. and, TheFacebook, LLC**

90. Plaintiff repeats and realleges each and every allegation set forth in this Amended Complaint.

91. To plead a claim for breach of the covenant of good faith and fair dealing under Massachusetts law, ConnectU must allege: (1) a contract exists, (2) a party to the contract knowingly violated an express term of the contract, and (3) the defendant violated the contract to obtain benefits from the other party beyond that agreed to in the contract, resulting in damages. As detailed below, ConnectU alleges facts sufficient to support each of these elements.

92. Zuckerberg's representations in ¶¶ 58-59, 63, 66, 69, 71, 73, 75, 78, 79, were either false when made or he used such code for his own website, either by incorporating it into the website or deriving a head start from the ideas underlying it. In making such false statements, and/or by using the code he wrote for Harvard Connection for his own website, Zuckerberg was not dealing with the Founders fairly, or in good faith, and obtained benefits far beyond the bounds of his agreement with the Founders.

93. Each of Zuckerberg's breaches described in the first claim for relief was knowing and willful. As the result of such breaches, Zuckerberg obtained benefits far beyond the bounds of his agreement with the Founders. Each breach of the contract therefore also constitutes a violation of the duty of good faith and fair dealing.

94. Zuckerberg knowingly and intentionally violated the terms of the agreement to obtain benefits from the Founders beyond those agreed to in the contract, resulting in damages to the Founders in violation of Zuckerberg's duty of good faith and fair dealing. ConnectU's damages at least equal the value of the facebook.com website, which would not exist but for Zuckerberg's breach.

95. Zuckerberg's breaches caused severe damage to the Founders' ability to launch the Harvard Connection website, causing them to lose the first mover advantage. The Founders and ConnectU were never able to recover from the loss of the first mover advantage caused by Zuckerberg's breaches. Such damages are irreparable, but at least equal the value of thefacebook.com website, which would not exist but for Zuckerberg's breaches.

### Breach of Good Faith and Fair Dealing Claim Against Defendant Facebook, Inc.

96. Facebook, Inc. is liable for the breach of covenant of good faith and fair dealing committed by Zuckerberg under the doctrine of successor liability, for the reasons set forth in ¶¶ 16-22.

### Breach of Good Faith and Fair Dealing Claim Against Defendant TheFacebook LLC

97. TheFacebook LLC is liable for the breach of covenant of good faith and fair dealing committed by Zuckerberg under the doctrine of successor liability, for the reasons set forth in ¶¶ 16-22.

### THIRD CLAIM FOR RELIEF
#### Fraud Under Massachusetts Common Law
#### Asserted by ConnectU, Inc., or by Cameron Winklevoss, Tyler Winklevoss, and Divya Narendra, Against Zuckerberg, Facebook. Inc., and TheFacebook LLC

98. Plaintiffs repeat and reallege each and every allegation set forth in this Amended Complaint.

99. This claim for fraud is asserted against Zuckerberg by ConnectU, Inc. This claim involves damage to property and is a mixed tort/contract claim, and therefore was assignable by the Founders to ConnectU, LLC. In the alternative, if the assignment to ConnectU LLC from the Winklevoss twins and Narendra, as explained in ¶ 5 above, was ineffective for any reason, this claim is asserted against Zuckerberg by Cameron and Tyler Winklevoss and Divya Narendra, personally.

## Claim Against Defendant Zuckerberg

*Elements of the Claim*

100.    To plead a claim for fraud under Massachusetts law, ConnectU must allege: (1) that the defendant made a false statement to the plaintiff, and that statement concerned some fact that a reasonable person would consider important to the decision that the plaintiff was about to make, (2) when the defendant made the statement, the defendant either knew that the statement was false, or recklessly made the statement by willfully disregarding its truth or falsity, (3) with the intention that the plaintiff would rely on that statement in making its decision, (4) the plaintiff did in fact rely on the defendant's statement as true, that the reliance was reasonable under the circumstances, and (5) the plaintiff suffered some financial loss as a result of relying on the defendant's false statement. As detailed below, ConnectU alleges facts sufficient to support each of these elements.

