tomorrow night." (Ex. 43, C004621). At this time, Zuckerberg did not tell the Harvard

Connection Founders of his work on thefacebook.com website, the nature of the project he was

working on with other people, or the identity of such other people, and fraudulently withheld

such material facts from them. The Founders would have considered such facts material to

making decisions about their relationship with Zuckerberg, and whether to find a new developer

to finish the site and handle its technical aspects after launch. However, at this time, the

Founders reasonably believed that Zuckerberg was acting in their best interest, that they could

trust him, and that he was working diligently to complete the Harvard Connection website and

help them launch it within a few days. Alternatively, Zuckerberg omitted to disclose material

facts to the Founders (including the facts that he had decided to steal the Founders' ideas and

business plan and was or soon would be actively working on the development of a competing

website using the Founders' ideas) and failed to disclose facts necessary to make his statements

to the Founders not false and misleading. The Founders reasonably relied on Zuckerberg's

statement.

     133.    On January 14, 2004, Zuckerberg met with the Founders for the third and final

time, at the Kirkland Dining Hall after Zuckerberg refused to meet in his dorm room. At that

meeting, Zuckerberg noted that he had a lot of school work, but he did not quit the team and

agreed to finish the Harvard Connection website. At the end of the meeting, the Harvard

Connection Founders believed that Zuckerberg was still on the team, but was distracted by

school work and other unknown activities. During this meeting everyone agreed to speak again

as soon as exams were over and they returned to campus from Harvard's Intersession break. At

this time, Zuckerberg did not tell the Harvard Connection Founders of his work on

thefacebook.com website, and fraudulently withheld such material facts from them. The

Dockets.Justia.com

Founders would have considered such facts material to making decisions about their relationship with Zuckerberg, and whether to find a new developer to finish the site and handle its technical aspects after launch. However, at this time, the Founders reasonably believed that Zuckerberg was acting in their best interest and that they could trust him, and hoped to get him back on track to complete the Harvard Connection website and help them launch it within a short period of time. Alternatively, Zuckerberg omitted to disclose material facts to the Founders (including the facts that he had decided to steal the Founders' ideas and business plan and was or soon would be actively working on the development of a competing website using the Founders' ideas) and failed to disclose facts necessary to make his statements to the Founders not false and misleading. The Founders reasonably relied on Zuckerberg's statements.

134.    Zuckerberg later confided to a friend: "Remember those guys I was supposed to be making that dating site for? Well, I stopped working on it but never really told them about it." (Ex. 28).

135.    On January 16, 2004, Harvard University's Reading Period ended, and the Exam Period began.

136.    On January 19, 2004, believing that Zuckerberg was still a Harvard Connection website development team member, Cameron Winklevoss emailed Zuckerberg, providing ideas for the website and asking Zuckerberg's advice regarding a design issue. (Ex. 46, C004265). At this time, Zuckerberg did not tell the Harvard Connection Founders of his work on thefacebook.com website, withheld such material facts from them, and did not respond to Cameron Winklevoss's email. For example, he did not tell the Founders that almost two weeks prior to Cameron Winklevoss's email that he had obtained funding from Saverin for the project that would become thefacebook.com. (Ex. 4 at ¶12). However, at this time, the Founders

48

reasonably believed that Zuckerberg was acting in their best interest and that they could trust him, and hoped to get him back on track to complete the Harvard Connection website and help them launch it within a short period of time.

137.    On January 22, 2004, still believing that Zuckerberg was still a Harvard Connection website development team member, Cameron Winklevoss again emailed Zuckerberg, asking "hey mark [sic], just checking to see how things are going. Lemme know what's up." (Ex. 47, C004264). At this time, Zuckerberg did not tell the Harvard Connection Founders of his work on thefacebook.com website, withheld such material facts from them, and did not respond to Cameron Winklevoss's email. However, at this time, the Founders reasonably believed that Zuckerberg was acting in their best interest and that they could trust him, and believed he would complete the Harvard Connection website and help them launch it within a short period of time.

138.    On January 27, 2004, Harvard University's Exam Period ended. Its Spring term began on February 4, 2004.

### The Founders Learn of Zuckerberg's Fraud, When Thefacebook.com Launches

139.    On February 4, 2004, Zuckerberg and his co-defendants launched thefacebook.com website to correspond with the beginning of the new term. (Ex. 64, FACE001179).

140.    On February 10, 2004, Cameron Winklevoss sent Zuckerberg a cease and desist letter. (Ex. 29a).

141.    On February 11, 2004, Zuckerberg's counsel, Eric Stenshoel, responded to the cease and desist letter, and admitted that both harvardconnection.com and thefacebook.com are both online directories for college students. The only way Mr. Stenshoel could have made this

determination is by comparing the websites as they existed on that date, yet such evidence was either destroyed or was not preserved. Facebook Defendants have not yet produced thefacebook.com website code from before or at launch or the harvardconnection.com code that Zuckerberg possessed and allegedly worked on, and have either destroyed such code or failed to preserve it. (Ex. 50, FACE002570-71).

***Zuckerberg Makes Further False Statements***

142.    On February 12, 2004, Zuckerberg emailed Cameron Winklevoss in response to the cease and desist letter. This email shows an instance of Zuckerberg's pattern of dishonest behavior. He wrote: "Originally, I was intrigued by the project and was asked to finish the Connect side of the website. I did this . . . **After this meeting, and not before, I began working on Thefacebook,** using none of the same code nor functionality that is present in Harvard Connection. This was a separate venture, and did not draw on any of the ideas discussed in our meetings. The only common aspects of the site are that users can upload information about and images of themselves, and that information is searchable. . . any coincidental similarity between our sites is not a misappropriation of your work product. . . . Finally, I think I have as much of a reason to be disappointed with this arrangement as you do, since I worked with the expectation that I would be included in the overall development and control of the project . . . ." (Ex. 17) (emphasis added). As set forth in ¶¶ 132-134, Zuckerberg's only January 2004 meeting with the Harvard Connection Founders was on January 14, 2004. Zuckerberg's statement that he began working on thefacebook.com website "after this meeting, and not before," was false when written, as shown by the facts set forth in ¶¶ 125, 127, 130-131, 219, 283. Zuckerberg's statement that he finished the Connect side of the site was also false when written, as he never delivered a finished website. Zuckerberg knew such material

statements were false when he made them, and/or recklessly made the statements and willfully disregarded their truth or falsity, and he intended the Founders to rely on them specifically, so that the Founders would not pursue a claim against him.

143.    Defendants' supplemental response to Plaintiff's Interrogatory No. 1 also says that Zuckerberg started working on thefacebook.com website on or about January 11, 2004. (Ex. 51, Defendants' Supplemental Responses to Plaintiff's First Set of Interrogatories at 3-4, Civil Action No. 1:04-cv-11923 (DPW)). This response was verified by Mark Zuckerberg, and was false when written.

144.    On or around February 12, 2004, the Harvard Connection Founders filed a complaint against Zuckerberg with the Harvard Administrative Board, for violation of the Harvard Honor Code. (Ex. 53, HU000077-87).

145.    On February 17, 2004, Zuckerberg showed another instance of his pattern of dishonest behavior. On that date, he submitted to the Harvard Administrative Board a written statement of his version of the facts relating to his involvement with Harvard Connection and thefacebook.com. In his statement, he said "After that [1/14/04] meeting I began making thefacebook." This statement was false when it was written and submitted in defense of a claim of violating the Harvard Honor Code, as shown by the facts set forth in ¶¶ 125, 127, 130-131, 219, 283. Zuckerberg also said "I released a successful website while theirs was still unfinished." This statement shows that his email statements made on November 22nd, 30th, and December 1st, 4th, 10th, 15th in 2003, and on January 8th, 12th, 19th, and 22nd in 2004, and quoted in ¶¶ 108, 114-116, 118, 120, 122, 129, 132-133, were false when written, and that his oral statements to the Founders (see ¶¶ 112, 123, 134) were false when made. (Ex. 84, HU00059-61).

146.    Zuckerberg either never wrote the code he said he wrote for Harvard Connection, or he used such code for thefacebook.com website, either by incorporating it or using it as a head start, by positive or negative example.  Facebook Defendants have not yet produced thefacebook.com website code from before launch or the Harvard connection code that Zuckerberg allegedly worked on, and have either destroyed such code or failed to preserve it. However, Zuckerberg had counsel when Cameron Winklevoss sent him the Founders' February 10, 2004 cease and desist email and should have been advised to preserve such code. Zuckerberg also should have known to preserve such code, and had an obligation to do so. Zuckerberg's counsel stated in his February 11, 2004 email response (see ¶ 251) that "any code created by Mr. Zuckerberg remains his property unless and until it has been assigned in writing. Assuming that you and your partners are interested in obtaining a right to use this code in connection with the HC [Harvard Connection] website, any settlement of your dispute with Mr. Zuckerberg will therefore need to deal with the legal disposition of these rights, either by assignment or license."  This response implies that Zuckerberg wrote code for the Harvard Connection website, but kept it for himself, despite his representations to the Founders, on which they relied.  At the time Mr. Zuckerberg represented that he was working on the Harvard Connection website, as described in ¶¶ 107-108, 110-112, 114-116, 118, 120, 120-123, 129, 132-134, the Founders viewed such statements as material, reasonably believed that Zuckerberg was acting in their best interest, that they could trust him, that he was working diligently to complete the Harvard Connection website, and that Zuckerberg intended that Harvard Connection would own such code.  The Founders reasonably relied on Zuckerberg's statements.

***Damages***

147.    The acts set forth in ¶¶ 102-147 constitute fraud under Massachusetts law.  Such acts damaged ConnectU's or the Founders' valuable property rights in (a) their contract with Zuckerberg (see ¶¶ 52-71), (b) the Harvard Connection website, and (c) the market for the website Harvard Connection, which was usurped by Defendants and has proven to be enormously successful (see ¶¶ 26, 38, 40, 186-193).  Such damages at least equal the value of thefacebook.com website, which would not exist but for Zuckerberg's fraud.

## Fraud Claim Against Defendant Facebook, Inc.

148.    Facebook, Inc. is liable for the fraud committed by Zuckerberg under the doctrine of successor liability, for the reasons set forth in ¶¶ 16-22.

## Fraud Claim Against Defendant TheFacebook LLC

149.    TheFacebook LLC is liable for the fraud committed by Zuckerberg under the doctrine of successor liability, for the reasons set forth in ¶¶ 16-22.

## FOURTH CLAIM FOR RELIEF
### Promissory Estoppel Under Massachusetts Law
### Asserted by ConnectU Against
### Zuckerberg, Facebook, Inc., and TheFacebook, LLC

150.    Plaintiff repeats and realleges each and every allegation set forth in this Amended Complaint.

## Claim Against Defendant Zuckerberg

151.    To plead a claim of promissory estoppel under Massachusetts law, ConnectU must allege that: (1) the defendant made a promise, (2) which he should have reasonably expected to induce action or forbearance of a definite and substantial character on the part of the plaintiff, (3) the promise did induce such action or forbearance, and  (4) injustice can be avoided only by enforcement of the promise.  As detailed below, ConnectU alleges facts sufficient to support each of these elements.

