# EXHIBIT 2

Dockets.Justia.com

1                UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3                    SAN JOSE DIVISION

4            ---------------------------

5

6     FACEBOOK, INC., and MARK

7     ZUCKERBERG,

8                 Plaintiffs

9     vs.                    Docket No. 5:07-CV-01389

10    CONNECTU, INC. (formerly known as

11    CONNECTU, LLC), et al.,

12                Defendants

13           ---------------------------

14       VIDEOTAPED 30(b)(6) DEPOSITION OF DAVID TUFTS

15               In Re: IMARC LLC

16          Friday, October 5, 2007, 9:20 a.m.

17                Proskauer Rose LLP

18              One International Place

19            Boston, Massachusetts 02110

20

21     -------Reporter:  ALAN H. BROCK, RDR, CRR-------

22          FARMER ARSENAULT BROCK LLC, for:

23    LiveNote World Service, 221 Main Street, Suite 1250

24             San Francisco, California 94105

25          Phone: 415.321.2300  Fax: 415.321.2301

1    APPEARANCES:

2    For Plaintiffs

3        Neel Chatterjee, Esq.

4        Theresa A. Sutton, Esq.

5        Orrick, Herrington, & Sutcliffe, LLP

6        1000 Marsh Road

7        Menlo Park, California 94025

8        650.614.7307

9        Fax: 650.614.7401

10       nchatterjee@orrick.com

11       tsutton@orrick.com

12

13   For Defendants

14       Christopher S. Schultz, Esq.

15       Finnegan Henderson Farabow Garrett & Dunner LLP

16       55 Cambridge Parkway

17       Cambridge, Massachusetts 02142

18       617.452.1600

19       Fax: 617.452.1666

20       christopher.schultz@finnegan.com

21

22

23

24

25

1    For ConnectU in Massachusetts litigation

2       Meredith H. Schoenfeld, Esq.

3       Finnegan Henderson Farabow Garrett & Dunner LLP

4       901 New York Avenue, N.W.

5       Washington, D.C.  20001

6       202.408.4000  fax: 202.408.4400

7       meredith.schoenfeld@finnegan.com

8

9    For Eduardo Saverin in Massachusetts litigation

10      Daniel K. Hampton, Esq.

11      Holland & Knight LLP

12      10 St. James Avenue, 11th Floor

13      Boston, Massachusetts  02116

14      617.523.2700  fax: 617.523.6850

15      dan.hampton@hklaw.com

16

17   For iMarc LLC and the witness

18      Stephen Y. Chow, Esq.

19      Burns & Levinson LLP

20      125 Summer Street

21      Boston, Massachusetts  02110

22      617.345.3000  fax: 617.345.3299

23      schow@burnslev.com

24

25   ALSO:  Rosa Fox-Ogg, Jared Drewniak, Videographers

```
1              October 5, 2007        9:20 a.m.

2          P R O C E E D I N G S

3              THE VIDEOGRAPHER:  Here begins the

4     30(b)(6) deposition of David Tufts, Tape 1, Volume

5     1, in the matter of Facebook, Inc., et al. versus

6     ConnectU, et al. in the United States District

7     Court, Northern District of California, San Jose

8     Division, Case No. 5:07-CV-01389-RS.  Today's date

9     is October 5th, and the time on the video monitor is

10    9:21.  The video operator today is Rosa Fox-Ogg,

11    representing LiveNote World Service, located at 221

12    Main Street, San Francisco, California 94105, phone

13    number 415-321-2300.  The court reporter is Alan H.

14    Brock, of the firm Farmer Arsenault Brock, on behalf

15    of LiveNote World Service.  Today's deposition is

16    being taken on behalf of the plaintiffs and is

17    taking place at One International Place, Boston,

18    Massachusetts.

19              Counsel, please introduce yourselves and

20    state whom you represent.

21              MR. CHATTERJEE:  This is Neel Chatterjee

22    and Theresa Sutton, representing Facebook, Inc., and

23    Mark Zuckerberg.

24              MR. HAMPTON:  My name is Dan Hampton.  I

25    don't represent a party in the California case, but
```

**10/5/2007  CAL - iMarc (30(b)6), Tufts, David**

1    addresses were at iMarc.  Mr. Bushee, do you know

2    what his email address was?

