UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CONNECTU, INC., CAMERON WINKLEVOSS, TYLER WINKLEVOSS, AND DIVYA NARENDRA,<br><br>Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC., MARK ZUCKERBERG, EDUARDO SAVERIN, DUSTIN MOSKOVITZ, ANDREW MCCOLLUM, AND THEFACEBOOK LLC,<br><br>Defendants. | 1:07-CV-10593 (DPW)<br><br>Related Action: Civil Action No. 04-CV-11923 (DPW)<br><br><br><br>District Judge Douglas P. Woodlock<br><br>Magistrate Judge Robert B. Collings |

**MEMORANDUM IN OPPOSITION TO THE FACEBOOK DEFENDANTS' MOTION TO COMPEL PLAINTIFFS TO IMAGE AND SEARCH THEIR MEMORY DEVICES FOR SOURCE CODE, AND TO COMPLY WITH REQUESTS FOR PRODUCTION NOS. 1-2, 67-68 AND 117**

I.   **Introduction**

In yet another example of scorched-earth litigation tactics, Defendants Facebook, Inc., Mark Zuckerberg, Dustin Moskovitz, Andrew McCollum, and TheFacebook, LLC (collectively, the "Facebook Defendants") have moved this court to compel the production of documents that have already been produced. There is no real pretense by the Facebook Defendants that this motion is anything other than a tit-for-tat manuever seeking revenge for the remedial imaging protocol put in place by this Court's September 13 Order for Discovery of Computer Memory Devices (the "Imaging Protocol") [Dkt. 103].

Put simply, Plaintiffs produced to the Facebook Defendants all known relevant documents responsive to Requests for Production Nos. 1, 2, 67, 68 and 117. This includes documents that were not in the Plaintiffs' actual custody and control.[1] The only electronic storage devices truly at issue – those that were used to write and store relevant code – have all been searched, and any responsive code found therein was produced to the Facebook Defendants.

The Imaging Protocol which Defendants now seek to reproduce was granted to Plaintiffs because the Facebook Defendants' hard drives are a mystery to all parties, including the Facebook Defendants. As demonstrated by recent correspondence, the Facebook Defendants have no idea whether or not the relevant code requested by Plaintiffs exists on the hard drives. Declaration of Adam B. Wolfson ("Wolfson Decl."), Ex. A (October 15, 2007 letter from Neel

---

[1] *See* Declaration of Monte M.F. Cooper in Support of Facebook Defendants' Motion to Compel Plaintiffs to Image and Search Their Hard Drives for Source Code ("Cooper Decl."), Ex. 14. Exhibit 14 is an August 24, 2007 letter from Margaret Schoenfeld to Monte Cooper. In pertinent part, Schoenfeld states, "[A]s we stated in the meet and confer, all versions of the Harvard Connection code in ConnectU's possession, custody or control were produced. (footnote continued)

Chatterjee to Rick Werder: "[T]he Facebook Defendants have performed a search and have not identified any Harvard Connection...code in the code Facebook Defendants produced."). In contrast, Plaintiffs have always known where relevant code is located and *produced all of it to the Facebook Defendants in a cognizable fashion.* This is a crucial distinction, and one that the Facebook Defendants conveniently ignore.

Beyond relevant code, the motion also seeks to compel the production of code wholly irrelevant to this dispute. Facebook Defendants seek post-2004 versions of connectu.com code, which have absolutely no bearing on the trade secrets issue or any of the potential defenses in this case. Perhaps more troubling, the Defendants also seek code relating to the hazily defined subprograms "Social Butterfly" and "Facebook Importer." Facebook Defendants have brought suit in California based on allegations surrounding these two subprograms, both of which were allegedly written at least several months after thefacebook.com's launch. Neither of these subprograms relate to any of the claims Plaintiffs assert in this action, nor are they related to any potential defense. As such, it is clear Facebook Defendants are attempting to get two bites at the apple: first in Massachusetts, then in California.

Plaintiffs have met and exceeded their discovery obligations by obtaining and producing all code relevant to this dispute, including code that was not actually within their control. Plaintiffs thus urge the Court to deny the motion because it is completely without merit.

## II.   ARGUMENT

From the outset, Plaintiffs have agreed that, in certain situations, imaging of electronic devices is both appropriate and effective. This Court authorized such a practice when

---

ConnectU even arranged for the production of Harvard Connection code...in the possession of Victor Gao, Sanjay Mavinkurve and iMarc."

