# EXHIBIT 36

```
1                UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3                      SAN JOSE DIVISION

4              ----------------------------

5

6    FACEBOOK, INC., and MARK

7    ZUCKERBERG,

8                   Plaintiffs

9    vs.                      Docket No. 5:07-CV-01389

10   CONNECTU, INC. (formerly known as

11   CONNECTU, LLC), et al.,

12                  Defendants

13             ----------------------------

14      VIDEOTAPED 30(b)(6) DEPOSITION OF DAVID TUFTS

15                   In Re: IMARC LLC

16          Friday, October 5, 2007, 9:20 a.m.

17                   Proskauer Rose LLP

18                 One International Place

19               Boston, Massachusetts 02110

20

21    -------Reporter:  ALAN H. BROCK, RDR, CRR-------

22         FARMER ARSENAULT BROCK LLC, for:

23   LiveNote World Service, 221 Main Street, Suite 1250

24              San Francisco, California 94105

25          Phone: 415.321.2300  Fax: 415.321.2301
```

```
1     APPEARANCES:
2     For Plaintiffs
3        Neel Chatterjee, Esq.
4        Theresa A. Sutton, Esq.
5        Orrick, Herrington, & Sutcliffe, LLP
6        1000 Marsh Road
7        Menlo Park, California 94025
8        650.614.7307
9        Fax: 650.614.7401
10       nchatterjee@orrick.com
11       tsutton@orrick.com
12
13    For Defendants
14       Christopher S. Schultz, Esq.
15       Finnegan Henderson Farabow Garrett & Dunner LLP
16       55 Cambridge Parkway
17       Cambridge, Massachusetts 02142
18       617.452.1600
19       Fax: 617.452.1666
20       christopher.schultz@finnegan.com
21
22
23
24
25
```

```
 1    For ConnectU in Massachusetts litigation
 2        Meredith H. Schoenfeld, Esq.
 3        Finnegan Henderson Farabow Garrett & Dunner LLP
 4        901 New York Avenue, N.W.
 5        Washington, D.C.  20001
 6        202.408.4000  fax: 202.408.4400
 7        meredith.schoenfeld@finnegan.com
 8
 9    For Eduardo Saverin in Massachusetts litigation
10        Daniel K. Hampton, Esq.
11        Holland & Knight LLP
12        10 St. James Avenue, 11th Floor
13        Boston, Massachusetts  02116
14        617.523.2700  fax: 617.523.6850
15        dan.hampton@hklaw.com
16
17    For iMarc LLC and the witness
18        Stephen Y. Chow, Esq.
19        Burns & Levinson LLP
20        125 Summer Street
21        Boston, Massachusetts  02110
22        617.345.3000  fax: 617.345.3299
23        schow@burnslev.com
24
25    ALSO:  Rosa Fox-Ogg, Jared Drewniak, Videographers
```

1      A.  No.

2      Q.  It's G-u-c-w-a.

3      A.  I don't know.

4      Q.  What about John Taves, T-a-v-e-s?

5      A.  Yes, I believe that he was sort of the new
6   webmaster, maybe.  He was technically in charge of
7   the site after we -- he took over after we were
8   done.

9      Q.  Have you ever had conversations with
10  Mr. Taves?

11     A.  Yep.

12     Q.  And when do you remember having your first
13  conversation with him?

14     A.  I'm not sure of the exact -- maybe late
15  2004, or summer 2004.  When we were -- we -- iMarc
16  moved ConnectU off of our servers, onto their own
17  server, he seemed to be the one who was going to
18  take over, technically take over.  So there was a
19  couple of conference calls, talking about where
20  files were, where stuff was.

21     Q.  Why was ConnectU being taken off of your
22  servers?

23     A.  We just weren't happy with stuff they were
24  asking us to do, and we just weren't happy with our
25  relationship with them.

