## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CONNECTU, INC., CAMERON WINKLEVOSS, TYLER WINKLEVOSS, AND DIVYA NARENDRA, | Civil Action No. 1:07-CV-10593-DPW |
| Plaintiff, | |
| v. | |
| FACEBOOK, INC., MARK ZUCKERBERG, EDUARDO SAVERIN, DUSTIN MOSKOVITZ, ANDREW MCCOLLUM, and FACEBOOK, LLC, | |
| Defendants. | |

**DEFENDANTS MARK ZUCKERBERG, FACEBOOK, INC., DUSTIN MOSKOVITZ, ANDREW MCCOLLUM AND FACEBOOK LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM OF COPYRIGHT INFRINGEMENT**

Dockets.Justia.com

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................ 1

II.   PROCEDURAL HISTORY ....................................................................... 2

    A.   Defendants Attempt to Learn the Basis for Plaintiffs' Copyright Claim in Discovery .................................................................. 2

    B.   Plaintiffs' Supplementation Identifies No Protectable Expression or Copying of Code ............................................................ 4

III.  CONNECTU CANNOT IDENTIFY PROTECTABLE EXPRESSION IN ITS GUI ........................................................................................... 4

    A.   Methods of Operating a Graphical User Interface are Not Protectable Under the Copyright Law .................................................. 4

    B.   ConnectU's Theory Rests on Function, Not Expression ..................... 5

    C.   Facebook's GUI is not Similar to Plaintiffs' GUI ............................... 7

        1.   ConnectU's Website Developer Testified the GUIs Were Different ........ 8

        2.   Harvard Connection's Programmers Testified the Two Websites Were Not Substantially Similar ............................................. 12

IV.  CODE WRITTEN BY MARK ZUCKERBERG FOR FACEBOOK IS NOT OWNED BY CONNECTU ..................................................... 14

V.   CONCLUSION ........................................................................................ 17

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*Cabrera* v. *Teatro del Sesenta, Inc.*, 914 F. Supp. 743 (D.P.R. 1995).......................................... 14

*Donna* v. *Dodd, Mead & Co.*, 374 F. Supp. 429 (S.D.N.Y. 1974) .............................................. 14

*Hutchins* v. *Zoll Med. Corp.*, 492 F.3d 1377 (Fed. Cir. 2007) ...........................................5, 7, 14

*Ilog, Inc.* v. *Bell Logic, LLC*, 181 F. Supp. 2d 3 (D. Mass. 2002) ................................................. 5

*Johnson* v. *Gordon*, 409 F.3d 12 (1st Cir. 2005) ......................................................................... 5

*Lotus Dev. Corp.* v. *Borland Int'l, Inc.*, 49 F.3d 807 (1st Cir. 1995),
    *aff'd by an equally divided Court*, 516 U.S. 233 (1996) ..............................................4, 5, 6, 7

*Oddo* v. *Ries*, 743 F.2d 630 (9th Cir. 1984)................................................................................ 14

*Picture Music, Inc.* v. *Bourne, Inc.*, 314 F. Supp. 640 457 F.2d 1213 (2d Cir. 1972),
    *cert. denied*, 409 U.S. 997 (1972) ........................................................................................ 14

*Rainey* v. *Am. Forest & Paper Assoc., Inc.*, 26 F. Supp. 2d 82 (D.D.C. 1998)......................... 15

*Richmond* v. *Weiner*, 353 F.2d 41 (9th Cir. 1965), *cert. denied*, 384 U.S. 928 (1966),
    *reh'g denied*, 384 U.S. 994 (1966)........................................................................................ 14

*Venegas-Hernandez* v. *Peer*, 2004 U.S. Dist. LEXIS 28622 (D.P.R. May 2004)...................... 14

## STATE CASES

*Caraustar Indus., Inc.* v. *North Ga. Converting, Inc.*,
    No. 3-4CV187-H 2006 WL. 3751453 (W.D.N.C. 2006) ..................................................... 15

## FEDERAL STATUTES

37 C.F.R. § 202.1(b) (2007) ........................................................................................................... 5

37 C.F.R. § 202.1(c) (2007)............................................................................................................ 7

17 U.S.C. § 102(b)........................................................................................................................... 5

17 U.S.C. § 204(a)......................................................................................................................... 16

# I.    INTRODUCTION

Plaintiffs ConnectU, Inc., Cameron Winklevoss, Tyler Winklevoss, and Divya Narendra (collectively "ConnectU" or "Plaintiffs") cannot identify any protectable original expression allegedly copied by Defendants Facebook, Inc, Mark Zuckerberg, Dustin Moskovitz, Andrew McCollum, and Facebook LLC (collectively "Defendants")[1] to support their claim of copyright infringement.  In addition, ConnectU as a matter of law cannot identify any material facts to support its new alternative theory that it "owns" the underlying Facebook source code.  As a result, Plaintiffs' Seventh Claim for Relief for Copyright Infringement fails as a matter of law.

