# EXHIBIT 9

Dockets.Justia.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

Certified Copy

---------------------------

FACEBOOK, INC., and MARK

ZUCKERBERG,

Plaintiffs

vs.                              Docket No. 5:07-CV-01389

CONNECTU, INC. (formerly known as

CONNECTU, LLC), et al.,

Defendants

----------------------------

VIDEOTAPED 30(b)(6) DEPOSITION OF DAVID TUFTS

In Re: IMARC LLC

Friday, October 5, 2007, 9:20 a.m.

Proskauer Rose LLP

One International Place

Boston, Massachusetts 02110

-------Reporter: ALAN H. BROCK, RDR, CRR-------

FARMER ARSENAULT BROCK LLC, for:

LiveNote World Service, 221 Main Street, Suite 1250

San Francisco, California 94105

Phone: 415.321.2300  Fax: 415.321.2301

```
1    APPEARANCES:

2    For Plaintiffs

3       Neel Chatterjee, Esq.

4       Theresa A. Sutton, Esq.

5       Orrick, Herrington, & Sutcliffe, LLP

6       1000 Marsh Road

7       Menlo Park, California 94025

8       650.614.7307

9       Fax: 650.614.7401

10      nchatterjee@orrick.com

11      tsutton@orrick.com

12

13   For Defendants

14      Christopher S. Schultz, Esq.

15      Finnegan Henderson Farabow Garrett & Dunner LLP

16      55 Cambridge Parkway

17      Cambridge, Massachusetts 02142

18      617.452.1600

19      Fax: 617.452.1666

20      christopher.schultz@finnegan.com

21

22

23

24

25
```

```
 1    For ConnectU in Massachusetts litigation

 2        Meredith H. Schoenfeld, Esq.

 3        Finnegan Henderson Farabow Garrett & Dunner LLP

 4        901 New York Avenue, N.W.

 5        Washington, D.C.  20001

 6        202.408.4000  fax: 202.408.4400

 7        meredith.schoenfeld@finnegan.com

 8

 9    For Eduardo Saverin in Massachusetts litigation

10        Daniel K. Hampton, Esq.

11        Holland & Knight LLP

12        10 St. James Avenue, 11th Floor

13        Boston, Massachusetts  02116

14        617.523.2700  fax: 617.523.6850

15        dan.hampton@hklaw.com

16

17    For iMarc LLC and the witness

18        Stephen Y. Chow, Esq.

19        Burns & Levinson LLP

20        125 Summer Street

21        Boston, Massachusetts  02110

22        617.345.3000  fax: 617.345.3299

23        schow@burnslev.com

24

25    ALSO:  Rosa Fox-Ogg, Jared Drewniak, Videographers
```

1              October 5, 2007          9:20 a.m.

2              P R O C E E D I N G S

3              THE VIDEOGRAPHER:  Here begins the

4    30(b)(6) deposition of David Tufts, Tape 1, Volume

5    1, in the matter of Facebook, Inc., et al. versus

6    ConnectU, et al. in the United States District

7    Court, Northern District of California, San Jose

8    Division, Case No. 5:07-CV-01389-RS.  Today's date

9    is October 5th, and the time on the video monitor is

10   9:21.  The video operator today is Rosa Fox-Ogg,

11   representing LiveNote World Service, located at 221

12   Main Street, San Francisco, California 94105, phone

13   number 415-321-2300.  The court reporter is Alan H.

14   Brock, of the firm Farmer Arsenault Brock, on behalf

15   of LiveNote World Service.  Today's deposition is

16   being taken on behalf of the plaintiffs and is

17   taking place at One International Place, Boston,

18   Massachusetts.

19              Counsel, please introduce yourselves and

20   state whom you represent.

