# EXHIBIT 12

Dockets.Justia.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Certified Copy

CONNECTU, INC., CAMERON WINKLEVOSS,    )
TYLER WINKLEVOSS, and DIVYA NARENDRA,  )
                                       )
          Plaintiffs,                  )
                                       )
              vs.                      ) Index No.
                                       )
FACEBOOK, INC., MARK ZUCKERBERG,       ) 107-CV-10593-DPW
EDUARDO SAVERIN, DUSTIN MASKOVITZ,     )
ANDREW MCCOLLUM and FACEBOOK, LLC,     )
          Defendants.                  )
--------------------------------------)

VIDEOTAPED DEPOSITION OF VICTOR GAO

New York, New York

Monday, December 3, 2007

Reported by:

ERICA L. RUGGIERI, RPR

Job No: 13783

1

2

3

4                        December 3, 2007

5                          9:14 a.m.

6

7

8            Deposition of VICTOR GAO, held at the

9    offices of Orick, Herrington & Sutcliffe, LLP,

10   666 Fifth Avenue, New York, New York, pursuant

11   to ^ notice, before Erica L. Ruggieri,

12   Registered Professional Reporter and Notary

13   Public of the State of New York.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    A P P E A R A N C E S :

 2    Attorneys for all Defendants except Eduardo Saverin

 3

 4         MONTE COOPER, ESQ.

 5         I. NEEL CHATTERJEE, RSQ.

 6         ORRICK HERRINGTON & SUTCLIFFE, LLP

 7         1000 Marsh Road

 8         Menlo Park, California 94025-1015
           Phone: 650.614.7400
 9         Fax: 650.614.7401
           Mcooper@orrick.com
10         Nchatterjee@orrick.com

11
      Attorneys for Defendant Eduardo Saverin
12
           DANIEL K. HAMPTON, ESQ.
13         HOLLAND & KNIGHT
           10 St. James Avenue, 11th floor
14         Boston, Massachusetts 02116
           Phone: 617.523.2700
15         Fax: 617.523.6850
           Dan.hampton@hklaw.com
16

17    Attorneys for Victor Gao

18         RENEE BEA, ESQ.

19         ADAM B. WOLFSON, ESQ.

20         QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

21         51 Madison Avenue, 22nd floor

22         New York, New York 10010
           Phone: 212.849.7000
23         Fax: 212.849.7100
           Reneebea@quinnemanuel.com
24         Adamwolfson@quinnemanuel.com

