IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CONNECTU, INC., CAMERON WINKLEVOSS, TYLER WINKLEVOSS, AND DIVYA NARENDRA,<br><br>        Plaintiff,<br><br>v.<br><br>FACEBOOK, INC., MARK ZUCKERBERG, EDUARDO SAVERIN, DUSTIN MOSKOVITZ, ANDREW MCCOLLUM, and FACEBOOK, LLC,<br><br>        Defendants. | Civil Action No. 1:07-CV-10593-DPW |

**DEFENDANTS FACEBOOK, INC., MARK ZUCKERBERG, DUSTIN MOSKOVITZ, ANDREW MCCOLLUM, AND FACEBOOK, LLC'S
STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1 IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM OF COPYRIGHT INFRINGEMENT**

## I. DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

Defendants Facebook, Inc, Mark Zuckerberg, Dustin Moskovitz, Andrew McCollum, and Facebook LLC (collectively "Defendants")[1] pursuant to Local Rule 56.1 hereby provide a concise statement of material facts of record as to which there exists no genuine issue of fact to be tried. Copies of all referenced documentation are attached as Exhibits to the Declaration of Monte M.F. Cooper in Support of Defendants' Motion for Summary Judgment on Plaintiffs' Claim of Copyright Infringement, or are matters of public record.

## II. PROCEDURAL HISTORY

1. ConnectU LLC ("ConnectU")[2] filed its original action on September 2, 2004. [Case No. 1:04-cv-11923, Dkt. 1].

2. On October 28, 2004, ConnectU later added a copyright infringement claim via a defective first amended complaint. [*Id*., Dkt. 13 at ¶¶ 24-29]. The new copyright claim alleged that defendant Mark Zuckerberg ("Zuckerberg") copied portions of source code written for Plaintiffs' Harvard Connection website project and then used the copied code to launch Zuckerberg's own website, thefacebook.com. *Id*. at ¶ 26.

3. Plaintiffs later reiterated the same allegations in their original and first amended complaints filed in this subsequent action on March 28, 2007 and August 8, 2007, respectively. Complaint [Dkt. 1] at ¶ 45; First Amended Complaint ("FAC") [Dkt. 71] at ¶ 257. Additionally, Plaintiffs' FAC specifically alleged that the Harvard Connection and Facebook websites were "substantially similar." FAC at ¶ 255.

---

[1] Defendant Eduardo Saverin is represented by separate counsel.
[2] ConnectU LLC initiated the original lawsuit between the parties, but dissolved in 2006. Its successor, ConnectU, Inc. subsequently re-filed the present lawsuit. For purposes of this motion and Statement of Undisputed Facts, "ConnectU" refers to both ConnectU LLC and ConnectU, Inc.

4. None of the complaints identified any facts showing substantial similarity of copyrightable expression between the Facebook and Harvard Connection websites. See, e.g., FAC at ¶¶ 254-257.

### A. Defendants Attempt to Learn the Basis for Plaintiffs' Copyright Claim in Discovery

5. On July 11, 2005, Defendants served ConnectU with Interrogatory No. 1, which reads as follows:

### INTERROGATORY NO. 1:

> Identify with precision and specificity all facts in support of Your contention that any HarvardConnection Code or ConnectU Code is infringed.

Declaration of Monte M.F. Cooper In Support Of Defendants' Motion for Summary Judgment of Non-Infringement ("Cooper Decl."), Ex. 1 at 5.

6. ConnectU responded on August 22, 2007. *See id.* at 5-7. Plaintiffs did not identify a single line of any Facebook source code which they contend is substantially similar to any code for the Harvard Connection website. *See* Cooper Decl. Exs. 1 & 6.

7. In July 2005, Defendants produced multiple versions of Facebook source code, including some code that existed at launch in February 2004, as well as the website's code as of October and December 2005. *Id.* Exs. 2-3. Defendants later supplemented their production by serving additional Facebook source code from late-January 2004, immediately before the website launched. *Id.* Ex. 4.