101.    As described in detail below, the facts set forth in ¶¶ 105-120, 122-127, 129-135, 136-138, are material facts which, if known to the Founders at the time of such acts and omissions, would have led them to make decisions and take actions other than they did, for example, confronting Zuckerberg, asking him for assurances that they were not true, no longer working with him as part of the Harvard Connection development team, engaging other

30

developers to complete the harvardconnection.com website and launch it before thefacebook.com launched, seeking legal redress, etc. A reasonable person, including the Founders, would have considered such material facts important to making decisions about his relationship with Zuckerberg, and whether to find a new developer to finish the site and handle its technical aspects after launch.

102.    As described in detail below, Cameron Winklevoss, Tyler Winklevoss, and Divya Narendra relied on the material representations Zuckerberg made on November 22nd, 25th, 30th, and December 1st, 4th, 10th, 15th, 17th in 2003, and on January 8th, 12th, 14th, 19th, and 22nd in 2004, as set forth in ¶¶ 108-109, 112-118, 120, 122-123, 126, 129, 132-134, 137-138. Specifically, they relied on Zuckerberg's written material representations set forth in ¶¶ 108, 114-116, 118, 120, 122, 129, 132-133. They also relied on Zuckerberg's material oral statements made on November 25, 2003, December 18, 2003, and January 14, 2004, as described in ¶¶ 112, 123, 134. Such reliance was to their detriment because Zuckerberg's fraudulent statements and conduct described in this claim damaged the Founders and/or ConnectU's valuable property rights in (a) their contract with Zuckerberg (see ¶¶ 43-88), (b) the Harvard Connection website, and (c) the market for the Harvard Connection website, which was usurped by Defendants and has proven to be enormously successful (see ¶¶ 186-193). Such damages at least equal the value of thefacebook.com website, which would not exist but for Zuckerberg's fraud.

103.    Mr. Zuckerberg has a pattern of unethical behavior. One instance of such behavior related to his creation of the facemash.com website, as described in ¶¶ 49-51.

*The Founders' Relationship With Zuckerberg Begins*

104.    As described above in greater detail in ¶¶ 53-60, Zuckerberg agreed to be a part of the Harvard Connection team and gained access to the Harvard Connection website and code.

105.    The Founders had entered inot a partnership with Zuckerberg and therefore allowed him access to the incomplete Harvard Connection website and code, and disclosed to him the ideas for the Harvard Connection website, as described in ¶¶ 56-59.  Such ideas were disclosed to Zuckerberg during telephone conversations and meetings with the Founders, a meeting with Victor Gao, in emails, and by Zuckerberg's access to and viewing of the incomplete Harvard Connection website and code, as described in ¶¶56-59.

106.    On November 22, 2003, Zuckerberg sent an email to Gao, requesting the graphics for the Harvard Connection website, explaining that if Gao could provide the graphics, Zuckerberg could "wrap this thing up for you tonight." (Ex. 13).  The representations in this email are material facts that reasonably led the Founders to believe that Zuckerberg was acting in their best interest, and that he was working diligently to complete the Harvard Connection website and help them launch it in December 2003, which they told him was their goal.  The Founders reasonably relied on Zuckerberg's statement.

***Zuckerberg Begins to Make Fraudulent Statements, On Which The Founders Rely***

107.    Zuckerberg then falsely represented that he began to complete the Harvard Connection website.  On November 22, 2003, Zuckerberg emailed Narendra and said: "I have most of the coding done, and I think that once I get the graphics we'll be able to launch this thing.  You should probably look over the searches and everything just to make sure I'm asking about the right criteria, but other than that it seems like everything is working.  I still have some last minute stuff to do but I'll send you a link later tonight when it's really in good shape and you can check it out tomorrow morning." (Ex. 14).  This was a false and fraudulent statement when made; either Zuckerberg never did such work or used such work product for his own website, either by incorporating it or using it as a head start, by positive or negative example.  Zuckerberg

32

knew such statement was false when he made it, and/or recklessly made the statement and willfully disregarded its truth or falsity, and he intended the Founders to rely on it. Zuckerberg did not send the link he promised in this email and never delivered to the Founders a Harvard Connection website in which "most of the coding" was "done," or in which "everything is working." However, the representations in this email are material facts that reasonably led the Founders to believe that Zuckerberg was acting in their best interest, that they could trust him as a partner, and that he was working diligently to complete the Harvard Connection website and help them launch it in December 2003, and that he was close to finished. Alternatively, Zuckerberg omitted to disclose material facts to the Founders (including the facts that he had decided to steal the Founders' ideas and business plan and was or soon would be actively working on the development of a competing website using the Founders' ideas) and failed to disclose facts necessary to make his statements to the Founders not false and misleading. The Founders reasonably relied on Zuckerberg's statement.