152.    The course of conduct described in ¶¶ 45-88, in the First Claim for Relief For Breach of Contract demonstrates Zuckerberg's understanding that he made promises on which the Founders reasonably relied, and that he represented having substantially carried out such promises. Specifically, Zuckerberg promised to complete the Harvard Connection website and participate in the management and control of the project as a team member, including design of the user interface, suggesting features, launching the site, marketing the site to users and advertisers, operating the site, and handling its technical requirements. He represented that he could do so, and in fact had done so. See ¶¶ 55-80.

153.    The course of conduct described in ¶¶ 102-147 in the Third Claim for Relief for Fraud demonstrates that Zuckerberg induced the Founders to continue to rely on his promises. As described above, Zuckerberg consistently assured the Founders and led them to believe that he was using his best efforts to complete the project and ready the website for launch and for market, even though this was not true. At no time did Zuckerberg inform the Founders that he could not or would not complete the website. Rather, on numerous occasions, he stated that he was almost finished, and would deliver a launch-ready version of the site.

154.    Relying on such promises and representations, the Founders did not attempt to engage anyone else to complete the Harvard Connection website or participate in the development, management, and operation of the website. Zuckerberg knew or should have known that the Founders were relying on his promises and representations.

155.    Zuckerberg's actions as described above give rise to a claim of promissory estoppel under Massachusetts law. Zuckerberg and his successors, Facebook, Inc., TheFacebook LLC, and the Thefacebook.com *de facto* partnership should be estopped from arguing that

Zuckerberg made no such promises, and that the Founders and their successor, ConnectU, were not damaged by his failure to honor such promises.

156.    Zuckerberg intentionally induced the Founders not to act by falsely representing the status of the Harvard Connection website and Zuckerberg's commitment to his promises.

157.    The Founders' reliance was reasonable.

158.    Zuckerberg broke his promises in the following independent ways: (1) by representing that the Harvard Connection website was complete, when it was not, (2) by failing to deliver the completed, functioning website for a December 2003 or January 2004 launch, or at all, as he promised to do, (3) by using the Founders' ideas described in Ex. 1a, for his own competing website and his own gain, after promising to keep them confidential, (4) by using the Harvard Connection Code for his own gain, either by incorporating it into the website or deriving a head start from the ideas underlying it, after promising to complete it for the Founders, (5) by using the code he said he wrote for Harvard Connection for his own website and his own gain, either by incorporating it into the website or deriving a head start from the ideas underlying it, or by not writing it at all, after promising to write it for the Founders, (6) by revealing the Founders' confidential ideas to unauthorized third parties, after promising to keep them confidential, (7) by working on or for a competing website, after promising to complete the Harvard Connection website and to act as the Founders' partner, (7) by failing to act as a partner, after promising to do so, (8) by failing to provide the Founders with the benefit of his ideas and expertise to improve the Harvard Connection website, after promising to do so, and (9) by doing all of the above after promising to act as a Harvard Connection development team partner.

159.    The Founders' reliance on Zuckerberg's unfulfilled promises caused and is causing injustice and damages.  Specifically, the Founders did not receive from Zuckerberg a

completed website, as he promised, were unable to launch the Harvard Connection website because of his broken promises, lost the first mover advantage because Zuckerberg broke his promises and launched his own website incorporating the Founders' ideas, and did not receive the benefit of his expertise, which he promised to provide as their partner. Such damages at least equal the value of the website facebook.com, which would not exist but for Zuckerberg's broken promises.

<strong>Promissory Estoppel Claim Against Facebook, Inc.</strong>

160.    Facebook, Inc. is liable to the extent Zuckerberg is liable under this promissory estoppel claim, under the doctrine of successor liability, for the reasons set forth in ¶¶ 16-22.

<strong>Promissory Estoppel Claim Against TheFacebook LLC</strong>

161.    TheFacebook LLC is liable to the extent Zuckerberg is liable under this promissory estoppel claim, under the doctrine of successor liability, for the reasons set forth in ¶¶ 16-22.

<strong>FIFTH CLAIM FOR RELIEF</strong><br>
<strong>Breach of Fiduciary Duty Under Massachusetts Common Law</strong><br>
<strong>Asserted by ConnectU, Inc., or by Cameron Winklevoss, Tyler Winklevoss, and Divya</strong><br>
<strong>Narendra, Against Zuckerberg, Facebook, Inc., and TheFacebook, LLC</strong>

162.    Plaintiffs repeat and reallege each and every allegation set forth in this Amended Complaint.

163.    This claim for breach of fiduciary duty is asserted against Zuckerberg by ConnectU, Inc. This claim involves damage to property and is a mixed tort/contract claim, and therefore was assignable by the Founders to ConnectU, LLC. In the alternative, if the assignment to ConnectU LLC from the Winklevoss twins and Narendra, as outlined in ¶ 5 above, was ineffective for any reason, this claim is asserted against Zuckerberg by Cameron and Tyler Winklevoss and Divya Narendra, personally.

### Claim Against Defendant Zuckerberg

164.    To plead a claim for breach of fiduciary duty under Massachusetts law, ConnectU must allege: (1) the existence of a duty that is fiduciary in nature, (2) a breach of that duty, (3) damages, (4) proximately caused by the breach.  As detailed below, ConnectU alleges facts sufficient to support each of these elements.

165.    The course of conduct described in detail in ¶¶ 45-88, 102-147, in the First and Third Claims for Relief demonstrate the special relationship between the Founders and Zuckerberg.  The Founders were not programmers, and Zuckerberg had special expertise in that area.  He was the only member of the team with such expertise, and he knew it.  The Founders therefore relied exclusively and entirely on Zuckerberg to finish the code and the website, and trusted Zuckerberg to do so, without direct supervision, for a December 2003 launch.  Zuckerberg controlled if and when the Harvard Connection website would be completed or launch.  Zuckerberg knew that the Founders would so rely on his special expertise and controlling role, and that he would work independently to complete the Harvard Connection website.  Zuckerberg therefore owed a fiduciary duty to the Founders.

166.    Zuckerberg intended to and in fact associated in a partnership or a joint venture to develop, launch, manage, and control the Harvard Connection enterprise, and the Founders viewed him as such.  (Ex. 81, C006956 which describes the team as Cameron and Tyler Winklevoss, Divya Narendra, and Mark Zuckerberg).  Accordingly, Zuckerberg, Divya Narendra, Cameron Winklevoss, and Tyler Winklevoss were either partners in the Harvard Connection *de facto* partnership or joint venturers.

167.    As a partner or joint venturer, and/or because of his special duty to the Founders, Zuckerberg owed a fiduciary duty to the Founders, namely, he had a duty to maintain the

confidentiality of the Harvard Connection ideas, as described in Ex. 1a, to complete and launch the Harvard Connection website by late 2003 or early 2004, to use his best efforts to support and further the goals of the Founders, to act as a partner, and to refrain from participating in a competing venture.

168.    Zuckerberg's actions as described above constitute breach of fiduciary duty under Massachusetts law.

169.    Zuckerberg breached his fiduciary duty in the following ways: (1) by failing to complete and launch the Harvard Connection website; (2) by failing to provide the benefit of his ideas and expertise to improve the Harvard Connection website; (3) by using the Harvard Connection ideas to launch a competing website; (4) by disclosing the Harvard Connection ideas to his co-Defendants; (5) by launching a competing website; and (6) by failing to act as the Founders' partner.  Such breaches damaged the ConnectU or the Founders.  Such damages at least equal the value of the facebook.com website, which would not exist but for Zuckerberg's breach.

### Breach of Fiduciary Duty Claim Against Defendant Facebook, Inc.

170.    Facebook, Inc. is liable for the breach of fiduciary duty committed by Zuckerberg, under the doctrine of successor liability, for the reasons set forth in ¶¶ 16-22.

### Breach of Fiduciary Claim Against Defendant TheFacebook LLC

171.    TheFacebook LLC is liable for the breach of fiduciary duty committed by Zuckerberg under the doctrine of successor liability, for the reasons set forth in ¶¶16-22.

### SIXTH CLAIM FOR RELIEF
**Unjust Enrichment Under Massachusetts Common Law**
**Asserted by ConnectU, Inc. Against All Defendants**

172.    Plaintiff repeats and realleges each and every allegation set forth in this Amended Complaint.

## Claim Against Defendant Zuckerberg

173.    The facts set forth below are set forth in greater detail in ¶¶ 45-88, 102-147 of the First and Third Claims for Relief.

*Elements of the Claim*

174.    To plead a claim of unjust enrichment under Massachusetts law, ConnectU must allege that: (1) a benefit was conferred upon the defendant by the plaintiff, (2) the defendant appreciated and understood the benefit, (3) the acceptance and retention of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value, and (4) the absence of a remedy at law. As detailed below, ConnectU alleges facts sufficient to support each of these elements.

*Summary of the Facts*

175.    In December 2002, the Founders came up with a great idea: to bring the concept of a social and professional directory, and networking website to the college level, starting with Harvard University, where they were juniors at the time. The site was to be called Harvardconnection.com and was later renamed connectu.com.

176.    In early November 2003, the Founders asked Zuckerberg to join with them as a team member to launch and market the site as quickly as possible.

177.    They disclosed to him the core ideas for the site, as well as its details, as described in ¶¶ 53-59, 62, 64-66, 68, 70, 75, 77, 79. The also gave him a copy of the Harvard Connection Code and the incomplete Harvard Connection website, which showed the nature of the site.

59

Zuckerberg enthusiastically agreed, and joined the Founders as a team member to complete and manage the site. As part of his role, Zuckerberg promised to complete the site.

178.    Beginning on November 22, 2003, Zuckerberg sent the Founders a series of emails saying he had essentially completed the website and offering suggestions for the improving of the site. These e-mails are described in detail in ¶¶ 62-63, 68-69, 71, 78.

179.    Although the Founders were sending Zuckerberg their ideas for the website and soliciting his input, beginning in mid-December 2003 he dodged their efforts to meet with him to see his progress.

**Defendants' Unjust Enrichment Begins**

180.    Beginning in mid-December 2003, Zuckerberg, together with Moskovitz, Saverin, and McCollum, began to develop thefacebook.com which embodied the features described in ¶ 36. Zuckerberg did not tell the Founders he was developing a competing site with the same features as Harvard Connection, which he had learned from the Founders.

181.    Although the Founders met with Zuckerberg three times between November 26, 2003 and January 14, 2004 regarding his work on the site, he never showed them his work, yet continued to assure them that he was working diligently to complete his work on the Harvard Connection website.