3        A.  B-i-l-l@imarc.net.

4        Q.  And Nick Grant?

5        A.  Nick@imarc.net.

6        Q.  Fred LeBlanc?

7        A.  Fred@imarc.net.

8        Q.  And Marc Pierrat?

9        A.  Marc, M-a-r-c, @imarc.net.

10       Q.  So emails with those email headers would be

11   emails that originated from the people that you

12   identified?

13       A.  If the header was the "from" address.

14           MR. SCHULTZ:  Sorry.  Objection, calls

15   for speculation.

16       Q.  So if it said bill@imarc.net, it would be

17   an email that came -- if it said from Bill at

18   imarc.net, it would be an email from Bill Bushee.

19           MR. SCHULTZ:  Same objection.

20       A.  This is what I don't understand:  Should I

21   still answer the question?

22       Q.  Yes.

23       A.  Yes.

24       Q.  As I said, when he lodges an objection or

25   anybody lodges an objection, as long as the question

1      is clear to you, you can go ahead and answer it.

2          A.  All right.

3          Q.  Is there a general practice at iMarc for

4      people to use each others' email addresses?

5          A.  I don't understand that question.

6          Q.  So, for example, would Mr. LeBlanc

7      generally be allowed to use Mr. Bushee's email

8      address?

9               MR. SCHULTZ:  Objection, vague.

10         A.  I don't know of any case where that's

11     happened.

12         Q.  Now I'm going to turn to a different topic.

13     I want to talk to you about ConnectU, Cameron and

14     Tyler Winklevoss, and Divya Narendra.  Do you

15     recall --

16              Well, let me start with this:  Have you

17     ever met, either electronically, through an email or

18     the like, or live, Divya, Cameron Winklevoss, or

19     Tyler Winklevoss?

20              MR. SCHULTZ:  Object to the form.

21         A.  Yes.

22         Q.  When was the first time that you met any

23     one of those people?

24              MR. SCHULTZ:  Object to the form.

25         A.  This is including electronically, you said?

**10/5/2007  CAL - iMarc (30(b)6), Tufts, David**

1      Q.  Yes.

2      A.  Whenever the first email is.

3      Q.  Can you give me an estimate as to time?

4      A.  2003.

5      Q.  Do you recall the first time you met them

6   via a telephone call or in person?

7             MR. SCHULTZ:  Object to the form.

8      A.  I don't recall the first time.  I'm

9   guessing it was probably after that.

10     Q.  And do you recall who it was that contacted

11  iMarc?

12            MR. SCHULTZ:  Objection, foundation.

13     A.  I believe one of the Winklevosses.

14     Q.  One of the Winklevoss brothers?

15     A.  Yes.

16     Q.  Do you recall why they said they were

17  contacting iMarc?

18            MR. SCHULTZ:  Objection, foundation.

19  Assumes facts not in evidence.

20     A.  I was not part of the original.  That would

21  be typical of a client.  Specifically, in this case,

22  the client contacts our sales department.  That

23  would have been Marc -- to talk about a probable

24  job.  And then after it was ironed out, it would go

25  to me or the production team.  So I don't recall who

1    contacted us first and why, but I'm guessing it's

2    all in those emails.

3        Q.  And when you said you were contacted --

4    iMarc was contacted about a possible job, what did

5    you understand the job ultimately to be?

6        A.  By the time Marc presented it to me, I

7    believed it to be a social networking site.

8        Q.  What do you mean by "social networking

9    site"?

10       A.  A website where people can create profiles

11   about themselves to interact with or network with

12   other people on the website, either for personal

13   dating reasons or professional reasons.

14       Q.  Please explain a little bit more what you

15   mean by that.

16           MR. SCHULTZ:  Objection, vague.

17       A.  I'm not sure.  Can you ask me a specific

18   question?

19       Q.  Sure.  You described the scope of the

20   project being a social networking website.  Did I

21   get that right?

22       A.  Yes.

23       Q.  And you said that it was a website where

24   people can create profiles to interact with others

25   for dating or professional reasons.

**10/5/2007  CAL - iMarc (30(b)6), Tufts, David**

1      A.  Correct.

2      Q.  Maybe I can probe a little bit more into

3  what you mean by "dating and professional reasons."