2

it became clear that Plaintiffs did not receive an adequate production of information stored on the Facebook Defendants' various hard drives. The Imaging Protocol is currently underway and has not met with any resistance or problems from either side of this dispute.

Where Plaintiffs draw the line is when the threat of imaging and other types of forensic electronic analysis is used in a purely harassing and vengeful manner. Plaintiffs produced all known instances of relevant code in their possession, custody or control. Declaration of Cameron Winklevoss ("Cameron Decl."), ¶¶ 9-12, 14-15; Declaration of Tyler Winklevoss ("Tyler Decl."), ¶¶ 9-12, 14-15; Declaration of Divya Narendra ("Narendra Decl."), ¶¶ 9-12, 14-15. The Plaintiffs' personal electronic storage devices have *never* been used to store or work on any of the responsive, relevant code. Cameron Decl., ¶¶ 2-4, 8, 16; Tyler Decl., ¶¶ 2-4, 8, 16; Narendra Decl., ¶¶ 2-4, 8, 16. Neither have Howard Winklevoss's personal or business electronic storage devices, either by him or his employees. Declaration of Howard Winklevoss ("Howard Decl."), ¶¶ 2-3.

In their motion, the Facebook Defendants only half describe their burden in seeking the imaging of hard drives and other memory devices. Defendants state only that "a party must show that it has a particularized likelihood of finding discoverable material." Def. Br. at 5 (citing *Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 533 (1st Cir. 1996)). This is incomplete. Where, as here, a party has undertaken its own search of electronic devices and sworn to that search's accuracy, "the inquiring party must present at least some reliable information that the opposing party's representations are misleading or substantively inaccurate." *Williams v. Massachusetts Mut. Life Ins. Co.*, 226 F.R.D. 144, 146 (D. Mass. 2005).

Facebook Defendants' citation to *Frees, Inc. v. McMillian*, 2007 WL 184889 (W.D.La. Jan. 22, 2007), is only instructive in that it shows a situation in which a party's

3

representations were likely "misleading or substantively inaccurate." In *Frees*, the defendant, a former Frees employee, was accused of stealing company secrets. The record showed that the stolen secrets were computer data, and the issue before the court was whether Frees' request to view McMillian's current computers (a hard drive he kept at home and a laptop provided to him by Frees) was acceptable discovery. *Id.* at *1-2. The Court held that McMillian's affidavit stating the data was not on his two computers was not credible because these computers were the "most likely" places the data existed. *Id.* at *2. Notably, McMillian never produced any of the computer data he was accused of stealing. *Id.*

Clearly, in *Frees*, there was reason to believe that the defendant's representations about the status of his electronic storage devices was either "misleading or substantively inaccurate." This is so because simple logic stated that his two personal computers were most likely to house the relevant data. Similarly, some sort of discovery was needed because crucial evidence the plaintiff sought was never provided. As such, the Court in *Frees* granted the motion to compel because the facts suggested important discovery was being withheld, the defendant's statements were unlikely to be true and there was a "particularized likelihood" that the evidence existed on his computers.

Here, Plaintiffs are hiding nothing and the Facebook Defendants have moved to compel based on the weakest of evidence *despite* the fact they received the evidence they seek. Unlike in *Frees*, Plaintiffs looked in the "most likely" places for code, including their former programmers' computers, which housed both the programmers' work pre-Zuckerberg as well as the versions of code that existed on the Hurricane Electric server both directly before and after Zuckerberg started thefacebook.com. Cameron Decl., ¶¶ 9-12, 14-15; Tyler Decl., ¶¶ 9-12, 14-

4

15; Narendra Decl., ¶¶ 9-12, 14-15. Every instance of code they found was produced to the Facebook Defendants. *Id.*

Facebook Defendants point to *one* statement[2] to contradict numerous representations that (a) Plaintiffs have produced every instance of relevant code, and (b) that unsearched electronic storage devices never housed any relevant code. The rest of Defendants' assertions about the potential location of code rely only on speculation. This does not meet the burden incumbent upon Defendants, and fails to show how Plaintiffs' representations over the past few months are either "misleading" *or* "substantively inaccurate." Furthermore, it fails to explain exactly what evidence is missing from Plaintiffs' production.