1      Q.  Describe what you mean by that.
2      A.  They asked us to do a couple of things that
3   we deemed unethical, and they actually seemed to do
4   something -- seemed to send out emails that we saw,
5   and we didn't want that happening on a server that
6   we managed.
7      Q.  Anything else?
8      A.  Just in general we just weren't happy
9   working with them any more.
10     Q.  Other than the email issue, when you say
11  you generally weren't happy, what was prompting
12  those feelings?
13     A.  I think I touched on in that personal rant,
14  where they were just telling us to "Do this, add
15  this, add this," and that's not really how we work
16  and like to work.  We were growing and had enough
17  other clients that we just really didn't want to
18  work that way with them.  Compound that with a
19  couple of unethical things that they seemed to be
20  doing, we just didn't want any part of managing
21  their server or working with them any more.
22     Q.  Were you concerned at all for iMarc's
23  liability associated with some of those activities?
24     A.  Oh, yeah, sure, yep.
25     Q.  Describe what you mean by that.

```
1        A.  If it's a server that we manage that might
2    have other clients on it and someone sends out mass
3    emails from it and the server gets blacklisted --
4    which would mean that it's known to send spam, so
5    email clients won't accept mail from that -- if
6    they're sending spam, it gets the whole server
7    blacklisted, and we have other clients that suddenly
8    their email stops working.  So we didn't want to
9    deal with that.  That's not what we do.
10       Q.  You used the term "spam."  What do you mean
11   by that?
12       A.  Sending out email without someone signing
13   up for it or requesting it.
14       Q.  Did you ever tell the Winklevoss brothers
15   or Divya Narendra that you didn't -- that you found
16   these emails unethical?
17       A.  Yes.
18       Q.  Tell me when you first discussed that issue
19   with any of them.
20       A.  It's in one of the emails.  It's referenced
21   in the bullet list in the back of the thing, where
22   they sent out a number of emails, 6:00 a.m. by
23   a.m. we saw, what are they doing, and we disabled
24   the ability to do that and talked with them about
25   it.
```

```
1       Q.  I'll ask a little bit more about that a
2    little bit later today.
3            I want to go back to John Taves.  So
4    after migrating the ConnectU website from the iMarc
5    servers to John Taves --
6            Does he have a business?
7       A.  I think originally -- so iMarc hosted a
8    number of websites on shared servers.  So we buy one
9    single piece of hardware and can fit, you know, 40
10   to 50 websites on it.  Step No. 1, when we saw that,
11   you know -- when we started to question their
12   ethics, we told them, "You guys get your own server.
13   You sign up for it, and we'll help you move stuff
14   there."  I don't know if John Taves had anything to
15   do with that, if he actually owned the server or
16   whatnot.  So it's not saying it's John Taves'
17   server.  It's a server that ConnectU set up.  They
18   gave us the log-in information to move everything
19   to.  So I think that was before there was any talk
20   of John Taves.
21      Q.  And so what was the first circumstance you
22   remember having an interaction with John Taves?
23      A.  I think he wanted to add a feature to the
24   website, and he was obviously taking over the
25   webmastering stuff.  We were not as responsive with
```

```
1    ConnectU.  We were pushing them to schedule work.
2    And I think that they contacted John to actually
3    implement stuff, maybe.  We ended up talking with
4    John about, "Here's where the server is.  Here's the
5    log-in.  Here's what's going on" -- just an overview
6    of what's happening.  I'm not sure what date it was.
7    I'm guessing 2004, summer to winter of 2004.
8        Q.  Other than those discussions, did you have
9    any further discussions with John Taves?
10       A.  Off the top of my head, no.
11       Q.  Are you familiar with the company Pacific
12   Northwest Software?
13       A.  I think that that is his company, or a
14   company he works for.
15       Q.  Other than the discussions you've described
16   with John Taves, do you recall any other discussions
17   with anyone from Pacific Northwest Software?
18       A.  Well, yeah, I don't -- there was -- he
19   seemed to have this team of people that he was
20   working with, and I'm not sure if they worked at
21   Pacific Northwest Software.  We had no official
22   dealings with a company called Pacific Northwest
23   Software, but we had dealings -- John Taves and
24   other people seemed to be starting to take over work
25   on the site.  So I'm not sure if they worked for
```

1            (Exhibit 75 marked for identification.)

2       Q.   After you're done looking at it, let me

3    know.

4       A.   I'm done.

5       Q.   Do you recognize what's been marked as

6    Exhibit 75?

7       A.   Yes.

8       Q.   And what is that?

9       A.   This is an email from myself with a

10   previous thread between me, Nils Menten, Cameron

11   Winklevoss, and Nick Grant.

12      Q.   And in the middle of this email is the

13   remark, "I deleted all ConnectU email accounts from

14   our servers."  Was that from a statement you made or

15   someone made to you?

16      A.   I believe that was something I made.

17      Q.   And what did you mean when you wrote that?

18      A.   Well, so, Cameron had sent me an email

19   saying -- so this is a week after this other one.