On November 19, 2007, this Court issued an order compelling Plaintiffs "to serve a full and complete answer" to an Interrogatory requiring Plaintiffs to identify "with precision and specificity all facts" in support of their copyright infringement claim.  Plaintiffs served their Court-ordered response on January 21, 2008.  In doing so, Plaintiffs did not provide any protectable original work of authorship to which copyright protection would apply, nor did they identify any facts supporting literal or non-literal copying of computer code.  Rather, they asserted copyright infringement based upon the following two theories:

1.    Plaintiffs contend that Facebook's graphical user interface ("GUI") employs a method of operation that is allegedly substantially similar to the GUI Plaintiffs used with their own Harvard Connection website.

2.    Plaintiffs contend that its code was allegedly copied and, in the alternative, that they own all computer source code written by Mark Zuckerberg prior to February 4, 2004 for use with any social network, including all source code underlying the Facebook website at the date of its launch.

Neither assertion is viable as a matter of law.

As to the first theory, methods of operation are not copyrightable subject matter.  Indeed, every deposed developer for Plaintiffs has testified that the expressive features of the Facebook

---

[1] Defendant Eduardo Saverin is represented by separate counsel.

and Harvard Connection websites were not similar.  As to the second theory, ConnectU's 30(b)(6) witness admitted that any code written by Mark Zuckerberg is not owned by ConnectU and no written assignment (as required by the copyright laws) exists.  For these reasons, summary judgment on the copyright infringement claim in favor of Defendants is warranted.

## II.    PROCEDURAL HISTORY

The facts concerning Plaintiffs' copyright have been at issue for a considerable amount of time.  ConnectU LLC ("ConnectU")[2] filed its original action on September 2, 2004.  [Case No. 1:04-cv-11923, Dkt. 1].  On October 28, 2004, ConnectU later added a copyright infringement claim via a defective first amended complaint.  [*Id*., Dkt. 13 at ¶¶ 24-29].  The new copyright claim alleged that defendant Mark Zuckerberg ("Zuckerberg") copied portions of source code written for Plaintiffs' Harvard Connection website project and then used the copied code to launch Zuckerberg's own website, thefacebook.com.  *Id*. at ¶ 26.  Plaintiffs later reiterated the same allegations in their original and first amended complaints filed in this subsequent action on March 28, 2007 and August 8, 2007, respectively.  Complaint [Dkt. 1] at ¶ 45; First Amended Complaint ("FAC") [Dkt. 71] at ¶ 257.  Additionally, Plaintiffs' FAC specifically alleged that the Harvard Connection and Facebook websites were "substantially similar."  FAC at ¶ 255.  None of the complaints identified any facts showing substantial similarity of copyrightable expression between the Facebook and Harvard Connection websites.  *See, e.g.,* FAC at ¶¶ 254-257.

### A.    Defendants Attempt to Learn the Basis for Plaintiffs' Copyright  Claim in Discovery

For two-and-one half years, Defendants have been attempting to understand the basis for

---

[2] ConnectU LLC initiated the original lawsuit between the parties, but dissolved in 2006.  Its successor,  ConnectU, Inc. subsequently re-filed the present lawsuit.  For purposes of this motion, "ConnectU" refers to both ConnectU LLC and ConnectU, Inc.

Plaintiffs' assertion of copyright infringement, including any substantial similarity between the parties' websites. On July 11, 2005, the Defendants served ConnectU with Interrogatory No. 1, which reads as follows:

### INTERROGATORY NO. 1:

Identify with precision and specificity all facts in support of Your contention that any HarvardConnection Code or ConnectU Code is infringed.