21              MR. CHATTERJEE:  This is Neel Chatterjee

22   and Theresa Sutton, representing Facebook, Inc., and

23   Mark Zuckerberg.

24              MR. HAMPTON:  My name is Dan Hampton.  I

25   don't represent a party in the California case, but

1    I represent defendant Eduardo Saverin in a case

2    sharing many of the same parties now pending in the

3    District of Massachusetts.

4              MS. SCHOENFELD:  This is Meredith

5    Schoenfeld, from Finnegan Henderson Farabow Garrett

6    & Dunner.  I represent the plaintiffs in the same

7    Massachusetts litigation, ConnectU.

8              MR. SCHULTZ:  Chris Schultz, for the

9    defendants.

10             MR. CHOW:  Stephen Chow, for iMarc,

11   Inc., and the witness today.

12             MR. CHATTERJEE:  And just for sake of

13   clarity, Ms. Sutton and I also represent all of the

14   defendants except for Eduardo Saverin in the

15   Massachusetts case that Ms. Schoenfeld and Mr.

16   Hampton referred to.

17             DAVID TUFTS, duly sworn

18                  EXAMINATION

19   BY MR. CHATTERJEE:

20      Q.  Please state your name for the record.

21      A.  David Tufts.

22      Q.  Mr. Tufts, my name is Neel Chatterjee, and

23   I'm an attorney for the plaintiffs in a lawsuit

24   pending in California.  I represent Facebook, Inc.

25   and Mark Zuckerberg in that case.

1    is clear to you, you can go ahead and answer it.

2        A.   All right.

3        Q.   Is there a general practice at iMarc for

4    people to use each others' email addresses?

5        A.   I don't understand that question.

6        Q.   So, for example, would Mr. LeBlanc

7    generally be allowed to use Mr. Bushee's email

8    address?

9             MR. SCHULTZ:  Objection, vague.

10       A.   I don't know of any case where that's

11   happened.

12       Q.   Now I'm going to turn to a different topic.

13   I want to talk to you about ConnectU, Cameron and

14   Tyler Winklevoss, and Divya Narendra.  Do you

15   recall --

16            Well, let me start with this:  Have you

17   ever met, either electronically, through an email or

18   the like, or live, Divya, Cameron Winklevoss, or

19   Tyler Winklevoss?

20            MR. SCHULTZ:  Object to the form.

21       A.   Yes.

22       Q.   When was the first time that you met any

23   one of those people?

24            MR. SCHULTZ:  Object to the form.

25       A.   This is including electronically, you said?

1    Q.   Yes.

2    A.   Whenever the first email is.

3    Q.   Can you give me an estimate as to time?

4    A.   2003.

5    Q.   Do you recall the first time you met them

6   via a telephone call or in person?

7            MR. SCHULTZ:   Object to the form.

8    A.   I don't recall the first time.   I'm

9   guessing it was probably after that.

10    Q.   And do you recall who it was that contacted

11   iMarc?

12            MR. SCHULTZ:   Objection, foundation.

13    A.   I believe one of the Winklevosses.

14    Q.   One of the Winklevoss brothers?

15    A.   Yes.

16    Q.   Do you recall why they said they were

17   contacting iMarc?

18            MR. SCHULTZ:   Objection, foundation.

19   Assumes facts not in evidence.

20    A.   I was not part of the original.   That would

21   be typical of a client.   Specifically, in this case,

22   the client contacts our sales department.   That

23   would have been Marc -- to talk about a probable

24   job.   And then after it was ironed out, it would go

25   to me or the production team.   So I don't recall who

1  contacted us first and why, but I'm guessing it's

2  all in those emails.

3      Q.  And when you said you were contacted --

4  iMarc was contacted about a possible job, what did

5  you understand the job ultimately to be?

6      A.  By the time Marc presented it to me, I

7  believed it to be a social networking site.

8      Q.  What do you mean by "social networking

9  site"?

10     A.  A website where people can create profiles

11 about themselves to interact with or network with

12 other people on the website, either for personal

13 dating reasons or professional reasons.

14     Q.  Please explain a little bit more what you

15 mean by that.

16         MR. SCHULTZ:  Objection, vague.

17     A.  I'm not sure.  Can you ask me a specific

18 question?