25    ALSO PRESENT: HENRY MARTY, Videographer
```

1

2          THE VIDEOGRAPHER:  Good morning.

3      Here begins tape 1, Volume I in the

4      videotape deposition of Victor Gao, in the

5      matter of ConnectU, et al. against Facebook

6      et al., defendants, in the United States

7      District Court, for the District of

8      Massachusetts, case number

9      107-CV-10593-DPW.  Today's date is

10     December 3rd, 2007.  The time on the video

11     monitor is now 9:14 a.m.

12          The video operator is Henry Marty,

13     representing LiveNote World Services,

14     located at 221 Main Street, suite 1250, San

15     Francisco, California.  The court reporter

16     is Erica Ruggieri, also on behalf of

17     LiveNote World Services.

18          Today's deposition is being taken by

19     the defendant and is taking place at

20     666 Fifth Avenue, New York, New York.

21          At this time will counsel please

22     introduce yourselves, starting with the

23     party taking the deposition.

24          MR. COOPER:  This is Monte Cooper of

25     the law firm Orrick, Herrington &

1

2    Sutcliffe, representing all defendants

3    except Eduardo Saverin.  With me is Neel

4    Chatterjee of my office, also of Orrick,

5    Herrington & Sutcliffe.

6         MR. HAMPTON:  Hi.  This is Dan

7    Hampton of the law firm Holland & Knight.

8    I represent the defendant Eduardo Saverin.

9    Thank you.

10        MS. BEA:  Renee Bea and Adam Wolfson,

11   appearing for Victor Gao, of Quinn Emanuel.

12        THE VIDEOGRAPHER:  Thank you.

13        Now will the court reporter please

14   administer the oath.

15  V I C T O R   G A O ,   called as a witness,

16   having been duly sworn by a Notary

17   Public, was examined and testified as

18   follows:

19  EXAMINATION BY

20  MR. COOPER:

21     Q.   Good morning, Mr. Gao.  Thank you for

22  joining us today.

23        Have you ever had your deposition

24  taken before?

25     A.   I have not.

1

2  referred to would actually, technically, be the

3  host domain for www.Harvardconnection.com,

4  correct?

5       A.    It would be the host, yes.

6       Q.    And that means that, just so the

7  record is clear, that means that's where the IP

8  address for that particular domain would be

9  generated from, correct?

10      A.    Yes.

11      Q.    How extensive, if you recall, were

12 your modifications, between the time you went on

13 line after the Facebook launched and when you

14 downloaded the code?

15           MS. BEA:  Objection, vague.

16      A.    To the best of my knowledge, not

17 much; maybe a day's worth.

18      Q.    Okay.  What did you do, at a high

19 level, just tell us what you did in that day's

20 work.

21      A.    I don't remember.

22      Q.    All right.  Did you delete any work

23 that you believed had been performed by Mark

24 Zuckerberg?

25      A.    No.

1

2      Q.    Did you modify any work that you

3   believe had been performed by Mark Zuckerberg?

4      A.    I may have, yes.

5      Q.    Did you complete any work that you

6   believe was left incomplete by Mark Zuckerberg?

7      A.    I performed additional work.

8      Q.    All right.  To the best of your

9   recollection, what is the additional work you

10   did?

11      A.    I don't remember.

12      Q.    Now, you said you may have modified

13   some work that had been performed by Mark

14   Zuckerberg.

15          What modifications do you have in

16   mind that you think you may have done?

17      A.    May have been registration, profile,

18   handshake.

19      Q.    All right.  Did you create any new

20   part of the database schema?

21      A.    I don't remember.

22      Q.    All right.  Would you agree that the

23   Harvard Connection code had what was known as a

24   date side?

25      A.    Yes.

1

2      Q.    All right.  Would you agree the

3    Harvard Connection code also had what is known

4    as a connect side?

5      A.    Yes.

6      Q.    All right.  Did you create any new

7    portion of the database schema to address

8    changes to the date side?

9      A.    I don't remember.

10     Q.    Did you create any new portions of

11   the database schema to address changes to the

12   connect side?

13     A.    I don't remember.

14     Q.    Do you recall if, at a high level, if

15   your work that you performed was directed to one

16   or the other, the date or the connect side?

17     A.    It would have been mostly to connect

18   side.

19     Q.    All right.  And why do you say that?

20     A.    The date side was -- the date side

21   was effectively functional.

22     Q.    All right.  After you addressed the

23   connect side, was the whole website functional?

24     A.    No.

25     Q.    All right.  What -- why wasn't it, to

1