8. After Plaintiffs re-filed this action, Defendants sought a precise recitation of all facts supporting the copyright claim and moved to compel a further response to Interrogatory No. 1. [Dkt. 146-147]. The Court granted the motion to compel, ruling that "[t]he plaintiffs are ORDERED to serve a full and complete answer to Interrogatory #1 from all sources of

information within their possession, custody and/or control on or before the close of business on Tuesday, January 15, 2008." [11/19/07 Electronic Order].

9. The Court permitted Plaintiffs more than two months to respond, in part because Plaintiffs' counsel acknowledged that the motion required "line-by-line comparisons of code and asks for the facts which [Plaintiffs] will assert the copyright infringement," and "once [Plaintiffs] actually make this comparison [Plaintiffs] will supplement." *Id.* Ex. 7 at 31:5-14.

### B. Plaintiffs' Supplementation Identifies No Protectable Expression or Copying of Code

10. Plaintiffs provided their Court-ordered response on January 21, 2008. *See id* Ex. 6. Plaintiffs did not identify a single line of copied code from any of the versions of Facebook website. *Id.*

11. Plaintiffs' supplemental response set out two arguments in support of its claim of copyright infringement: (1) Plaintiffs argued that Facebook's graphical user interface ("GUI"), as implemented in the its January 2004 source code, employs methods of operation that Plaintiffs believe are substantially similar to the methods of operation used by their own Harvard Connection GUI (*see id.* at 6-11); and (2) any code Zuckerberg wrote for Facebook was owned by ConnectU based upon the ambiguous relationship between Zuckerberg and the ConnectU founders (*see id.* at 2-6).

### III. CONNECTU CANNOT IDENTIFY PROTECTABLE EXPRESSION IN ITS GUI

#### A. ConnectU's Theory Rests on Function, Not Expression

12. To support its theory of infringement, ConnectU compares Facebook's and Harvard Connection's methods of operation of their respective GUIs. *See* Cooper Decl. Ex. 6.

13. Plaintiffs cite: (a) the methods by which users registered to use the Facebook and Harvard Connection websites (*id.* at 7); (b) the manner in which users created profiles (*id.* at 8-

9); (c) the procedures by which users requested permission to introduce themselves to one another and communicate by email (*id.* at 9-10); and (d) the methods of operation that permitted users to search certain profile information (*id.* at 11). None of these descriptions relied upon any citation to underlying computer source code. *Id.* at 7-11.

14. Plaintiffs' comparison of the "profile search" capabilities for the Facebook and Harvard Connection GUIs is representative of their copyright analysis of methods of operation, and reads as follows:

| Step | Harvard Connection | Facebook (Jan. 2004) |
|---|---|---|
| 1. | Provide "Quick Search" capability | Provide "Quick Search" capability |
| 2. | User clicks advanced search button to initiate search process | User clicks advanced search button to initiate search process |
| 3. | User enters information in search fields, including:<br>• Employment Status<br>• Major<br>• House | User enters information in search fields, including:<br>• Employment Status<br>• Concentration<br>• House |
| 4. | User clicks search button to submit fields to system | User clicks search button to submit fields to system |
| 5. | System takes field values and searches database to create result set | System takes field values and searches database to create result set |
| 6. | System generates a web page consisting of summaries of the profiles and displays it back to the user | System generates a web page consisting of summaries of the profiles and displays it back to the user |
| 7. | User clicks on profile image to view the profile of a user in the search results | User clicks on profile image to view the profile of a user in the search results |

*Id.* at 7.

### B. Facebook's GUI is not Similar to Plaintiffs' GUI

15. Plaintiffs do not assert any visual similarity between the parties' websites in support of its infringement claim. *See* Cooper Decl. Ex. 6 at 6-11.

### 1. ConnectU's Website Developer Testified the GUIs Were Different

16. Defendants deposed a company named iMarc, LLC which specializes in website design. iMarc was hired in 2004 by ConnectU to complete the Harvard Connection project. Cooper Decl. Ex. 9 at 24:10-25:13.