108.    Later on November 22, 2003, Narendra responded by email, saying that "I was hoping you had some thoughts on design . . . . I mean once all the functionality is set, teh [sic] rest is testing and design. The site looks fine right now but I was thinking we could go all out and put up something truly beautiful. Let me know what you think" and that "me you [sic] and the other guys also have to sit down and discuss strategy in terms of roll out and marketing, etc." (Ex. 15). This email shows that the Founders believed Zuckerberg was acting in their best interest, and that he was working diligently to complete the Harvard Connection website and help them launch it in December 2003, and that they trusted him.

109.    In response to a November 24, 2003 email request from Cameron Winklevoss,
Zuckerberg agreed to meet with the Harvard Connection Founders on November 24, 2003. (Ex.
30, C004579.

110.    On the evening of November 24, 2003, Zuckerberg cancelled the meeting at the
"last minute," blaming homework.  (Ex. 30).

111.    On November 25, 2003, Zuckerberg met with Cameron and Tyler Winklevoss in
Harvard's Kirkland Dining Hall, and discussed the website and Zuckerberg's progress on
completing it.  Zuckerberg assured them that the Harvard Connection website was essentially
complete but did not show them his work to date, despite their requests to see it.  Zuckerberg's
statements at such meeting were false and fraudulent when made; either Zuckerberg never did
such work or used such work product for his own website, either by incorporating it or using it as
a head start.  Zuckerberg knew such statements were false when he made them, and/or recklessly
made the statements and willfully disregarded their truth or falsity, and he intended the Founders
to rely on them.  Zuckerberg never delivered to the Founders a Harvard Connection website that
was essentially complete, or even close to complete.  However, Zuckerberg's statements during
the meeting were material facts that reasonably led the Founders to believe that Zuckerberg was
acting in their best interest, that they could trust him, and that he was working diligently to
complete the Harvard Connection website and help them launch it in December 2003, and that he
was close to finished.  Alternatively, Zuckerberg omitted to disclose material facts to the
Founders (including the facts that he had decided to steal the Founders' ideas and business plan
and was or soon would be actively working on the development of a competing website using the
Founders' ideas) and failed to disclose facts necessary to make his statements to the Founders
not false and misleading.  The Founders reasonably relied on Zuckerberg's statements.

34

112.     On November 29, 2003, Cameron Winklevoss emailed Zuckerberg, suggesting ideas and asking "how is the site going?  Do you have stuff up that we could beta test for you? I'm looking forward to getting this thing rolling next week." (Ex. 31, C004588-89).  This email shows that the Founders believed Zuckerberg was acting in their best interest, and that he was working diligently to complete the Harvard Connection website and help them launch it in December 2003, and that they trusted him.

113.     On November 30, 2003, Zuckerberg emailed Cameron Winklevoss and said "I still need to get the registration page up but I'll do that once I get back tomorrow (Sunday) evening so everything will be ready for testing by Monday," and that "I read over all of the stuff you sent and it seems like it shouldn't take too long to implement, so we can talk about that after I get all the basic functionality up tomorrow night.  I had another idea for directing people to parties on campus, but I don't know how easily it can be incorporated into this project.  We'll speak about it through.  I'll shoot you an email late tomorrow evening when I get everything up on the server." (Ex. 31).  These were false and fraudulent statements when made; either Zuckerberg never did such work or used such work product for his own website, either by incorporating it or using it as a head start.  Zuckerberg knew such statements were false when he made them, and/or recklessly made the statements and willfully disregarded their truth or falsity, and he intended the Founders to rely on them.  Zuckerberg never delivered to the Founders a version of the harvardconnection.com website that was "ready for testing," or in which the registration page was up and functioning, or in which all the basic functionality was working, and never uploaded a complete or even close to complete version of the harvardconnection.com website to the server.  However, Zuckerberg's material statements during the meeting reasonably led the Founders to believe that Zuckerberg was acting in their best interest, that they could trust

him, and that he was working diligently to complete the Harvard Connection website and help them launch it in December 2003, and that he was close to finished. Alternatively, Zuckerberg omitted to disclose material facts to the Founders (including the facts that he had decided to steal the Founders' ideas and business plan and was or soon would be actively working on the development of a competing website using the Founders' ideas) and failed to disclose facts necessary to make his statements to the Founders not false and misleading. The Founders reasonably relied on Zuckerberg's statements.