182.    The last meeting was on January 14, 2004, during which Zuckerberg again repeated to the Founders that he was on board and was working to complete the website.

183.    What he did not tell them at that meeting, or at any other time, was that he had started developing a competing website about a month earlier using their ideas.

**Thefacebook.com Launches and Grows Virally in Users and Value**

184.    On February 4, 2004, Zuckerberg, with the help of McCollum, Moskovitz, and Saverin, launched a website called thefacebook.com. The website stole the Founders' ideas for the Harvard Connection website. When it launched, thefacebook.com had substantially all the features as the Harvard Connection website, as described in ¶ 35.

185.    Defendants admitted in ¶16 of the Answer and Counterclaims that "there may be a first mover advantage with respect to certain websites." With respect to Internet websites, the first to enter a market has a substantial advantage. Part of the Founders' idea, which they entrusted to Zuckerberg, was the timing of the launch of the Harvard Connection website. They expected a first mover advantage, which would result in viral growth and success for the Harvard Connection website.

186.    This viral growth proved to be true. As a result of being the first to enter the college market, the traffic and number of users on thefacebook.com increased with unbelievable speed. Within days of launch, over 65% of the student population at Harvard had become members of thefacebook.com. As of March 2004, thefacebook.com already had 15 million page views a month and that number was necessarily an estimate because the traffic was growing "exponentially." (Ex. 54, FACE000122-23). Within two months after launch, thefacebook.com had expanded to thirteen schools, including the entire Ivy League. (Ex. 55, FACE000166-168). Thefacebook.com was gaining so much momentum that on March 5, 2004 (one month after launch), the *Stanford Daily* wrote "Classes are being skipped. Work is being ignored. Students are spending hours in front of the computer in utter fascination. Thefacebook.com craze has swept through campus." (Ex. 56, C005743-46).

187.    The growth of thefacebook.com continued at an astounding rate. In December of 2004, the website celebrated its one millionth member. (Ex. 4 at ¶35). As of May 2005, after its

first fourteen months of operation, thefacebook.com went from zero users to a reported 2.6 million registered users, operating at 640 of 1400 U.S. colleges and universities, with 50% to 90% market penetration at such schools. (Ex. 56b ). On February 7, 2005, facebook.com launched at the first European colleges. (Ex. 56c). On September 2, 2005, facebook.com expanded to high schools. (Ex. 56c). On September 11, 2006, facebook.com became open to all users. (Ex. 56d).

188.    As of July 2007, the website had the largest number of registered users among college-focused sites, with over 30 million members worldwide. (Ex. 56e). In June 2007 it was ranked between top 10–20 websites, and was the number one site for photographs in the United States. (Ex. 56f; Ex. 56g). It is also the seventh most-visited site in the United States. (Ex. 56h). Facebook.com caught on so rapidly and spread so quickly that it was impossible for the Founders and ConnectU to catch up. This immense base of users was a benefit that should have gone to the Founders and ConnectU, but instead was received by Zuckerberg, his co-Defendants, and their successors, Facebook, Inc. and TheFacebook LLC, which they appreciated, accepted, and retained.

189.    Since the launch of thefacebook.com, its value has increased at a staggering rate. Numerous news reports suggest that Microsoft has offered $6 billion for Facebook. (Ex. 56i). Facebook's own documents indicate that they have received at least REDACTED in financing (Ex. 56a, FBMA0000012) and that on REDACTED of Facebook. (Ex. 56a, FBMA00000026).

*Defendants' Unfair Benefits*

190.    Being the first mover also allowed thefacebook.com to obtain advertising that should have otherwise belonged to the Founders and ConnectU. For example, thefacebook.com

attracted advertisers that were looking to reach the Ivy League demographic. (Ex. 56j, FACE000130-31). Those advertisers were unlikely to pay for ads on both thefacebook.com and connectu.com. Getting the first crack at advertisers hoping to appeal to college students was a benefit that should have gone to the Founders and ConnectU, and instead was received by Zuckerberg, his co-Defendants, and their successors, Facebook, Inc. and TheFacebook LLC, which they appreciated, accepted and retained.

191.    Zuckerberg unfairly benefited from full access to everything relating to the Harvard Connection website, which was confidential information,  first and foremost, the core ideas, without which facebook.com would never have existed; second, the business plan including the plans for expansion, which Defendants adopted as their own despite acknowledging that this had been the Founders' plan (Ex.58, July 1, 2004 Letter from Zuckerberg's counsel which described the idea as being expanded to "10 or 15 elite schools"; Ex. 76 in which Cameron Winklevoss indicates that the Founders were planning on expanding to all colleges and universities); third, the incomplete Harvard Connection website, which was a roadmap for creating thefacebook.com; fourth, the Harvard Connection Code, which Zuckerberg either copied or used as a head start for designing his own website, or both; and fifth, the code Zuckerberg said he wrote for Harvard Connection, which he never delivered and instead used for thefacebook.com.

192.    By misleading the Founders, and therefore ensuring that thefacebook.com was launched first, Zuckerberg obtained an unfair and unjust advantage. By using the Harvard Connection ideas to create and launch thefacebook.com, Zuckerberg used information confidentially given or acquired to his own advantage, at the expense of the Founders, who were tricked into disclosing the information by Zuckerberg's representations that he would complete,

and that he did in fact complete, the Harvard Connection website, as set forth in ¶¶ 55-80. But for Zuckerberg's access to and theft of the Harvard Connection ideas, thefacebook.com would not exist. But for Zuckerberg's defection from the Harvard Connection development team, facebook.com would be known today as connectu.com and the Founders and Zuckerberg would be sharing the rewards that Defendants are unjustly enjoying instead.

193.    The Founders were shocked at Zuckerberg's duplicity and thievery, and sent him a cease and desist letter on February 10, 2004. On March 2, 2004, the Founders filed a Complaint against Zuckerberg with the Harvard Administrative Board, charging that Zuckerberg violated the Harvard Honor Code. On September 2, 2004, ConnectU LLC filed a Complaint , against Zuckerberg in this Court. Therefore, Zuckerberg has absolutely no reason to be unaware of the unfair and unjust benefit that has been conferred on him, and of the benefit that the Founders have been deprived of. Despite this knowledge, he has continued to retain this benefit.

194.    As a result of the conduct described above, Zuckerberg has been and will be unjustly enriched at the expense of the Founders and ConnectU. Zuckerberg's duplicitous, unfair, and illegal actions as described above have enabled him, along with McCollum, Moskovitz, and Saverin, and their corporate successors, to launch and operate thefacebook.com, using the ideas, business plans, unfinished website, and source code that were not rightfully theirs.

195.    Zuckerberg's unjust enrichment exceeds the damages resulting from his breach of the agreement to deliver the completed Harvard Connection website. Specifically, he gained all the information he needed to create and launch an unbelievably valuable website, as described in ¶¶ 26, 38, 40, 186-193.

196.    The benefits of launching and operating a social and professional directory, and networking website for the college community, which have proved to be enormously valuable, should have accrued to the Founders and ConnectU, not Zuckerberg.

***Willfulness and Damages***

197.    Zuckerberg's actions described above have at all times relevant to this action been willful and/or knowing.  Specifically, Zuckerberg knew that his theft and deception, as described above, would result in his being unjustly enriched, and in his gaining a benefit that was not rightfully his.

198.    As a direct and proximate result of Zuckerberg's actions alleged above, the Plaintiff has no adequate legal remedy (unjust enrichment is being pled in the alternative to any claim in which a legal remedy exists), has been irreparably injured (i.e., it lost the first mover advantage, the fame and reputation that Zuckerberg now enjoys, and the expertise that Zuckerberg's participation would have provided), and has suffered monetary damages in an as yet undetermined amount, and it is inequitable for Zuckerberg to retain the benefit conferred on him by the Founders without repayment of its value.

199.    Zuckerberg should be required to disgorge this unjust enrichment.

**Difference Between Unjust Enrichment and Copyright Claim**

200.    The unjust enrichment claim covers subject matter beyond copyright.  Namely, Zuckerberg's unjust enrichment is grounded in the theft of ideas and business plans, as set forth in Ex. 1a, which are not eligible for copyright protection.  Zuckerberg also has alleged that he owns the copyright in any code he created for the Harvard Connection website.  (Ex. 50, FACE002570-71).  Thus, Zuckerberg claims that he obtained the ownership of code he promised to write for Harvard Connection and the Founders.  The issue of the ownership of such code and

65

whether it unjustly enriched Zuckerberg is not preempted. Zuckerberg was also unjustly enriched by his access to the Harvard Connection website, either because he copied it, or because he learned uncopyrightable ideas from it, and therefore obtained a head start on the development of his own website. The unjust enrichment claim also contains extra elements not contained in the copyright claim, namely, the injustice element of reaping rewards that others have sown, and the quasi contract element, i.e., a contract implied in law. Zuckerberg's unjust enrichment results from the fact that he knowingly misled the Founders to gain extremely valuable benefits, as set forth in ¶¶ 101-148. Even with respect to the source code, the difference between this claim and the copyright claim is Zuckerberg's passing off the Founders' code or the ideas embodied therein, as his own. Therefore, the unjust enrichment claim is not preempted by the copyright claim.

### Unjust Enrichment Claim Against Defendant Facebook, Inc.

201.    Facebook, Inc. has been unjustly enriched by Zuckerberg's actions as described in ¶¶ 175-201, to the detriment of the Founders and ConnectU.

202.    Facebook, Inc. should be required to disgorge this unjust enrichment.

203.    While Facebook, Inc. has been unjustly enriched in its own right, it should also be held liable under the doctrine of successor liability, as explained above in ¶¶ 16-22.

### Unjust Enrichment Claim Against Defendant TheFacebook, LLC

204.    TheFacebook LLC has been unjustly enriched by Zuckerberg's actions as described in ¶¶ 175-201, to the detriment of the Founders and ConnectU.

205.    TheFacebook LLC should be required to disgorge this unjust enrichment.

206.    While TheFacebook LLC has been unjustly enriched in its own right, it should also be held liable under the doctrine of successor liability, as explained above in ¶¶ 16-22.

66

## Unjust Enrichment Claim Against Defendant McCollum

207.    McCollum and Zuckerberg were classmates during the 2003-2004 school year, were both computer science majors, and were partners in a computer science class on operating systems. (Ex. 59, FBCA000517-18). McCollum is frequently cited in the media as being a co-founder of Facebook.

208.    Although documents identifying McCollum's role in the company and agreements he has with the company have been requested, to date ConnectU has not received such documentation.