4          Let me ask the question, first:  What

5  did you mean when you said "for dating reasons"?

6      A.  I believe that they wanted to allow their

7  users to create profiles so they could meet, connect

8  with other people for personal reasons --

9  friendship, dating.  The website was really just

10  about bringing people together, and from then on,

11  it's not going to impose any rules about dating or

12  something like that.  It's mostly about just

13  meeting.

14      Q.  That was the scope of the project they

15  presented.

16      A.  Yes.

17      Q.  And what about professional reasons?  What

18  do you mean when you said that?

19      A.  Perhaps someone would create a profile much

20  like a resume.  Other people in a company could

21  search through or look for specific people to hire,

22  to work with, things like that -- professional

23  business.

24      Q.  And were you given any guidance when you

25  were given the scope of this project about what to

**10/5/2007  CAL - iMarc (30(b)6), Tufts, David**

1    look at to develop this website?

2        A.  Yes.

3        Q.  And what guidance were you given?

4        A.  By the time it came to me with a proposal,

5    there was a number of benchmarking sites --

6    match.com, I believe, rise.com, thefacebook.com,

7    friendster.com -- and then also some -- so those

8    were all, especially friendster.com -- those were

9    all social networking sites that were already out on

10   the Internet that did something similar.  And they

11   also gave us a number of benchmarking sites for the

12   visual look and feel.  Most of those sites were

13   really stripped down and technical.  And they sent

14   us, I believe, YSL, which might be a fashion

15   company, a couple of sites that we had actually

16   developed they liked the look at -- look of.  So

17   they gave us a couple other, maybe four sites --

18   again, it's in those emails -- of benchmarking sites

19   which they liked the look of.  So we had a couple of

20   sites that they liked features from, a couple of

21   sites that they liked the look of.

22       Q.  You mentioned these benchmarking sites.

23   Were you told to do anything specifically with

24   respect to your review of the match.com website?

25       A.  No.  I think that they pointed out features

1    that they liked.  Again, this is just from me

2    recently looking through these emails.  I noticed

3    that on match.com there was a feature where, I think

4    you could wink at someone.  If you had a profile and

5    -- if I had a profile and you had a profile and I

6    found you attractive, I could wink at you and send

7    you a little email.  They liked something like that,

8    and I think we ended up implementing something

9    similar to that.  That was something from match.com

10   that they found appealing.

11       Q.  And what about rise.com?  Do you remember

12   anything specific that they identified that they

13   wanted?

14             MS. SCHOENFELD:  Objection, relevance.

15       A.  I believe rise.com did a good job of

16   presenting professional profiles, much like, you

17   know, a resume, but online.

18       Q.  Anything else?

19             MS. SCHOENFELD:  Same objection.

20       A.  No.

21       Q.  What about thefacebook.com?  What did they

22   identify from that?

23             MS. SCHOENFELD:  Same objection.

24       A.  Some of the features that -- I think the

25   Facebook had more of a mix of the professional and

1      Q.  Was this the mockup that you were talking

2    about?

3      A.  I think this was more of the concept.

4    There actually was -- yeah, this is not HTML, I

5    don't think.  This looks like it might have been,

6    you know, a text document or a Word document.

7      Q.  And if you look at the top part of this

8    document, it says "My date profile" and "My connect

9    profile."  Do you see that?

10     A.  Yes.

11     Q.  When you originally learned of the project

12   that iMarc was being hired for, were those the terms

13   that you recall being used?

14     A.  No.  If you had mentioned "My connect

15   profile," that would not ring a bell with me.

16     Q.  Do you ever remember discussing this

17   document with anybody?

18     A.  No.  I remember looking at it and seeing

19   it.  Typically, a client comes to iMarc, works with

20   the sales team -- in this case Marc Pierrat.  They

21   go through a couple of revisions of site maps --

22   basically, the organization of all the pages; maybe

23   some wire frames, sometimes is what we call this,

24   which looks like what the Web page would look like,

25   just represented in text.

1              Usually it goes through a couple of

2    revisions, and then when it's finalized, we started

3    building it.

4              We never actually built -- I don't think

5    we ever built anything with "My connect profile,"

6    terms like that.   There's like 15 pages of forms to

7    fill out for your profile, and we never actually

8    built a form this complex.