### A. Plaintiffs Produced All Known Relevant and Responsive Code

#### 1. Harvard Connection Code

The Facebook Defendants currently possess every instance of Harvard Connection code either Plaintiffs or their previous programmers possessed. When served with discovery requests, Plaintiffs searched every device known or suspected to contain relevant code and provided it to the Facebook Defendants. Cameron Decl., ¶ 9; Tyler Decl., ¶ 9; Narendra Decl., ¶ 9. All instances of the code resided outside of Plaintiffs' control, yet they nevertheless procured copies (notably, from Sanjay Mavinkurve, Victor Gao and iMarc) and provided it to the Facebook Defendants. Cameron Decl., ¶¶ 9-12, 14-15; Tyler Decl., ¶¶ 9-12, 14-15; Narendra

---

[2] This statement is the qualification, written by Margaret Schoenfeld to Monte Cooper on August 24 and September 10, 2007, that the Plaintiffs' personal devices never contained relevant code "before the lawsuit began." *See* Cooper Decl., Exs. 14 & 16. Schoenfeld also reiterated several times in these letters that those computers were not subsequently used to store any relevant code. All references to "before the lawsuit began" were thus indications that, contrary to Facebook Defendants' assertions, there were no potential spoliation problems.

5

Decl., ¶¶ 9-12, 14-15. No relevant code was ever deleted,[3] and Plaintiffs produced it in the same state as it existed at the beginning of this lawsuit. *Id.*

    2.    <u>"Social Butterfly" and "Facebook Importer" Code</u>

Plaintiffs never possessed either of these subprograms' code on any of their electronic storage devices. Cameron Decl., ¶ 17; Tyler Decl., ¶ 17; Narendra Decl., ¶ 17. This includes personal devices, the Hurricane Electric server, ConnectU servers, and the devices, both personal and commercial, owned by Howard Winklevoss and his company. *Id.*; Howard Decl., ¶¶ 2-3. All alleged development and use of either of these subprograms would have occurred at a company called Pacific Northwest Software ("PNS"), located in Washington,[4] or by one of PNS's employees. Cameron Decl., ¶ 17; Tyler Decl., ¶ 17; Narendra Decl., ¶ 17. Plaintiffs were able to access the development versions of these programs, but never the actual code itself. *Id.* As such, there was simply no code for the Plaintiffs themselves to ever produce.

Plaintiffs also note that, even if they did possess code relating to these subprograms, the programs are irrelevant to this action and relate, instead, to the Facebook Defendants' action against Plaintiffs in the Northern District of California. Both programs were written in late 2004 and have nothing to do with the actual claims alleged by Plaintiffs. Though Facebook Defendants make some disingenuous statements about these programs relating to an unclean hands defense, they fail to explain how exactly programs written much later than Zuckerberg's theft and with no connection to the functioning of the connectu.com or Harvard

---

    [3] Facebook Defendants make much of Hurricane Electric wiping its servers sometime after March 2004. As the accompanying affidavits and Exs. 14 & 16 to the Cooper Decl. demonstrate, however, Plaintiffs have consistently represented and proven that all instances of the Harvard Connection code (the only code ever stored on the Hurricane Electric server) were preserved in various forms by Victor Gao and iMarc.

Connection websites can be at all relevant. *See Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387-88 (1944) (holding that, in order to state a valid unclean hands defense, the plaintiff's wrongdoing must bear directly on the subject matter of the litigation); *cf. Leventhal v. Jennings*, 311 Mass. 622, 627 (1942) (dismissing case because plaintiff's misconduct created the problem for which he was suing). Furthermore, they fail to explain how these programs could demonstrate behavior by the Plaintiffs such that it contributed to Zuckerberg's theft and the Defendants' subsequent profit at the Plaintiffs' expense. *Id.* Such overreaching makes improper use of the discovery process and should not be rewarded, even if Plaintiffs actually possessed this code.

### 3. ConnectU.com Code

The only truly relevant computer code in this case are the Harvard Connection and thefacebook.com codes. This is because the relevant disputes – copyright infringement, trade secrets violations and various state law claims – hinge on (a) Zuckerberg's copying, theft and infringement of the code he wrote for Harvard Connection, and (b) whether thefacebook.com code infringed upon the trade secrets embodied in the Harvard Connection website at the time of Zuckerberg's theft.

Facebook Defendants attempt to state this code is relevant by saying connectu.com code relates directly to the potential trade secrets defense. This ignores that Plaintiffs allege it is the overall design and basic functionality of their website that constitute the trade secrets at issue. *See* Amended Complaint ("FAC"), Ex. 1A; *see also TouchPoint Solutions, Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 28 (D. Mass. 2004) (stating that the "overall

---

[4] Plaintiffs contest the ambiguous definition given to these subprograms and do not admit that Defendants' characterizations of the code are valid.