20   Basically the other one says, "We're turning off the

21   Web server.  Do you want to leave email and DNS on?"

22   And Cameron says, "I'll let you know when we decide

23   to change email or DNS."  So I'm guessing a week,

24   week and a half later he decided to turn those off.

25            So if I don't actually remove the DNS

```
1    and email accounts from my own server, when I send
2    email to anything at ConnectU, it will go to my
3    server, it will bypass the real route to the new
4    one.  So the only way to avoid having a lame DNS or
5    lame email record, you need to completely remove
6    those.  So now when I type in "ConnectU," it goes to
7    the real DNS and finds its way to the real address,
8    instead of stopping at my own server.
9         Q.  So what exactly did you delete when you
10   said you deleted all ConnectU email accounts?
11        A.  Just the pointer to the account.  Like you
12   said, it's a delivery system.  So it was -- at this
13   point it was not doing anything.  It would only be
14   basically messing up or intercepting my iMarc email
15   to ConnectU.  So removing that sort of like pointer,
16   as you called it, a delivery method, it finds its
17   way to the real one.  And the same thing with DNS.
18        Q.  Earlier today -- I'm going to move now to
19   the topics of data that may have been obtained from
20   the Facebook website and the sending of email
21   messages to people based upon information obtained
22   from Facebook.
23             You mentioned earlier today that there
24   were several or a number -- I don't remember the
25   exact word that you used -- of unethical actions
```

```
1    that you felt were taken by ConnectU.  Could you
2    please list what those actions were.
3         A.  The two primary ones are what's listed in
4    this document.  Those are something about like
5    screen-scraping Facebook, asking us if we would do
6    that, and something about sending out a whole bunch
7    of unsolicited emails.
8         Q.  Anything else?  Okay, sorry.
9         A.  So June and July of 2004.  And right after
10   that is when we took their Web hosting off of our
11   Web server.  They set it up on their own server.
12   And then in that other email we were suggesting,
13   "Instead of you managing on your own server, move to
14   Wayne" whatever.
15             But yeah, that is what, June 11 and July
16   6, those two instances are what promoted us not
17   wanting to host their website or really do anything.
18        Q.  Is there anything else that you recall,
19   other than those two instances?
20        A.  No.
21        Q.  Are you aware of whether any additional --
22   after the website was moved to another hosting
23   provider, are you aware of whether there was any
24   further efforts to obtain email addresses from
25   Facebook?
```

```
 1       A.  I don't know.  At that point we kind of
 2   washed our hands of it.  I didn't know, nor did I
 3   care.
 4       Q.  And are you aware of whether after the
 5   hosting ended whether any further sending of
 6   unsolicited emails occurred?
 7       A.  I don't know.
 8           MR. CHATTERJEE:  Let's mark this as
 9   Exhibit 76.
10           (Exhibit 76 marked for identification.)
11       Q.  After you're done looking at this, let me
12   know.
13       A.  Uh-huh.  Yep.
14       Q.  Do you know someone named Marc M. Pierrat,
15   P-i-e-r-r-a-t?
16       A.  Yes.
17       Q.  Who is that?
18       A.  He's the person we discussed at the
19   beginning of this meeting.  He was the salesperson
20   for iMarc at the time.
21       Q.  Are you familiar with any discussions
22   between anyone at iMarc and any of the ConnectU
23   founders about creating something called a parser?
24       A.  No.
25       Q.  And do you have any reason to believe that
```

1   CERTIFICATE OF COURT REPORTER
2       I, Alan H. Brock, Registered
3   Professional Reporter and Certified Realtime
4   Reporter, do certify that the deposition of David
5   Tufts, in the matter of Face Book, Inc., and Mark
6   Zuckerberg v. ConnectU, Inc., et al., on October 5,
7   2007, was stenographically recorded by me; that the
8   witness provided satisfactory evidence of
9   identification, as prescribed by Executive Order 455
10  (03-13) issued by the Governor of the Commonwealth
11  of Massachusetts, before being sworn by me, a Notary
12  Public in and for the Commonwealth of Massachusetts;
13  that the transcript produced by me is a true and
14  accurate record of the proceedings to the best of my
15  ability; that I am neither counsel for, related to,
16  nor employed by any of the parties to the above
17  action; and further that I am not a relative or
18  employee of any attorney or counsel employed by the
19  parties thereto, nor financially or otherwise
20  interested in the outcome of the action.
21
22
23  _____*Alan H. Brock*_____   October 9, 2007
24  Alan H. Brock, RDR, CRR
25