Declaration of Monte M.F. Cooper In Support Of Defendants' Motion for Summary Judgment of Non-Infringement ("Cooper Decl."), Ex. 1 at 5. Rather than provide any details "with precision and specificity," ConnectU responded on August 22, 2007 with objections and speculative allegations. *See id.* at. 5-7. Notably, Plaintiffs did not identify a single line of any Facebook source code which they contend is substantially similar to any code for the Harvard Connection website. *See Cooper Decl.* Exs. 1 & 6.

Meanwhile, in July 2005, Defendants produced multiple versions of Facebook source code, including some code that existed at launch in February 2004, as well as the website's code as of October and December 2005. *Id.* Exhs. 2-3. Defendants later supplemented their production by serving additional Facebook source code from late-January 2004, immediately before the website launched. *Id.* Ex. 4.

After Plaintiffs re-filed this action, Defendants sought to receive a precise recitation of all facts supporting the copyright claim and moved to compel a further response to Interrogatory No. 1. [Dkt. 146-147]. The Court granted the motion to compel, ruling that "[t]he plaintiffs are ORDERED to serve a full and complete answer to Interrogatory #1 from all sources of information within their possession, custody and/or control on or before the close of business on Tuesday, January 15, 2008." [11/19/07 Electronic Order]. The Court permitted Plaintiffs more than two months to respond, in part because Plaintiffs' counsel acknowledged that the motion

required "line-by-line comparisons of code and asks for the facts which [Plaintiffs] will assert the copyright infringement," and "once [Plaintiffs] actually make this comparison [Plaintiffs] will supplement." *Id.* Ex. 7 at 31:5-14.

> **B.** **Plaintiffs' Supplementation Identifies No Protectable Expression or Copying of Code**

Plaintiffs provided their Court-ordered response on January 21, 2008. *See id* Ex. 6. However, despite their understanding of the need to provide "line-by-line comparisons" of source code, Plaintiffs did not identify a single line of copied code from any of the versions of Facebook website. *Id.* Instead, Plaintiffs' supplemental response set out two arguments in support of its claim of copyright infringement: (1) Plaintiffs argued that Facebook's GUI, as implemented in the its January 2004 source code, employs methods of operation that Plaintiffs believe are substantially similar to the methods of operation used by their own Harvard Connection GUI (*see id.* at 6-11); and (2) any code Zuckerberg wrote for Facebook was owned by ConnectU based upon the ambiguous relationship between Zuckerberg and the ConnectU founders. (*see id.* at 2-6). Neither theory is viable.

> **III.** **CONNECTU CANNOT IDENTIFY PROTECTABLE EXPRESSION IN ITS GUI**

> **A.** **Methods of Operating a Graphical User Interface are Not Protectable Under the Copyright Law**

To establish copyright infringement, ConnectU must prove: (1) ownership of a valid copyright and (2) copying of constituent elements of the work that are original. *See Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, 813 (1st Cir. 1995), *aff'd by an equally divided Court*, 516 U.S. 233 (1996). Proof of wrongful copying is itself a two-step process: first, requiring proof that, as a factual matter, the defendant copied the plaintiff's copyrighted material; and second, establishing actionable copying by proving that the copying of the protected material was so extensive that it rendered the infringing and copyrighted works "substantially similar."

*Johnson v. Gordon*, 409 F.3d 12, 18 (1st Cir. 2005). To find substantial similarity, the Court must "focus on 'what aspects of the plaintiff's work are protectible under copyright laws and whether whatever copying took place appropriated those [protected] elements.'" *Id.* at 19 (quoting *Matthews v. Freedman*, 157 F.3d 25, 27 (1st Cir. 1998)).

When the alleged copyrighted material is software or GUIs, a Court must first determine whether the allegedly copied material actually was a "method of operation" within the meaning of 17 U.S.C. § 102(b). *Lotus Dev. Corp.*, 49 F.3d at 816. This threshold determination is necessary because the First Circuit has acknowledged that methods of operation, including "specific words [that] are essential to operating something," are not original expression entitled to copyright protection whatsoever, regardless of "whether they must be highlighted, typed in, or even spoken…." *Id.* (concluding that a menu command hierarchy structure was not subject to copyright infringement even when literally copied, since it constituted a method of operation); s*ee also Hutchins v. Zoll Med. Corp.*, 492 F.3d 1377, 1383-84 (Fed. Cir. 2007) (applying First Circuit law and holding that copyright protection was not available for standard instructions for performing CPR or their independent placement in electronic form); *Ilog, Inc. v. Bell Logic, LLC*, 181 F.Supp.2d 3, 12-14 (D. Mass. 2002) (holding that copying of rules editors and various methods of implementing the editor functions were not subject to copyright infringement, since the functions were un-protectable ideas and methods of operation); 37 C.F.R. § 202.1(b) (2007) (excluding from copyright protection "[i]deas, plans, methods, systems, or devices, as distinguished from the particular manner in which they are expressed in a writing").