19     Q.  Sure.  You described the scope of the

20 project being a social networking website.  Did I

21 get that right?

22     A.  Yes.

23     Q.  And you said that it was a website where

24 people can create profiles to interact with others

25 for dating or professional reasons.

1    A.   Correct.

2    Q.   Maybe I can probe a little bit more into

3  what you mean by "dating and professional reasons."

4              Let me ask the question, first:  What

5  did you mean when you said "for dating reasons"?

6    A.   I believe that they wanted to allow their

7  users to create profiles so they could meet, connect

8  with other people for personal reasons --

9  friendship, dating.  The website was really just

10  about bringing people together, and from then on,

11  it's not going to impose any rules about dating or

12  something like that.  It's mostly about just

13  meeting.

14    Q.   That was the scope of the project they

15  presented.

16    A.   Yes.

17    Q.   And what about professional reasons?  What

18  do you mean when you said that?

19    A.   Perhaps someone would create a profile much

20  like a resume.  Other people in a company could

21  search through or look for specific people to hire,

22  to work with, things like that -- professional

23  business.

24    Q.   And were you given any guidance when you

25  were given the scope of this project about what to

1    look at to develop this website?

2         A.   Yes.

3         Q.   And what guidance were you given?

4         A.   By the time it came to me with a proposal,

5    there was a number of benchmarking sites --

6    match.com, I believe, rise.com, thefacebook.com,

7    friendster.com -- and then also some -- so those

8    were all, especially friendster.com -- those were

9    all social networking sites that were already out on

10   the Internet that did something similar.  And they

11   also gave us a number of benchmarking sites for the

12   visual look and feel.  Most of those sites were

13   really stripped down and technical.  And they sent

14   us, I believe, YSL, which might be a fashion

15   company, a couple of sites that we had actually

16   developed they liked the look at -- look of.  So

17   they gave us a couple other, maybe four sites --

18   again, it's in those emails -- of benchmarking sites

19   which they liked the look of.  So we had a couple of

20   sites that they liked features from, a couple of

21   sites that they liked the look of.

22        Q.   You mentioned these benchmarking sites.

23   Were you told to do anything specifically with

24   respect to your review of the match.com website?

25        A.   No.  I think that they pointed out features

1    that they liked.  Again, this is just from me

2    recently looking through these emails.  I noticed

3    that on match.com there was a feature where, I think

4    you could wink at someone.  If you had a profile and

5    -- if I had a profile and you had a profile and I

6    found you attractive, I could wink at you and send

7    you a little email.  They liked something like that,

8    and I think we ended up implementing something

9    similar to that.  That was something from match.com

10   that they found appealing.

11      Q.  And what about rise.com?  Do you remember

12   anything specific that they identified that they

13   wanted?

14          MS. SCHOENFELD:  Objection, relevance.

15      A.  I believe rise.com did a good job of

16   presenting professional profiles, much like, you

17   know, a resume, but online.

18      Q.  Anything else?

19          MS. SCHOENFELD:  Same objection.

20      A.  No.

21      Q.  What about thefacebook.com?  What did they

22   identify from that?

23          MS. SCHOENFELD:  Same objection.

24      A.  Some of the features that -- I think the

25   Facebook had more of a mix of the professional and

1     personal, and they liked some of the stuff that that

2     was doing.  I think they liked the search results,

3     how they were displayed on the Facebook.

4          Q.  Did they tell you anything else about the

5     relationship with Mark Zuckerberg or the Facebook?

6                    MR. SCHULTZ:  Just an objection as to

7     vague, as vague.

8          A.  Cameron and Tyler Winklevoss?

9          Q.  Yes.

10         A.  They -- after we had started developing the

11    site, I think, you know, they brought that

12    facebook.com up as a benchmarking site, among those

13    other ones.  And I think well into the development

14    the whole story came out about that, but it wasn't

15    upfront that there was any relationship with the

16    Facebook or its creators.

17         Q.  Let me probe into that just a little bit,

18    because I'm not sure I understand your response.