2    the best of your recollection?

3        A.    Because I didn't finish it.

4        Q.    All right.  Did you -- how much time,

5    in your estimation, would have been necessitated

6    to finish the code, after you've worked on it?

7        A.    According to the design parameters at

8    the time?

9        Q.    Yes.

10       A.    About a week.

11       Q.    All right.  A week, as in 40 hours?

12       A.    Thereabouts.

13       Q.    All right.  I don't mean to be

14   facetious.  We all know coders can work

15   extraordinary hours.  I just want to know what

16   you mean by a week.

17             Or programmers can.

18             So is 40 hours a safe estimate, in

19   your mind?

20       A.    I would say between 40 to 80.

21       Q.    Okay.  What were the critical

22   problems that remained, that necessitated 40 to

23   80 hours of work?

24       A.    Where do I begin?

25       Q.    Wherever you feel --

1

2    A.    Uploading files, uploading resumes,

3    probably were still some design issues,

4    handshaking, registration, searching, full text

5    searching of resumes, full text searching of

6    theses.

7    Q.    All right.  I just want to make

8    something clear.  When you say "uploading

9    files," you are talking about a function, not

10   the actual process of needing to upload a file?

11   A.    That's correct, yes.

12   Q.    All right.  All right.  So this was a

13   function that needed to be coded into this site,

14   not something you actually needed to upload a

15   file, correct?

16   A.    Yes.

17   Q.    When you say something like

18   "handshaking," what are you referring to?

19   A.    The mechanics by which two

20   interested -- one interested party could connect

21   with the other party, for professional reasons,

22   employment, et cetera.

23   Q.    All right.  So by that you mean a

24   communication protocol by which one party could

25   become aware of another party?

1
2    you quickly reviewed, correct?
3         A.    Yes.
4         Q.    Would you turn to 5398.  It should be
5    begin with register1action.PHP.
6         A.    Yes.
7         Q.    This is on the connect side, correct?
8         A.    No.
9         Q.    It is not?
10        A.    No.
11        Q.    All right.  This is on the date side?
12        A.    No.  This is a combined page.
13        Q.    All right.  And what's a combined
14   page?
15        A.    The registration process was designed
16   to be used by both sides.
17        Q.    All right.  Who created this script,
18   if you know?
19              Would it have been you?
20        A.    Myself or Sanjay.
21        Q.    All right.  This was created before
22   Mark Zuckerberg ever worked on the site, if you
23   know?
24        A.    This file, definitely.
25        Q.    Okay.

1

2          A.    Yes.

3          Q.    How much of the connect side was

4     developed, before Mark Zuckerberg had ever

5     worked on the site?

6                MS. BEA:  Objection, vague.

7          A.    Relatively little.

8          Q.    All right.  Would you turn to 5292.

9                Do you see a connecthome.php?

10         A.    Yes.

11         Q.    That is the connect side, correct?

12         A.    Yes.

13         Q.    All right.  Is that a script that, if

14    you know, that Mark Zuckerberg you would

15    anticipate have worked on?

16         A.    Yes.

17         Q.    All right.  So this is an example of

18    what you saw when you went on the site,

19    following -- for the first time after you had --

20    in February or so, 2004, correct?

21               MS. BEA:  Objection, misstates the

22         witness's prior testimony.

23         A.    This looks more like it, yes.

24         Q.    All right.  So you did, in fact, see

25    attributions of code, for instance, 5292

1

2    connecthome.php, that, to the best of your

3    knowledge, had been added on by Mark?

4              MS. BEA:  I'm sorry, counsel, where

5         is the path you just referred to?

6              MR. COOPER:  5292, connecthome.php.

7         A.    Sorry.  Can you repeat the question.

8    I forgot the question.

9         Q.    Let me try and restate it another

10   way.

11             Would you agree that connecthome.php

12   appearing on 5292, the script function runs all

13   the way, approximately, to page 5312, where

14   there is a print function?

15        A.    Yes.

16        Q.    All right.  Would you agree that the

17   entire code section there would have been one of

18   the sections you attributed to Mark Zuckerberg's

19   work?

20        A.    This code is the code that I had

21   worked on.  That is not connect.

22        Q.    All right.  But connecthome.php you

23   agreed was?

24        A.    It was a copy of datehome.php.

25        Q.    That's not what I'm asking.