17. When iMarc compared the features of the original Harvard Connection website to the Facebook website, it concluded the two sites were not substantially similar insofar as they used different methods of presenting profiles:

> Q: Describe what the differences were between thefacebook.com website and the mockup you were given to work on.
>
> …
>
> A. Thefacebook.com website had a single user profile. If I signed up for a Facebook account, there would be one profile, whether I was -- I think when you sign up, you say "I'm here for dating, just to meet friends, for professional networking" on thefacebook.com, and on Friendster you had one profile. On the mockup that was given to us, the original idea for the site that we saw, you had a professional profile and a completely segregated personal profile. That was the main difference.
>
> Q: Were there any other differences that you recall?
>
> A: Well, thefacebook.com was a website, and what we were presented was a mockup, a screen shot, light HTML. It was not a working website.

*Id.* at 32:8-33:1 (objection omitted).

18. The Harvard Connection website included what Plaintiffs called a "date side" and a "connect side," which were intended to facilitate dating and developing professional contacts among Harvard students and alumni. *See* Cooper Decl. Ex. 12 at 67:22-68:5. This division resulted in the "professional profile" and a "completely segregated personal profile" referenced by iMarc. Plaintiffs concede that the "connect" side of the website was not functional when the

Harvard Connection code was provided to Mark Zuckerberg, because "very little" of it had been coded. *Id.* at 68:14-69:4; 174:3-7; 330:5-24; 332:13-333:10.

19. iMarc's Rule 30(b)(6) witness testified that the appearance of Facebook's and Harvard Connection's GUIs were not substantially similar:

> Q. … Before we broke for lunch, you talked about, several times about a screen, an HTML screen that showed what the HarvardConnection graphical user interface looked like. Do you recall that?
>
> A. Yes.
>
> Q. Did I characterize that right?
>
> A. Yes.
>
> Q. Do you recall if that graphical user interface looked like the graphical user interface of Facebook?
>
> …
>
> A. I do recall it; and no, it did not look at all like Facebook.
>
> Q. And why do you say that?
>
> …
>
> A. Because it looked different.
>
> Q. And you don't remember any specific points of differentiation?
>
> …
>
> A. Yes. The Facebook, to my recollection, was blue with a white background, really square, squared-up edges, squared design elements. And that HarvardConnection one was brown, a lot more graphical. Facebook seemed very sparse, cold. And the HarvardConnection one was earth tones. Just completely different color scheme, different design elements.
>
> Q. Were the pages themselves designed differently?
>
> A. Yes. They looked different.

*Id.* Ex. 9 at 107:14-108:21 (objections omitted).

20. On the whole, iMarc concluded that Harvard Connection's user interface did not "look good." *Id.* at 60:5-14.

21. iMarc also testified that any resemblance between ConnectU and Facebook resulted from ConnectU's copying Facebook's GUI, as well as the earlier Friendster website:

> Q. Mr. Tufts, do you recognize what I've handed to you as Exhibit No. 65?
>
> A. Yes. It is "my personal rent" [sic, rant].
>
> Q. And when you say "my personal rent" [sic, rant], that's an email that you've written?
>
> A. It was an email that I authored, sending it to myself, Nick Grant, and Nils Menten, collectively known as partners@imarc.net.
>
> Q. And you authored this on about June 22nd, 2005?
>
> A. I would say exactly on that date.
>
> Q. If you look at the third paragraph of the email, it starts with "ConnectU." Do you see that?
>
> A. Yes.
>
> Q. "ConnectU came to us with a specification and design for harvardconnection.com which did not look or act anything like Facebook." Do you see that?
>
> A. Yes.
>
> Q. Could you describe what you meant when you wrote that?
>
> A. I meant that they came to us with something really complicated, like this, and by the time we launched a website, it was much more user-friendly, like friendster.com or thefacebook.com or match.com or any of the sites that were represented in that benchmarking.
>
> Q. And in the next sentence you state, "In April Facebook was already hugely popular. 90 percent of the direction we received from ConnectU was 'Copy Facebook' and ignore