114.    On December 1, 2003, Zuckerberg emailed Cameron Winklevoss and said "I put together one of the two registration pages so I have everything working on my system now. I tried to upload everything to the main server and some things were not working perfectly so I'll take a look at them tomorrow. Do you want to meet up on Tuesday to go over everything we have? . . . I'll keep you posted as I patch stuff up and it starts to become completely functional." (Ex. 19). These were false and fraudulent statements when made; either Zuckerberg never did such work or used such work product for his own website, either by incorporating it or using it as a head start. Zuckerberg knew such material statements were false when he made them, and/or recklessly made the material statements and willfully disregarded their truth or falsity, and he intended the Founders to rely on them. Zuckerberg never delivered to the Harvard Connection Founders a version of the harvardconnection.com website that was completely functional, or even close. Due to Zuckerberg's stalling, the meeting he suggested also did not occur until over two weeks later. However, Zuckerberg's material statements during the meeting reasonably led the Founders to believe that Zuckerberg was acting in their best interest, that they could trust him, and that he was working diligently to complete the Harvard Connection website and help them launch it in December 2003, and that he was close to finished. Alternatively, Zuckerberg

omitted to disclose material facts to the Founders (including the facts that he had decided to steal the Founders' ideas and business plan and was or soon would be actively working on the development of a competing website using the Founders' ideas) and failed to disclose facts necessary to make his statements to the Founders not false and misleading. The Founders reasonably relied on Zuckerberg's statement.

115.    On December 4, 2004, Zuckerberg began to evade meeting with the Founders, and engaged in a pattern of tactics, often blaming homework, to stall meetings with the Founders over the next few weeks. At 4:03 a.m. on December 4, 2003, he mailed Cameron Winklevoss, saying "Sorry I was unreachable tonight [i.e., the night of December 3, 2003]. I just got about three of your missed calls. I was working on a problem set and I had my phone silenced in my pocket the whole time, wondering why nobody was calling me. . . ," and suggesting a meeting on December 5, 2005. (Ex. 32, C004592). However, at the time, the Founders reasonably believed Zuckerberg's excuses and did not suspect that he was not acting in their best interest, that they could not trust him, that he was not working diligently to complete the Harvard Connection website and help them launch it in December 2003, that the Harvard Connection website was not almost finished, or that he was working on his own website incorporating the Harvardconnection.com ideas. Alternatively, Zuckerberg omitted to disclose material facts to the Founders (including the facts that he had decided to steal the Founders' ideas and business plan and was or soon would be actively working on the development of a competing website using the Founders' ideas) and failed to disclose facts necessary to make his statements to the Founders not false and misleading. The Founders reasonably relied on Zuckerberg's statement, which was material. Zuckerberg recently agreed to produce his homework from this period, and ConnectU is awaiting such production.

37

116.    On December 6, 2003, Cameron Winklevoss emailed Zuckerberg ideas for the Harvard Connection website, repeatedly referring to "we," and therefore treating Zuckerberg as a member of the Harvard Connection team.  Cameron Winklevoss also asked for Zuckerberg's opinion, saying "Let me know what you think, and if you've thought of anything else."  (Ex. 20). At this time, the Founders viewed Zuckerberg as a trusted partner in the Harvard Connection team and did not suspect that he was not acting in their best interest, that they could not trust him, that he was not working diligently to complete the Harvard Connection website and help them launch it in December 2003, that the Harvard Connection website was not almost finished, or that he was working on his own website incorporating the Harvardconnection.com ideas.

117.    On December 10, 2003, Zuckerberg emailed Cameron Winklevoss and stalled meeting with the Founders, which Cameron Winklevoss requested, but said "I'll keep you posted on what I'm working on though so you can see the latest versions of everything on the site."  (Ex. 22).  This was a false and fraudulent statement when made; either Zuckerberg never did such work or used such work product for his own website, either by incorporating it or using it as a head start.  Zuckerberg knew such statement was false when he made it, and/or recklessly made the statement and willfully disregarded its truth or falsity, and he intended the Founders to rely on it.  Zuckerberg failed to keep the Harvard Connection Founders posted on his progress on the Harvardconnection.com website, and never showed them any version of the website.  However, at the time, the Founders reasonably believed Zuckerberg's excuses and did not suspect that he was not acting in their best interest, that they could not trust him, that he was not working diligently to complete the Harvard Connection website and help them launch it in December 2003, or that he was working on his own website incorporating the harvardconnection.com ideas. To the contrary, such material statements reasonably led the Founders to believe that Zuckerberg