209.    McCollum was instrumental in the development and launch of thefacebook.com, particularly in developing the graphics to be used on the site. For example, the day before the launch of thefacebook.com (on February 3, 2004), McCollum sent an e-mail to Zuckerberg about the look and feel of thefacebook.com website and sent Zuckerberg a proposed logo. (Ex. 60, FACE002069-70). McCollum was developing thefacebook.com website at exactly the same time that his roommate, Zuckerberg, was telling the Founders, falsely, that he was completing the Harvard Connection website. McCollum surely knew this and participated in Zuckerberg's wrongdoing.

210.    McCollum was also involved in operating and running thefacebook.com prior to incorporation, as a partner of Thefacebook.com *de facto* partnership, and benefited from that involvement during that period.

211.    On February 10, 2004, Zuckerberg forwarded an e-mail to McCollum from Cameron Winklevoss, which identified the allegations against Zuckerberg. (Ex. 29, FACE002246). Therefore, McCollum must have been aware of Zuckerberg's wrongdoing, and the tainted pedigree of thefacebook.com.

212. On May 6, 2004, Zuckerberg asked McCollum not to discuss his involvement with the site, and suggested that should anyone ask he should respond with something funny, such as "Executive Rockstar." (Ex. 61, FACE002239). Due to Zuckerberg's and McCollum's secrecy, the full extent of McCollum's role in thefacebook.com is not yet known.

213. On May 22, 2004, Zuckerberg complained to the Harvard Administrative Board that information about his wrongdoing had entered the "public sphere" and that "e-mails have circulated on house lists, *Crimson* newstalk and campus group lists (like crew, for example)." (Ex. 62, FBCA028906). Therefore, McCollum must have been aware of Zuckerberg's wrongdoing, and the inauspicious beginnings of thefacebook.com.

214. At least as early as February 10, 2004 (and probably earlier), McCollum was aware that thefacebook.com was accused of being the fruits of a poisonous tree. Despite that knowledge, McCollum continued his involvement with thefacebook.com, as one of its founders and partners.

215. At some point after the launch of thefacebook.com, McCollum invested at least REDACTED in Facebook. (Ex. 63, TFB002344-45). McCollum also has been, and upon information and belief is currently, a stockholder in Facebook, Inc. McCollum has been, and upon information and belief, still is involved with the operations of Facebook. McCollum has been and will be unjustly enriched by all of the benefits conferred upon him, such as an ownership interest in Facebook, Inc.'s value, because of his involvement. This value rightfully belongs to ConnectU.

**Unjust Enrichment Claim Against Defendant Moskovitz**

216.    Moskovitz and Zuckerberg were roommates during the 2003-2004 school year. (Ex. 64, FACE0001178-79). Moskovitz is frequently cited in the media as being a co-founder of Facebook.

217.    Although documents identifying Moskovitz's role in the company and agreements he has with the company have been requested, to date ConnectU has not received such documentation. However, documents from *Facebook, Inc. v. Saverin* indicate that Moskovitz was brought on board to fulfill a programming and management role, and was made a 5% owner of the informal partnership that existed at that time. (Ex. 4 at ¶14). They also state that Moskovitz formed TheFacebook LLC with Zuckerberg and Saverin on or about April 13, 2004 (Ex. 3 at ¶10), and later Moskovitz incorporated TheFacebook, Inc. with Zuckerberg on July 29, 2004. (*Id.* at ¶15).

218.    At least as early as December 22, 2003, a computer that was identified by Defendants as belonging to Moskovitz contained a folder labeled "Facebook" (see ¶ 125) and code files called "courseparse" and "coursename". Moskovitz was developing thefacebook.com code at exactly the same time that his roommate, Zuckerberg, was telling the Founders, falsely, that he was completing the Harvard Connection website. Moskovitz surely knew this and participated in Zuckerberg's wrongdoing.

219.    Moskovitz was instrumental in the development and launch of thefacebook.com. According to his current facebook.com bio, Moskovitz "has been instrumental in the company's growth and development since its inception." (Ex. 65). The company's inception was in mid-December 2003 (see ¶ 35, 72, 119, 125, 127). Moskovitz was involved in operating and running thefacebook.com prior to the incorporation, as a partner of Thefacebook.com *de facto* partnership, and benefited from that involvement during that period.

220.    The day of the launch of thefacebook.com (on February 4, 2004), Moskovitz sent

promotional emails to students at Harvard, announcing the launch of thefacebook.com. (Ex. 64,

FACE001179). Moskovitz was actively involved in developing and expanding the site. In his

role as part owner, he regularly corresponded with Zuckerberg about ideas for the site and was in

charge of expansion and growth of the site. In fact, according to a Harvard *Crimson* article on

February 24, 2005: "Tensions ran high this summer when Zuckerberg decided to reapportion

ownership of the company, increasing Moskovitz's share to match the work he put in. The rest

of the team was shocked, but Zuckerberg says it was only fair: **he says TheFacebook is just as**

**much the overlooked Moskovitz's project as it is his own.**" (Ex. 66) (emphasis added).

Moskovitz was conferred a benefit from his involvement, as his ownership percentage was

increased.

221.    In May 2004, Zuckerberg complained to the Harvard Administrative Board that

information about his wrongdoing had entered the "public sphere" and that "e-mails have

circulated on house lists, *Crimson* newstalk and campus group lists (like crew, for example)."

(Ex. 62). Therefore, Moskovitz must have been aware of Zuckerberg's wrongdoing, and the

inauspicious beginnings of thefacebook.com.

222.    At least as early as May 2004 (and probably earlier), Moskovitz was aware that

thefacebook.com was accused of being the fruits of a poisonous tree. Despite that knowledge,

Moskovitz continued his involvement with thefacebook.com.

223.    Moskovitz is currently identified on the facebook.com website as the "Co-

Founder and Vice President of Product Engineering at Facebook, where he manages the resource

allocation for engineering and oversees the architecture of the site. He is also responsible for the

company's mobile strategy and development." (Ex. 65). Moskovitz has invested at least

REDACTED in Facebook. (Ex. 63, TFB002344-45). Moskovitz has been, and upon information and belief, is a manager and a stockholder in Facebook. (Ex. 67, TFB002347-48). Moskovitz has been and will be unjustly enriched with all of the benefits conferred upon on him, such as an ownership interest in Facebook, Inc's value and the management and control of a successful business, because of his involvement with facebook.com. This value rightfully belongs to ConnectU.

### Unjust Enrichment Claim Against Defendant Saverin

224.    Saverin and Zuckerberg were good friends and fraternity brothers during the 2003-2004 school year. Saverin is frequently cited in the media as being a co-founder of Facebook.

225.    Although documents identifying Saverin's role in the company and agreements he has with the company have been requested, to date ConnectU has not received such documentation. However, Saverin and Facebook, Inc., TheFacebook LLC, and Zuckerberg are involved in a pending lawsuit to determine Saverin's equity in the company. Discovery of this lawsuit has thus far been blocked. However, documents obtained independently by Plaintiff from *Saverin* indicate that Saverin originally had a 1/3 share in the informal partnership that later became Facebook, Inc. (Ex. 4 at ¶11). Saverin, according to the pleadings, is asserting that he is entitled to a 30% stake in the business. (Ex. 3 at ¶1).

226.    At least as early as January 2004, Saverin was working on a project with Zuckerberg that was to become thefacebook.com. (Ex. 4 at ¶11). At that point, Saverin and Zuckerberg reached an oral agreement about the parties' respective ownerships rights and Saverin invested $1,000 in the website. (*Id.* at ¶12)

227.    Saverin was instrumental in the development, control, and launch of thefacebook.com, particularly in securing advertising and financing for the website. Two days before launch of the website (February 2, 2004), Zuckerberg emailed Saverin and said "let me know what needs to be changed." (Ex. 68, FACE004678). As early as May 2004, Zuckerberg referred to Saverin as "our CFO." (Ex. 69, FACE00076-77). Saverin himself stated that he "became one of the founders of Thefacebook" and that he focused "on the business side of Thefacebook." (*See* Defendant Saverin's Memorandum in Opposition to Plaintiff's Motion to Compel Production of Documents in Response to Requests No. 42, 44-46, 70-71, 85-96, 98-105, 107-110, 113, and 169, R.A. Dkt. 75 at 2). Saverin was investing in thefacebook.com and participated in its business issues at exactly the same time that Zuckerberg was telling the Founders, falsely that he was completing the Harvard Connection website. Saverin surely knew this and participated in Zuckerberg's wrongdoing. Saverin was involved in running thefacebook.com prior to incorporation, as a partner of TheFacebook.com *de facto* partnership, and benefited from that involvement during that period.

228.    Saverin was actively involved in developing and expanding thefacebook.com website in his role as part owner. He regularly corresponded with Zuckerberg about ideas for the site.

229.    On February 11, 2004, Zuckerberg informed Saverin that "we may have a legal issue." The legal issue that he was referring to was the allegations made by the Founders, as set forth in their cease and desist letter. (Ex. 70, FACE001360; Ex. 29a). Therefore, Saverin must have been aware of Zuckerberg's wrongdoing, and the inauspicious beginnings of thefacebook.com, at least as early as February 2004.

230.    Within the next few days, Zuckerberg and Saverin continued to correspond about the cease and desist letter from Cameron Winklevoss.  Zuckerberg told Saverin "make absolutely sure nobody else sees that email."  (Ex. 71, FACE000586).  Therefore, Saverin must have been aware of Zuckerberg's wrongdoing, and the tainted pedigree of thefacebook.com.

231.    At least as early as February 10, 2004 (and probably earlier), Saverin was aware that thefacebook.com was accused of being the fruits of a poisonous tree.  Despite that knowledge, Saverin continued his involvement with facebook.com.

232.    To the extent that Saverin is found to have an ownership interest in Facebook, Inc., Saverin will be unjustly enriched by the benefits conferred upon on him, because of his involvement with facebook.com.  To the extent that Saverin has already received any benefits from his previous ownership interest in any Facebook entity, he has already been unjustly enriched.  This value rightfully belongs to ConnectU.

233.    ConnectU's entitlement to the damages it seeks in this action is in direct conflict with Saverin's claims to 30% of the value of Facebook, Inc., which he seeks in the *Facebook, Inc. v. Saverin* case.

### Allegations Relating to McCollum, Moskovitz, and Saverin

234.    Zuckerberg's duplicitous, unfair, and illegal actions as described above enabled McCollum, Moskovitz, and Saverin to help Zuckerberg launch and operate thefacebook.com, using ideas, business plans, and source code that were not rightfully theirs, as set forth in detail in ¶¶ 181-199.  By helping launch thefacebook.com, they used information confidentially given to Zuckerberg or acquired by him, to their own advantage, at the expense of the Founders, who were tricked into disclosing the information.

235.    The benefits of launching and operating a social and professional networking directory, and networking website for the college community, which have proved to be enormously valuable, should have accrued to the Founders and ConnectU, not McCollum, Moskovitz, and Saverin.