9       Q.   Did you ever receive code that had already

10   been written before you started work, from the

11   Winklevoss brothers or Divya Narendra?

12      A.   Yes.   Well, there was HTML, which I'm not

13   sure if you call that code.   I wouldn't.   There's no

14   back-end code.   There's no database, no scripting

15   code.   There was HTML and graphics.

16      Q.   Describe what you were given from the

17   Winklevoss brothers or Divya Narendra before you

18   started work.

19              MS. SCHOENFELD:  Objection, vague.

20      A.   They gave us a CD with some -- again, I'm

21   calling them HTML mockups, nonworking -- HTML

22   versions of what they thought the Web page would

23   look like.   I'm not sure if they actually came with

24   like a request -- you know, an RFP or anything like

25   that -- or if they just talked about it with Marc

**10/5/2007  CAL - iMarc (30(b)6), Tufts, David**

1    and they collaboratively developed this document.

2    But typically, I think by the time it came to us,

3    there was like a plan that was like, "Here's what

4    we're going to build."

5        Q.  And do you know if the plan that was

6    created by Marc Pierrat -- and I'm going to use the

7    name Marc Pierrat because there are two Marks in

8    this case.  There's Mark Zuckerberg and Marc

9    Pierrat.

10        A.  Uh-huh.

11        Q.  Do you know if the plan that was developed

12   by Marc Pierrat with the Winklevoss brothers and

13   Divya Narendra was based upon anything that had been

14   previously done?

15            MR. SCHULTZ:  Objection, vague and

16   overbroad.

17        A.  I wouldn't say that Marc Pierrat developed

18   the plan.  I would say that Marc Pierrat worked with

19   HarvardConnection, helping them develop a plan and

20   coaching them on what might work.  But regardless,

21   there was a plan developed.  I'm not sure who

22   developed it.  But typically, it's not us who

23   invents the website for the client.  We coach them

24   and help them and tell them what we think will work.

25            So I think when -- again, the HTML

**10/5/2007  CAL - iMarc (30(b)6), Tufts, David**

```
1    mockup that they showed us on a CD had, maybe it was

2    called connect profile and date profile; but by the

3    time we actually started creating a website, I

4    believe that there was a single profile at that

5    point.  So, again, I'm not sure.

6         Q.  A single profile for both?

7         A.  Yes.  We didn't build a website that had my

8    date profile and my connect profile.

9         Q.  Now, the CD that you talked about that you

10   received, was it ever represented to you that it

11   included the HarvardConnection code?

12        A.  What do you mean by "code"?

13        Q.  Were you ever told that "This is the code

14   that we've developed so far for HarvardConnection"?

15             MR. SCHULTZ:  Objection, vague.

16        A.  I'm not sure if they -- I'm not sure if

17   anyone told us that.

18        Q.  Do you know if these HTML mockups that you

19   received had any database structures associated with

20   the website?

21        A.  I do not -- I mean, no, I don't think so.

22             MR. CHATTERJEE:  Let's mark this as

23   Exhibit 65.

24             (Exhibit 65 marked for identification.)

25        Q.  After you've reviewed it, let me know when
```

1    you're done.

2         A.  I've reviewed it.

3         Q.  Mr. Tufts, do you recognize what I've

4    handed to you as Exhibit No. 65?

5         A.  Yes.  It is "my personal rent."

6         Q.  And when you say "my personal rent," that's

7    an email that you've written?

8         A.  It was an email that I authored, sending it

9    to myself, Nick Grant, and Nils Menten, collectively

10   known as partners@imarc.net.

11        Q.  And you authored this on about June 22nd,

12   2005?

13        A.  I would say exactly on that date.

14        Q.  If you look at the third paragraph of the

15   email, it starts with "ConnectU."  Do you see that?

16        A.  Yes.

17        Q.  "ConnectU came to us with a specification

18   and design for harvardconnection.com which did not

19   look or act anything like Facebook."  Do you see

20   that?

21        A.  Yes.

22        Q.  Could you describe what you meant when you

23   wrote that?

24        A.  I meant that they came to us with something

25   really complicated, like this, and by the time we

1      It's more concepts.  But friendster.com was doing

2      groups, and Friendster was a really similar layout

3      as well.