7

design" of a software program may constitute a trade secret). Despite this, Plaintiffs produced the December 31, 2004 "iMarc version" of the code to Facebook Defendants to demonstrate that Plaintiffs still employed their stolen trade secrets in the new website. This is only relevant to show why Zuckerberg's theft damaged Plaintiffs.

One must remember that this is a case about the theft of *Plaintiffs'* trade secrets in *late 2003 and early 2004*. The crucial examination occurs at the point Mark Zuckerberg stole the trade secrets and set up his own competing website, thus pinning the "continuous use" examination in the timeframe leading up to Zuckerberg's theft. *See Id.* at 25-27 (exploring only the facts surrounding the existence of a trade secret up to the point at which that secret was stolen). Plaintiffs contest that post-2004 connectu.com code can show, in any way, that they abandoned their trade secrets at the time Zuckerberg completed his theft in February 2004. As such, this evidence is entirely irrelevant to the trade secrets claim or defense.

As to the Facebook Defendants' claims that post-2004 connectu.com code is relevant to their potential unclean hands, mitigation of damages and "flawed business model" defenses, these are yet another red herring. First, the Facebook Defendants cannot seriously claim that redesigning connectu.com based on Plaintiffs' stolen trade secrets *after* those secrets were stolen somehow constituted unclean hands and was the source of Zuckerberg's theft (and subsequent damage to the Plaintiffs). *See Leventhal*, 311 Mass. at 627. Second, on the mitigation of damages issue, it is clearly evident that Plaintiffs designed and put out a website before December 31, 2004, the date of the version of connectu.com code provided to the Facebook Defendants. It is also clear that connectu.com still exists to this day. If the Defendants wish to claim that Plaintiffs did not mitigate quickly enough, they now have proof of the date by which Plaintiffs possessed a competing website. Third, a "flawed business model" is not proven

through source code, no matter how disingenuously the Facebook Defendants argue to the contrary.

Despite all this, should the Court disagree and require production of what Plaintiffs believe to be irrelevant, nonresponsive documents, ordering an imaging process would be excessive and unnecessary. Plaintiffs have withheld this information only on responsiveness grounds and have easy access to this information. Plaintiffs strongly disagree that the connectu.com code has *any* bearing on the outcome of this case, but point out that these documents can be produced should the Court order it.

> **B.     The *Playboy* Factors Militate Against Burdening Plaintiffs With an Irrelevant Imaging Process**

Facebook Defendants cite the five "discovery balancing factors" set forth in *Playboy Enters. v. Welles*, 60 F. Supp. 2d 1050 (S.D. Cal. 1999), as favoring their proposed imaging process. These factors determine whether discovery is warranted by weighing: (i) the needs of the case; (ii) the amount in controversy; (iii) the importance of the issues; (iv) the potential for finding relevant materials; and (v) the importance of the discovery in resolving issues. *Id.* at 1053-54. For the reasons below, Plaintiffs disagree that any of these factors weigh in favor of imposing wholly inappropriate imaging processes.

> 1.     The Needs of the Case

In support of this factor, the Facebook Defendants *only* state that the Imaging Protocol demonstrates the overarching need for forensic analysis of source code in this case. Def. Br. at 17. This is a remarkable oversimplification of the entire process leading up to the Imaging Protocol and ignores the fact that *no one* – not even the Facebook Defendants – has yet been able to locate relevant code on the Facebook Defendants' hard drives. *See, e.g.*, Wolfson Decl., Ex. A (letter from Neel Chatterjee to Rick Werder in which Chatterjee admits that

9

Facebook Defendants have never been able to locate Harvard Connection code in the code produced to Plaintiffs). Plaintiffs' entire copyright claim is contingent on both the code Zuckerberg wrote in late 2003-early 2004 and thefacebook.com code as it existed at launch in February 2004. As stated to and recognized by this Court, the Facebook Defendants had not identified this code with any level of accuracy, and so the Imaging Protocol allowed the Plaintiffs access to potential sources of information crucial to their claims. In other words, there was significant reason to disbelieve Facebook Defendants' self-serving statements regarding the location of the code and the Court granted access to the "most likely" places the code existed.