### B.    ConnectU's Theory Rests on Function, Not Expression

ConnectU's first theory of infringement is based upon a comparison of Facebook's and Harvard Connection's methods of operation of their respective GUIs. No similarity in appearance or code structure is identified, as Plaintiffs promised to set forth if it existed. *See*

Cooper Decl. Ex. 7 at 31:5-14. Instead, to support its claim, Plaintiffs cite only: (a) the methods by which users registered to use the Facebook and Harvard Connection websites (*id.* Ex. 6 at 7); (b) the manner in which users created profiles (*id.* at 8-9); (c) the procedures by which users requested permission to introduce themselves to one another and communicate by email (*id.* at 9-10); and (d) the methods of operation that permitted users to search certain profile information (*id.* at 11). None of these descriptions relied upon any citation to underlying computer source code. *Id.* at 7-11. Plaintiffs' comparison of the "profile search" capabilities for the Facebook and Harvard Connection GUIs is representative of their "copyright" analysis of methods of operation:

| Step | Harvard Connection | Facebook (Jan. 2004) |
|------|--------------------|-----------------------|
| 1. | Provide "Quick Search" capability | Provide "Quick Search" capability |
| 2. | User clicks advanced search button to initiate search process | User clicks advanced search button to initiate search process |
| 3. | User enters information in search fields, including:<br>• Employment Status<br>• Major<br>• House | User enters information in search fields, including:<br>• Employment Status<br>• Concentration<br>• House |
| 4. | User clicks search button to submit fields to system | User clicks search button to submit fields to system |
| 5. | System takes field values and searches database to create result set | System takes field values and searches database to create result set |
| 6. | System generates a web page consisting of summaries of the profiles and displays it back to the user | System generates a web page consisting of summaries of the profiles and displays it back to the user |
| 7. | User clicks on profile image to view the profile of a user in the search results | User clicks on profile image to view the profile of a user in the search results |

*Id.* at 7. These are common website operations, as opposed to original and protectable expression, and are not protectable under the copyright laws. *Borland*, 49 F.3d at 815 (explaining that a method of operation "refers to the means by which a person operates something, whether it

be a car, a food processor, or a computer….other people would be free to employ that method and to describe it in their own words").  The generic entry of registration information using terms like "name" is precisely the type of subject matter that the First Circuit has confirmed is not subject to copyright protection.  *See Borland*, 49 F.3d at 816 ("The 'expressive' choices of what to name the command terms and how to arrange them do not magically change the uncopyrightable menu command hierarchy into copyrightable subject matter"); s*ee also Hutchins*, 492 F.3d at 1385 (explaining that "'stay calm' (Zoll's 'remain calm'); 'if no pulse, start CPR' ('if no pulse, continue'); and 'give two breaths' ('start with two breaths')…are entirely functional…and that they are not subject to copyright").  Indeed, a registration page or a profile creation tool simply present a user with "blank forms," which are themselves expressly excluded from copyright protection.  *See* 37 C.F.R. § 202.1(c) (2007) (excluding from copyright protection "[b]lank forms, such as time cards, graph paper, account books, diaries, bank checks, scorecards, address books, report forms, order forms and the like, which are designed for recording information and do not in themselves convey information").

Furthermore, ConnectU cannot claim copyright protection in words that are common place to the functioning of its website as a social networking website.  *See Hutchins*, 492 F.3d at 1385 (citing *John G.Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 43) (1st Cir. 2003) (noting that "when the terms at issue are the only available forms of expression, these expressions are not subject to copyright"). As a result, ConnectU cannot meet its burden to demonstrate the copying of protectable original expression and it is improper to reach an analysis of substantial similarity based on methods of operation.  Thus, summary judgment is proper.