19                    So when you first started working with

20    the Winklevoss brothers and Divya Narendra they

21    never mentioned any dispute with the Facebook?

22                    MS. SCHOENFELD:  Objection, relevance.

23         A.  No, they didn't.  They mentioned that they

24    had -- and they actually came to us with, you know,

25    some mockups of a website and said that they had

1    started working on it, it was unfinished, and they

2    wanted to get something up really quickly.

3         Q.  But they didn't say anything about Mark

4    Zuckerberg or thefacebook.com website at the time,

5    that they came to you with this mockup?

6              MS. SCHOENFELD:  Same objection.

7         A.  Again, I think by the time -- when they

8    came to iMarc as a company, it was probably a month

9    before the project came to me.  So when the project

10   came to me initially, within the, you know, first

11   week, maybe, no.

12        Q.  When was the first time after you started

13   working with the Winklevoss brothers and Divya

14   Narendra that you heard about a dispute that they

15   had with Mark Zuckerberg relating to thefacebook.com

16   website?

17             MR. SCHULTZ:  Objection, foundation,

18   assumes facts not in evidence.

19        A.  By "dispute" you mean a personal grudge

20   dispute or a legal dispute?

21        Q.  Well, let's start with the first one.  I'll

22   ask you about both.  A personal grudge.

23        A.  Maybe within the first month of developing

24   the site.  They'd complain about it and then, you

25   know -- I mean, we --

1          Yeah, probably within the first month we

2    heard, you know, more of the whole story.

3        Q.  And what was the whole story?

4        A.  The whole story at that time, as it was

5    conveyed to us, was they hired Mark Zuckerberg to

6    build a site and he never finished it, so then they

7    hired us -- then they hired iMarc to build a site,

8    and while ours was still in development,

9    thefacebook.com was getting a fair amount of press,

10   among Harvard, B.U., and they were complaining about

11   that his site was up and had, it seemed like, a

12   significant amount of users.

13       Q.  Did they say anything to you about whether

14   they felt thefacebook.com website and what they were

15   asking you to build were similar or dissimilar?

16           MS. SCHOENFELD:  Objection.

17           MR. SCHULTZ:  Objection, form and vague.

18           MS. SCHOENFELD:  Relevance.

19       A.  I actually find that a little vague.

20       Q.  Well, did the Winklevoss brothers, either

21   of them, or Divya Narendra in that first month say

22   anything to you about whether they found

23   thefacebook.com website similar or dissimilar to the

24   project they had you working on?

25           MR. SCHULTZ:  Object to the form, vague

1    and overbroad.

2        A.   Again, I think all these social networking

3    benchmark sites were similar, as was theirs.  There

4    was mass amounts of similarities between all of

5    them.

6        Q.   Were there differences?

7        A.   Yes.

8        Q.   Describe what the differences were between

9    thefacebook.com website and the mockup that you were

10   given to work on.

11            MR. SCHULTZ:  Objection, foundation.

12       A.   Thefacebook.com website had a single user

13   profile.  If I signed up for a Facebook account,

14   there would be one profile, whether I was -- I think

15   when you sign up, you say, "I'm here for dating,

16   just to meet friends, for professional networking"

17   on thefacebook.com, and on Friendster you had one

18   profile.  On the mockup that was given to us, the

19   original idea for the site that we saw, you had a

20   professional profile and a completely segregated

21   personal profile.  That was the main difference.

22       Q.   Were there any other differences that you

23   recall?

24       A.   Well, thefacebook.com was a website, and

25   what we were presented was a mockup, a screen shot,

1    light HTML.   It was not a working website.

2       Q.   What do you mean by "light HTML"?

3       A.   There was HTML -- it wasn't a picture of a

4    Web page that you would make in a graphics program,

5    like Photoshop or something like that.   It actually

6    was a Web page -- although the buttons that you

7    clicked weren't connected to any database, or it

8    didn't actually do anything.   But it was a Web page,

9    in the fact that it was made of HTML, not just a

10   graphic.