1

2              MS. BEA:  Objection.  Calls for a

3        legal conclusion.

4        A.    I don't understand the question.

5        Q.    Well, you said you weren't even there

6   to recruit him, correct?

7        A.    I was there to inform him.

8        Q.    You were there to inform him, but you

9   weren't there to recruit him, correct?

10        A.    Fair.

11        Q.    Is it fair to say whatever choice

12   Mark ultimately was going to make about what

13   role he had with Harvard Connection would have

14   to be expressed by him to the founders, rather

15   than to you?

16              MS. BEA:  Objection.  Argumentative

17        and misleading.

18        A.    Yes.

19        Q.    All right.  So it's fair to say you

20   weren't there to offer or accept whatever

21   contract was going to ever be formed between

22   Harvard Connection and Zuckerberg, correct?

23              MS. BEA:  Objection.  Calls for a

24        legal conclusion.

25        A.    That was my understanding.

1

2      Q.    And you met with him for two hours to

3 go over the technical details?

4      A.    Yes.

5      Q.    And then you say, "During the meeting

6 I showed Zuckerberg the website in its then

7 current stage of development."

8      A.    Yes.

9      Q.    What was the current stage of

10 development?

11          MS. BEA:  Objection, vague.

12      A.    There were parts that worked and

13 parts that didn't.

14      Q.    What parts worked and what parts

15 didn't?

16      A.    Most of the dating parts worked.  But

17 not -- if not all.

18      Q.    And what didn't work on the dating

19 side?

20      A.    I don't know.  I have not bug tested

21 it.

22      Q.    What had to be done on the connect

23 side?

24      A.    A fair amount.

25      Q.    All right.  Turning to your February

1

2      17th, 2004 e-mail from Cameron Winklevoss.

3      Would you turn to the page GAO154.

4           A.    Yes.

5           Q.    There are quotes from Victor Gao,

6      second programmer on the HC team.

7                 Do you see that?

8           A.    Yes.

9           Q.    All right.  These are relating to

10     your review of the code as it existed after

11     February 1st, 2004, when you reviewed it again,

12     correct?

13          A.    Sometime in February.

14          Q.    All right.  When was the first time

15     after the January 25th letter from, or e-mail

16     from Cameron that you actually looked at the

17     site?

18          A.    Beginning of February.

19          Q.    You still had access to the site,

20     correct?

21          A.    I still have the password and user

22     name.

23          Q.    All right.  And it was still under

24     Hurricane Electric's server, correct?

25          A.    Yes.

1

2     Q.    All right.  It says -- where do these

3  quotes come from?

4     A.    Various newspaper articles.

5     Q.    All right.  The various newspaper

6  articles, were they The Crimson?

7     A.    Amongst others.

8     Q.    Did you, in fact, talk to a reporter

9  from The Crimson?

10          MS. BEA:  Objection.  Asked and

11      answered.

12     A.    I don't think so.

13     Q.    So do you have any reason to think

14  the quotes are inaccurate?

15     A.    No.

16     Q.    So they are accurate, in your mind?

17     A.    Yes.

18     Q.    All right.  The first quote says,

19  "When I looked at the code and architecture of

20  Harvard Connection in the beginning of February,

21  after Mark was no longer with the project, I

22  discovered, one, key parts of the connect side

23  did not work, such as the full search; two,

24  minor parts of the connect side still

25  incomplete, such as a fully working registration

1

2    process; and three, some parts implemented

3    incorrectly, such as the connect handshaking

4    procedure."

5            Do you see that?

6        A.    Yes.

7        Q.    All right.  What key parts of the

8    connect side did not work, besides full search?

9        A.    This is overstating what worked.

10   Effectively, nothing worked.

11       Q.    All right.  When you say

12   "Effectively, nothing worked," are you sure

13   nothing worked?

14       A.    When I looked at the site, that was

15   my conclusion.

16       Q.    How long did you look at the site?

17       A.    30 minutes.

18       Q.    Then you said, "Minor parts of the

19   connect side were still incomplete, such as

20   fully working registration process."

21       A.    Yes.

22       Q.    That implies that some parts of the

23   registration process were complete, correct?

24       A.    Yes.

25       Q.    All right.  And some parts were

1

2    implemented incorrectly, such as a connect

3    handshaking procedure?

4         A.    Yes.