|   |   |
|---|---|
| | the HarvardConnection spec and design." What did you mean when you wrote that? |
| | … |
| A. | I meant that they kept pointing us -- again, benchmarking -- Facebook, Friendster, sites like that. I think I only mentioned Facebook here because I knew that they were asking for stuff relating to some lawsuit that they were filing against Facebook. |
| Q. | When you use the phrase "Copy Facebook," explain what you meant when you said that. |
| A. | I meant that -- again, I'm not sure if they actually used the word "copy." But we were directed at features on Facebook and other social networking sites, mostly for look and feel, usability, ideas, things like that, that they would see on another website and say, "Hey, that's a good feature. We should add that." |
| Q. | And those weren't features that were in the original documents that they gave you? |
| | … |
| A. | I think we added a number of features that are not in this document or in whatever our original plan was. |
| Q. | Do you remember any specific features that came from Facebook that the Winklevoss brothers or Divya Narendra asked you to add to the ConnectU website design? |
| A. | I think the ones I can -- or the layout of the search results they especially liked on Facebook; the ability to create groups of people with similar interests as you. If you're a Boston Red Sox fan, you could create a group called Boston Red Sox fans, and if there are other people on the website who are also Boston Red Sox fans, they could join that group and you could collectively email. I think that's something that Facebook was doing that they thought was a worthy feature to add to their site.<br>    Those are the two specific things. But obviously, by "copy," there's no way to copy code. It's more concepts. But friendster.com was doing groups, and Friendster was a really similar layout as well. |
| Q: | Had a similar layout to whom? |

>   A: Facebook and ConnectU.

*Id.* at 39:3-42:5 (objections removed); Cooper Decl. Ex. 10. *See also id.* Ex. 9 at 26:24-29:3; 31:20-32:5.

### 2. **Harvard Connection's Programmers Testified the Two Websites Were Not Substantially Similar**

22. Joe Jackson was one of the three programmers who in 2003 developed the source code, the user interface and related functionality for the Harvard Connection website. *Id.* Ex. 11 at 34:6-38:23. Plaintiffs also identified him as a "co-author" on their copyright registration for the Harvard Connection code. *See id.* Ex. 13.

23. Mr. Jackson observed the Facebook website when it launched in February 2004. He confirmed that Facebook's GUI was not substantially similar to Harvard Connection's GUI:

>   Q: When did you first become aware of the www.facebook web site?
>
>   A: Pretty much as soon as it launched. Everyone was signing up on campus.
>
>   Q: Did that include you?
>
>   A: Yep. Yes.
>
>   Q: Did you consider it to be similar to the Harvard Connection site you had worked on?
>
>   A: I don't remember thinking that. No. I thought it was similar to Friendster.

*Id.* Ex. 11 at 144:21-145:5.

24. Mr. Jackson testified that Harvard Connection was not a social network, given that it lacked the critical function of connecting friends. *Id.* at 128:11-129:4. *See also id.* at 145:10-146:6.

25. Victor Gao, one of the other two original programmers for Harvard Connection

and one of the other named co-authors of the copyrighted source code, testified that Facebook's and Harvard Connection's GUI were different:

> Q: All right. And the user interfaces were different, correct?
>
> A: Yes.
>
> Q: All right. And the registration fields were different, correct?
>
> A: There's some difference.
>
> Q: There were differences, correct?
>
> A: There were differences.

*See id.* Ex. 12 at 343:16-23.

26. Mr. Gao admitted that to the extent Facebook and Harvard Connection shared any functional similarities in the use of college profile fields (such as the identification of a student's "house"), such information necessarily was used with many resources associated with university profile information. *Id.* at 342:2-343:4. Mr. Gao also testified that Harvard Connection and Facebook did not even share the same type of "dating" information. *Id.* 345:17-346:16.

27. Mr. Gao testified he has "no opinion" as to how the Harvard Connection code he worked on could even have been used for Facebook. *Id.* at 346:21 - 347:11.

28. Mr. Gao testified that Facebook resembled the Friendster website which pre-dated Harvard Connection. *Id.* at 335:23-339:11. Among the reasons for Facebook's resemblance to the earlier Friendster social network were the inclusion of "friends" lists, contact by email, listing of profile information, and the ability to search. *Id.* at 338:5-339:11.