was acting in their best interest, that they could trust him, and that he was working diligently to complete the Harvard Connection website and help them launch it in December 2003. Alternatively, Zuckerberg omitted to disclose material facts to the Founders (including the facts that he had decided to steal the Founders' ideas and business plan and was or soon would be actively working on the development of a competing website using the Founders' ideas) and failed to disclose facts necessary to make his statements to the Founders not false and misleading. The Founders reasonably relied on Zuckerberg's statement.

### Zuckerberg Develops Thefacebook.com, While He Says He is Completing Harvard Connection

118.    On December 11, 2003, Zuckerberg sent himself an email detailing functionality ideas for the "Harvard bot," including ideas that were in the parties' earlier correspondence (e.g. course schedules, information on clubs, user information, etc.). (Ex. 23). This document demonstrates that although Zuckerberg represented to the Founders that he was working on the Harvard Connection website, he was actually working on a competing website, thefacebook.com. The Founders reasonably relied on Zuckerberg's material statements that he was working on the Harvard Connection website and Zuckerberg never informed the Founders that he was working on a competing website. Alternatively, Zuckerberg omitted to disclose material facts to the Founders (including the facts that he had decided to steal the Founders' ideas and business plan and was or soon would be actively working on the development of a competing website using the Founders' ideas) and failed to disclose facts necessary to make his statements to the Founders not false and misleading.

119.    On December 15, 2003, Zuckerberg emailed Cameron Winklevoss, stalling a meeting with the Harvard Connection founders until December 18, 2003, again blaming homework. (Ex. 33, C004601). However, at the time, the Founders reasonably believed

Zuckerberg's excuses and did not suspect that he was not acting in their best interest, that they could not trust him, that he was not working diligently to complete the Harvard Connection website and help them launch it in December 2003, or that he was working on his own website incorporating the Harvardconnection.com ideas. Alternatively, Zuckerberg omitted to disclose material facts to the Founders (including the facts that he had decided to steal the Founders' ideas and business plan and was or soon would be actively working on the development of a competing website using the Founders' ideas) and failed to disclose facts necessary to make his statements to the Founders not false and misleading. The Founders reasonably relied on Zuckerberg's material statement.

120.    On December 17, 2003, Harvard University's Winter Recess began.

121.    On December 17, 2003, 3:43 p.m., Zuckerberg emailed Cameron Winklevoss, saying "Sorry I have not been reachable for the past few days." Again he blamed homework and suggested meeting the night of December 17, 2003. (Ex. 34, C004604). On December 17, 2003, 9:24 p.m., Zuckerberg emailed Cameron Winklevoss, stalling the meeting for that night, again blaming homework. (Ex. 35, C004607). However, at the time, the Founders reasonably believed Zuckerberg's excuses and did not suspect that he was not acting in their best interest, that they could not trust him, that he was not working diligently to complete the Harvard Connection website and help them launch it in December 2003, or that he was working on his own website incorporating the Harvardconnection.com ideas. Alternatively, Zuckerberg omitted to disclose material facts to the Founders (including the facts that he had decided to steal the Founders' ideas and business plan and was or soon would be actively working on the development of a competing website using the Founders' ideas) and failed to disclose facts

necessary to make his statements to the Founders not false and misleading. The Founders reasonably relied on Zuckerberg's material statement.

122.    On December 18, 2003 at 11:00 a.m., Zuckerberg met for the second time with the Founders, in Zuckerberg's dorm room. Zuckerberg assured them that the Harvard Connection website was essentially complete but did not show them his work to date. Zuckerberg's statements at such meeting were false and fraudulent when made; either Zuckerberg never did such work or used such work product for his own website, either by incorporating it or using it as a head start. Zuckerberg knew such statements were false when he made them, and/or recklessly made the statements and willfully disregarded their truth or falsity, and he intended the Founders to rely on them. Zuckerberg never delivered to the Founders a Harvard Connection website that was essentially complete, or even close to complete. However, such material statements reasonably led the Founders to believe that Zuckerberg was acting in their best interest, that they could trust him, and that he was working diligently to complete the Harvard Connection website and help them launch it in December 2003. Alternatively, Zuckerberg omitted to disclose material facts to the Founders (including the facts that he had decided to steal the Founders' ideas and business plan and was or soon would be actively working on the development of a competing website using the Founders' ideas) and failed to disclose facts necessary to make his statements to the Founders not false and misleading. The Founders reasonably relied on Zuckerberg's statements.