236.    McCollum's, Moskovitz's, and Saverin's actions described above have at all times relevant to this action been willful and/or knowing.  Specifically, they were involved with Zuckerberg from the beginning, and knew his involvement with thefacebook.com would result in their being unjustly enriched.

237.    As a direct and proximate result of  McCollum's, Moskovitz's, and Saverin's knowing involvement with thefacebook.com, they have been unjustly enriched.  Plaintiff has no adequate legal remedy (unjust enrichment is being pleaded in the alternative to any claim in which a legal remedy exists), has been irreparably injured (i.e., it lost the first mover advantage), and has suffered monetary damages in an as yet undetermined amount, and it is inequitable for McCollum, Moskovitz, and Saverin to retain the benefit conferred on them.

238.    McCollum, Moskovitz, and Saverin should be required to disgorge this unjust enrichment.

239.    The unjust enrichment claim covers subject matter beyond copyright.  Namely, McCollum's, Moskovitz's, and Saverin's unjust enrichment stems from the theft of at least ideas and business plans, as set forth in ¶¶ 181-201, none of which are eligible for copyright protection.  The unjust enrichment claim also contains extra elements not contained in the copyright claim, namely, the injustice element of reaping rewards that others have sown, and the quasi contract element, i.e., a contract implied in law.  McCollum's, Moskovitz's, and Saverin's unjust enrichment results from their involvement in facebook.com despite their knowledge that

Zuckerberg knowingly misled the Founders to gain an extremely valuable benefit. Even with respect to the source code, the difference between this claim and the copyright claim is McCollum's, Moskovitz's, and Saverin's passing off the Founders' code or the ideas embodied therein as their own. Therefore, the unjust enrichment claim is not preempted by the copyright claim.

### Unjust Enrichment Claim Against Christopher Hughes

240. At this time, no claim of unjust enrichment is being asserted against Christopher Hughes ("Hughes"). Plaintiff recently **independently** discovered and obtained the docket of the ongoing litigation, *Facebook, Inc. v. Saverin*. The Second Amended Complaint (Ex. 3) and Cross Complaint (Ex. 4) in that action revealed that Hughes has never been an owner of any Facebook entity and appears not to have had access to source code. Although Plaintiff repeatedly requested information from Defendants about Hughes's equity, ownership, and involvement and even filed a motion to compel such information, it has not been produced to date (Plaintiff's First Request for Production of Documents, Request No. 104, which requests contracts between the individual Defendants and Facebook, Inc., and Request No. 107, which requests documents identifying the individual Defendants' equity, ownership, and shares in Facebook, Inc.; Plaintiff's Motion to Compel Documents Responsive to First Requests for Production, Civil Action No. 1:04-cv-11923 (DPW) Dkt. 68). Plaintiff wishes to reserve the right to name Hughes as a Defendant should Plaintiff later learn that his role is greater than currently believed.

### SEVENTH CLAIM FOR RELIEF
**Copyright Infringement**
**17 U.S.C. § 101 et seq.**
**Asserted by ConnectU, Inc. Against Defendants Zuckerberg, Facebook, Inc.,**

**TheFacebook, LLC, Moskovitz, and McCollum**

241.    Plaintiff repeats and realleges each and every allegation set forth in this Amended Complaint.

*Elements of the Claim*

242.    To plead a claim for copyright infringement under 17 U.S.C. § 101 *et seq.*, ConnectU must allege: (1) ownership of a valid copyright and (2) copying by the defendant. As detailed below, ConnectU alleges facts sufficient to support both of these elements.

## Claim Against Defendants Zuckerberg, Moskovitz, and McCollum

*Copyright Ownership*

243.    ConnectU LLC obtained assignments of all rights, title, and interest, including all copyright rights, from the three programmers who worked on the Harvard Connection Code before Zuckerberg, namely, Sanjay Mavinkurve, Joe Jackson, and Victor Gao. (Ex. 72, 73, 74).

244.    The Founders assigned to ConnectU LLC all of their own rights, title, and interest, including all copyright rights, in the Harvard Connection Code. (Ex. 1, C011285-C011335).

245.    ConnectU LLC registered the copyright in the Harvard Connection Code with the United States Copyright Office under Registration No. TXu 1-196-126. The effective date of registration was October 15, 2004. A true and correct copy of the certificate of copyright registration for the Harvard Connection Code is attached hereto as Ex. 75. This registration is *prima facie* evidence of the validity of the copyright and of the facts stated in the certificate. The Harvard Connection Code constitutes copyrightable subject matter.

246.    ConnectU LLC merged into ConnectU, Inc., which now owns all right, title, and interest, including all copyright rights, in the Harvard Connection Code (see ¶ 5).

247.    ConnectU, Inc. presently owns all right, title, and interest in all copyright rights covering the Harvard Connection Code.

### Zuckerberg's Access to the Harvard Connection Code

248.    In November 2003, Zuckerberg was given access to the Harvard Connection Code (see ¶ 58). Zuckerberg later admitted in his Answer to the Amended Complaint in Civil Action No.1:04-cv-11923 (DPW) that he "was given access to the HC [Harvard Connection] website source code as it existed in late 2003."

249.    The Harvard Connection Code to which Zuckerberg had access bore a copyright notice.

### The Code Zuckerberg Said He Wrote for Harvard Connection

250.    Zuckerberg's counsel stated in his February 11, 2004 email responding to Cameron Winklevoss's cease and desist email (see ¶ 82) that "any code created by Zuckerberg remains his property unless and until it has been assigned in writing. Assuming that you and your partners are interested in obtaining a right to use this code in connection with the HC [Harvard Connection] website, any settlement of your dispute with Zuckerberg will therefore need to deal with the legal disposition of these rights, either by assignment or license." (Ex. 50, FACE002570-71). Because Zuckerberg was a Harvard Connection development team partner when he wrote such code, such code was created by Zuckerberg as a work made for hire for the Harvard Connection Founders' *de facto* partnership, and therefore any copyright in such code is owned by ConnectU.

251.    Alternatively, Zuckerberg made no copyrightable contributions to the Harvard Connection Code.

### Co-Defendants' Involvement in the Infringement

252.   Moskovitz was and/or is involved with the coding of thefacebook.com website, as demonstrated in ¶ 125, 219.

253.   McCollum was and/or is involved with the graphic design of the facebook.com website, as demonstrated in ¶ 210.

254.   Because of their close association with Zuckerberg and their work on thefacebook.com code at the same time Zuckerberg was a Harvard Connection development team member, Moskovitz and McCollum also had access to Zuckerberg's copy of the Harvard Connection Code and/or the code Zuckerberg said he wrote for Harvard Connection (see ¶¶ 13, 125, 208-211, 217-220).

*Infringement*

255.   The fact that thefacebook.com website was, at launch, substantially similar to the Harvard Connection website and embodied the ideas and features of the Harvard Connection website, as described in Ex. 1a, is strong evidence that Zuckerberg, Moskovitz, and/or McCollum copied all or part of the Harvard Connection Code or the code Zuckerberg said he wrote for Harvard Connection, or created derivative works thereof, and incorporated such copies or derivative works into thefacebook.com code, in violation of 17 U.S.C. § 106(1) and/or (2).

256.   The fact that Zuckerberg claims that he wrote thefacebook.com code after January 14, 2004, and that he created thefacebook.com website in only two and a half weeks (Ex. 17), if true, is also strong evidence that Zuckerberg, Moskovitz, and/or McCollum copied all or part of the Harvard Connection Code or the code Zuckerberg said he wrote for Harvard Connection, or created derivative works thereof, and incorporated such copies or derivative works into thefacebook.com code, in violation of 17 U.S.C. § 106(1) and/or (2).  They could not have written such code from scratch, tested it, and launched it within such a short period of time

without copying all or part of the Harvard Connection code or the code Zuckerberg said he wrote for Harvard Connection.

257.    Without the Founders' permission, Zuckerberg, Moskovitz, and/or McCollum copied the code Zuckerberg said he wrote for the Harvard Connection website, or a derivative work thereof, by incorporating all or some such code in thefacebook.com website and facebook.com code, in violation of 17 U.S.C. § 106(1) and/or (2) (see ¶ 244-257).

258.    Without the Founders' permission, Zuckerberg, Moskovitz, and McCollum copied the copyrightable subject matter of the Harvard Connection Code, and/or created a derivative work thereof, and used it in the thefacebook.com code, in violation of 17 U.S.C. § 106(1) and/or (2).

***Defendants' Destruction of Evidence, or Failure to Preserve It***

259.    Defendants have not yet produced thefacebook.com website code from before launch, or at launch, nor have they produced the Harvard Connection Code that Zuckerberg allegedly programmed, and likely have either destroyed such code or failed to preserve it. ConnectU is entitled to an adverse inference that Zuckerberg, McCollum, and Moskovitz copied all or part of the Harvard Connection Code or the code Zuckerberg said he wrote for Harvard Connection, or created derivative works thereof, and incorporated such copies or derivative works into thefacebook.com code, in violation of 17 U.S.C. § 106(1) and/or (2).

***Willfulness and Damages***

260.    The actions of Zuckerberg, Moskovitz, and McCollum described above have at all times relevant to this action been willful and/or knowing.

261.    The Defendants' actions as described above constitute copyright infringement of the Harvard Connection Code, and/or of the copyright in the code Zuckerberg said he wrote for Harvard Connection, all of which copyrights are owned by ConnectU. As a direct and proximate result of the actions alleged above, Plaintiff has no adequate legal remedy, has been irreparably injured, and has suffered monetary damages in an as yet undetermined amount. Such damages at least equal the value of the facebook.com website.

### Copyright Infringment Claim Against Defendant Facebook, Inc.

262.    Facebook, Inc. is liable for the copyright infringement committed by Zuckerberg, Moskovitz, and McCollum, under the doctrine of successor liability, for the reasons set forth in ¶¶ 16-22.

### Copyright Infringement Claim Against Defendant TheFacebook, LLC

263.    TheFacebook LLC is liable for the copyright infringement committed by Zuckerberg, Moskovitz, and McCollum, under the doctrine of successor liability, for the reasons set forth in ¶¶ 16-22.

### EIGHTH CLAIM FOR RELIEF
#### Misappropriation of Trade Secrets
#### Massachusetts G.L. ch. 266, § 30(4) and ch. 93 § 42
#### Asserted by ConnectU, Inc. Against All Defendants

264.    Plaintiff repeats and realleges each and every allegation set forth in this Amended Complaint.

### Claim Against Defendant Zuckerberg

*Elements of the Claim*

265.    To plead a claim for trade secret misappropriation under Massachusetts law, ConnectU must allege: (1) the ownership of a trade secret, (2) that plaintiff took reasonable steps to protect that secret, (3) that defendant used improper means to acquire and use the trade secret

in breach of a duty of confidentiality and thereby gaining an unfair competitive advantage, and (4) causing damage.  As detailed below, ConnectU alleges facts sufficient to support each of these elements.