4          Q.  Had a similar layout to whom?

5          A.  Facebook and ConnectU.

6          Q.  And any other websites that had some

7      similar features to Facebook and Friendster that

8      you're aware of?

9          A.  I think I touched on match.com had a wink

10     feature, and they liked that.  We implemented a

11     feature called like Wave, I think.  Facebook had

12     something called Poke.  I think that all the social

13     networking sites had similar features.

14         Q.  This HTML code that you received from the

15     Winklevoss brothers or Divya Narendra, do you know

16     which of those three people it came from?

17         A.  No.

18         Q.  Do you remember anyone ever telling you

19     that someone named Vic was sending you a CD of code?

20         A.  I don't remember that.

21         Q.  Of the materials that were originally given

22     to you or given to iMarc by the ConnectU founders,

23     Divya Narendra, Winklevoss -- let me restate that.

24             Of the materials that were originally

25     given to you by the ConnectU founders -- Divya

1    Narendra, Tyler Winklevoss, and Cameron

2    Winklevoss -- were any of those materials ultimately

3    used to build the ConnectU website?

4        A.  No.

5        Q.  Do you know if they're in use today?

6        A.  I don't know if they're in use today.

7        Q.  As of -- well, let me step back.  Was there

8    a time when the relationship between ConnectU and

9    iMarc ended?

10       A.  Was there a time?

11       Q.  Yes.

12       A.  Yes.

13       Q.  And approximately when was that time?

14       A.  By the tone of voice of this personal rant

15   here, I would say it was before June 22nd, 2005.  I

16   think sometime in 2004 we wanted -- we moved them

17   off our server, that we were having some issues with

18   them.  So yeah, I mean, I'd say at least a year

19   before this.

20       Q.  And as of a year before this email, June

21   2004, were any of the ideas that were originally

22   provided to you by the ConnectU founders -- Divya

23   Narendra, Cameron Winklevoss, and Tyler

24   Winklevoss -- being used on the ConnectU website?

25                MR. SCHULTZ:  Objection, vague and

1    overbroad; also vague as to time.

2        A.   I think the only thing -- the only

3    technical materials that they provided us was a CD

4    with some HTML on it and some graphics that looked

5    like a Web page.  It was unusable, and we never used

6    it.  I don't even -- we glanced at it and realized

7    that it was not -- you know, it's not functioning.

8    It's easier to start -- we're well ahead of that

9    using our own tools.

10               So no, we never -- iMarc never used any

11    technical materials that ConnectU provided us.

12        Q.   And what about Exhibit 64?  Was any of the

13    information in Exhibit 64 used in the ConnectU

14    website?

15        A.   Yes.  I mean, so, well, the concepts were.

16    So it looks like this first thing, Link 9, it says

17    "date recommendation."  It shows me "I'm a man,

18    woman, looking for a man, woman."  So this is

19    telling me I can search for the people based on

20    their gender and age.  That was implemented.

21    "Connect to a student," the second one, it looks

22    like I can look for people based on their major in

23    school.  So that concept was also implemented.

24               Down this left column, "friend request,"

25    that was implemented.  "My pictures," that concept,

**10/5/2007  CAL - iMarc (30(b)6), Tufts, David**

1    the ability to upload pictures, was implemented.

2    "Comments," that was also implemented.  "Messages,"

3    emailing people back and forth through the website,

4    as opposed to traditional email clients, that also

5    was implemented.

6                    "Shopping cart," I don't think it was.

7    "Matchmaker," I'm not sure what that is.

8                    But yeah, a number of these concepts

9    were actually implemented in the final -- on the

10   first version of the website.

11       Q.  And those concepts that you just walked

12   through, were they concepts that you had seen on

13   other publicly available websites?

14       A.  Yes, and -- yeah, yes.

15       Q.  Could you give some examples, please?

16                    MS. SCHOENFELD:  Objection, relevance.

17       A.  Any of the benchmarking websites --

18   match.com, rise.com, friendster.com,

19   thefacebook.com.

20       Q.  Did any of the ConnectU founders ever tell

21   you that Mark Zuckerberg had stolen their idea?

22       A.  Yes.

23       Q.  When was the first time they told you that?

24       A.  The first time -- again, they may have

25   talked about this earlier with Marc Pierrat.  The

**10/5/2007  CAL - iMarc (30(b)6), Tufts, David**

1    they delete them all.  IMarc does not -- it's a POP

2    mail server, so you download it and it's up the POP

3    male server.