In contrast to Facebook Defendants' deficiencies, Plaintiffs have produced every instance of the relevant code requested from them *without* gigabytes of superfluous code attached. Plaintiffs have represented that unsearched electronic storage devices never housed any relevant code. Cameron Decl., ¶¶ 2-8, 16; Tyler Decl., ¶¶ 2-8, 16; Narendra Decl., ¶¶ 2-8, 16. Plaintiffs have stated time and again that they located every requested document in their control, and have detailed where those documents were located in the various productions. Cameron Decl., ¶¶ 10-12, 14-15; Tyler Decl., ¶¶ 10-12, 14-15; Narendra Decl., ¶¶ 10-12, 14-15. It is insincere of the Facebook Defendants to claim that this case *needs* imaging or further production when such conditions exist.

    2.    The Amount in Controversy

Plaintiffs concede that this is a case worth billions of dollars, yet disagree that, just because their potential damages are large, the cost of forensic analysis should be carelessly placed upon them. Defendants' argument on this point, *see* Def. Br. at 17, seems to be that thousands of dollars are a pittance when billions are at stake, and that alone is why Plaintiffs should be subjected to an invasive imaging process.

This, of course, is in line with the Facebook Defendants' history of questionable litigation tactics, but it does not carry weight as a legitimate legal argument. Plaintiffs have not complained about the expense of this litigation or discovery process. Considering Plaintiffs produced every responsive document in their custody and control and never cited the expense of forensic analysis as a reason for withholding anything, this factor is wholly irrelevant.

3.   The Importance of the Issues

The Facebook Defendants cite trade secrets and unclean hands as defining the importance of Plaintiffs' source code to their case. Though, as discussed above, Plaintiffs believe these arguments are red herrings (at least with respect to anything but the Harvard Connection code), the relative importance of Defendants' potential defenses bears no relation to further document production here given that (i) Plaintiffs provided everything in their possession, and (ii) further production will do nothing to help resolve these allegedly "important" issues. *See infra.*

4.   The Potential For Finding Relevant Materials

This factor strongly weighs against granting the Facebook Defendants' motion because, unlike with the Facebook Defendants' hard drives, there is no potential for finding relevant materials. Again, Plaintiffs have stated to the Court that they (i) searched in every place suspected to house relevant code, and (ii) produced every instance of the code they found. Cameron Decl., ¶¶ 9-12, 14-15; Tyler Decl., ¶¶ 9-12, 14-15; Narendra Decl., ¶¶ 9-12, 14-15. There is simply no reason to suspect these representations are either "misleading" or "substantively inaccurate." *See Williams v. Massachusetts Mut. Life Ins. Co.*, 226 F.R.D. at 146.

Furthermore, despite the Facebook Defendants' speculative assertions based on alleged access to the code via the internet, Plaintiffs *never accessed the code from their personal*

11

*computers.* Cameron Decl., ¶ 16; Tyler Decl., ¶ 16; Narendra Decl., ¶ 16. All the emails Facebook Defendants cite as "proof" Plaintiffs accessed the code itself, *see* Def. Br. at 12-15, reference lines of code that appeared on screen when Cameron Winklevoss and Divya Narendra attempted to use the unfinished, development or "administration" versions of the connectu.com website and alleged "Facebook Importer" subprogram,[5] both of which were available through a simple web browser. Cameron Decl., ¶¶ 16-18; Tyler Decl., ¶¶ 16-17; Narendra Decl., ¶¶ 16-18. This means, of course, that even the Facebook Defendants' carefully chosen "proof" fails to show that the Plaintiffs ever viewed the code on the server itself.

Disturbingly, Facebook Defendants twist Winston Williams' words into an admission that he somehow worked on "Facebook Importer" code on ConnectU, Inc.'s computers. Def. Br. at 16. Facebook Defendants base this assertion on Williams' response to the question "Did you ever use any computer that was provided to you by Cameron Winklevoss to access the Facebook site?" Williams replied, "Yes," and then explained the computer had been located in Cambridge, Massachusetts. Cooper Decl. Exh. 4, at 67:24-68:2. To clarify, Williams, a PNS employee who is being sued by Facebook Defendants in their California action, accessed *Facebook.com* from ConnectU, Inc.'s computers, nothing more. Facebook Defendants make remarkable leaps of logic based on this admission, including that Williams then necessarily accessed the "Facebook Importer" code and that "it [was] likely" Williams downloaded code onto ConnectU, Inc.'s computers (rather than PNS' servers). *See* Def. Br. at 16. Such rampant speculation is irresponsible and (a) does not show that there is any likelihood "Facebook

---

[5] Plaintiffs still deny that "Facebook Importer" has anything to do with this case.