### C.    Facebook's GUI is not Similar to Plaintiffs' GUI

In addition, Plaintiffs cannot demonstrate substantial similarity between Harvard Connection's and Facebook's GUI.  The undisputed evidence is that the websites are not

substantially similar. Plaintiffs do not assert, and cannot assert, any *visual* similarity between the parties' websites in support of its infringement claim. *See* Cooper Decl. Ex. 6 at 6-11. Had they had a viable copyright infringement claim based on the visual similarities of the parties' respective GUIs, Plaintiffs could have merely shown screen shots and compared the two websites, explaining how the look and feel reflected protectable expression. Alternatively, Plaintiffs could have described the similar "look and feel" of protectable elements, such as color scheme and fanciful page layout. Plaintiffs did not do so.

Instead, Plaintiffs' website developers have consistently testified that the GUI used by Facebook upon its launch was not substantially similar to ConnectU's. These witnesses have testified that if Facebook resembled any other social network, it was the "Friendster" website which pre-dated Harvard Connection.

### 1. ConnectU's Website Developer Testified the GUIs Were Different

For example, Defendants deposed a company named iMarc, LLC which specializes in website design. iMarc was hired in 2004 by ConnectU to complete the Harvard Connection project. Cooper Decl. Ex. 9 at 24:10-25:13. In fact, when iMarc compared the features of the original Harvard Connection website to the Facebook website, it concluded the two sites were not substantially similar insofar as they used different methods of presenting profiles:

> Q: Describe what the differences were between thefacebook.com website and the mockup you were given to work on.
>
> …
>
> A: Thefacebook.com website had a single user profile. If I signed up for a Facebook account, there would be one profile, whether I was -- I think when you sign up, you say "I'm here for dating, just to meet friends, for professional networking" on thefacebook.com, and on Friendster you had one profile. On the mockup that was given to us, the original idea for the site that we saw, you had a

> professional profile and a completely segregated personal
> profile.  That was the main difference.

> Q:  Were there any other differences that you recall?

> A:  Well, thefacebook.com was a website, and what we were
> presented was a mockup, a screen shot, light HTML.  It
> was not a working website.

*Id.* at 32:8-33:1 (objection omitted).[3]  iMarc's witness further elaborated on why the appearance

of Facebook's and Harvard Connection's GUIs were not substantially similar:

> Q.  … Before we broke for lunch, you talked about, several
> times about a screen, an HTML screen that showed what
> the HarvardConnection graphical user interface looked
> like.  Do you recall that?

> A.  Yes.

> Q.  Did I characterize that right?

> A.  Yes.

> Q.  Do you recall if that graphical user interface looked like the
> graphical user interface of Facebook?

> …

> A.  I do recall it; and no, it did not look at all like Facebook.

> Q.  And why do you say that?

> …

> A.  Because it looked different.

> Q.  And you don't remember any specific points of
> differentiation?

---

[3] The Harvard Connection website included what Plaintiffs called a "date side" and a "connect side," which were intended to facilitate dating and developing professional contacts among Harvard students and alumni.  *See* Cooper Decl. Ex. 12 at 67:22-68:5.  This division resulted in the "professional profile" and a "completely segregated personal profile" referenced by iMarc. Even Plaintiffs concede that the "connect" side of the website was not functional when the Harvard Connection code was provided to Mark Zuckerberg, because "very little" of it had been coded.  *Id.* at 68:14-69:4; 174:3-7;  330:5-24;  332:13-333:10.

   …

  A.  Yes.  The Facebook, to my recollection, was blue with a white background, really square, squared-up edges, squared design elements.  And that HarvardConnection one was brown, a lot more graphical.  Facebook seemed very sparse, cold.  And the HarvardConnection one was earth tones.  Just completely different color scheme, different design elements.

  Q.  Were the pages themselves designed differently?

  A.  Yes.  They looked different.

*Id.* at 107:14-108:21 (objections omitted).  On the whole, iMarc concluded that Harvard Connection's user interface did not "look good."  *Id.* at 60:5-14.

 iMarc also testified that any later resemblance between ConnectU and Facebook resulted from ConnectU copying Facebook's GUI, as well as the earlier Friendster website.  In that regard, iMarc testified as follows:

  Q.  Mr. Tufts, do you recognize what I've handed to you as Exhibit No. 65?

  A.  Yes.  It is "my personal rent" [sic, rant].

  Q.  And when you say "my personal rent" [sic, rant],  that's an email that you've written?

  A.  It was an email that I authored, sending it to myself, Nick Grant, and Nils Menten, collectively known as partners@imarc.net.