11      Q.   You described the dating portion of the

12   website as personal.   Was that --

13           Let me step back.   You described the

14   dating portion as personal, which would be both for

15   dating people and potentially for interacting with

16   social colleagues.   Was that the original concept

17   that you were given, or was this interaction with

18   just nondating people originally on this

19   professional side?

20           MR. SCHULTZ:   Objection, foundation,

21   mischaracterizes testimony.

22      A.   The original concept had both of those

23   profiles that the user actually would fill out

24   separately, and one would show up sort of on one

25   screen, so you could send a link to someone -- if

1    it's a colleague, someone I'd go to college with,

2    they might be interested in that.  But if I'm

3    applying for a job, maybe I'd post my resume on the

4    other side.  And they were fairly segregated -- in

5    the, you know -- it wasn't an actual -- it wasn't

6    working.  There was nothing working.  That was what

7    was talked about.

8         MR. CHATTERJEE:  Let's mark this as

9    Exhibit 64.

10             (Exhibit 64 marked for identification.)

11        Q.  Mr. Tufts, what I've handed you is Exhibit

12   64.  Take a quick look at this document, and then

13   let me know when you're done.

14        A.  I'm done.

15        Q.  Mr. Tufts, do you recognize this document?

16        A.  I recognize -- yes, I recognize some of the

17   concepts, yes.

18        Q.  What do you understand this document to be?

19        A.  I'm not sure if this is something that Marc

20   Pierrat made with them or if this was a document

21   that came directly from HarvardConnection.  But I

22   think this is what was originally presented to the

23   iMarc production team -- or I don't know if this was

24   exactly it -- originally.  It might have went

25   through some revisions before it came down to us.

1    mockup that they showed us on a CD had, maybe it was

2    called connect profile and date profile; but by the

3    time we actually started creating a website, I

4    believe that there was a single profile at that

5    point.  So, again, I'm not sure.

6        Q.  A single profile for both?

7        A.  Yes.  We didn't build a website that had my

8    date profile and my connect profile.

9        Q.  Now, the CD that you talked about that you

10   received, was it ever represented to you that it

11   included the HarvardConnection code?

12       A.  What do you mean by "code"?

13       Q.  Were you ever told that "This is the code

14   that we've developed so far for HarvardConnection"?

15            MR. SCHULTZ:  Objection, vague.

16       A.  I'm not sure if they -- I'm not sure if

17   anyone told us that.

18       Q.  Do you know if these HTML mockups that you

19   received had any database structures associated with

20   the website?

21       A.  I do not -- I mean, no, I don't think so.

22            MR. CHATTERJEE:  Let's mark this as

23   Exhibit 65.

24            (Exhibit 65 marked for identification.)

25       Q.  After you've reviewed it, let me know when

1   you're done.

2       A.   I've reviewed it.

3       Q.   Mr. Tufts, do you recognize what I've

4   handed to you as Exhibit No. 65?

5       A.   Yes.  It is "my personal rent."

6       Q.   And when you say "my personal rent," that's

7   an email that you've written?

8       A.   It was an email that I authored, sending it

9   to myself, Nick Grant, and Nils Menten, collectively

10  known as partners@imarc.net.

11      Q.   And you authored this on about June 22nd,

12  2005?

13      A.   I would say exactly on that date.

14      Q.   If you look at the third paragraph of the

15  email, it starts with "ConnectU."  Do you see that?

16      A.   Yes.

17      Q.   "ConnectU came to us with a specification

18  and design for harvardconnection.com which did not

19  look or act anything like Facebook."  Do you see

20  that?

21      A.   Yes.

22      Q.   Could you describe what you meant when you

23  wrote that?

24      A.   I meant that they came to us with something

25  really complicated, like this, and by the time we

1    launched a website, it was much more user-friendly,

2    like friendster.com or thefacebook.com or match.com

3    or any of the sites that were represented in that

4    benchmarking.