5         Q.    How was it implemented incorrectly?

6         A.    The handshaking procedure is not the

7    same as the dating handshaking procedure.

8         Q.    And how do you know that to be the

9    case?

10        A.    It's not meant to be the same

11   procedure, but it was.

12        Q.    And why do you say it wasn't meant to

13   be?

14        A.    That was part of the design.

15        Q.    Isn't it a coder's -- was the design

16   of the site solely yours?

17        A.    No.

18        Q.    So the programmers have discretion,

19   correct?

20              MS. BEA:  Objection.  Vague.

21        A.    I designed it with Divya.

22        Q.    That's not my question.

23              Programmers still have discretion,

24   correct?

25        A.    Yes.

1

2        Q.    All right.  Did Divya understand --

3    did Divya look at the code to understand the

4    problems?

5             MS. BEA:  Objection.  Calls for

6         speculation.

7        A.    I don't remember.

8        Q.    So the only person that you know for

9    sure looked at the code was yourself, correct?

10       A.    Yes.

11            MR. COOPER:  I think he needs to

12        change the tape.

13            THE VIDEOGRAPHER:  Sure.  Stand by.

14        The time is 5:41 p.m., and this

15        completes tape number five.  We are going

16        off the record.

17            (Whereupon, there is a recess in the

18        proceedings.)

19            THE VIDEOGRAPHER:  This marks the

20        beginning of videotape number six, Volume

21        I, in the deposition of Victor Gao.  The

22        time is 5"50 p.m.  On the record.

23       Q.    Mr. Gao, before the break I was

24    having you look at Exhibit -- what was it, 20 --

25    19.  On page 154, middle paragraph, there's a

1

2    quote from you.  "I have looked at

3    theFacebook.com, using a friend's account."

4            Do you see that?

5        A.    Yes.

6        Q.    And then it says, "although

7    theFacebook.com has the look and feel of

8    Friendster, there is no doubt that the idea of

9    introducing a web-based social network

10   exclusively for the Harvard community, with

11   intentions of packaging the service to be

12   plugged in at all universities, was copied

13   directly from Divya's original idea."

14           Do you see that?

15       A.    Yes.

16       Q.    Is that an accurate quote from you?

17       A.    Yes.

18       Q.    When you say you've looked at

19   theFacebook.com, using a friend's account, what

20   friend were you referring to?

21       A.    No recollection.

22       Q.    Do you know someone named Paul Arthur

23   Fili, F-I-L-I?

24       A.    Yes.

25       Q.    Is that a friend?

1

2      A.    Yes.

3      Q.    Is that the friend whose account you

4  used to look at the Facebook?

5      A.    No recollection.

6      Q.    All right.  Who is Paul Arthur Fili?

7      A.    A friend of mine.

8      Q.    All right.  Does he live in the same

9  dorm as you?

10     A.    No.

11     Q.    All right.  You say that it was --

12  was there a reason you used a friend's account

13  to look at the Facebook, rather than register

14  yourself?

15     A.    No reason.

16     Q.    You indicate, "Although the Facebook

17  has the look and feel of Friendster."

18          What do you mean, it had the look and

19  feel of Friendster?

20     A.    It had very similar functionalities

21  to Friendster.

22     Q.    It had functionalities.

23          The graphical user interface didn't

24  look the same, though, correct?

25     A.    I would say it did.  The layout did.

1

2      Q.    All right.  Did it look exactly the

3   same?

4      A.    No.

5      Q.    The functionality, are you referring

6   to the fact that Friendster and Facebook

7   permitted friends lists?

8      A.    Yes.

9      Q.    And they both permitted contact by

10  e-mail?

11     A.    Contact by whom?

12     Q.    You could list your e-mail, and

13  friends could contact you at that e-mail

14  address, correct?

15     A.    Yes.

16     Q.    All right.  They both permitted you

17  to list profile information about yourself,

18  correct?

19     A.    Yes.

20     Q.    And they both permitted you to allow

21  yourself to leave messages to friends, correct?

22     A.    I don't remember that function was in

23  Facebook at the time.

24     Q.    All right.  It was at some point in

25  time, correct?

1

2      A.    Yes.

3      Q.    All right.  How soon after Facebook

4  launched did you look at it?

5      A.    I don't have a recollection.

6      Q.    All right.  When you say -- what

7  other look and feel of Friendster did you see

8  similar between it and the Facebook?

9      A.    The ability to search.

10     Q.    All right.  Anything else?

11     A.    That's all I recollect.