29. Mr. Gao testified that Friendster had the same type of "date" information as existed in Harvard Connection. *Id.* at 346:2-20.

## IV. CODE WRITTEN BY MARK ZUCKERBERG FOR FACEBOOK IS NOT OWNED BY CONNECTU

30. ConnectU's claims that the Facebook code infringes its copyright because ConnectU alleges that it is the owner or co-owner of the Facebook code written by Zuckerberg. *See* Cooper Decl. Ex. 6 at 2-6.

31. ConnectU admitted in a Rule 30(b)(6) deposition that any source code written by Zuckerberg and not included with the copyright deposit for Harvard Connection was owned by Zuckerberg. *See id.* Ex. 5 at 284:1-13. Among the Topics for that deposition was one directed to ConnectU's "alleged ownership of all intellectual property (including … copyrighted material …) referenced in the Amended Complaint, and any alleged transfers of any rights to [ConnectU] by Harvard Connection …." *Id.* Ex. 8 at Topic 10.

32. During ConnectU's Rule 30(b)(6) deposition, its witness, Cameron Winklevoss, testified that ConnectU did not register any code written by Zuckerberg for copyright protection, because ConnectU did not own it:

> Q. Did Mr. Gao strip out any code from the version that he gave you which you gave to your lawyers to deposit with the copyright office?
>
> A. I am -- I can't answer that. I don't know the answer to that. I know that the code given to the copyright office has none of Mark Zuckerberg's code.
>
> Q. And how do you know that? Is that because Mr. Gao told you that?
>
> A. Because we wouldn't have filed code that he [sic] written -- wrote for copyright because it's not our code.

*Id.* Ex. 5 at 284:1-13.

33. ConnectU has not cited any written assignment, non-competition agreement or other instrument by which they contend Zuckerberg either transferred to Plaintiffs a copyright in

Facebook, or agreed to exclusively develop social networking code for Plaintiffs. *See id.* Ex. 6 at 2-6.

34. Plaintiffs assert they own such code because: (a) they allege that they entered into an oral partnership agreement with Zuckerberg by which any computer code he created for *any* social networking website (not merely Harvard Connection) "inured to the benefit" of the Plaintiffs (Cooper Decl. Ex. 6 at 2-4); (b) Plaintiffs claim Zuckerberg created all social networking website code (including Facebook's) at their "special behest" (*id.* at 5); and (c) Plaintiffs argue that Zuckerberg wrote social networking code "specifically with the intent of completing a collaborative project with the Plaintiffs," and thus any Facebook code must have been written "to add to, integrate with and complete that creative work" (*id.* at 5-6).

35. Defendants have separately moved for summary judgment that no oral partnership agreement between Plaintiffs and Defendant Mark Zuckerberg existed. *See* Memorandum of Points and Authorities in Support of Defendants' Mark Zuckerberg, Facebook, Inc. and TheFacebook LLC's Motion for Summary Judgment on Plaintiff's Claims for Breach of Contract, Breach of Covenant of Good Faith and Fair Dealing, and Promissory Estoppel [Dkt. 81].

/ / /

Dated:  February 12, 2008.	Respectfully submitted,


  /s/ I. Neel Chatterjee /s/
I. Neel Chatterjee*
Monte Cooper*
Theresa A. Sutton*
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, California  94025
Telephone:    (650) 614-7400
Facsimile:    (650) 614-7401
nchatterjee@orrick.com
mcooper@orrick.com
tsutton@orrick.com

Steven M. Bauer
Jeremy P. Oczek
PROSKAUER ROSE, LLP
One International Plaza, 14th Floor
Boston, MA 02110-2600
Telephone:    (617) 526-9600
Facsimile:    (617) 526-9899
sbauer@proskauer.com
joczek@proskauer.com

* Admitted Pro Hac Vice

# CERTIFICATE OF SERVICE

   I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 12, 2008.

Dated: February 12, 2008.      Respectfully submitted,

                  /s/ I. Neel Chatterjee /s/
                    I. Neel Chatterjee

OHS West:260384570.1