123.    On December 20, 2003, Cameron Winklevoss emailed Zuckerberg, asking him for the status of his work on the Harvard Connection website, as well as his ideas. He said "I wanted to touch base with you about the site. We really want to have it up and running when we get back so we can start promoting the site. Its [sic] a great launch time, because I will be free to

focus on the site, and students will be looking for diversions from studying.  Do you think this

[sic] it is possible to implement the things we talked about, and have an operable website by

then? . . . . Let me know where you stand, and if you have any other ideas.  Also, let me know a

good time I can call you and talk to over [sic] the phone about the website."  (Ex. 36, C004277).

At this point in time, the Founders still believed Zuckerberg was part of the Harvard Connection

development team, that Zuckerberg was acting in their best interest, that they could trust him,

and that he was working diligently to complete the Harvard Connection website and help them

launch it, now in early January 2004.

124.    By no later than December 22, 2003, Zuckerberg and co-Defendant Moskovitz

were writing code for thefacebook.com website, as evidenced by the coursename and

courseparse files found in the Facebook folder on Moskovitz's hard drive.  (Ex. , TFB000086).

As of December 22, 2003, Zuckerberg had not told the Harvard Connection Founders of his

work on thefacebook.com website, and fraudulently withheld such material facts from them.

The Founders would have considered such facts material to making decisions about their

relationship with Zuckerberg, and whether to find a new developer to finish the site and handle

its technical aspects after launch.  At that point in time, the Founders still believed Zuckerberg

was part of the Harvard Connection development team, that Zuckerberg was acting in their best

interest, that they could trust him, and that he was working diligently to complete the Harvard

Connection website and help them launch it in January 2004.

125.    On Christmas Day, 2003, Cameron Winklevoss emailed Zuckerberg, asking him

to complete the remaining functionality so the Harvard Connection website could launch in early

January 2004.  He said "Good talking to you. . . . [I]t is imperative that we have it done before

the 5th of January so we can get it off the ground.  If its [sic] not done by then, then we it won't

[sic] get out till Feb. I know you have a lot of stuff to do, but please make a good effort to get it done so we can start promoting it. . . Here is the basic functionality that needs to be done by the 5th . . . As I said before, we really need this thing up so we can spend the second semester promoting it. Let me know if you have any questions, and send me back an email letting me know what's up. Thanks." (Ex. 25). But it was too late; Zuckerberg was already gone, as he was well into thefacebook.com development. However, at this point in time, the Founders still believed Zuckerberg was part of the Harvard Connection development team, that Zuckerberg was acting in their best interest, that they could trust him, and that he was working diligently to complete the Harvard Connection website and help them launch it in January 2004.

126.    On December 29 and 30, 2003, register@thefacebook.com sent Zuckerberg test emails confirming his user registration for thefacebook.com website, as described in ¶ 283. At this time, Zuckerberg did not tell the Harvard Connection Founders of his work on thefacebook.com website, and fraudulently withheld such material facts from them. The Founders would have considered such facts material to making decisions about their relationship with Zuckerberg, and whether to find a new developer to finish the site and handle its technical aspects after launch. At this point in time, the Founders still believed Zuckerberg was part of the Harvard Connection development team, that Zuckerberg was acting in their best interest, that they could trust him, and that he was working diligently to complete the Harvard Connection website and help them launch it in January 2004.

127.    On January 5, 2004, Harvard University's Winter Recess ended, and the Winter Reading Period began. No classes were held during the reading period.