### ConnectU's Trade Secret

266.    The Harvard Connection ideas described in Ex. 1a, in combination, constitute a trade secret under Massachusetts G.L. ch. 93 § 42 and the definition of trade secret set forth in Massachusetts G.L. ch. 266, § 30(4).  The project of developing the Harvard Connection website was a secret, and the Founders intended that it would remain as such until the website launched.

267.    The Founders expended significant effort in both time and money to develop the trade secret before Zuckerberg joined the team.  The Founders and their programmers spent hundreds of hours developing and working on the secret website project before Zuckerberg became involved.

268.    The Harvard Connection trade secret was not easily acquired or duplicated by others.  For example, Facebook's own documents indicate that                REDACTED

REDACTED                     REDACTED

(Ex. 78, FBMA 0000102).  That the Harvard Connection idea was not easily duplicated by others is also demonstrated in part by the fact that no one else provided a website embodying the Harvard Connection ideas before thefacebook.com launched, and no one else has been able to compete effectively with thefacebook.com since it launched. (See Ex. 76, in which Victor Gao describes how thefacebook.com and the harvardconnection.com ideas are set apart from other websites.)  Thus, the Harvard Connection ideas gave the Founders an advantage over potential competitors, who did not know or use such combination.

269. No website containing all of the features described in Ex. 1a, existed before Harvard Connection and thefacebook.com.

*Reasonable Efforts Under the Circumstances to Protect the Secret*

270. The Founders took reasonable steps under the circumstances to maintain the secrecy of the Harvard Connection ideas described in Ex. 1a. For example, the Founders ensured that there was an agreement or understanding with each person to whom such information was disclosed that the information was confidential, and/or disclosed only a limited part of the information to each such person so that the details of the secret were maintained, and/or disclosed the information only under circumstances that assured that the necessary degree of secrecy would be maintained. This included Zuckerberg, who was told that the Harvard Connection project was confidential and he agreed to maintain it as such. Based on his knowledge and experience in the programming field, Zuckerberg should have also understood, independently, that the project and ideas were confidential.

271. The Founders and their representative, Gao, met with Zuckerberg in private places and under private circumstances, and were careful not to allow other people to hear their discussions. The Harvard Connection Code was password protected and only the Founders, Zuckerberg, and the programmers knew of its existence and location on the server. The Founders disclosed to Zuckerberg the information described in Ex. 1a. When Zuckerberg was originally given the Harvard Connection Code, this information was conveyed to him confidentially. (Ex. 11, FACE002618). Zuckerberg was given a unique login and password to access the Harvard Connection website. (Ex. 19, FACE002497).

*Zuckerberg Misled the Founders to Believe He Could be Trusted*

272.    Zuckerberg misled the Founders into believing that he could be trusted with such ideas, the website in its then-current state of development, and the Harvard Connection code.  As detailed in ¶ 107-108, 110-112, 114-116, 118, 120, 122-123, 129, 132-134, Zuckerberg made a series of statements that reasonably led the Founders to believe that he was acting as their partner and in their best interest, that he was working diligently to complete the Harvard Connection website and help them launch it in December 2003, and that he would maintain the confidentiality of the information with which he was trusted.

273.    In early November 2003, Zuckerberg agreed to join with the Founders as a Harvard Connection development team member to complete, launch, and market their website, as described in ¶¶ 53-60.  In addition to agreeing to complete the Harvard Connection website, Zuckerberg was involved with website development and business planning, and acted as a member of the Harvard Connection development team.  In that capacity, the Founders entrusted Zuckerberg with (1) the ideas for the Harvard Connection website project, (2) the incomplete website, screens, and user interfaces, and (3) the Harvard Connection Code, as more fully described in ¶¶ 58-59, 64-66, 67-70, 75-77.

274.    Zuckerberg then represented that he began to complete the Harvard Connection website.  On November 22, 2003, Zuckerberg emailed Narendra and said:  "I have most of the coding done, and I think that once I get the graphics we'll be able to launch this thing.  You should probably look over the searches and everything just to make sure I'm asking about the right criteria, but other than that it seems like everything is working.  I still have some last minute stuff to do but I'll send you a link later tonight when it's really in good shape and you can check it out tomorrow morning."  (Ex. 14).  This statement shows Zuckerberg's misappropriation.  He did not send the link he promised in this email and never delivered to the

Founders a Harvard Connection website in which "most of the coding" was "done", or in which "everything is working." Zuckerberg therefore must have kept such code for his own website. Nevertheless, such statements led the Founders to trust Zuckerberg.

275.    On November 25, 2003, Zuckerberg met with Cameron and Tyler Winklevoss in a private area of Harvard's Kirkland Dining Hall, and discussed the website and Zuckerberg's progress in completing it. As it was the beginning of Harvard's Thanksgiving break, there were no other students in the vicinity. Zuckerberg assured them that the Harvard Connection website was essentially complete but did not show them his work to date, despite their requests to see it. Zuckerberg's statements at such meeting show his misappropriation. Zuckerberg never delivered to the Founders a Harvard Connection website that was essentially complete. He must have kept the code for his own website. However, his statements further induced the Founders to share their ideas with him, and encourage his participation in team meetings.

*Zuckerberg Misappropriates the Founders' Secret Project*

276.    Over the course of the next couple weeks, Zuckerberg began to evade the Founders. However, at the time, the Founders reasonably believed Zuckerberg's excuses and did not suspect that he was not acting in their best interest, that he could not be trusted, that he was not working diligently to complete the Harvard Connection website and help them launch it quickly, or that he was working on his own website based on the harvardconnection.com ideas. Therefore, they kept sharing their ideas with him.

277.    Zuckerberg began working on thefacebook.com website around December 11, 2003, when he sent himself an email detailing his "early thought process" regarding functionality for the website. (Ex. 23).

84

278.    On December 18, 2003 at 11:00 a.m., Zuckerberg met for the second time with the Founders, in Zuckerberg's dorm room.  No one else was present at the meeting.  Again believing Zuckerberg was a team member, and trusting him, they discussed the Harvard Connection ideas described in Ex. 1a.

279.    At this time, Zuckerberg did not tell the Harvard Connection founders of his work on thefacebook.com website, which was well underway by this time, and withheld such material facts from them.  At this point in time, the Founders still believed Zuckerberg was part of the Harvard Connection development team, that they could trust him, that Zuckerberg was acting in their best interest, and that he was working diligently to complete the Harvard Connection website and help them launch it in December 2003.

280.    Moskovitz joined thefacebook.com development team no later than December 22, 2003, as evidenced by Facebook code found on his hard drive, bearing such date.  (See ¶ 219).

281.    Portions of thefacebook.com code existed at least as early as December 22, 2003 (see ¶ 219), which means that Zuckerberg was developing thefacebook.com website, which had the same features as the Harvard Connection website, at exactly the same time he was developing the Harvard Connection website.  He could not possibly develop his own competing website without using or incorporating the Harvard Connection ideas.

282.    By late 2003, Zuckerberg was incorporating the Harvard Connection ideas into his own website.  On December 29, 2003, register@thefacebook.com sent Zuckerberg a test email confirming his user registration for thefacebook.com website. (Ex. 38).  At this time, Zuckerberg did not tell the Harvard Connection founders of his work on thefacebook.com website, and fraudulently withheld such material facts from them.

283.    On January 8, 2004, Zuckerberg emailed Cameron Winklevoss, blaming school work for delays, when in fact he had been working on thefacebook.com website, and incorporating into it the Harvard Connection ideas described in Ex. 1a, instead of working on the Harvard Connection website. He said "Sorry it's taken me a while [sic] to get back to you. I'm completely swamped with work this week. I have three programming projects and a final paper due by Monday, as well as a couple of problem sets due Friday. I'll be available to discuss the site again starting Tuesday. As far as the site goes for now, I've made some of the changes, although not all of them, and they seem to be working on my computer. I have not uploaded them to the live site yet though. I'll do this once I get everything done. I'm still a little skeptical that <u>we</u> have enough functionality in the site to really draw the attention and gain the critical mass necessary to get a site like this to run. And in its current state, if the site does get the type of traffic <u>we're</u> looking for, I don't know if <u>we</u> have enough bandwidth from the ISP you're using to handle the load without some serious optimization, which will take a few more days to implement. Anyhow, we'll talk about it once I get everything else done." (Ex. 27) (emphasis added). At this time, Zuckerberg did not tell the Founders of his work on thefacebook.com website, and withheld such material facts from them. Nevertheless, such statements reinforced the Founders' trust of Zuckerberg.

284.    On January 14, 2004, Zuckerberg met with the Founders for the third and final time, in the Kirkland Dining Hall. As it was off-peak hours, there were no people in the vicinity. At that meeting, Zuckerberg told them that he would complete the site, but that he was working on other personal projects. He did not tell the Founders of his work on thefacebook.com website, and withheld such material facts from them. However, at the time, the Founders still reasonably believed that Zuckerberg was acting in their best interest, and hoped to get him back

on track to complete the Harvard Connection website and help them launch it within a short period of time. Therefore, they continued to discuss the secret project with him.

285.    Although Zuckerberg stopped working on Harvard Connection, he misled the Founders into believing he was still onboard. Zuckerberg later confided his actions to a friend: "Remember those guys I was supposed to be making that dating site for? Well, I stopped working on it [the Harvard Connection website] but never really told them about it." (Ex. 28).

286.    On January 19, 2004, believing that Zuckerberg was still a Harvard Connection website development team partner, Cameron Winklevoss emailed Zuckerberg, providing ideas for the website and asking Zuckerberg's advice regarding a design issue. (Ex. 46). At this time, Zuckerberg did not tell the Founders of his work on thefacebook.com website, and he did not respond to Cameron Winklevoss's email.

### Defendants Launch Thefacebook.com

287.    On February 4, 2004, Zuckerberg, Moskovitz, McCollum, and Saverin launched a directly competitive website, thefacebook.com, which incorporated the Harvard Connection ideas described in Ex. 1a, misappropriated the Founders' trade secrets, and usurped their extraordinarily valuable business opportunity.

288.    On February 12, 2004, Zuckerberg acknowledged his duty of confidentiality to the Founders, stating that "In response to your email, I would like to let you know that I have no intention of disclosing your work product, any of your ideas, or your demands." (Ex. 17).

289.    Moskovitz, McCollum, and Saverin were closely associated with Zuckerberg and collaborated with him to launch thefacebook.com website. Zuckerberg disclosed the Harvard Connection ideas to them, as evidenced by the fact that the website they launched together embodies those ideas. Thus, Moskovitz, McCollum, and Saverin received and used such ideas.