4         Q.  Well, iMarc doesn't go and erase emails

5    that people have that they've kept.

6         A.  No.

7         Q.  So the emails --

8         A.  IMarc does not do that.

9         Q.  That would have to be an individual choice.

10        A.  Correct.

11        Q.  Are you aware that iMarc produced a source-

12   code compact disk in this case?

13        A.  I think so, yes.

14             MR. CHATTERJEE:  Let's mark this as

15   Exhibit 67.

16             (Exhibit 67 marked for identification.)

17        Q.  Mr. Tufts, you don't have to study this CD

18   carefully.  I'll represent to you that it is a copy

19   of the source code that was produced in this case.

20   I want to go back to something we talked about

21   earlier, where you mentioned that you'd received

22   some HTML code.

23        A.  Uh-huh.

24        Q.  Do you know if any PHP code was provided to

25   iMarc by any of the founders of ConnectU?

**10/5/2007  CAL - iMarc (30(b)6), Tufts, David**

1       A.  I don't think so.  I remember looking at

2    two to three HTML pages.

3       Q.  I'm going to give you some documents and

4    see if it refreshes your recollection; and if it

5    does, it does, and if it doesn't, it doesn't.

6               MR. CHATTERJEE:  Let's mark this as

7    Exhibit 68.

8               (Exhibit 68 marked for identification.)

9       A.  This does not -- this doesn't mean anything

10   to me.

11      Q.  Do you know what TreeSize Professional is?

12      A.  No.

13      Q.  What I've handed you, Exhibit No. 68, are

14   the folder contents of a document that was produced

15   to us in this litigation.  It's actually on that

16   source-code CD.  Do you recognize any of the file

17   names that are listed?

18      A.  No.

19      Q.  And you don't recall receiving any

20   documentation with respect to these files from the

21   founders of ConnectU?

22      A.  No.  I can give you an educated guess,

23   based on the directory structure here.

24      Q.  I don't want you to give an educated guess.

25   Are you talking about this last-change indicator?

1       A.  No, the 2004 0101-client_supply_site.  I am

2   guessing that ConnectU gave us the CD, we threw it

3   up on our Web server in that folder.  I think this

4   is where we probably looked at some of these pages

5   and realized that this is just a complete mess and

6   not worth looking into.

7       Q.  So you don't remember looking at this at

8   all.

9       A.  Again, like I said before, we looked at a

10  couple of pages.  By looking at this directory

11  structure, it would take longer to figure out what's

12  going on here than to just, you know, figure out

13  what the client wants and solve their problem.  So

14  we probably got the CD from them, threw it in our

15  file server for archive purposes, and that's what

16  this is.  But no, we didn't -- I certainly --

17  there's no code in here that we could have --

18  there's nothing in here that we used.

19      Q.  It was all abandoned?

20      A.  It wasn't even -- it wasn't even -- we

21  didn't even use it to abandon.

22          MR. SCHULTZ:  Object to the term

23  "abandoned."

24      A.  To abandon it, you have to start using it

25  and then abandon it.

**10/5/2007  CAL - iMarc (30(b)6), Tufts, David**

1      Q.  That's a fair point.  That's a fair point.

2  You never made use of it in developing the

3  connectu.com website.

4      A.  Correct.

5      Q.  So if I were to show you excerpts of that

6  code, you don't think it would refresh your

7  recollection as to anything.

8      A.  I think visually if you showed me the front

9  page, it said like "HarvardConnection" with some

10  sort of brown picture, visually -- that's what we

11  looked at, and we said this doesn't look good, the

12  code isn't good, we're not using any of this.  "If

13  you want to make a website with us, we're going to

14  make a Website our way."

15      Q.  And let me drill down a little bit on that.

16  For example, I have here some excerpts of PHP codes

17  and table structures that are based upon files in

18  those directories.

19      A.  Uh-huh.

20      Q.  And what you're telling me is you never

21  looked at any of that.

22      A.  No.

23      Q.  What was the financial arrangement between

24  iMarc and the ConnectU founders?

25          MS. SCHOENFELD:  Objection, relevance;

1    objection, vague.