Importer" code exists on ConnectU, Inc.'s computers, or (b) that there is any reason to doubt Plaintiffs' assertions to the contrary.[6]

Compelling further production of the various pieces of code requested will do nothing more than trouble the Plaintiffs, which seems to be Facebook Defendants exclusive point. As there is no likelihood that relevant materials will be found, imaging process or no, this factor weighs against granting the motion.

5. The Importance of the Discovery in Resolving Issues

The Facebook Defendants' arguments on this factor raise the specter of spoliation and suggest that forensic analysis is the only way to recreate code that has never been produced. It is amazing that Defendants admit this fact, yet attempt to paint Plaintiffs as the wrongdoers. Plaintiffs allege that Zuckerberg downloaded the *incomplete* Harvard Connection source code from the Hurricane Electric server sometime in November 2003, worked on it over the next few months and never provided Plaintiffs with a copy. (FAC, ¶¶ 35, 37, 57, 65, 67-79). Plaintiffs further allege, in support of their copyright claim, that Zuckerberg took this code and used it when he wrote the code for thefacebook.com. (FAC, ¶¶ 250-51, 255-58). As the Facebook Defendants stated, "[a] full version of the code contemporaneous to the operative events of this case has not been produced." Def. Br. at 19. Indeed, that is what the Imaging Protocol hoped to remedy because Plaintiffs have never possessed the code truly at issue: the code Zuckerberg wrote.

Plaintiffs produced every version of code that was ever in their control, including code that was stored on the Hurricane Electric servers and subsequently erased. Cameron Decl.,

---

[6] An additional point worth repeating is that "Facebook Importer" and "Social Butterfly," the only code Williams would have had any contact with, is wholly irrelevant to this (footnote continued)

13

¶¶ 9-12, 14-15; Tyler Decl., ¶¶ 9-12, 14-15; Narendra Decl., ¶¶ 9-12, 14-15. Facebook Defendants attempt to discredit these representations by merely saying they are "self-serving," but offer no true reason to doubt their veracity. Plaintiffs have fully complied with their document production obligations and explained many times that the electronic storage devices Defendants wish to further search *never* contained any relevant source code, both before and after this litigation commenced. Cooper Decl., Exs. 14 & 16; Cameron Decl., ¶¶ 8, 16; Tyler Decl., ¶¶ 8, 16; Narendra Decl., ¶¶ 8, 16. No outstanding issues will be resolved by implementing an expensive process to search irrelevant hard drives.

---

dispute and is blatantly tied to Facebook Defendants' affirmative California case.

## III. <u>CONCLUSION</u>

This spurious motion is aimed at harassing Plaintiffs and is based solely on conjecture and hyperbole. It cannot stand. Plaintiffs have fully complied – to the extent they possessed or could reasonably obtain responsive documents – with Requests for Production Nos. 1, 2, 67, 68 and 117. A process similar to the Imaging Protocol would be a waste of money and time and further perpetuate the serial motion practice Facebook Defendants have engaged in to this date. For the reasons above, Plaintiffs request this Court to deny the Facebook Defendants' motion.


DATED: November 7, 2007               /s/ Daniel P. Tighe
                                      Daniel P. Tighe (BBO # 556583)
                                      Scott McConchie (BBO # 634127)
                                      GRIESINGER, TIGHE, & MAFFEI, L.L.P.
                                      176 Federal Street
                                      Boston, MA 02110
                                      T: (617) 542-9900
                                      F: (617) 542-0900

                                      Richard I. Werder, Jr. (*pro hac vice*)
                                      Peter Calamari (*pro hac vice*)
                                      Adam B. Wolfson (*pro hac vice*)
                                      QUINN EMANUEL URQUHART
                                      OLIVER & HEDGES, LLP
                                      51 Madison Avenue
                                      New York, New York 10010-1601
                                      T: (212) 849-7000
                                      F: (212) 849-7100


                                      Attorneys for Plaintiffs
                                      ConnectU, Inc., Cameron Winklevoss, Tyler
                                      Winklevoss and Divya Narendra

## **CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to any non-registered participants as of November 7, 2007.

/s/ Daniel P. Tighe
Daniel P. Tighe