  Q.  And you authored this on about June 22nd, 2005?

  A.  I would say exactly on that date.

  Q.  If you look at the third paragraph of the email, it starts with "ConnectU."  Do you see that?

  A.  Yes.

  Q.  "ConnectU came to us with a specification and design for harvardconnection.com which did not look or act anything like Facebook."  Do you see that?

A.     Yes.

Q.     Could you describe what you meant when you wrote that?

A.     I meant that they came to us with something really complicated, like this, and by the time we launched a website, it was much more user-friendly, like friendster.com or thefacebook.com or match.com or any of the sites that were represented in that benchmarking.

Q.     And in the next sentence you state, "In April Facebook was already hugely popular. 90 percent of the direction we received from ConnectU was 'Copy Facebook' and ignore the HarvardConnection spec and design." What did you mean when you wrote that?

…

A.     I meant that they kept pointing us -- again, benchmarking -- Facebook, Friendster, sites like that. I think I only mentioned Facebook here because I knew that they were asking for stuff relating to some lawsuit that they were filing against Facebook.

Q.     When you use the phrase "Copy Facebook," explain what you meant when you said that.

A.     I meant that -- again, I'm not sure if they actually used the word "copy." But we were directed at features on Facebook and other social networking sites, mostly for look and feel, usability, ideas, things like that, that they would see on another website and say, "Hey, that's a good feature. We should add that."

Q.     And those weren't features that were in the original documents that they gave you?

…

A.     I think we added a number of features that are not in this document or in whatever our original plan was.

Q.     Do you remember any specific features that came from Facebook that the Winklevoss brothers or Divya Narendra asked you to add to the ConnectU website design?

A.     I think the ones I can -- or the layout of the search results they especially liked on Facebook; the ability to create

groups of people with similar interests as you. If you're a Boston Red Sox fan, you could create a group called Boston Red Sox fans, and if there are other people on the website who are also Boston Red Sox fans, they could join that group and you could collectively email. I think that's something that Facebook was doing that they thought was a worthy feature to add to their site.

Those are the two specific things. But obviously, by "copy," there's no way to copy code. It's more concepts. But friendster.com was doing groups, and Friendster was a really similar layout as well.

Q: Had a similar layout to whom?

A: Facebook and ConnectU.

*Id.* at 39:3-42:5 (objections removed); Cooper Decl. Ex. 10. *See also id.* Ex. 9 at 26:24-29:3; 31:20-32:5.

## 2. Harvard Connection's Programmers Testified the Two Websites Were Not Substantially Similar

Joe Jackson was one of the three programmers who in 2003 developed the source code, the user interface and related functionality for the Harvard Connection website. *Id.* Ex. 11 at 34:6-38:23. Plaintiffs also identified him as a "co-author" on their copyright registration for the Harvard Connection code. *See id.* Ex. 13. Mr. Jackson observed the Facebook website when it launched in February 2004, and therefore was in a unique position to compare both GUIs. He confirmed that they were not substantially similar to one another:

Q: When did you first become aware of the www.facebook web site?

A: Pretty much as soon as it launched. Everyone was signing up on campus.

Q: Did that include you?

A: Yep. Yes.

Q: Did you consider it to be similar to the Harvard Connection site you had worked on?

> A:    I don't remember thinking that. No. I thought it was
>       similar to Friendster.

*Id.* Ex. 11 at 144:21-145:5. In fact, Mr. Jackson concedes that Harvard Connection was not even

a social network like Facebook or Friendster, given that it lacked the critical function of

connecting friends. *Id.* at 128:11-129:4. *See also id.* at 145:10-146:6.

Notably, Victor Gao, one of the other two original programmers for Harvard Connection

and one of the other named co-authors of the copyrighted source code, likewise agreed that

Facebook's and Harvard Connection's GUI were different:

> Q:    All right. And the user interfaces were different, correct?
>
> A:    Yes.
>
> Q:    All right. And the registration fields were different, correct?
>
> A:    There's some difference.
>
> Q:    There were differences, correct?
>
> A:    There were differences.