5        Q.  And in the next sentence you state, "In

6    April Facebook was already hugely popular.  90

7    percent of the direction we received from ConnectU

8    was 'Copy Facebook' and ignore the HarvardConnection

9    spec and design."  What did you mean when you wrote

10   that?

11             MS. SCHOENFELD:  Objection, relevance.

12       A.  I meant that they kept pointing us --

13   again, benchmarking -- Facebook, Friendster, sites

14   like that.  I think I only mentioned Facebook here

15   because I knew that they were asking for stuff

16   relating to some lawsuit that they were filing

17   against Facebook.

18       Q.  When you use the phrase "Copy Facebook,"

19   explain what you meant when you said that.

20       A.  I meant that -- again, I'm not sure if they

21   actually used the word "copy."  But we were directed

22   at features on Facebook and other social networking

23   sites, mostly for look and feel, usability, ideas,

24   things like that, that they would see on another

25   website and say, "Hey, that's a good feature.  We

1    should add that."

2        Q.   And those weren't features that were in the

3    original documents that they gave you?

4            MS. SCHOENFELD:   Objection, misstates

5    testimony.

6        A.   I think we added a number of features that

7    are not in this document or in whatever our original

8    plan was.

9        Q.   Do you remember any specific features that

10   came from Facebook that the Winklevoss brothers or

11   Divya Narendra asked you to add to the ConnectU

12   website design?

13       A.   I think the ones I can -- or the layout of

14   the search results they especially liked on

15   Facebook; the ability to create groups of people

16   with similar interests as you.  If you're a Boston

17   Red Sox fan, you could create a group called Boston

18   Red Sox fans, and if there are other people on the

19   website who are also Boston Red Sox fans, they could

20   join that group and you could collectively email.  I

21   think that's something that Facebook was doing that

22   they thought was a worthy feature to add to their

23   site.

24            Those are the two specific things.  But

25   obviously, by "copy," there's no way to copy code.

```
 1    It's more concepts.  But friendster.com was doing
 2    groups, and Friendster was a really similar layout
 3    as well.
 4         Q.   Had a similar layout to whom?
 5         A.   Facebook and ConnectU.
 6         Q.   And any other websites that had some
 7    similar features to Facebook and Friendster that
 8    you're aware of?
 9         A.   I think I touched on match.com had a wink
10    feature, and they liked that.  We implemented a
11    feature called like Wave, I think.  Facebook had
12    something called Poke.  I think that all the social
13    networking sites had similar features.
14         Q.   This HTML code that you received from the
15    Winklevoss brothers or Divya Narendra, do you know
16    which of those three people it came from?
17         A.   No.
18         Q.   Do you remember anyone ever telling you
19    that someone named Vic was sending you a CD of code?
20         A.   I don't remember that.
21         Q.   Of the materials that were originally given
22    to you or given to iMarc by the ConnectU founders,
23    Divya Narendra, Winklevoss -- let me restate that.
24              Of the materials that were originally
25    given to you by the ConnectU founders -- Divya
```

1    Narendra, Tyler Winklevoss, and Cameron

2    Winklevoss -- were any of those materials ultimately

3    used to build the ConnectU website?

4        A.   No.

5        Q.   Do you know if they're in use today?

6        A.   I don't know if they're in use today.

7        Q.   As of -- well, let me step back.  Was there

8    a time when the relationship between ConnectU and

9    iMarc ended?

10       A.   Was there a time?

11       Q.   Yes.

12       A.   Yes.

13       Q.   And approximately when was that time?

14       A.   By the tone of voice of this personal rant

15   here, I would say it was before June 22nd, 2005.  I

16   think sometime in 2004 we wanted -- we moved them

17   off our server, that we were having some issues with

18   them.  So yeah, I mean, I'd say at least a year

19   before this.

20       Q.   And as of a year before this email, June

21   2004, were any of the ideas that were originally

22   provided to you by the ConnectU founders -- Divya

23   Narendra, Cameron Winklevoss, and Tyler

24   Winklevoss -- being used on the ConnectU website?

25            MR. SCHULTZ:  Objection, vague and

1     A.   No, the 2004 0101-client_supply_site.  I am

2   guessing that ConnectU gave us the CD, we threw it

3   up on our Web server in that folder.  I think this

4   is where we probably looked at some of these pages

5   and realized that this is just a complete mess and

6   not worth looking into.