12     Q.    Could you upload multiple profile

13  pictures?

14     A.    I don't remember.

15          MS. BEA:  Objection, vague.

16     Q.    Do you recall if the Facebook

17  permitted to you to allow you to upload multiple

18  photos of yourself?

19     A.    No recollection.

20     Q.    You indicate, "There is no doubt that

21  the idea of introducing a web-based social

22  network exclusively for the Harvard community,

23  with intentions of packaging the service to be

24  plugged in at all universities, was copied

25  directly from Divya's original idea."

1

2              As of February 17th, did you have

3   some sense the Facebook would be packaged as a

4   service to be plugged in at all universities.

5       A.    I don't recall right now.

6       Q.    In fact, as of February 17, 2004,

7   wasn't the Facebook only available at three

8   universities?

9              MS. BEA:  Objection, lack of

10      foundation.

11      A.    I don't recall.

12      Q.    Do you recall if the three

13  universities that Facebook was available at --

14  would you agree that Facebook initially launched

15  only at Harvard?

16      A.    I knew that Harvard was one of, if

17  not the only, first.

18      Q.    Were the other two Columbia and

19  Stanford?

20      A.    I don't know.

21      Q.    Do you know if Columbia and Stanford

22  had their own social networks, even if

23  preexisting Facebook?

24      A.    No idea.

25      Q.    Have you ever heard of CU Community?

1

2      A.    No.

3      Q.    Do you know anybody at Columbia?

4            Did you know anybody at Columbia?

5            MS. BEA:  Objection, vague.

6      A.    Today?

7      Q.    No, in 2003.

8      A.    Yes.

9      Q.    All right.  But you don't recall

10 anything called CU Community, correct?

11     A.    No.

12     Q.    When you say that there's no doubt

13 that the idea of introducing a web-based social

14 network exclusively for the Harvard community

15 was copied directly from Divya's original idea,

16 do you have any proof of that?

17           MS. BEA:  Objection, vague.

18     A.    Proof in what sense?

19     Q.    Is that just your opinion?

20     A.    My understanding was that was a novel

21 idea.

22     Q.    But that's just your understanding,

23 correct?

24     A.    I have not done the extensive

25 research, no.

1

2      Q.    You say, "Some of the fields in

3  theFacebook.com profile, especially those

4  relating to dating, seem to be inspired from his

5  involvement with Harvard Connection," correct?

6      A.    Yes.

7      Q.    All right.  What fields are you

8  referring to?

9      A.    Like which house he lived in, for

10  instance.

11      Q.    Isn't it true that some of those

12  fields are natural for a university setting?

13          MS. BEA:  Objection, vague.

14      A.    Can you qualify natural.

15      Q.    Isn't it true that many of the fields

16  that Mark used were available, for instance,

17  to -- in the electronic versions of the online

18  face books that were available at the houses?

19      A.    That information was available, yes.

20      Q.    So isn't it true that some of the

21  fields, for instance, included, say, what year

22  the student was, correct?

23      A.    Yes.

24      Q.    That isn't necessarily inspired by

25  Harvard Connection, correct?

1

2              MS. BEA:  Objection.  Calls for

3       speculation.

4       A.    I don't know.

5       Q.    In fact, isn't it true that the

6  fields that were used by Mark Zuckerberg were

7  different from the fields that were used in

8  Harvard Connection?

9       A.    I didn't do a side-by-side

10 comparison.

11      Q.    So this was just a general overall

12 sense you had, as of 2003, correct -- 2004,

13 correct?

14      A.    From what I could see and look at the

15 time, yes.

16      Q.    All right.  And the user interfaces

17 were different, correct?

18      A.    Yes.

19      Q.    All right.  The registration fields

20 were different, correct?

21      A.    There's some difference.

22      Q.    There were differences, correct?

23      A.    There were differences.

24      Q.    And that would have to be hard-coded

25 into the Facebook site, correct?

1

2          MS. BEA:  Objection, vague.

3     A.    They don't have to be.  There are

4  many ways to do it.

5     Q.    But to your knowledge, they may have

6  been, correct?

7     A.    They may have been.

8     Q.    And if the Harvard Connection -- and

9  if the Facebook site was launched as HTML, it

10  was launched on a different type of scripting

11  program altogether than Harvard Connection,

12  correct?

13     A.    Can you say that again.

14     Q.    If -- if the Facebook was launched as

15  a scripted HTML program, it was based on an