128.    On January 8, 2004, Zuckerberg emailed Cameron Winklevoss, blaming school work for delays, when in fact he had been working on thefacebook.com website instead of the

Harvard Connection website. He said "Sorry it's taken me a while [sic] to get back to you. I'm completely swamped with work this week. I have three programming projects and a final paper due by Monday, as well as a couple of problem sets due Friday. I'll be available to discuss the site again starting Tuesday. As far as the site goes for now, I've made some of the changes, although not all of them, and they seem to be working on my computer. I have not uploaded them to the live site yet though. I'll do this once I get everything done. I'm still a little skeptical that **we** have enough functionality in the site to really draw the attention and gain the critical mass necessary to get a site like this to run. And in its current state, if the site does get the type of traffic **we're** looking for, I don't know if **we** have enough bandwidth from the ISP you're using to handle the load without some serious optimization, which will take a few more days to implement. Anyhow, we'll talk about it once I get everything else done." (Ex. 27) (emphasis added). At this time, Zuckerberg did not tell the Harvard Connection Founders of his work on thefacebook.com website, and fraudulently withheld such material facts from them. Zuckerberg's material statements were false and fraudulent when made. The Founders would have considered such facts material to making decisions about their relationship with Zuckerberg, and whether to find a new developer to finish the site and handle its technical aspects after launch. Zuckerberg knew such statements were false when he made them, and/or recklessly made the statements and willfully disregarded their truth or falsity, and he intended the Founders to rely on them. Zuckerberg never delivered to the Harvard Connection Founders any version of the harvardconnection.com website that was working. Zuckerberg's statements were also intended to delay and sabotage the harvardconnection.com website. However, at the time, the Founders reasonably believed Zuckerberg's excuses and did not suspect that he was not acting in their best interest, that they could not trust him, that he was not working diligently to

complete the Harvard Connection website and help them launch it in January 2004, or that he was working on his own website incorporating the Harvardconnection.com ideas. In fact, from his repeated use of "we," his apparently constructive suggestions, and his representations regarding the near completion of the site, the Founders reasonably believed that Zuckerberg was acting in their best interest, that they could trust him, and that he was working diligently to complete the Harvard Connection website and help them launch it within a few days. Alternatively, Zuckerberg omitted to disclose material facts to the Founders (including the facts that he had decided to steal the Founders' ideas and business plan and was or soon would be actively working on the development of a competing website using the Founders' ideas) and failed to disclose facts necessary to make his statements to the Founders not false and misleading. The Founders reasonably relied on Zuckerberg's statement.

129.    On January 11, 2004, Zuckerberg registered "thefacebook.com" domain name, and identified himself as the administrative contact. (Ex. 40, C002813). At this time, Zuckerberg did not tell the Harvard Connection Founders of his work on thefacebook.com website, and fraudulently withheld such material facts from them. The Founders would have considered such facts material to making decisions about their relationship with Zuckerberg, and whether to find a new developer to finish the site and handle its technical aspects after launch. However, at this time, the Founders reasonably believed that Zuckerberg was acting in their best interest, that they could trust him, and that he was working diligently to complete the Harvard Connection website and help them launch it within a few days.

130.    On January 12, 2004 10:05 a.m., Zuckerberg emailed co-Defendant Saverin, offering to show him the "mostly completed" website, which must have been thefacebook.com website. (Ex. 41, FACE004682). Because thefacebook.com website was substantially complete

45

on January 12, 2004, the development of the website must have begun well before that date. At this time, Zuckerberg did not tell the Harvard Connection Founders of his work on thefacebook.com website, and fraudulently withheld such material facts from them. The Founders would have considered such facts material to making decisions about their relationship with Zuckerberg, and whether to find a new developer to finish the site and handle its technical aspects after launch. However, at this time, the Founders reasonably believed that Zuckerberg was acting in their best interest, that they could trust him, and that he was working diligently to complete the Harvard Connection website and help them launch it within a few days.

131.    On January 12, 2004 2:26 p.m., Zuckerberg emailed Cameron Winklevoss, stalling a meeting Cameron requested, until January 14, 2004. (Ex. 42, C004619). At this time, Zuckerberg did not tell the Harvard Connection Founders of his work on thefacebook.com website, and fraudulently withheld such material facts from them. The Founders would have considered such facts material to making decisions about their relationship with Zuckerberg, and whether to find a new developer to finish the site and handle its technical aspects after launch. However, at this time, the Founders reasonably believed that Zuckerberg was acting in their best interest, that they could trust him, and that he was working diligently to complete the Harvard Connection website and help them launch it within a few days. The Founders reasonably relied on Zuckerberg's statement.

132.    On January 14, 2004 4:37 a.m., Zuckerberg emailed Cameron Winklevoss, saying "Hey sorry it took me a while [sic] to respond to this. Tomorrow should be fine but we probably shouldn't use my room since my roommate will be writing a paper all day long and I don't really want to disturb him. I also can't meet for too long because whenever we meet, I'll be taking time away from a project I'm working on with some other people that needs to be finished by