Some of the Harvard Connection ideas involved website design and features (see Ex. 1a), which are the areas of thefacebook.com website development in which Moskovitz and McCollum were involved. Some of the Harvard Connection ideas involved business issues (see Ex. 1a), which is the area of thefacebook.com website development in which Saverin was involved. Moskovitz, McCollum, and Saverin therefore participated in Zuckerberg's misappropriation, acquired and used the Harvard Connection ideas through Zuckerberg, and knowingly benefited from such use, based on knowledge acquired no later than the dates set forth in ¶¶ 13, 210, 211, 219, 227, 228, 281, 282.

**Defendants' Benefits from the Misappropriation**

290.    As described in detail in ¶¶ 273-287, Zuckerberg used improper means to obtain the Founders' secret ideas and plans. Zuckerberg induced the Founders to share the Harvard Connection ideas and plans with him, by convincing them that he was an active, willing, and loyal member of their team. In reality, he was working solely for the benefit of his own commercial enterprise on a directly competitive website. But for Zuckerberg's misappropriation and breach of his agreement to maintain the confidentiality of the Harvard Connection ideas, harvardconnection.com would have been first in the market and Zuckerberg would be at the Founders' side, sharing the benefits of the site with them.

291.    Zuckerberg must have a gotten a head start from the Founders' work product because he claims to have created thefacebook.com website in only two and a half weeks time, and that he didn't even start working on thefacebook.com until after his January 14, 2007 meeting with the Founders. (Ex. 17). Since Zuckerberg claims to have conceived, planned, developed, tested, and launched thefacebook.com in two and half weeks, he must have benefited from the secret Harvard Connection project and ideas.

*Willfulness and Damages*

292.    Zuckerberg's, Moskovitz's, McCollum's, and Saverin's actions described above have at all times relevant to this action been willful and/or knowing, thereby allowing the Court to award multiple or exemplary damages to the Plaintiff under M.G.L. c. 93, § 42.

293.    As a direct and proximate result of Zuckerberg's actions alleged above, Plaintiff has been irreparably injured (i.e. the loss of a valuable business opportunity due to the use of the Harvard Connection ideas to launch a competitive website, resulting in the loss of the first mover advantage and the viral growth resulting from the network effect in the college market (see ¶¶ 26, 38, 40, 186-193), and has suffered monetary damages in an as yet undetermined amount. Such damages at least equal the value of the facebook.com website, which would not exist but for Zuckerberg's misappropriation.

### Trade Secret Misappropriation Claim Against Defendant Facebook, Inc.

294.    Facebook, Inc. is liable for the misappropriation of trade secrets under the doctrine of successor liability, for the reasons set forth in ¶¶ 16-22.

### Trade Secret Misappropriation Claim Against Defendant TheFacebook, LLC

295.    TheFacebook LLC is liable for the misappropriation of trade secrets under the doctrine of successor liability, for the reasons set forth in ¶¶ 16-22.

### NINTH CLAIM FOR RELIEF
### Breach of Massachusetts Unfair Trade Practices Statute
### Mass. G.L. ch. 93A, §2 and 11, Asserted by ConnectU Against Zuckerberg, Facebook, Inc., TheFacebook LLC, Moskovitz, McCollum, and Saverin

296.    Plaintiff repeats and realleges each and every allegation set forth in this Amended Complaint, insofar as such allegations are consistent with this claim.

### Claim Against Defendant Zuckerberg

*Elements of the Claim*

297. To plead a claim under MGL 93A § 2 and § 11, ConnectU must allege: (1) the defendant engaged in unfair methods of competition and unfair or deceptive acts or practices, (2) in the conduct of trade or commerce, (3) that both parties were engaged in trade or commerce, (4) the acts occurred primarily and substantially in Massachusetts, (5) the plaintiff suffered a loss of money or property as a result of defendant's unfair or deceptive acts or practices. As detailed below, ConnectU alleges facts sufficient to support each of these elements.

298. This claim is pleaded in the alternative to any claim in which ConnectU is required to prove that Zuckerberg was a partner or employee of the Founders.

***The Harvard Connection De facto Partnership Was a Commercial Enterprise***

299. At all relevant times, the Founders were engaged in trade or commerce within the meaning of M.G.L. ch. 93A, § 1, to develop, launch, and operate the Harvard Connection Website. Early emails indicate that the Founders were always pursuing Harvard Connection as a business pursuit. (*See* Answer and Counterclaims, Counterclaims ¶¶ 20 & 46; Ex. 81, C004793; Ex. 82, C006957).

300. The Founders intended to profit from this business endeavor, as shown by the email exchange described in ¶¶ 53, 65, 70, 74, 76-77. For example, Narendra emphasized to Zuckerberg that working to develop the Harvard Connection website would be a "really rewarding experience, especially if you have an entrepreneurial personality," and explained to Zuckerberg that the Founders needed to talk to Zuckerberg to "discuss strategy in terms of a roll out and marketing, etc." (Ex. 9, C004632-33; Ex. 82, C004642).

301. Facebook Defendants admitted in their Pre-Hearing Statement filed on October 23, 2006 in Civil Action No. 1:04-cv-11923 (DPW) in the U.S. District Court for the District of Massachusetts (Dkt. 251 at 2) that "Cameron Winklevoss, Tyler Winklevoss, and Divya

Narendra formed Harvard Connection, later known as ConnectU, to attempt to found a business for profit." Zuckerberg's counsel, Stenshoel, also acknowledged the Founders' business plan to roll out the website to other colleges. (Ex. 58).

### Zuckerberg and TheFacebook.com De Facto Partnership Were Commercial Enterprises

302.    Beginning no later than mid-December 2003, Zuckerberg was also engaged in trade or commerce within the meaning of M.G.L. ch. 93A, § 1, to develop, launch, and operate thefacebook.com website. Defendants admitted in their Counterclaims in the Related Action that Facebook, Inc. was engaged in trade or commerce "at all relevant times hereto." (*See* Answer and Counterclaims, Counterclaims ¶ 46). Prior to December 2003, Zuckerberg was engaged in trade or commerce as a web-developer and programmer. (Ex. 9, C004632-33).

303.    Zuckerberg, Moskovitz, McCollum, and Saverin always intended that thefacebook.com website would be a commercial enterprise, despite presenting a different picture to thefacebook.com users. (Ex. 83, FACE004433).

304.    In November of 2003, Zuckerberg agreed to provide his services as a web-developer to the Founders. (Ex. 9, C004632-33). The Founders asked Zuckerberg to complete the Harvard Connection website. Zuckerberg expected to be paid for his services. (Ex. 84, HU000059).

305.    Zuckerberg believed he was working on the Harvard Connection website in his capacity as a freelance web developer. *See* Defendants' Opposition to ConnectU's Motion to Compel Production of Documents and Things, Civil Action No. 1:04-cv-11923 (DPW) (Dkt. 82) at 30.

306.    Zuckerberg denies that he was ever a partner with the Founders.

### Zuckerberg Unfairly Competed and Committed Unfair and Deceptive Acts

307.    Zuckerberg entered into an actual or implied contract with the Founders to complete work on the Harvard Connection website, as explained in detail in ¶¶ 53-57. Zuckerberg breached such contract by failing to complete the Harvard Connection website, as described in ¶¶ 72-86. Zuckerberg breached such contract as part of his secret scheme to compete unfairly with the Founders, and to deceive them with his words and acts.

308.    Zuckerberg agreed to complete the Harvard Connection website, and unfairly and/or deceptively represented that he did so. Zuckerberg repeatedly told the Founders, both orally and in writing, that he had essentially finished the Harvard connection website, as described in ¶¶ 62-63, 68-69, 71, 78. Such statements were false, as Zuckerberg never delivered the Harvard Connection website to the Founders. Zuckerberg either never wrote the code he said he wrote, and therefore lied to the Founders, or kept it for himself. Zuckerberg also deceptively wrote in a February 12, 2004 email, "Originally, I was intrigued by the project and was asked to finish the Connect side of the website. **I did this**, and in doing so, I realized over time that my concept of the website was not as it had initially been portrayed by yourself and Divya." (Ex. 17) (emphasis added). Zuckerberg's statement that "I did this" was false or deceptive. He never delivered a finished website.

309.    The Founders trusted Zuckerberg and relied on him to act in their best interests and complete and launch the Harvard Connection website, and they had full confidence that he could and would do so, partly because of the deceptive representations and assurances that Zuckerberg provided (see ¶ 107-108, 110-112, 114-116, 118, 120, 122-123, 129, 132-134). Zuckerberg had full knowledge of such trust, reliance, and confidence. Zuckerberg unfairly and deceptively manipulated and breached such trust, reliance, and confidence for the benefit of his

own competitive business venture, and the gain of all of the Defendants, who were involved in or

benefited from such venture, to further his scheme to compete unfairly with the Founders.

310.    Although Zuckerberg unfairly and deceptively pretended to be the Founders'

partner in creating the Harvard Connection website, and although the Founders believed he was

their partner at the time, he was in fact spying on the Founders for the benefit of his own secret

commercial venture, which was directly competitive to the Harvard Connection venture, in

violation of Sections 2 and 11 of Chapter 93A.  The other Defendants were involved in or

benefited from such venture.

***Chronology of Relevant Events***

311.    On or about December 11, 2003, Zuckerberg began working on thefacebook.com

website.  (Ex. 23, FACE002496).  Zuckerberg competed unfairly with the Founders by using the

code he claimed he created for the Harvard Connection website to create his own website,

thefacebook.com, either by incorporating it into thefacebook.com website, or getting a headstart

from the ideas embodied therein, by positive or negative example.

312.    The Founders expected to receive a completed website and launch it at the same

time Zuckerberg was developing thefacebook.com.

313.    No later than December 22, 2003, Zuckerberg and Moskovitz were writing

thefacebook.com code.  Zuckerberg admitted in his Answer and Counterclaims, Counterclaim

¶ 2, that he "is the creator of the internet website thefacebook.com."  In the discovery process,

Plaintiff found on Moskovitz's hard drive designated as Device No. 371-09, a folder entitled

"Facebook," which was created no later than December 22, 2003.  Because Zuckerberg was the

founder of thefacebook.com website, he must have been working with Moskovitz on such code.

314.    On December 29, 2003, register@thefacebook.com sent Zuckerberg an email confirming his user registration for thefacebook.com website. This is believed to be a test email, which Zuckerberg or his co-Defendants arranged to be sent to Zuckerberg to test thefacebook.com's registration process.

315.    On January 11, 2004, Zuckerberg registered "thefacebook.com" domain name. (Ex. 40).

316.    On January 14, 2004, Zuckerberg met with the Founders for the final time. At that meeting, Zuckerberg did not mention his work on thefacebook.com.