2        A.  What was the financial obligation?

3        Q.  Arrangement.

4        A.  Arrangement?

5        Q.  Let me state it a different way:  Describe

6    to me what you understood the contractual

7    relationship between iMarc and the ConnectU founders

8    or anybody with respect to the ConnectU website.

9            MS. SCHOENFELD:  Same objection.

10           MR. SCHULTZ:  Objection, foundation.

11       A.  We -- they came to us, described a website

12   that they wanted.  Our sales, business-development

13   team worked with ConnectU to roughly define a scope.

14   They put a time line and a budget on that.  We get

15   either 30 or 50 percent upfront.  If it's 30

16   percent, we get another 30 percent in the middle,

17   and a final payment at the end.  We build the

18   website.  And there's no ongoing contract.  If they

19   want to add updates after the fact, it's either

20   hourly, or if it's a really large update -- again,

21   we define what it's going to be, how long it's going

22   to take, and put a price to it.

23       Q.  Who did iMarc sign a contract with?

24       A.  I don't know if it was -- I don't know.

25       Q.  Do you know if it was with ConnectU, LLC?

```
 1    contract with Mark Zuckerberg?

 2              MR. SCHULTZ:  Objection, outside the

 3    scope of the deposition.

 4         A.  Not that I remember.

 5         Q.  Did they ever tell you that Mark Zuckerberg

 6    was a partner in their project?

 7              MR. SCHULTZ:  Same objection.

 8         A.  Not that I remember.

 9         Q.  Do you remember at any point in time any of

10    the ConnectU founders telling you to keep

11    information confidential that they were sharing?

12              MR. SCHULTZ:  Objection, outside the

13    scope of the 30(b)(6) topics.

14         A.  I don't remember that, no.

15         Q.  We'll go through a few more names, not

16    iMarc names.

17              Are you familiar with someone by the

18    name of David Gucwa?

19         A.  Again, I'll probably -- if I saw his name

20    printed -- the pronunciation doesn't sound familiar.

21    If I saw it printed -- a lot of these people are

22    just email addresses to me, so if you showed me his

23    name printed --

24         Q.  He's not actually in any emails that I

25    recall.  I just wondered if you'd heard the name.
```

1      A.  No.

2      Q.  It's G-u-c-w-a.

3      A.  I don't know.

4      Q.  What about John Taves, T-a-v-e-s?

5      A.  Yes, I believe that he was sort of the new

6  webmaster, maybe.  He was technically in charge of

7  the site after we -- he took over after we were

8  done.

9      Q.  Have you ever had conversations with

10  Mr. Taves?

11      A.  Yep.

12      Q.  And when do you remember having your first

13  conversation with him?

14      A.  I'm not sure of the exact -- maybe late

15  2004, or summer 2004.  When we were -- we -- iMarc

16  moved ConnectU off of our servers, onto their own

17  server, he seemed to be the one who was going to

18  take over, technically take over.  So there was a

19  couple of conference calls, talking about where

20  files were, where stuff was.

21      Q.  Why was ConnectU being taken off of your

22  servers?

23      A.  We just weren't happy with stuff they were

24  asking us to do, and we just weren't happy with our

25  relationship with them.

1        Q.   Describe what you mean by that.

2        A.   They asked us to do a couple of things that

3    we deemed unethical, and they actually seemed to do

4    something -- seemed to send out emails that we saw,

5    and we didn't want that happening on a server that

6    we managed.

7        Q.   Anything else?

8        A.   Just in general we just weren't happy

9    working with them any more.

10       Q.   Other than the email issue, when you say

11   you generally weren't happy, what was prompting

12   those feelings?

13       A.   I think I touched on in that personal rant,

14   where they were just telling us to "Do this, add

15   this, add this," and that's not really how we work

16   and like to work.  We were growing and had enough

17   other clients that we just really didn't want to

18   work that way with them.  Compound that with a

19   couple of unethical things that they seemed to be

20   doing, we just didn't want any part of managing

21   their server or working with them any more.

22       Q.   Were you concerned at all for iMarc's

23   liability associated with some of those activities?