*See id.* Ex. 12 at 343:16-23. Mr. Gao further admitted that to the extent Facebook and Harvard

Connection shared any functional similarities in the use of college profile fields (such as the

identification of a student's "house"), such information necessarily was used with many

resources associated with university profile information. *Id.* at 342:2-343:4. Indeed, Mr. Gao

conceded Harvard Connection and Facebook did not even share the same type of "dating"

information. *Id.* 345:17-346:16. Not surprisingly, therefore, Mr. Gao specifically admits he has

"no opinion" as to how the Harvard Connection code he worked on could even have been used

for Facebook. *Id.* at 346:21-347:11.

On the other hand, Mr. Gao agreed that Facebook resembled the Friendster website

which pre-dated Harvard Connection. *Id.* at 335:23-339:11. Among the reasons for Facebook's

resemblance to the earlier Friendster social network were the inclusion of "friends" lists, contact by email, listing of profile information, and the ability to search – essentially, with the exception of the use of friends lists, the precise same functions that Plaintiffs now cite as their own protectable expression for purposes of alleging copyright infringement. *Id.* at 338:5-339:11. Likewise, Mr. Gao conceded Friendster had the same type of "date" information as existed in Harvard Connection, and which is cited by Plaintiffs for purposes of copyright infringement. *Id.* at 346:2-20.

## IV. CODE WRITTEN BY MARK ZUCKERBERG FOR FACEBOOK IS NOT OWNED BY CONNECTU[4]

ConnectU's second theory of infringement, although not entirely clear, is that the Facebook code somehow infringes its copyright because ConnectU is the owner or co-owner of the Facebook code written by Zuckerberg. *See* Cooper Decl. Ex. 6 at 2-6. ConnectU cannot as a matter of law assert ownership over Facebook code, let alone copyright infringement as a result of such "ownership."

First, ConnectU admitted in a Rule 30(b)(6) deposition that any source code written by Zuckerberg and not included with the copyright deposit for Harvard Connection was owned by

---

[4] Plaintiffs do not explain how Facebook code can be considered part of the base of code registered with the Copyright Office which serves as the basis for its claim. To the extent that Plaintiffs claim that somehow the Facebook code is part of the work registered with the Copyright Office, Zuckerberg is a joint owner in the work and cannot be an infringer. *See Oddo v. Ries*, 743 F.2d 630 (9th Cir. 1984) (noting that one joint owner may exploit the work themselves without obtaining consent from other joint owners); *Cabrera v. Teatro del Sesenta, Inc.*, 914 F. Supp. 743, 763 (D.P.R. 1995) (explaining that joint authors have an undivided interest in the work as co-owners of the copyright); *Venegas-Hernandez v. Peer*, 2004 U.S. Dist. LEXIS 28622, *95 (D.P.R. May 2004) ("'Since the purpose of an infringement action is to protect the owner's property interest in the copyright against unauthorized use by a nonowner, it follows that an infringement action cannot be maintained against a joint owner who exercises his legal right to use or license others to use the copyright.'"); *Donna v. Dodd, Mead & Co.*, 374 F. Supp. 429 (S.D.N.Y. 1974) (explaining that one joint owner cannot be held liable for copyright infringement to another joint owner because one cannot infringe their own copyright); *see also Picture Music, Inc. v. Bourne, Inc.*, 314 F. Supp. 640, S.D.N.Y., *aff'd*, 457 F.2d 1213 (2d Cir. 1972), *cert. denied*, 409 U.S. 997 (1972); *Richmond v. Weiner*, 353 F.2d 41 (9th Cir. 1965), *cert. denied*, 384 U.S. 928 (1966), *reh'g denied*, 384 U.S. 994 (1966).

Zuckerberg.  *See* Cooper Decl. Ex. 5 at 284:1-13.  Among the Topics for that deposition was one

directed to ConnectU's "alleged ownership of all intellectual property (including … copyrighted

material …) referenced in the Amended Complaint, and any alleged transfers of any rights to

[ConnectU] by Harvard Connection …."  *Id.* Ex. 8 at Topic 10.  During that deposition,

ConnectU's Rule 30(b)(6) witness, Cameron Winklevoss, testified that it did not register any

code written by Zuckerberg for copyright protection, because ConnectU did not own it:

> Q.  Did Mr. Gao strip out any code from the version that he
> gave you which you gave to your lawyers to deposit with
> the copyright office?
>
> A.  I am -- I can't answer that.  I don't know the answer to that.
> I know that the code given to the copyright office has none
> of Mark Zuckerberg's code.
>
> Q.  And how do you know that?  Is that because Mr. Gao told
> you that?
>
> A.  *Because we wouldn't have filed code that he [sic] written --
> wrote for copyright because it's not our code.*

*Id.*  Ex. 5 at 284:1-13 (emphasis added).