7     Q.   So you don't remember looking at this at

8   all.

9     A.   Again, like I said before, we looked at a

10  couple of pages.  By looking at this directory

11  structure, it would take longer to figure out what's

12  going on here than to just, you know, figure out

13  what the client wants and solve their problem.  So

14  we probably got the CD from them, threw it in our

15  file server for archive purposes, and that's what

16  this is.  But no, we didn't -- I certainly --

17  there's no code in here that we could have --

18  there's nothing in here that we used.

19    Q.   It was all abandoned?

20    A.   It wasn't even -- it wasn't even -- we

21  didn't even use it to abandon.

22         MR. SCHULTZ:  Object to the term

23  "abandoned."

24    A.   To abandon it, you have to start using it

25  and then abandon it.

1    Q.   That's a fair point.   That's a fair point.

2    You never made use of it in developing the

3    connectu.com website.

4    A.   Correct.

5    Q.   So if I were to show you excerpts of that

6    code, you don't think it would refresh your

7    recollection as to anything.

8    A.   I think visually if you showed me the front

9    page, it said like "HarvardConnection" with some

10   sort of brown picture, visually -- that's what we

11   looked at, and we said this doesn't look good, the

12   code isn't good, we're not using any of this.  "If

13   you want to make a website with us, we're going to

14   make a Website our way."

15   Q.   And let me drill down a little bit on that.

16   For example, I have here some excerpts of PHP codes

17   and table structures that are based upon files in

18   those directories.

19   A.   Uh-huh.

20   Q.   And what you're telling me is you never

21   looked at any of that.

22   A.   No.

23   Q.   What was the financial arrangement between

24   iMarc and the ConnectU founders?

25              MS. SCHOENFELD:   Objection, relevance;

1    objection, vague.

2        A.   What was the financial obligation?

3        Q.   Arrangement.

4        A.   Arrangement?

5        Q.   Let me state it a different way:  Describe

6    to me what you understood the contractual

7    relationship between iMarc and the ConnectU founders

8    or anybody with respect to the ConnectU website.

9            MS. SCHOENFELD:  Same objection.

10           MR. SCHULTZ:  Objection, foundation.

11       A.   We -- they came to us, described a website

12   that they wanted.  Our sales, business-development

13   team worked with ConnectU to roughly define a scope.

14   They put a time line and a budget on that.  We get

15   either 30 or 50 percent upfront.  If it's 30

16   percent, we get another 30 percent in the middle,

17   and a final payment at the end.  We build the

18   website.  And there's no ongoing contract.  If they

19   want to add updates after the fact, it's either

20   hourly, or if it's a really large update -- again,

21   we define what it's going to be, how long it's going

22   to take, and put a price to it.

23       Q.   Who did iMarc sign a contract with?

24       A.   I don't know if it was -- I don't know.

25       Q.   Do you know if it was with ConnectU, LLC?

1   document.  I'm just going to ask you one kind of

2   windup question with respect to this document.  As

3   to the functionality that's described in this

4   document in its entirety, all of it together --

5       A.  Yes.

6       Q.  -- is that something that the ConnectU

7   founders asked you to implement at the beginning of

8   the project for them?

9           MS. SCHOENFELD:  Objection, relevance,

10  outside the scope of the deposition.

11      A.  I don't think that we saw this document in

12  its entirety at the beginning of the project.

13      Q.  I'm not asking whether you saw the

14  document.  The functionality that we've just walked

15  through, did they ask you to implement all of this

16  at the beginning of -- all of this functionality?

17      A.  As soon as you preclude one line item, then

18  all of the functionality would be false.  So no,

19  they did not ask us to implement all of this

20  functionality.