16  entirely different scripting program than

17  Harvard Connection, correct?

18     A.    Do I know that?

19     Q.    It would be, correct?

20     A.    It would be, if what?

21     Q.    Harvard Connection was a PHP-based

22  back end, correct?

23     A.    Yes.

24     Q.    So if the back end of Facebook was

25  HTML, it had to necessarily have a different

1

2  code base, correct?

3      A.    Doesn't necessarily.  PHP is a

4  superset of HTML.  There's no way the back end

5  can be done using HTML.

6      Q.    Well, do you have any reason, as you

7  sit here today, independent of your own just

8  judgment, to believe that in any way that the

9  Facebook copied Harvard Connection's back end?

10     A.    I have no way of knowing that.

11     Q.    In fact, you know for a fact it had

12  to populate different types of database fields,

13  don't you?

14         MS. BEA:  Objection, misleading.

15     A.    Can you -- can you repeat that

16  question.

17     Q.    Well, for instance, the Facebook

18  didn't have a dating feature, correct?

19     A.    I think it had something relating to

20  dating.

21     Q.    It had something, but it wasn't a

22  dating site, correct?

23         MS. BEA:  Objection, vague.

24     A.    The functionality was not nearly as

25  developed as Harvard Connection's.

1

2     Q.    And in fact, it didn't even refer to

3 dating, correct?

4     A.    I believe there was a field that it

5 did.

6     Q.    How do you know there was a field?

7     A.    I should say the profile logic would

8 say what you are interested in.

9     Q.    But that -- that isn't the same as

10 saying who you were interested in, correct?

11     A.    Yes.

12     Q.    So it wasn't directed to dating per

13 se, it was directed towards interest level,

14 correct?

15        MS. BEA:  Objection, vague.

16     A.    Okay.

17     Q.    And that's a function that actually

18 existed in Friendster, correct?

19        MS. BEA:  Objection, foundation.

20     A.    Yes.

21     Q.    Can you conceive of any way Harvard

22 Connection code could have been used for

23 Facebook?

24        MS. BEA:  Objection, vague and

25     ambiguous.

1

2      A.     Repeat the question.

3      Q.     Can you conceive of any way that the

4 Harvard Connection code, as it existed when you

5 last used it in the fall of 2003, could have

6 been used to develop Facebook?

7      A.     I don't have an opinion.

8      Q.     Okay. So the answer is no?

9      MS. BEA: Objection, misstates the

10      witness's testimony.

11      A.     I don't have an opinion.

12      Q.     All right.

13      (Gao Exhibit 21, March 11, 2004

14      e-mail from Paul Arthur Fili to Victor

15      Gao, marked for identification, as of

16      this date.)

17      Q.     Mr. Gao, I put in front of you a

18 March 11, 2004 e-mail from Paul Arthur Fili to

19 you, do you see that?

20      A.     Yes.

21      Q.     And below it is an earlier March 11,

22 2000 e-mail from you to Paul Arthur Fili, right?

23      A.     Yes.

24      Q.     And in that e-mail you say, "Yo,

25 Paul, you want to shoot an e-mail to Zuckerberg

1

2    and tell him to clear the reject request?"

3         A.    Yes.

4         Q.    You were registered for Facebook at

5    this point, correct?

6         A.    Yes.

7         Q.    What's the reject request you were

8    referring to?

9         A.    I don't recall, specifically.

10        Q.    You then say, "Better if you do it,

11   because I'm the one requesting," correct?

12        A.    Yes.

13        Q.    Why did you want Paul Arthur Fili to

14   make that request, instead of you?

15        A.    I don't recall the circumstances.

16        Q.    Were you concerned that Paul -- that

17   Mark Zuckerberg would be hostile to you?

18        A.    I may have been.

19        Q.    Okay.  And is that because of your

20   cooperating with the Winklevosses in the Harvard

21   admin board proceedings?

22             MS. BEA:  Objection, argumentative.

23        A.    May have been.

24        Q.    As you sit here today, you agree the

25   Harvard Connection code, as it was left to you,

374

C E R T I F I C A T I O N

STATE OF NEW YORK          )

                          ) ss.:

COUNTY OF NEW YORK         )


        I, ERICA L. RUGGIERI, RPR and a

Notary Public within and for the State of

New York, do hereby certify:

        That I reported the proceedings in

the within-entitled matter, and that the

within transcript is a true record of

such proceedings.

        I further certify that I am not

related by blood or marriage, to any of

the parties in this matter and that I am

in no way interested in the outcome of

this matter.

        IN WITNESS WHEREOF, I have hereunto

set my hand this 7th day of December,

2007.

_____

        ERICA L. RUGGIERI, RPR