317.    After Zuckerberg launched thefacebook.com website, Cameron Winklevoss sent Zuckerberg a cease and desist letter on February 10, 2004. (Ex. 29a, C004263). Zuckerberg responded to the cease and desist letter in an email to Cameron Winklevoss on February 12, 2004. In that email, Zuckerberg lied to Cameron Winklevoss by falsely stating that "After this meeting [the January 14, 2004 meeting], and not before, I began working on Thefacebook." (Ex. 83, FACE002243-44). This statement was false and deceptive because, as stated in ¶¶ 35, 119, 125, Zuckerberg was working on thefacebook.com website as early as mid-December 2003. Zuckerberg repeated this lie to the Harvard Administrative Board in his own defense against the Founders' complaint that Zuckerberg violated the Harvard Honor Code. (Ex. 84).

*Nature of § 11 Violation*

318.    By such words and acts, Zuckerberg engaged in unfair competition and unfair and deceptive acts or practices in violation of M.G.L. ch. 93A, §§ 2 and 11 by willfully breaching his contract with the Founders, and the implied covenant of good faith and fair dealing, defrauding the Founders, breaking his promises to the Founders, on which they relied to their detriment, unjustly enriching himself at the Founders' expense, stealing the Founders' ideas,

misappropriating the Founders' trade secret, misrepresenting material facts on which the Founders relied to their detriment, and by other unfair and deceptive acts or practices described in this Complaint, or implied thereby.

319.    Further, by the time Zuckerberg launched thefacebook.com website, he had exited any relationship he had with the Founders.

320.    Zuckerberg's unfair and deceptive trade practices are grounded in breach of contract and breach of the implied covenant of good faith and fair dealing, fraud, promissory estoppel, unjust enrichment, misappropriation of a trade secret, misrepresenting material facts, and theft of ideas, and unethical business conduct, none of which are eligible for copyright protection. Such unfair and deceptive business practices also involved elements that are not required to prove a copyright claim, as described herein.

321.    Zuckerberg also unfairly competed with the Founders, and engaged in unfair and deceptive acts and practices with respect to the Founders, independently of any of the claims alleged in this Amended Complaint. As the result of his spying on the directly competitive commercial venture, Harvard Connection, Zuckerberg learned the Harvard Connection ideas described in Ex. 1a, and used them to create and launch his own website. Because he was Harvard Connection's only programmer, he had direct control over the completion and launch of the Harvard Connection website, and if and when it would launch at all. In this unique position, Zuckerberg was able to deliberately sabotage the Harvard Connection website, and did so, by delaying the completion and launch of the website. He also deceptively led the Founders to believe the site was essentially complete, when in fact it was far from complete, so that they would not hand the site over to another developer for completion and launch. Zuckerberg never told the Founders that he was doing any of this, or that he stopped working on their site at the

very time he had said it was essentially complete and the Founders were expecting to launch. Zuckerberg also knew how important it was to the Founders to launch in December 2003 or January 2004, and to so before any competitor launched. Zuckerberg **WAS** that competitor, and never told them. Further, Zuckerberg failed to deliver the code he said he wrote for the Founders, which would have enabled them to launch before thefacebook.com, or even shortly after it. These acts constitute unfair competition and unfair, deceptive, and unethical business practices, in violation of Sections 2 and 11 of Chapter 93A, independent of any other wrongful conduct or claims alleged in this action.

322.    Zuckerberg's actions amounted to a deceptive and unfair course of conduct designed to harm the Founders, and that did in fact harm the Founders.

323.    Zuckerberg's actions described above occurred primarily and substantially within the Commonwealth of Massachusetts.

*Willfulness and Damages*

324.    The Founders suffered a loss of money and/or property as a result of Zuckerberg's unfair and deceptive acts. Such damages at least equal the value of the website facebook.com, which would not exist but for Zuckerberg's unfair and/or deceptive business practices.

325.    Zuckerberg's acts described above have at all times relevant to this action been willful and/or knowing, thereby allowing the Court to award multiple or exemplary damages to the Plaintiff under M.G.L. ch. 93A,§ 2 and 11, along with costs and attorneys' fees. For example, Zuckerberg confided his actions to a friend: "Remember those guys I was supposed to be making that dating site for?  Well, I stopped working on it [the Harvard Connection website] but never really told them about it."  (Ex. 28, FACE002567-68).

96

326.    Pursuant to M.G.L. ch. 93A, §§ 2 and 11, as a direct and proximate result of Zuckerberg's acts described above, Plaintiff has no adequate legal remedy, has been irreparably injured, and has suffered a loss of money and property as a result of Zuckerberg's unfair and deceptive acts or practices.

### Mass. G.L. ch. 93A Claim Against Defendant Facebook, Inc.

327.    Facebook, Inc. is liable for the unfair competition and unfair and deceptive trade practices, in violation of M.G.L. ch. 93A §§ 2 and 11, committed by Zuckerberg, Moskovitz, McCollum, and Saverin based on successor liability, for the reasons set forth in ¶ 16-22.

### Mass. G.L. ch. 93A Claim Against Defendant TheFacebook LLC

328.    TheFacebook LLC is liable for the unfair competition and unfair and deceptive trade practices, in violation of M.G.L. ch. 93A, §§ 2 and 11, committed by Zuckerberg, Moskovitz, McCollum, and Saverin based on successor liability, for the reasons set forth in ¶ 16-22.

### Mass. G.L. ch. 93A Claim Against Defendant Moskovitz, McCollum, and Saverin

329.    Since as early as mid-December 2003, Moskovitz, McCollum, and Saverin were engaged in trade or commerce within the meaning of M.G.L. ch. 93A, § 1, as founders of thefacebook.com website and Facebook, Inc.  (See ¶¶ 13, 21, 35, 125, 181, 209-211, 217-220, 225-229).

330.    Moskovitz's involvement with facebook.com is described in ¶¶ 13, 36, 125, 140, 181, 185, 217-224, 235-240, 254-259, 261-262, 288-290, 293-294.

331.    McCollum's involvement with facebook.com is described in ¶¶ 13, 36, 181, 185, 208-216, 235-240, 254-259, 261-262, 288-290, 293-294.

332.     Saverin's involvement with facebook.com is described in ¶¶ 13, 36, 131, 137, 181, 185, 225-240, 288-290, 293-294.

333.     Moskovitz's, McCollum, and Saverin's acts constitute unfair competition and unfair and deceptive trade practices in the conduct of trade or commerce within the meaning of, and in violation of, M.G.L. ch. 93A, §§ 2 and 11.

334.     The Founders suffered a loss of money and/or property as a result of Moskovitz's, McCollum, and Saverin's unfair and deceptive acts.

335.     Moskovitz's, McCollum, and Saverin's unfair and deceptive acts occurred primarily and substantially in the Commonwealth of Massachusetts.

336.     Moskovitz's, McCollum, and Saverin's acts described above have at all times relevant to this action been willful and/or knowing, thereby allowing the Court to award multiple or exemplary damages to the Plaintiff under M.G.L. ch. 93A, § 2 and 11, along with costs and attorneys' fees.

337.     Pursuant to M.G.L. ch. 93A, §§ 2 and 11, as a direct and proximate result of Moskovitz's, McCollum, and Saverin's acts described above, Plaintiff has no adequate legal remedy, has been irreparably injured, and has suffered a loss of money and property as a result of Moskovitz's, McCollum, and Saverin's unfair competition and unfair and deceptive acts or practices.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs request that this Court enter judgment in their favor on each and every claim for relief set forth above and award them relief, including but not limited to the following:

A.      An Order holding Defendants Zuckerberg, Facebook, Inc., and TheFacebook LLC jointly and severally liable for breach of contract, breach of implied covenant of good faith and fair dealing, fraud, promissory estoppel, and breach of fiduciary duty;

B.      An Order holding Defendants Zuckerberg, Facebook, Inc., TheFacebook LLC, Moskovitz, McCollum, and Saverin jointly and severally liable for unjust enrichment, misappropriation of trade secrets, and unfair trade practices;

C.      An Order holding Defendants Zuckerberg, Facebook, Inc., TheFacebook LLC, Moskovitz, and McCollum jointly and severally liable for copyright infringement;

D.      An Order directing Defendants to pay to Plaintiffs their actual damages, including the Defendants' profits associated with the Defendants' use of the Harvard Connection ideas described in Ex. 1a, and/or the Defendants' profits resulting from their wrongdoing, and/or the Defendants' value, and multiplying such damages pursuant to Mass. G.L. ch. 93 § 42;

E.      An Order holding Defendants jointly and severally liable for unfair business practices under Mass. G.L. ch. 93A, and directing Defendants to pay Plaintiff their actual damages, including Defendants' profits associated with Defendants' wrongdoing, and/or Defendants' profits resulting from their wrongdoing, and/or Defendants' value, or, at Plaintiff's election, statutory damages, and multiplying such damages pursuant to Mass. G.L. ch. 93A and Mass. G.L. ch. 93 § 42;

F.      An Order directing Defendants to pay Plaintiffs' damages, including but not limited to direct, consequential, indirect, compensatory, and punitive damages;

G.      An Order directing Defendants to pay Plaintiffs' attorneys' fees and costs associated with this action;

H.      An Order placing Facebook, Inc., TheFacebook LLC, the website facebook.com, and all related assets in constructive trust for Plaintiffs and transferring to Plaintiffs all rights, title, and interest in Facebook, Inc., TheFacebook LLC, the website facebook.com, and all related assets, pursuant to such constructive trust;

I.      An injunction preliminarily and permanently enjoining Defendants and their employees, agents, partners, officers, directors, owners, shareholders, principals, subsidiaries, related companies, affiliates, distributors, dealers, and all persons in active concert or participation with any of them:

(1)      From operating the website facebook.com, or any variation of that website under a different name, domain name, or URL;

(2)      From using the Harvard Connection ideas described in Ex. 1a;

(3)      From using the Harvard Connection Code, or any computer program derived therefrom;

(4)      From using the code Zuckerberg said he wrote for the Harvard Connection website;

J.      An Order directing Defendants to destroy all computer programs, business plans, and any other materials and things, whether printed or electronic, that consist of, contain, or were derived in any way from the Harvard Connection ideas;

K.      Other relief as the Court may deem appropriate, including increased damages, as available under applicable law.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all claims set forth in this Amended Complaint that are so triable.

Dated: August 8, 2007

Respectfully submitted,

_____

John F. Hornick (*pro hac vice*)
Margaret A. Esquenet (*pro hac vice*)
Meredith H. Schoenfeld (*pro hac vice*)
Daniel P. Kaufman (BBO# 663535)
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C.  20001
Tel: (202) 408-4000
Fax: (202) 408-4400

Daniel P. Tighe (BBO# 556583)
Scott McConchie (BBO# 634127)
GRIESINGER, TIGHE, & MAFFEI, L.L.P.
176 Federal Street
Boston, MA  02110
Telephone:  (617) 542-9900
Facsimile:  (617) 542-0900
dtighe@gtmllp.com
smcconchie@gtmllp.com

Attorneys for Plaintiffs
ConnectU, Inc., Cameron Winklevoss, Tyler
Winklevoss, and Divya Narendra