24       A.   Oh, yeah, sure, yep.

25       Q.   Describe what you mean by that.

**10/5/2007  CAL - iMarc (30(b)6), Tufts, David**

1       A.   If it's a server that we manage that might

2   have other clients on it and someone sends out mass

3   emails from it and the server gets blacklisted --

4   which would mean that it's known to send spam, so

5   email clients won't accept mail from that -- if

6   they're sending spam, it gets the whole server

7   blacklisted, and we have other clients that suddenly

8   their email stops working.  So we didn't want to

9   deal with that.  That's not what we do.

10      Q.   You used the term "spam."  What do you mean

11  by that?

12      A.   Sending out email without someone signing

13  up for it or requesting it.

14      Q.   Did you ever tell the Winklevoss brothers

15  or Divya Narendra that you didn't -- that you found

16  these emails unethical?

17      A.   Yes.

18      Q.   Tell me when you first discussed that issue

19  with any of them.

20      A.   It's in one of the emails.  It's referenced

21  in the bullet list in the back of the thing, where

22  they sent out a number of emails, 6:00 a.m. by

23  a.m. we saw, what are they doing, and we disabled

24  the ability to do that and talked with them about

25  it.

**10/5/2007  CAL - iMarc (30(b)6), Tufts, David**

1      Q.  I'll ask a little bit more about that a

2      little bit later today.

3              I want to go back to John Taves.  So

4      after migrating the ConnectU website from the iMarc

5      servers to John Taves --

6              Does he have a business?

7      A.  I think originally -- so iMarc hosted a

8      number of websites on shared servers.  So we buy one

9      single piece of hardware and can fit, you know, 40

10     to 50 websites on it.  Step No. 1, when we saw that,

11     you know -- when we started to question their

12     ethics, we told them, "You guys get your own server.

13     You sign up for it, and we'll help you move stuff

14     there."  I don't know if John Taves had anything to

15     do with that, if he actually owned the server or

16     whatnot.  So it's not saying it's John Taves'

17     server.  It's a server that ConnectU set up.  They

18     gave us the log-in information to move everything

19     to.  So I think that was before there was any talk

20     of John Taves.

21     Q.  And so what was the first circumstance you

22     remember having an interaction with John Taves?

23     A.  I think he wanted to add a feature to the

24     website, and he was obviously taking over the

25     webmastering stuff.  We were not as responsive with

1              CERTIFICATE OF COURT REPORTER

2              I, Alan H. Brock, Registered

3    Professional Reporter and Certified Realtime

4    Reporter, do certify that the deposition of David

5    Tufts, in the matter of Face Book, Inc., and Mark

6    Zuckerberg v. ConnectU, Inc., et al., on October 5,

7    2007, was stenographically recorded by me; that the

8    witness provided satisfactory evidence of

9    identification, as prescribed by Executive Order 455

10   (03-13) issued by the Governor of the Commonwealth

11   of Massachusetts, before being sworn by me, a Notary

12   Public in and for the Commonwealth of Massachusetts;

13   that the transcript produced by me is a true and

14   accurate record of the proceedings to the best of my

15   ability; that I am neither counsel for, related to,

16   nor employed by any of the parties to the above

17   action; and further that I am not a relative or

18   employee of any attorney or counsel employed by the

19   parties thereto, nor financially or otherwise

20   interested in the outcome of the action.

21

22

23   _____    October 9, 2007

24   Alan H. Brock, RDR, CRR

25

168

1    CERTIFICATE OF COURT REPORTER

2        I, Alan H. Brock, Registered

3  Professional Reporter and Certified Realtime

4  Reporter, do certify that the deposition of David

5  Tufts, in the matter of Face Book, Inc., and Mark

6  Zuckerberg v. ConnectU, Inc., et al., on October 5,

7  2007, was stenographically recorded by me; that the

8  witness provided satisfactory evidence of

9  identification, as prescribed by Executive Order 455

10  (03-13) issued by the Governor of the Commonwealth

11  of Massachusetts, before being sworn by me, a Notary

12  Public in and for the Commonwealth of Massachusetts;

13  that the transcript produced by me is a true and

14  accurate record of the proceedings to the best of my

15  ability; that I am neither counsel for, related to,

16  nor employed by any of the parties to the above

17  action; and further that I am not a relative or

18  employee of any attorney or counsel employed by the

19  parties thereto, nor financially or otherwise

20  interested in the outcome of the action.

21

22

23  _____    October 9, 2007

24  Alan H. Brock, RDR, CRR

25