ConnectU is bound by the testimony of Mr. Winklevoss, its designated Rule 30(b)(6)

witness, and cannot now contradict this testimony by asserting an ownership interest in code it

admits was written and owned by Zuckerberg.  *See Rainey v. Am. Forest & Paper Assoc., Inc.*,

26 F. Supp. 2d 82, 94 (D.D.C. 1998) ("[u]nless it can prove that the information was not known

or was inaccessible, a corporation cannot later proffer new or different allegations that could

have been made at the time of the discovery deposition");  *Caraustar Indus., Inc. v. North Ga.

Converting, Inc.*, No. 3-4CV187-H 2006 WL 3751453, at *6 - *7 (W.D.N.C. 2006) (same).

ConnectU's Rule 30(b)(6) testimony and ConnectU's interrogatory responses are binding for

purposes of summary judgment, and no genuine issue of material fact exists as to Zuckerberg's

ownership of the Facebook code.

Moreover, ConnectU cannot cite to any written assignment, non-competition agreement or other instrument by which they contend Zuckerberg either transferred to Plaintiffs a copyright in Facebook, or agreed to exclusively develop social networking code for Plaintiffs. *See* Cooper Decl. Ex. 6 at 2-6. A written assignment is required for ConnectU to assert ownership of any copyright in Facebook code. *See* 17 U.S.C. § 204(a) ("A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.").

Despite lacking a written agreement assigning Facebook code to ConnectU, Plaintiffs incorrectly assert they own such code because: (a) they allege that they entered into an oral partnership agreement with Zuckerberg by which any computer code he created for *any* social networking website (not merely Harvard Connection) "inured to the benefit" of the Plaintiffs (Cooper Decl. Ex. 6 at 2-4); (b) Plaintiffs claim Zuckerberg created all social networking website code (including Facebook's) at their "special behest" (*id.* at 5); and (c) Plaintiffs argue that Zuckerberg wrote social networking code "specifically with the intent of completing a collaborative project with the Plaintiffs," and thus any Facebook code must have been written "to add to, integrate with and complete that creative work" (*id.* at 5-6). None of these allegations support a copyright infringement claim or meet the explicit requirements of 17 U.S.C. § 204(a). Indeed, as set forth in Defendants' previous motion for summary judgment, no such agreement existed. *See* Memorandum of Points and Authorities in Support of Defendants' Mark Zuckerberg, Facebook, Inc. and TheFacebook LLC's Motion for Summary Judgment on Plaintiff's Claims for Breach of Contract, Breach of Covenant of Good Faith and Fair Dealing, and Promissory Estoppel [Dkt. 81].

Given ConnectU's admission that it does not own code written by Zuckerberg and its failure to identify any facts supporting a transfer of the Facebook copyright, summary judgment is warranted.

## V.     <u>CONCLUSION</u>

Defendants Mark Zuckerberg, Facebook, Inc., and TheFacebook LLC respectfully request that the Court enter summary judgment on Plaintiffs' Seventh Claim for Relief for Copyright Infringement.  Plaintiffs failure to identify any protectable original expression is dispositive of its claim.  Mark Zuckerberg's purported role as a "partner" of Plaintiffs likewise fails as a matter of law.

/ / /

Dated:  February 12, 2008.                           Respectfully submitted,

/s/ I. Neel Chatterjee /s/
I. Neel Chatterjee*
Monte Cooper*
Theresa A. Sutton*
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, California  94025
Telephone:    (650) 614-7400
Facsimile:    (650) 614-7401
nchatterjee@orrick.com
mcooper@orrick.com
tsutton@orrick.com

Steven M. Bauer
Jeremy P. Oczek
PROSKAUER ROSE, LLP
One International Plaza, 14th Floor
Boston, MA 02110-2600
Telephone:    (617) 526-9600
Facsimile:    (617) 526-9899
sbauer@proskauer.com
joczek@proskauer.com

* Admitted Pro Hac Vice

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 12, 2008.

Dated:  February 12, 2008.                    Respectfully submitted,

                                                            /s/ I. Neel Chatterjee /s/
                                            _____
                                                            I. Neel Chatterjee