21          MR. CHATTERJEE:  It's 12:15.  We've been

22  going for quite a while.  And I know I put you

23  through a very detailed analysis.  So why don't we

24  take a break for lunch and come back in about an

25  hour.

```
 1              THE VIDEOGRAPHER:  The time is 12:14,

 2    and we are off the record.

 3              (Recess for lunch.)

 4              THE VIDEOGRAPHER:  The time is 1:21.  We

 5    are back on the record.

 6       Q.  Mr. Tufts, we're back on the record.  Do

 7    you understand you're still under oath?

 8       A.  Yes.

 9       Q.  And you understand you're still testifying

10    as a witness on behalf of iMarc pursuant to the

11    subpoena notice?

12       A.  Yes.

13       Q.  I'm going to go through -- well, I'm going

14    to ask you one question:  Before we broke for lunch,

15    you talked about, several times about a screen, an

16    HTML screen that showed what the HarvardConnection

17    graphical user interface looked like.  Do you recall

18    that?

19       A.  Yes.

20       Q.  Did I characterize that right?

21       A.  Yes.

22       Q.  Do you recall if that graphical user

23    interface looked like the graphical user interface

24    of Facebook?

25              MS. SCHOENFELD:  Objection, calls for
```

1  speculation; objection, outside the deposition

2  notice.

3      A.  I do recall it; and no, it did not look at

4  all like Facebook.

5      Q.  And why do you say that?

6          MS. SCHOENFELD:  Same objection.

7      A.  Because it looked different.

8      Q.  And you don't remember any specific points

9  of differentiation?

10          MS. SCHOENFELD:  Same objection.

11      A.  Yes.  The Facebook, to my recollection, was

12  blue with a white background, really square,

13  squared-up edges, squared design elements.  And that

14  HarvardConnection one was brown, a lot more

15  graphical.  Facebook seemed very sparse, cold.  And

16  the HarvardConnection one was earth tones.  Just

17  completely different color scheme, different design

18  elements.

19      Q.  Were the pages themselves designed

20  differently?

21      A.  Yes.  They looked different.

22      Q.  Outside of the presence of your counsel,

23  have you ever had discussions about the lawsuit --

24  I'll say the lawsuits that ConnectU is involved in

25  with Cameron or Tyler Winklevoss or Divya Narendra?

1          MS. SCHOENFELD:  Objection, vague;

2   objection, outside the scope of the deposition.

3          A.  Yes, there's some emails from them to us

4   regarding that.

5          Q.  Other than those emails, did you have any

6   discussions with them?

7          A.  No.

8          Q.  Could you describe the emails that you're

9   talking about?

10         A.  I think somewhere around 2005, June, July

11  2005, they wanted to see the -- they wanted us --

12  the whole source code, the original source code that

13  they supplied us, the code that we created, they

14  wanted everything, because they said they were

15  having -- they were in a lawsuit against Facebook.

16         Q.  And other than that, you were unaware of

17  any lawsuits between ConnectU, Mark Zuckerberg, and

18  the Facebook?

19         A.  That was the first time I was made aware of

20  that, yeah.

21         Q.  In response to those requests for that

22  source code, did you provide copies of that source

23  code to ConnectU?

24         A.  Yes.  That's why there are a couple of

25  emails of us going back and forth, saying that we

# CERTIFICATE OF COURT REPORTER

I, Alan H. Brock, Registered Professional Reporter and Certified Realtime Reporter, do certify that the deposition of David Tufts, in the matter of Face Book, Inc., and Mark Zuckerberg v. ConnectU, Inc., et al., on October 5, 2007, was stenographically recorded by me; that the witness provided satisfactory evidence of identification, as prescribed by Executive Order 455 (03-13) issued by the Governor of the Commonwealth of Massachusetts, before being sworn by me, a Notary Public in and for the Commonwealth of Massachusetts; that the transcript produced by me is a true and accurate record of the proceedings to the best of my ability; that I am neither counsel for, related to, nor employed by any of the parties to the above action; and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.


_____  October 9, 2007
Alan H. Brock, RDR, CRR