1

1               UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
2      ------------------------------x
       CONNECTU, INC.             :   DOCKET NUMBER CA0710593
3           PLAINTIFF             :
                   versus         :   UNITED STATES COURTHOUSE
4      FACEBOOK, INC., ET AL      :
            DEFENDANTS            :   BOSTON, MASSACHUSETTS
5      ------------------------------x

6                      JUNE 2, 2008
                        2:30 p.m.
7
                 TRANSCRIPT OF MOTION HEARING
8
                   **UNSEALED HEARING ONLY**
9
       BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK
10              UNITED STATES DISTRICT JUDGE

11
       APPEARANCES:
12
            ATTORNEYS FOR THE PLAINTIFF:
13
                FINNEGAN HENDERSON FARABOW GARRETT & DUNNER LLP
14
                BY:  JOHN F. HORNICK, ESQUIRE
15                   901 NEW YORK AVENUE, NW
                     WASHINGTON, DC 20001-4413
16                   TELEPHONE:  202-408-4076
                     E-MAIL:  john.hornick@finnegan.com
17                   FAX:  202-4080-4400

18

19                   OFFICIAL COURT REPORTER

20              **DIANE M. MOLAS, RPR, DE CSR, AND NJ CCR**
                     **OFFICIAL COURT REPORTER**
21      **UNITED STATES DISTRICT COURT - DISTRICT OF MASSACHUSETTS**
                     **ONE COURTHOUSE WAY**
22                **THIRD FLOOR - SUITE 3200**
                     **BOSTON, MA 02210**
23                **TELEPHONE: (267) 977-2909**
                   **E-MAIL:  Dmolas1@aol.com**
24
            PROCEEDINGS REPORTED USING MACHINE STENOGRAPHY.
25     TRANSCRIPT PRODUCED EMPLOYING COMPUTER-AIDED TECHNOLOGY.

Dockets.Justia.com

1    APPEARANCES (CONTINUED):

2                        AND

3           BY:  TOM JENKINS, ESQUIRE
                 901 NEW YORK AVENUE, NW
4                WASHINGTON, DC 20001-4413
                 TELEPHONE:  202-408-4000
5                FAX:  202-4080-4400

6

7           BY:  SCOTT R. MOSKO, ESQUIRE
                 3300 HILLVIEW AVENUE
                 PALO ALTO, CA 94304-1203
8                TELEPHONE:  650-849-6600
                 E-MAIL:  scott.mosko@finnegan.com
9                FAX:  650-849-6666

10

11          BY:  MEREDITH H. SCHOENFELD, ESQUIRE
                 901 NEW YORK AVENUE, NW
12               WASHINGTON, DC 20001-4413
                 TELEPHONE:  202-408-4393
                 FAX:  202-4080-4400
13

14          BY:  DANIEL P. TIGHE, ESQUIRE
                 176 FEDERAL STREET
15               BOSTON, MA 02110-2214
                 TELEPHONE:  617-542-9900393
16               E-MAIL:  dtighe@gtmllp.com
                 FAX:  617-542-0900
17

                        AND
18

     PRO-HAC-VICE-PENDING ATTORNEY FOR THE PLAINTIFF:
19

          BOIES, SCHILLER & FLEXNER LLP
20

21          BY:  D. MICHAEL UNDERHILL, ESQUIRE, PRO HAC
                 VICE PENDING
                 5301 WISCONSIN AVENUE, N.W.
22               WASHINGTON, DC 20015
                 TELEPHONE:  202-237-2727
23               E-MAIL:  munderhill@bsfllp.com
                 FAX:  202-237-6131

24

25

1   <u>APPEARANCES (CONTINUED)</u>:

2       ATTORNEYS FOR THE ALL DEFENDANTS, EXCEPT EDUARDO SAVERIN:

3           ORRICK, HERRINGTON & SUTCLIFFE LLP

4               BY:  I. NEEL CHATTERJEE, ESQUIRE
                     1000 MARSH ROAD
5                    MENLO PARK, CA 94025-1015
                     TELEPHONE:  650-614-7356
6                    E-MAIL:  nchatterjee@orrick.com
                     FAX:  650-614-7401

7

8               BY:  THERESA A. SUTTON, ESQUIRE
                     1000 MARSH ROAD
9                    MENLO PARK, CA 94025-1015
                     TELEPHONE:  650-614-7356
10                   E-MAIL:  tsutton@orrick.com
                     FAX:  650-614-7401

11
                            AND
12
            PROSKAUER ROSE LLP
13
                BY:  STEVEN M. BAUER, ESQUIRE
14                   ONE INTERNATIONAL PLACE
                     BOSTON, MA 02110-2600
15                   TELEPHONE:  617-526-9700
                     E-MAIL:  sbauer@proskauer.com
16                   FAX:  617-526-9899

17                          AND

18              BY:  JEREMY P. OCZEK, ESQUIRE
                     ONE INTERNATIONAL PLACE
19                   BOSTON, MA 02110-2600
                     TELEPHONE:  617-526-9651
20                   E-MAIL:  joczek@proskauer.com
                     FAX:  617-526-9899

21

22

23

24

25

1    APPEARANCES (CONTINUED):

2         ATTORNEYS FOR THE DEFENDANT, EDUARDO SAVERIN:

3              HOLLAND & KNIGHT LLP

4                   BY:  DANIEL K. HAMPTON, ESQUIRE
                         10 ST. JAMES AVENUE
5                        ELEVENTH FLOOR
                         BOSTON, MA 02116
6                        TELEPHONE:  617-573-5886
                         E-MAIL:  dan.hampton@hklaw.com
7                        FAX:  617-523-6850

8                             AND

9              HELLER EHRMAN LLP

10                  BY:  ROBERT B. HAWK, ESQUIRE
                         275 MIDDLEFIELD ROAD
11                       MENLO PARK, CA 940252116
                         TELEPHONE:  650-324-7165
12                       E-MAIL:  robert.hawk@hellerehrman.com
                         FAX:  650-324-6016

13

14        ATTORNEYS FOR THE WITNESS, JEFFREY PARMET:

15             GESMER UPDEGROVE LLP

16                  BY:  LEE T. GESMER, ESQUIRE
                           AND JOSEPH LAFERRERA
17                       40 BROAD STREET
                         BOSTON, MA 02109
18                       TELEPHONE:  617-350-6800
                         E-MAIL:  lee.gesmer@gesmer.com
19                       FAX:  617-350-6878

20                            AND

21                  BY:  CHRISTOPHER SHEEHAN, ESQUIRE
                         40 BROAD STREET
22                       BOSTON, MA 02109
                         TELEPHONE:  617-350-6800
23                       FAX:  617-350-6878

24

25

**OFFICIAL COURT REPORTER:**

**DIANE M. MOLAS, RPR, DE CSR, and NJ CCR**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT - DISTRICT OF MASSACHUSETTS**
**ONE COURTHOUSE WAY**
**THIRD FLOOR - SUITE 3200**
**BOSTON, MA 02210**
**TELEPHONE: (267) 977-2909**
**E-MAIL:  Dmolas1@aol.com**

- - -

P R O C E E D I N G S

THE DEPUTY CLERK:  All rise.

This Honorable Court is now in session.

You may be seated.

Calling the case, Civil Action 07-10593,

ConnectU, Inc. versus Facebook, Inc., et al.

THE COURT:  Well, at the outset, I do have a motion

to move this case in camera.

My general view is, unless there is some showing of

specific necessity beyond the generalized discussion, then, I

won't do that.

1    If the party has a particular issue that believes

2    we're touching on a particular issue, apart from the general

3    topic, then, you can make a motion at that time, and I'll see

4    whether or not it justifies going into, you know, some sort of

5    in camera session, but I don't find, on its face, that, at

6    least, all of the discussion that we have today should be

7    dealt with in camera.

8    Now, I guess I just want to be sure I understand

9    fully, Mr. Hornick.

10    At the time of the settlement agreement, or, at

11    least, the term sheet -- we'll call it the term sheet -- was

12    executed, was ConnectU aware that there was some sort of a

13    dispute concerning the products of the Parmet inquiries?

14    MR. HORNICK:  Your Honor, at the time that the term

15    sheet was signed, ConnectU was aware that Mr. Parmet was in

16    some kind of dispute with the Facebook attorneys.

17    The -- the counsel for ConnectU asked Facebook, on

18    a couple of occasions, to tell what the subject of that

19    dispute was, and they wouldn't tell us, so all we knew was

20    that there was a dispute.

21    THE COURT:  Okay; and, then, aware that there was a

22    dispute, as to which Facebook would not disclose the

23    substance.

24    Nevertheless, the term sheet was entered into?

25    MR. HORNICK:  I'm not sure the two were necessarily

1  connected, but, yes, the term sheet was signed, and there was

2  knowledge that there was some kind of a dispute with

3  Mr. Parmet.

4        THE COURT:  Okay; and, in that connection, there

5  were a number of unresolved Discovery matters at that point?

6        MR. HORNICK:  Well, it was known that -- it was

7  known by ConnectU that Facebook had documents that they had

8  not yet produced, but the importance of those document, we

9  didn't know; I mean, Facebook hadn't said we have -- have any

10  material documents that we're going to produce.  They didn't

11  say.

12        THE COURT:  Were they under an obligation to tell

13  you how material they viewed the documents?

14        MR. HORNICK:  I'm sorry?

15        THE COURT:  Were they under an obligation to tell

16  you how material they viewed the documents?

17        MR. HORNICK:  No, I would say that they were not

18  under an obligation to tell us, per se, but I believe they

19  were under an affirmative obligation to produce the documents.

20        THE COURT:  Which was suspended by that settlement

21  exercise, I take it?

22        MR. HORNICK:  Well, at some point in time it was

23  suspended, Your Honor, but the defendants knew from Mr. Parmet

24  that these documents had been identified on December 14.

25        We said in our brief that it was no later than

1  January 7; in fact, it was December 14, so they actually had

2  five weeks before the mediation even became a possibility,

3  during which those documents should have been produced, and,

4  after the remediation became a possibility, there was another

5  three weeks during which they could have produced them before

6  mediation was actually scheduled, which was on February 11,

7  and, then, on February 11, there was another week, or so,

8  before the mediation actually occurred.

9              Somewhere in there, there was a decision that

10 parties would hold up.  It's in my notes, I can provide it to

11 you, but the point is that there was a period of, somewhere in

12 the neighborhood of, eight weeks, during which the case was

13 business as usual, and, in fact, in mid-February -- I believe

14 it was the day after the parties scheduled the mediation --

15 the day after the parties scheduled the mediation, Facebook

16 filed a Motion for Summary Judgment on the copyright claim,

17 and they, therefore, even as of the day the mediation had been

18 scheduled, believed the case was alive, and, if these

19 documents were, in any way material to that motion, they

20 should have been produced.

21             THE COURT:  And you filed a renewed motion under

22 56F?

23             MR. HORNICK:  There was a renewed motion under 56F,

24 Your Honor, but it related to the Summary Judgment motion on

25 the contract, which was filed in August of last year.

1           Shortly after the motion for Summary Judgment was

2   filed, the parties did put things on hold.

3           I'm sorry, shortly after the copyright

4   Summary Judgment motion was filed in February, the parties put

5   things on hold, so there wasn't a Rule 56 related to that.

6           THE COURT:  I see.

7           Now, turning to the order for Discovery on

8   computer-memory devices, Document Number 103, in this case, is

9   it your understanding that the matters to which Mr. Parmet

10  referred are not matters as to which he was properly

11  positioned to bring them to your attention?

12          MR. HORNICK:  Well, I don't really know for sure,

13  Your Honor.

14          I can surmise, from what he said to me, that it

15  wasn't code, and the subject to protocol is code.

16          THE COURT:  Mm-hmm.

17          MR. HORNICK:  But, other than what we put into our

18  brief about the subject matter of those documents, I don't

19  really know what they are.

20          THE COURT:  Well, is there any other mechanism by

21  which Mr. Parmet would properly have access to these

22  documents?

23          Let's assume that we're still in the Discovery

24  phase of the case, or they're clearly in the Discovery phase

25  of the case.

1      I should add that I make no judgment about

2  settlement or not settlement.

3      I'm more concerned with compliance with court

4  orders here than the question of settlement.

5      That's a matter, it seems to me, for Judge Ware to

6  deal with, but let's assume that we're still actively pursuing

7  this issue.

8      Is there any basis on which Mr. Parmet could

9  disclose matters beyond code?

10      MR. HORNICK:  Your Honor, when you first asked the

11  question, you asked about access and, now, you're asking about

12  disclosure.

13      I'd like --

14      THE COURT:  I'd like --

15      MR. HORNICK:  -- to answer for both.

16      THE COURT:  Yes.

17      MR. HORNICK:  With respect to access, the answer

18  is:  Yes.

19      Mr. Parmet had the ability and the right to access

20  everything, everything that was on those hard drives, and the

21  reason was the very subject of the September 13 hearing.

22      When we came into the September 13 hearing before

23  Judge Collings, the parties had not agreed, at that point, on

24  a couple of remaining issues in the protocol, and one of them

25  was the scope of the search that he could perform.

1    Now, the defendants took the position that he

2  should only be able to search for code, and I explained to

3  Judge Collings that you don't know it's code, necessarily,

4  until you find it, so, therefore, he had to have the ability

5  to search everything.

6    He had to have access to everything on those hard

7  drives, and I think that's clear in the protocol.  I think

8  it's clear in the transcript of the September 13 hearing.

9    With respect to disclosure, if he were to find

10  information that was not code, under the protocol,

11  technically, he was not supposed -- he could not disclose it

12  to ConnectU, but he could -- there were a couple of mechanisms

13  by which that information could have come out.

14    One was, in our view, he could have called or

15  E-mailed Facebook's counsel and ConnectU's counsel and

16  suggested there be a conference call.

17    During that conference call, he could have said,

18  simply:  I found information, found documents, that weren't

19  code; may be relevant.

20    That's all he had to say.

21    THE COURT:  Where do I find that he's authorized to

22  do that, though?

23    MR. HORNICK:  In Paragraph 3 of the protocol,

24  Your Honor, it gives them -- it simply says that, if there is

25  any communication by telephone with ConnectU's counsel,

1    regarding work under the protocol, Facebook's counsel needs to

2    be on the call, so he wasn't prevented from talking to us,

3    talking to ConnectU's counsel.

4            Under the protocol, he was only prevented from

5    talking to ConnectU's counsel without Facebook's counsel also

6    being on the line.

7            THE COURT:  I'm just looking at this fairly

8    carefully, I think, and the operative language that I'm

9    concerned about is the language that says that he may not

10   discuss with ConnectU's counsel or with anyone else any

11   information obtained from the Facebook hard drives, except,

12   with respect to program -- produced program code.

13           Wasn't it a condition of his involvement that he

14   was not to discuss with anyone else anything other than

15   produced program code?

16           MR. HORNICK:  Yes, Your Honor.

17           Technically, that is correct under the protocol.

18           THE COURT:  Okay; so --

19           MR. HORNICK:  Now, I can't speak for what

20   Mr. Parmet was thinking.

21           THE COURT:  No, I understand.

22           I'm just trying to understand what the provisions

23   of the arrangement are.

24           (Pause.)

25           THE COURT:  Okay.

1          MR. HORNICK:  Your Honor, we contemplated before

2     the protocol was signed that there could possibly be

3     situations that would arise where you don't know what to do or

4     Mr. Parmet didn't know what to do, and ConnectU, obviously,

5     wanted the situation where Mr. Parmet could approach us about

6     that.

7          Through negotiation, we came to the point where the

8     protocol says that, if there is any communication between

9     Mr. Parmet and ConnectU's counsel, if it's in writing, it has

10    to be approved, first, by defendant's counsel.

11         If it is by telephone, everyone has to be present.

12         THE COURT:  No, but the scope of the discussions

13    that he could have were limited to produce program code.

14         MR. HORNICK:  Yes, they were.

15         It was impossible at the time to conceive of every

16    possible problem that could have arisen.

17         THE COURT:  But that's the one that's in play here.

18         MR. HORNICK:  Yes.

19         THE COURT:  That's the, apparently, operative

20    position; so is there any other mechanism that you can

21    conceive of that Mr. Parmet would be permitted to disclose to

22    ConnectU's counsel, or anyone else, any information he

23    obtained from the Facebook hard drives?

24         MR. HORNICK:  Well, there was a mechanism for

25    disclosing it to The Court, and not to ConnectU's counsel, and

1    that's Paragraphs 7 through 9 of the protocol.

2           THE COURT:  Right.

3           MR. HORNICK:  Under -- the way those work is,

4    essentially, Mr. Parmet provides a report on what he has

5    found, and, then, the Facebook attorneys and Mr. Zuckerberg's

6    attorney, look at that report, and they can identify things

7    that they think don't belong there, because they're

8    privileged, or they're private material, or they're not code,

9    or they're not relevant somewhere, and, then, they send that

10   along with their reasoning to Mr. Parmet, and he reviews that,

11   and, if he agrees with them, then, he takes it off of his list

12   of things that should be provided to ConnectU.

13          If he doesn't agree with them, then, Facebook is

14   required to submit to The Court, within fifteen days, not only

15   their reasoning for why these things should be removed from

16   the list, but, also, Mr. Parmet's actual reasoning for why

17   they should be included on the list, and, if you read our

18   brief and if you read the defendant's brief, it appears

19   likely, very likely, that that was in play, that that was

20   actually happening, that process was playing itself out.

21          Now, on March 7, Mr. Parmet would have submitted to

22   Facebook a report in which he would have said:  I do not agree

23   with you.  These things need to be considered by the judge,

24   essentially.

25          Now, if they weren't code, then, maybe they

1 shouldn't have been in there, but it was a mechanism by which

2 he could have brought the situation to the judge's attention.

3         THE COURT:  Well, let's assume it was not code,

4 that it was not what's covered by Paragraph 3.

5         So, if it's not code, then, he's not authorized to

6 pursue this.  If he doesn't, in good faith, believe that it's

7 code, he's not authorized to pursue it.

8         Is he under these provisions -- is it 7 through

9 9 -- or -- yes, 7 through 9?

10         MR. HORNICK:  I think there is some ambiguity in

11 Paragraphs 7 and 8 about whether the information that Facebook

12 had the right to exclude from the list had to be privileged

13 and not relevant and not code or whether it could be

14 privileged or not relevant or not code.

15         I think that there is some room there by which --

16         THE COURT:  Well, let's assume that it's not

17 privileged, it's not irrelevant, but it's, also, not computer

18 program code.

19         Your position is:  It could be, then, included

20 there?

21         MR. HORNICK:  No, what I'm saying is:  There is so

22 much ambiguity in this paragraph, so that, if Facebook were to

23 delete from Mr. Parmet's list information that they believed

24 shouldn't be on the list because it didn't meet all three of

25 those requirements, that they may be wrong in doing that, and,

1    therefore, Mr. Parmet may have concluded -- and he had counsel

2    advising him, he may have concluded -- that he could --

3            THE COURT:  Well, I guess, at some point, I think

4    we'll hear from Mr. Parmet or his counsel, but I just want to

5    understand what your reading of this provision is, because

6    he -- to some degree, Mr. Parmet is the subcontractor to you,

7    and let's assume a circumstance in which Mr. Parmet discovers

8    something that is not code, and everybody concedes it's not

9    code.

10           I don't know if that's the case here.  It's just

11   simply setting a hypothetical, but whether he assumes it's not

12   code, but, nevertheless, he thinks it's, for whatever reason,

13   important, something he would like to learn about, does he

14   have any authorization under this to initiate that process of

15   back-and-forth?

16           MR. HORNICK:  Your Honor, I'd like to address the

17   issue whether or not it could have been code separately, but,

18   to answer your question specifically, in Paragraph 8, about

19   midway down Page 12 of the protocol, it says that, just to

20   paraphrase, Facebook has to provide notice and objection to

21   the list that Mr. Parmet has provided, quote, along with an

22   explanation of why the Facebook defendants believe the

23   objected-to materials are not computer program code, are not

24   relevant, and/or are privileged or protected, and I think that

25   it's possible to read that and to conclude that they may --

1  Facebook may -- not have the right to take them off of the

2  list, unless they meet all three of those requirements, so

3  it's possible that --

4          THE COURT:  How would I read it that way, that

5  and/or means just and?

6          MR. HORNICK:  Or that it could mean or.

7          If it means only or as opposed to and, then, it's

8  possible that, if it was --

9          THE COURT:  Alright.  We'll do it a different way.

10          Take the and off and the slash, and that is --

11          MR. HORNICK:  The point is that it could be

12  relevant.

13          THE COURT:  -- entirely disjunctive?

14          MR. HORNICK:  The point is, that, if it were

15  entirely disjunctive, then, it could be relevant information.

16          If it were relevant information, then, it would be

17  relevant to take it off the list, or to argue that it should

18  be taken off the list, but I'd like to address the question of

19  whether --

20          THE COURT:  Alright; so that, you suggest, is some

21  sort of ambiguity in this language?

22          MR. HORNICK:  I believe the ambiguity occurs in

23  another place, Your Honor, which I'll try to find while we're

24  talking, but, as I said, I'd like to address the question of

25  whether these documents that Mr. Parmet found could be code.

1      Now, I don't know what they are, but reasonable

2  minds might be able to differ about whether they are code, or

3  not, for two reasons.

4      One is that Mr. Zuckerberg was known -- and the

5  reason I know this is because defendants' counsel told me this

6  during meet-and-confer in Texas, Mr. Zuckerberg was known --

7  to write code in text files, so it would be a Word document,

8  for example.

9      He was writing code in a text file, so it might be

10 difficult to determine and to decide, and reasonable minds

11 might differ as to whether that is code or whether that is a

12 document that is not code.

13     THE COURT:  Well, then, we're back to the point of

14 which, if it's code, there was a known dispute about code, and

15 nevertheless, the settlement term agreement was entered into.

16     MR. HORNICK:  Well, again, Your Honor, I don't

17 think they are necessarily connected, because, for example,

18 Mr. Parmet is saying that these documents should be included

19 on the list, and Facebook is saying they can't be included on

20 the list because they're not code, and he thinks:  Well, they

21 are really, arguably, code, and there is another reason why

22 they could have been, and that's because we believe that the

23 documents that are the subject of Mr. Parmet's documents that

24 he found, we believe that they are Instant Message logs, and

25 they, as I understand it -- and Mr. Parmet would be a better

1  person to ask, but as I understand it, they -- were rendered

2  as HTML files.

3          THE COURT:  What is the basis for saying that they

4  are IM logs?

5          MR. HORNICK:  I'm sorry.

6          Exhibit 14 to Mr. Chatterjee's declaration.

7          Do you have it?

8          (Pause.)

9          MR. HORNICK:  If you turn to the next-to-the-last

10 page of this exhibit, it's Number 2 at the bottom.

11         This is Exhibit 14 to Mr. Chatterjee's declaration.

12         THE COURT:  I have it.

13         MR. HORNICK:  And you refer to the E-mail from

14 Mr. Parmet to Mr. Chatterjee, dated, December 14, 2007.

15         The last paragraph says:  The logs can be found on

16 Device 371-01 in the Windows -- Windows partition that we were

17 able to image, and I -- and, I believe your forensic experts

18 were previously able to image the paths to the -- and, then,

19 it's blacked out R, and, then, the path is blocked out.

20         Now, the word, "logs," there, I believe it's

21 referring to Instant Messaging logs.

22         The reason that I believe that is because, at the

23 time, right around the same time that this was all happening,

24 a dispute with Mr. Parmet, the defendants did produce some

25 other Instant Message logs, and this is commonly how they're

1    referred to.

2            Also, 37101, very important number.  That's

3    Mr. Zuckerberg's hard drive.

4            That is the hard drive that Mr. Zuckerberg used

5    while he was at Harvard.  That means that these are logs, some

6    kind of something, that came up on Mr. Zuckerberg's hard

7    drive.

8            Now, whether it was Instant Message logs or some

9    other kind of log, it was still a computer log, and, for this

10   reason, I think there is an argument, or, at least, reasonable

11   minds might differ, as to whether this was code, or not, and,

12   therefore, Mr. Parmet might have been totally within the

13   protocol to include it, but, if Facebook takes the position

14   that, no, you can't, and it's not code, then, they can make

15   the argument that he's in violation of the protocol.

16           THE COURT:  Okay; so let me just see if I can

17   recapitulate a bit on your theory here.

18           One is that there could have been code in this

19   disputed material that was going on.

20           The second is that there is potentially ambiguity

21   to be read into the agreement or the order, I should say, here

22   that would permit Mr. Parmet to raise the question of

23   something that's not code but is arguably relevant.

24           Is that -- that it?

25           Now, if the latter, why would there even need to be

1   an order; that is to say, Mr. Parmet is exposed to all of this

2   material.

3           Presumably, he can, if he's not under some sort of

4   limitation, can disclose that, as well.

5           MR. HORNICK:  Nothing under this protocol comes to

6   ConnectU's attention without Facebook's or The Court's

7   permission.

8           THE COURT:  Right; and the reason for that is that

9   it's supposed to limit itself to code.  That was the whole

10  purpose of this exercise, I assume.

11          MR. HORNICK:  But what we don't know, Your Honor,

12  is whether Mr. Parmet believed the information arguably was

13  code.

14          THE COURT:  Right.

15          MR. HORNICK:  And, therefore, he was trying to --

16          THE COURT:  Well, from that perspective, the only

17  basis, I think, fair basis in his authorization to make

18  disclosures is that it is somehow code.

19          The ambiguity, it seems to me, drops out when you

20  look at the purpose and structure of this agreement, which was

21  to limit his exposure or, at least, his ability to pass on his

22  disclosure to other things to be found in the hard drives.

23          MR. HORNICK:  Well, Your Honor, I don't really want

24  to box Mr. Parmet in a corner, but I will say this:  There was

25  discussion about the purpose of the security provisions in the

1  protocol at the September 13 hearing, and the purpose of these

2  provisions was not to prevent the production of responsive

3  documents.

4            It was to prevent ConnectU from coming into

5  possession of private information; such as, E-mails between

6  girl friends, financial information, and privileged

7  information.

8            THE COURT:  No, I understand all of that, and what

9  it did is, it said, I think, that access will be provided,

10 more or less unrestricted access, to review anything on the

11 hard drive, so long as the only disclosure that's made by this

12 subcontractor is of code material.

13            That was the balance that was struck.

14            Now, there's an independent obligation, obviously,

15 on the part of Facebook to provide Discovery according to

16 independent Discovery responsibilities; yet, that's a

17 different issue.

18            The issue here, it seems to me, is -- being a

19 focused issue is -- simply:  What is Mr. Parmet authorized to

20 discuss with anybody else; and that, it seems to me, is a

21 question of construction of this order by Judge Collings.

22            MR. HORNICK:  Well, I would argue here, Your Honor,

23 that, if the situation arose in which Mr. Parmet found

24 documents that, even, arguably were not code, documents that

25 were what everyone else would just call documents; such as, a

1  letter, an E-mail, something like that, then, I would argue

2  that, under Paragraph 3, he had the right to get all the

3  counsel on the line and simply say:  I found some things that

4  were not code, and I don't think that would be a violation of

5  the protocol.

6          THE COURT:  Well, I don't know how one could

7  discuss something that's not code.

8          MR. HORNICK:  Well, I'm saying, Your Honor, he has

9  nothing more than that.

10          THE COURT:  Well, that's the -- amounts to the same

11  thing.

12          It's not an extended discussion, but it is a

13  discussion of something that is not code, but I think I

14  understand that argument.

15          MR. HORNICK:  There's another possibility,

16  Your Honor, and that is that Mr. Parmet was not restricted in

17  talking to Facebook and Zuckerberg's attorneys about anything

18  that he found.

19          THE COURT:  Mm-hmm.

20          MR. HORNICK:  Which is what he did or what I

21  understand that he did, at least, and, at that point,

22  Facebook, in our view, had an affirmative obligation to

23  produce those documents, and, in fact, they told him, on

24  December 16 and 18, that they were going to produce these

25  documents.

1    Now, it's a separate subject, I think, of what

2 happens after that, whether they get produced, or not, and

3 whether Mr. Parmet is right or wrong in feeling like he has

4 some kind of an obligation to The Court or to ethics or to

5 what's right and wrong, to bring these documents into the

6 open, but he certainly could have discussed them with

7 Facebook, and it is Facebook that has put -- and

8 Mr. Zuckerberg -- who have put him in this situation.

9    THE COURT:  Well, yes, I think that's right.

10    It's a separate set of issues about what their

11 obligations are in an ongoing process, but is there anything

12 else that you want to focus on?

13    MR. HORNICK:  Well, I would like to focus on that

14 obligation, unless Your Honor would like to focus on something

15 else.

16    THE COURT:  Well, no, I think I want to hear from

17 Mr. Chatterjee, and I'll see what else I want to do, but are

18 there any other approaches to this that you see with respect

19 to Mr. Parmet's obligations?

20    MR. HORNICK:  You're asking if there are other ways

21 that the information could have come out, under the protocol?

22    THE COURT:  Yes.

23    Through Mr. Parmet.

24    MR. HORNICK:  I believe those are the ways that

25 either -- well, I suppose another way is Mr. Parmet could have

1   informed Facebook that he wanted to inform ConnectU of the

2   situation in writing.

3          They would have had to have approved it, so that

4   they could have vetoed that.

5          I mentioned the phone call, and I mentioned the

6   Paragraph 7 through 9, and, I mean, entirely independently of

7   the protocol, and -- oh, and I mentioned Mr. Parmet bringing

8   it to Facebook's attention, and, then, I think, totally

9   independently of that, I suppose Mr. Parmet could have come to

10  The Court; I mean, we are in a very strange situation here.

11         If you look through these -- these E-mails that are

12  the exhibits, Mr. Chatterjee's declaration, E-mails between

13  the Orrick firm and Mr. Parmet, he is an independent expert

14  who does not appear to have counsel, and, yet, they were

15  telling him that they need to meet and confer with him under

16  Local Rules before they file a motion.

17         Now, they don't know that he has counsel, so how

18  does he know what that means?

19         I think that they --

20         THE COURT:  I think it's coming out in camera, in

21  my opinion.

22         He did have counsel at that point, but I think he

23  did have counsel at that point.

24         MR. HORNICK:  I believe he did, but I don't

25  believe, from reviewing these E-mails, which I just saw for

1   the first time the other day when these were submitted to

2   The Court, I think, from reviewing those E-mails, it is not

3   apparent to me that it would have been apparent to anybody

4   reading them at the Orrick firm that he had counsel, and,

5   therefore, from their point of view, he's an independent

6   expert who is not a lawyer and he needs some kind of

7   protection.

8           It seems to me, at that point, he could have come

9   to The Court and maybe should have come to The Court, because

10  there wasn't anyone protecting him in Orrick's eyes.

11          Now, possibly, maybe he could have been between

12  lawyers at that point, too, because, as we explained in our

13  brief, the first lawyer passed away, but the point is --

14  simply the point is that Mr. Parmet, I think, could have come

15  to The Court in camera and, yet, you wouldn't have learned

16  anything, and the Court could have, then, decided how he

17  should be dealt with, with respect to his relationship with

18  Orrick, and whether these documents needed to be produced by

19  Mr. Zuckerberg and by Facebook.

20          THE COURT:  Alright; so, Mr. Chatterjee, let me

21  understand your position on this.

22          Let me make an analogy, not a perfect one, by any

23  means, but one of the things that came to my mind is the

24  Doctrine of Plain View, which authorizes those who are

25  constrained by a search warrant to seize materials not covered

1 by the search warrant but that are in plain view and are

2 evidentiary of the -- some sort of criminal activity, not a

3 perfect analogy on a whole range of issues, but let's put it

4 in the most extreme sense.

5          He encounters some document that discloses, wholly

6 independent of code, the potential for physical harm to some

7 other person, the imminent potential for physical harm to some

8 other person.

9          Is he barred from discussing that, at all?

10          MR. CHATTERJEE:  Your Honor, in your hypothetical,

11 which is not a factual situation here -- and I can explain

12 that -- I think the answer to that is:  Yes.

13          THE COURT:  Alright.

14          Now, he discloses that, how?

15          MR. CHATTERJEE:  He --

16          THE COURT:  You mean, he is barred?

17          MR. CHATTERJEE:  He is barred.

18          THE COURT:  He can't disclose that.

19          He's like a -- well, not a psychiatrist, I guess,

20 in California --

21          (Laughter.)

22          THE COURT:  -- but like a lawyer or a priest?

23          MR. CHATTERJEE:  Yes, Your Honor.

24          I mean, there is a court order that restricts what

25 he may or may not talk to.

1      It was one that the Finnegan Henderson firm

2 originally drafted, and, then, we participated in making

3 revisions, and we litigated some of the issues.

4      THE COURT:  Now, so the scope of his writ is

5 entirely to disclose nothing but code?

6      MR. CHATTERJEE:  That's absolutely correct,

7 Your Honor.

8      THE COURT:  Okay.

9      Now --

10      MR. CHATTERJEE:  And, in fact, he's supposed to --

11 if he looks at something; such as, the types of documents

12 Mr. Hornick identified, he is to quickly identify whether it

13 has, what's referred to as, the syntactical style in certain

14 languages.

15      These documents; such as, Exhibit E to the Wolfson

16 declaration that was in the 56F, that Mr. Parmet also found,

17 if you look at them, there is nothing that even closely

18 resembles code, nothing.

19      THE COURT:  Well, I guess I wasn't forced to -- or

20 certainly hadn't confronted the question of whether or not

21 he'd exceeded his authority in his Affidavit under the

22 Rule 56F.

23      MR. CHATTERJEE:  Oh, no, Your Honor.

24      I'm sorry, I didn't mean to be confusing.

25      The Wolfson declaration was a 56F.

1          THE COURT:  Mm-hmm.

2          MR. CHATTERJEE:  That was separately submitted by

3    the Quinn Emanuel firm.

4          They attached to it, as Exhibit E, an

5    Instant Message chat log.

6          That Instant Message chat log was one of the

7    documents that Mr. Parmet found.

8          If you look at that document, there is nothing in

9    there that comes even close to resembling code.

10         THE COURT:  Let me step back from that a bit.

11         Is it also a document that you have been disclosed

12    by Facebook?

13         MR. CHATTERJEE:  It was a document we produced.

14         We produced this document.

15         THE COURT:  Okay; so he made reference to a

16    document that was already disclosed by Facebook?

17         MR. CHATTERJEE:  No, Your Honor, he actually had

18    identified it, but we already had it in our production tracks,

19    so it was going out the door, and it was produced.

20         THE COURT:  Alright; so, let me understand the

21    status of the particular documents that were in dispute here.

22         Were they in the production track at the time that

23    the dispute arose?

24         MR. CHATTERJEE:  Yes, Your Honor.

25         THE COURT:  That is, things that were going to be

1  disclosed by Facebook?

2           MR. CHATTERJEE:  Yes, Your Honor.

3           THE COURT:  But could not be disclosed by

4  Mr. Parmet; is that it?

5           MR. CHATTERJEE:  Correct.

6           THE COURT:  Okay.

7           MR. CHATTERJEE:  And there was a reason for that,

8  Your Honor, because we had done a very, very broad keyword

9  search of all of our electronic devices, and we were doing

10 document review of those, eliminating the privilege privacy

11 issues, and the like, and we were rolling out the production

12 and sending it, essentially on a monthly basis, as we were

13 getting through the documents, and we kept the Quinn Emanuel

14 firm fully apprised of that.

15          THE COURT:  Well, where were these documents that

16 Mr. Parmet referred to in the disclosure queue?

17          MR. CHATTERJEE:  I think what we had said to the

18 Quinn Emanuel firm -- and I think we put this in our papers --

19 we had said we were going to be disclosing them in mid-to-late

20 February, and we said we would be done with all the production

21 from the electronic devices that were subject to the protocol.

22          THE COURT:  Now, how do I know that the documents

23 that Mr. Parmet referenced are ones that were going to be

24 disclosed, apart from your representation?

25          MR. CHATTERJEE:  Your Honor, what I can tell you

1    is, is:  We know the methodology that he used to find these,

2    and we had done the same methodology in the devices.

3              THE COURT:  Well, you say you know the methodology

4    that he used to find these, but his methodology was directed,

5    presumably directed at code, rather than non-code but relevant

6    documents.

7              MR. CHATTERJEE:  It was not, Your Honor; in fact,

8    that was part of our problem.

9              When we reviewed his logs, which he was obligated

10   to provide us under the protocol, it was very clear that what

11   Mr. Hornick had said in court at the hearing in front of

12   Judge Collings, that there was a computer program that was

13   used to pull out code, but that, in fact, was not what he did.

14             On many occasions, it appears to be a computer -- a

15   keyword searching.

16             As a matter of fact, we had a fully-executed expert

17   declaration that had reviewed his logs that basically was

18   saying what it was told -- what we were told -- he was going

19   to do, in fact, was not what he did.

20             Now, we didn't ultimately file that because of the

21   standstill agreement, the settlement documents which I have

22   here, but I don't know if we need to get into that today.

23             THE COURT:  But back to the question of his

24   obligation.

25             As you see it, he is simply barred from any

1  discussion of non-code documents?

2          Simplistic, that's it.

3          MR. CHATTERJEE:  Yes, Your Honor.

4          If he does get into a document that isn't code, he

5  can look at it to see if it has what they say is the

6  syntactical style, that looks like it has code in it, but,

7  beyond that, he can't review it in detail.

8          Now, just to be clear, as to these documents that

9  he identified, even though we disputed the interpretation of a

10  protocol, we did log them, we provided the log to Mr. Parmet,

11  and Mr. Parmet was going to be given the opportunity to object

12  and to take it to court if he felt it was appropriate; so,

13  notwithstanding the fact that we disagreed with him under the

14  protocol, and we disagreed with what he did, and we felt he

15  had violated it, we were still willing to take this to court

16  to resolve the dispute.

17          THE COURT:  Now, is it your position, then, that

18  all of this was pre-admitted by the settlement discussions and

19  the term agreement?

20          MR. CHATTERJEE:  Yes, Your Honor.

21          (Pause.)

22          THE COURT:  What do you want me to do?

23          MR. CHATTERJEE:  Your Honor, what I'd like you to

24  do is dismiss this case.

25          THE COURT:  Well, but that's a matter for

1  Judge Ware; I mean, the term agreement says that he's the one

2  who's got the responsibility for this, in reviewing it, and

3  now, of course, there is a dispute about whether it's actually

4  been settled.

5      Now, I don't think I'm going to go beyond what the

6  term agreement is.  That's where the resolution of any

7  disputes regarding this should be; that is, in the San Jose

8  Division of the Northern District.

9      MR. CHATTERJEE:  I agree with you, Your Honor.

10     THE COURT:  Okay; so I'm not in a position to

11 dismiss the case, I don't think, but to await the outcome, now

12 that there's a dispute, before Judge Ware; so what else do you

13 want me to do?

14     MR. CHATTERJEE:  So, Your Honor, the other thing

15 you can do is you can await the outcome of those proceedings

16 in front of Judge Ware.

17     If Your Honor believes that you have jurisdiction,

18 one thing you could do is refer this matter to Judge Collings,

19 for Mr. Parmet, to talk about in camera what he looked at --

20     THE COURT:  Well, I'm not going to be doing that.

21     This is not a, you know, trick question.

22     It is a question of what it is that I'm really

23 being asked to do and what my authority is to do it.

24     The only provisional kind of authority I think I

25 have in this area -- or, at least, the only one that I would

1   exercise -- is contempt; that is to say, someone is in

2   violation of a court order and I maintain some sort of

3   authority to deal with that as a contempt.

4          I'm not sure if there's anything else, I mean, you

5   say I could dismiss the case.  I suppose it's possible for me

6   to tee it up to dismiss the case by saying that I followed the

7   Massachusetts rules that you've identified, and they're

8   applicable here.

9          I'm loathe to do that when the parties have a

10  mechanism for resolving this locally, which is what they

11  wanted to do, apparently, so it's back again.

12         MR. CHATTERJEE:  Okay.

13         Thank you, Your Honor.

14         Going back to your original question:  What do we

15  want you to do?

16         If Your Honor is inclined to hold onto this case

17  until the proceedings before Judge Ware are resolved, I would

18  stay this case.

19         Your Honor, the only reason I had suggested

20  Judge Collings handle this is because he handled all the

21  issues leading up to the --

22         THE COURT:  But he doesn't have contempt power, and

23  that's the reason I took it.

24         MR. CHATTERJEE:  Correct, Your Honor.

25         He can do a court recommendation, but, if

1  Your Honor wants to handle it, that's a perfectly appropriate

2  thing to do.

3       I'll tell you, given the confidentiality issues

4  that we've had in this case, there is a lot of concern at

5  Facebook, and, if Your Honor does feel it's appropriate, we

6  would like to be heard on whether there's been a violation of

7  the order, but we would like ConnectU's counsel to be excluded

8  from the proceedings.  It's really an issue between us and

9  Mr. Parmet.

10       THE COURT:  It is, if you press it, I suppose, and

11  the question is:  Are you pressing it?

12       Mr. Hornick, it seems to me, unless you want to

13  argue otherwise, did the right thing, which is to bring to my

14  attention -- or, bring to The Court's attention -- the

15  question of some issue arising from the application of this

16  rule, and that's, I think, the appropriate way to deal with

17  it.

18       I don't think he's asked me to do anything about

19  that, other than to hold a hearing, which I'm doing.

20       Of course, I'll ask him in a minute what he wants

21  me to do, but I don't hear you asking me to do anything, other

22  than to go encounter with Mr. Parmet and you.

23       MR. CHATTERJEE:  Your Honor, what --

24       THE COURT:  I guess the answer to the question is:

25  To what end?

 1             As interesting as it would be to talk to both of

 2     you, on any occasion.

 3             MR. CHATTERJEE:  Thank you.

 4             I think the simple answer here is to deny their

 5     motion, deny their motion on the things that they're asking

 6     for.

 7             I would also like a court order instructing

 8     Mr. Parmet not to have further conversations about any of the

 9     work he was doing with anyone from ConnectU, and I think; at

10     least, until we resolve the issue before Judge Ware, that

11     should resolve where we are, and we don't need to press

12     anything further at this time.

13             THE COURT:  Alright; so you want an order, more

14     specific order, to Mr. Parmet?

15             MR. CHATTERJEE:  I think, Your Honor, just having

16     talked through with Your Honor, I think that's probably the

17     most logical way to go at this point.

18             THE COURT:  Mr. Hornick, is there anything that you

19     want?

20             MR. HORNICK:  Oh, yes, Your Honor.

21             THE COURT:  Well, now, that you can get from me.

22             MR. HORNICK:  Well, I don't really know what I can

23     get from you, Your Honor, but I'm willing to ask.

24             I mean, what we'd like, Your Honor, is for you to

25     interview Mr. Parmet in camera, because I think that there are

1  overriding considerations here that go beyond what happens to

2  be in this protocol.

3          I think that, if you talk to Mr. Parmet, you will

4  probably find that he was trying to do the right thing, which

5  may not have been in strict compliance with the protocol, and,

6  if so, then, I think, The Court should consider that and

7  should give some credit for that.

8          THE COURT:  But to what end?

9          I keep asking the question:  To what end, because,

10  ultimately, I don't have this kind of free-floating writ to

11  interview people and chat with them and find out historically

12  interesting information about the conduct of this litigation.

13          I'm supposed to rule on motions or some sort of

14  action that's presented to me, and, so, I've been told to --

15  told -- I've been asked to have some sort of conversation with

16  Mr. Parmet in which I direct him not to have any further

17  conversations, pending the outcome before Judge Ware.

18          Now, is there something specific that you want me

19  to do?

20          MR. HORNICK:  Well, in -- in -- we want you to take

21  these documents from Mr. Parmet.

22          I understand that he has them with him today.  We

23  also asked Facebook to bring them along today.

24          We would like you to take them in camera and take a

25  look at them, and I think that, if you did that, in the course

1    of having an interview with Mr. Parmet, it may make it easier

2    for the court to see what the relevance is.

3              THE COURT:  Why would -- why would I do that?

4              Let me place it in a somewhat different context.

5              Let's assume that the parties entered into an

6    agreement with the understanding that there were unresolved

7    Discovery disputes, but they, nevertheless, entered into the

8    agreement, and, then, there's an agonizing reappraisal of

9    whether it was a good agreement to enter into, and, they're

10   executing the various kinds of initiatives to try to undo it.

11             Isn't the first step to say:  If, on the basis of

12   this settlement; at least, as contended by Facebook, the

13   parties entered into it with the knowledge of unresolved

14   matters, then, the first thing for Judge Ware to do is to

15   decide whether or not to permit some further more open

16   Discovery?

17             I'm not -- I don't find compelling the kind of

18   Whitman Sampler of three or four cases regarding settlement

19   representations.

20             There were no settlement representations; at least,

21   as I can see it, in the settlement sheet.

22             Parties chose to do what they did on the basis of

23   imperfect knowledge about what the outcome of the case would

24   be.

25             Uncertainty isn't one of the greatest drivers of

1   settlement, of course, and, so, it seems to me the first thing

2   to do is simply say Judge Ware can decide this case on the

3   basis of what he has there.

4           Why should I look at these documents?

5           If he wants me to look at the documents, I'll look

6   at them, or if he wants to look at the documents.

7           MR. UNDERHILL:  Your Honor, I'm Mike Underhill, and

8   I am lead counsel in the California case with ConnectU.

9           May I respond to that question?

10          THE COURT:  Sure.

11          MR. UNDERHILL:  I appreciate it.

12          First of all, Judge Ware doesn't have any of these

13  issues in front of him.  He's not really become aware of these

14  issues.

15          THE COURT:  And whose fault is that?

16          MR. UNDERHILL:  Well, it's just happening now,

17  Your Honor.  It's not anybody's fault.

18          THE COURT:  And, so, if you want to raise this with

19  him --

20          MR. UNDERHILL:  Right.

21          THE COURT:  -- then, you can.

22          MR. UNDERHILL:  Right; but here's the issue,

23  Your Honor:  Judge Ware, presumably, is not going to have any

24  interest in diving into the protocol, which is a Massachusetts

25  order, in trying to get to the bottom of whether --

1          THE COURT:  Do you want me to rule on the protocol,

2    whether or not Mr. Parmet was authorized to disclose anything

3    other than the code?

4          MR. UNDERHILL:  No, Your Honor.

5          THE COURT:  I mean, I'll rule on that.

6          MR. UNDERHILL:  I'm not looking at that issue,

7    Your Honor.

8          What I am looking at, however, is, we believe,

9    under the facts as we know them now, is very, very serious

10   attorney misconduct in this case and a violation of

11   This Court's orders by Facebook's attorneys, and that is an

12   issue --

13         THE COURT:  Let me see.

14         What does in a mean?

15         Does it mean that they willfully withheld documents

16   that should have been disclosed; that is, they had an

17   obligation to disclose the documents and they didn't disclose

18   them?

19         MR. UNDERHILL:  That is, in fact, the case,

20   Your Honor.

21         THE COURT:  Now, how do I deal with that when it is

22   a moving target; that is to say, it was rolling Discovery, and

23   they have not come to the concluding point at which they were

24   obligated to make that disclosure?

25         MR. UNDERHILL:  Well, we believe that they were,

1  Your Honor, and I think that it is something Your Honor should

2  rule upon.

3          THE COURT:  How is that?

4          MR. UNDERHILL:  Your Honor, they were getting

5  E-mails from Parmet on December 14, where he was laying out,

6  with great specificity, apparently, what he felt was the

7  smoking gun.

8          THE COURT:  And what is the mechanism for dealing

9  with that?

10          MR. UNDERHILL:  The mechanism for dealing with that

11  at that time from Orrick is to produce the documents.

12          You cannot sit on smoking guns when they're, I

13  believe, inferring from the documents a relatively small

14  quantity of documents.

15          Your Honor could certainly find out today, because

16  I understand they are in the courtroom, but you cannot rely on

17  the refusal to produce a small number of smoking-gun documents

18  on the theory that:  Oh, we've got lots of documents, and

19  we're going to do it in the ordinary course of time.

20          THE COURT:  Why isn't the answer to this to say to

21  someone who enters into an agreement or appears to:  You knew

22  you didn't have everything.  You didn't ask for representation

23  that there were no smoking guns.

24          You didn't enter into an agreement to say:  Are

25  there any other documents that you have not produced that

1    would bear on the question?

2              None of that was done.

3              Parties knew that there was incompleteness to the

4    Discovery process at that point.  It had not come to rest its

5    final conclusion.

6              Now, those who would want to unravel an agreement,

7    certainly would want to pull at whatever strings they can pull

8    at, but the first order of business is to say:  Why is it that

9    we should unravel this if there was an agreement between the

10   parties, on those premises?

11             MR. UNDERHILL:  Right.

12             THE COURT:  Including -- you're making the

13   argument -- you're making the argument to Judge Ware:  We had

14   no idea there was something out there, and, in fact, nobody

15   will even let us look at it.

16             MR. UNDERHILL:  I think there is a compelling

17   answer to your question, Your Honor.

18             I think it is in the documents that counsel has

19   filed with their opposition.

20             There is an E-mail in early February.  There is an

21   E-mail by Mr. Wolfson at the Quinn Emanuel firm.

22             THE COURT:  Can you --

23             MR. HORNICK:  Let me have that?

24             MR. UNDERHILL:  Sure.

25             THE COURT:  Just bring me to the document.

1          MR. HORNICK:  Well, I'm going to refer you to a

2  document that I think is more compelling than the one that

3  Mr. Underhill was referring to.

4          This is Exhibit 7 of --

5          THE COURT:  The penultimately compelling document?

6          MR. HORNICK:  That remains to be seen, Your Honor.

7          THE COURT:  Compelling document?

8          MR. HORNICK:  That would be Exhibit 7 to

9  Mr. Chatterjee's declaration, in which is a January 23, 2008

10 E-mail from Miss Sutton of the Orrick firm, representing

11 Facebook, and Mr. Zuckerberg to Mr. Wolfson, who was with

12 Quinn Emanuel firm representing ConnectU, and, in the last

13 paragraph on the first page of this E-mail, it says:  With

14 regard to Facebook defendants' production, we intend to

15 produce by mid-February all responsive documents, paren, with

16 the exception of code, closed paren, retrieved from the hard

17 drives that are currently subject to the protocol, so, in this

18 E-mail, January 23, which was the day after the California

19 court issued the order, that the case, that case, by the way,

20 only the California case, had to be mediated within 90 days,

21 the day after they promised that they're going to produce

22 these documents by mid-February.

23         At that point in time, they had no idea when the

24 mediation would be scheduled.

25         As it turned out, the mediation was scheduled on

1    February 11 for February 22, but nobody knew that at the time.

2              I'd also like to refer The Court to Exhibit 14 to

3    this declaration, Chatterjee declaration, and that is a

4    December 15 E-mail from Miss Sutton to Mr. Parmet.

5              This is the day after Mr. Parmet brings these

6    documents to Facebook's attention, and, recall, we looked at

7    that document, which was the previous document, Exhibit 14,

8    and, in that document, all he did was tell him that they found

9    some things.

10             He didn't say:  Are you going to produce them; when

11   will you produce them; you need to produce them.

12             All he did was tell them about them, and, the next

13   day, in the fourth paragraph, in the middle, they say, quote:

14   We will review these documents consistent with the massive

15   document review we already have underway, and we'll produce

16   it, if appropriate; and, then, the next day, Exhibit 16 --

17   sorry.  It was three days later, December 18.

18             This is Exhibit 16 to the Chatterjee declaration,

19   and, if you look at the one that came from that, before that,

20   from Mr. Parmet, he wasn't saying:  When are you going to

21   produce these documents; you need to produce them.

22             He wasn't insisting, but, nevertheless, on

23   December 18, they wrote to him again, and, at the bottom of

24   the first page of this E-mail, the penultimate paragraph, they

25   say, quote:  We will also review the documents you have

1  identified in violation of the protocol, to the extent we have

2  not done so already, and will produce them if responsive, not

3  privileged or otherwise objectionable.  We will tell

4  ConnectU's counsel when production is complete.

5          Now, this was only three days, four days after

6  Mr. Parmet told them about the documents.  They told him,

7  unsolicited, that they would produce them, twice.

8          THE COURT:  Well, see, the problem with that -- and

9  it really goes back, I guess, to Exhibit 7, which is:  You

10  knew, at the time that you entered into the agreement, the

11  settlement term agreement, that it wasn't complete.

12          MR. HORNICK:  Well, Your Honor, that happens in

13  many cases, but not in all cases is there an affirmative

14  obligation to produce.

15          Now, Your Honor referred to a case --

16          THE COURT:  Wait.

17          The affirmative obligation to produce.

18          Now, what does that mean?

19          MR. HORNICK:  Yes.

20          THE COURT:  You mean, in Discovery?

21          MR. HORNICK:  Yes.

22          THE COURT:  And Discovery here is ongoing and

23  incomplete, so what you would like me to do is rear back and

24  say:  This disclosure should have been made on "X" date,

25  before the settlement term agreement?

1          MR. HORNICK:  That's right, Your Honor, and the

2    reason is --

3          THE COURT:  Where will I find that in the

4    Federal Rules of Civil Procedure, or anywhere else?

5          MR. HORNICK:  Well, Rule 26 says, for example, that

6    there must be a timely supplementation if you find out that

7    your production is incomplete.

8          Now, since Rule 34 only gives you 30 days to

9    produce documents in the first place, I would argue that, if

10   you come into knowledge that your production is incomplete

11   timely, there's a good argument to be made that timely means

12   around thirty days, no more than thirty days.

13         Now, this was not a case, Your Honor, where --

14         THE COURT:  Why didn't you come to court and ask

15   for that, then, because you had more than thirty days after

16   your request?

17         MR. HORNICK:  But, Your Honor, we had three motions

18   to compel pending over a period of two years.

19         THE COURT:  Right; so you didn't bring that one.

20         The short of it is that -- at least, the argument,

21   I think, can fairly be made that -- you knew it was

22   incomplete, you knew there was a dispute, and, yet, you

23   entered into the settlement term agreement.

24         Now, somebody may say:  Well, there is still some

25   sort of obligation to provide exculpatory evidence before the

1  negotiations take place; and, maybe, that's true somewhere.

2  I'm not aware of it.

3        MR. HORNICK:  Well, Your Honor, we cited to you the

4  Spaulding case, and I believe you indicated a moment ago that

5  you weren't impressed with that case, but I think that case is

6  directly relevant.

7        It did involve a minor who --

8        THE COURT:  I mean, that's like saying:  It did

9  involve a minor; which is to say it was fundamentally

10 different.

11       MR. HORNICK:  No.

12       THE COURT:  I have to actually have hearings on

13 whenever a minor comes in here, and I have to make an

14 independent determination.

15       I don't make any determination, nor do I think

16 Judge Ware is going to, about whether or not this was a good

17 agreement or bad agreement; so people with lots of money who

18 have engaged in some discussion and they clearly settled the

19 matter, that's the issue, so Spaulding doesn't really --

20       MR. HORNICK:  There is a reason, Your Honor, why

21 Spaulding does apply, and that is because in that case the

22 plaintiff failed to seek the information in Discovery, and,

23 therefore, The Court said the defendant has no obligation to

24 disclose this information and that the reason that the

25 obligation arose was because, when the settlement was

1   submitted to The Court for The Court's approval, that is when

2   the fraud on The Court occurred.

3          However, if, as in this case, the plaintiff had

4   sought Discovery, then, the defendant would have had an

5   obligation to disclose that information, and they didn't do

6   so.

7          THE COURT:  It doesn't follow.

8          MR. HORNICK:  There's also another case,

9   Your Honor, and that is the KATH v. Western Media case, which

10  we can hand up.

11         This is from the Supreme Court of Wyoming, and, in

12  this case --

13         THE COURT:  Why don't you pass it up, sir.

14         MR. HORNICK:  Approach?

15         THE COURT:  Mm-hmm.

16         (Handed to the Deputy Clerk.)

17         MR. HORNICK:  In this case, the appellants were

18  represented by an attorney with a strange name, which is

19  escaping me at the moment, and it was Panell (phonetic),

20  Planell (phonetic) -- Planell (phonetic),

21  Mr. Planell (phonetic), he was an attorney, he represented the

22  appellants, and he testified in a deposition, prior to

23  settlement, that he represented all of the appellants equally,

24  and the appellants had sought Discovery of him, and not just

25  the deposition, but they also had sought Discovery of his

1    litigation file, and he produced it, but he failed to produce

2    a letter from that file, and that letter admitted, clearly,

3    that he did not represent all the defendants equally.

4              The case settled.

5              After the case settled, Mr. Planell (phonetic)

6    disclosed this letter.

7              In this particular case, the trial court affirmed

8    the settlement.  There was a Motion to Enforce the Settlement,

9    trial court affirmed it, went up on appeal, the Wyoming

10   Supreme Court said:  No, that Mr. Planell (phonetic) had an

11   affirmative duty to produce this document.

12             They said that he had -- that the appellee's

13   attorney had an ethical duty to disclose the letter before

14   settlement.

15             That case cited another case, called, Virzi versus

16   Grand Trunk.

17             THE COURT:  Virzi, V-I-R-Z-I.

18             MR. HORNICK:  571 F.Supp. 507, Eastern District of

19   Michigan.

20             Now, in that case, the plaintiff's attorney, the

21   plaintiff died, and the plaintiff's attorney failed to tell

22   the other side that the plaintiff had died, and, then, the

23   plaintiff's attorney went into settlement talks with the

24   defendant and they settled, and, then, after they settled, the

25   plaintiff's attorney disclosed that the plaintiff had died,

1    and the defendant said:  The only reason that I settled this

2    case was because I thought the plaintiff would make an

3    excellent witness at trial; so, in that case, the

4    Eastern District of Michigan overturned the settlement,

5    because this information should have been disclosed before the

6    settlement, and it said, quote, there is an absolute duty of

7    candor and fairness on the part of counsel to both The Court

8    and opposing counsel, end quote.

9             Quote:  Zealous representation of interest,

10   however, does not justify a withholding of essential

11   information, such as the death of a client, unquote; when the

12   settlement of the case is based largely upon the defense

13   attorney's assessment of the impact the plaintiff would make

14   on the jury, unquote.

15            So, in these two cases and the Spaulding case,

16   which I urge Your Honor to read cover to cover, because these

17   three cases support --

18            THE COURT:  I have.

19            MR. HORNICK:  -- the situation here.

20            THE COURT:  They don't.

21            The short answer is:  They don't.

22            We're dealing with the question of The Court's

23   responsibility to act more or less independently on behalf of

24   minors in Spaulding.

25            Here, in Kath, K-A-T-H, the Wyoming case, we're

1 | dealing with a question of whether or not a particular

2 | attorney actually represented the parties involved, and, in

3 | the third case, we're dealing with the question of whether or

4 | not there is even a party to represent, <u>Virzi</u>, and the

5 | attorneys' abilities to represent that party.

6 |         MR. HORNICK:  With all due respect, Your Honor --

7 |         THE COURT:  With all due respect, I'll finish my

8 | statement, and, then, you'll have an opportunity to respond.

9 |         MR. HORNICK:  Sorry, Your Honor.

10 |         THE COURT:  The short of it is that none of those

11 | cases deal with arm's-length negotiations between parties who

12 | are aware that they have not resolved their Discovery disputes

13 | fully.  That's what this case is, entirely different from the

14 | protection that The Court provides to shareholders, and

15 | children, and dead people or the successors of dead people, so

16 | the short of it is:  I don't find any of these cases evenly

17 | scratching through the digest to find glittering generalities;

18 | like, duty of candor, and fairness with respect to The Court,

19 | to decide this case.

20 |         Of course, it's a duty case.  No one will deny it,

21 | and, of course, there is an obligation to comply with

22 | The Court orders, but here, these parties, between these

23 | parties, it seems to me, there is an entirely different set of

24 | factors and circumstances.

25 |         But you were saying?

1     MR. HORNICK:  Your Honor, I was saying that there

2  is a parallel to these cases, in that, in each one of those

3  three cases, there was material information that was withheld

4  by the opposing party before the parties entered into

5  settlement negotiations.

6     There is no reason to believe in any of those cases

7  that Discovery was complete, but it's not important.

8     What's important is that there was material

9  information that was withheld in all three of those cases from

10  the settling party, and, in all three of those cases,

11  The Court believed that that was a sufficient basis for your

12  opening settlement.

13     Now, we're not asking you to do that, Your Honor.

14     THE COURT:  No, and I don't have the power to do

15  it.  It's up to Judge Ware.

16     The question is:  What do you want me to do?

17     And I'm back to that question:  What do you want me

18  to do?

19     MR. HORNICK:  The reason why we want Your Honor to

20  review these documents and not to give them to Judge Ware is

21  that these documents -- let me step back for a moment.

22     The California case was ordered to mediation on

23  January 22 of this year by Judge Ware.  He did not order this

24  case to mediation.

25     The parties decided to make it a variable

1   discussion, so these documents are not relevant to the

2   California -- well, we don't know, but we don't think that

3   they're relevant to the California case, so, if we make -- so

4   the point is that this is the place.

5           This is the place to address whether these

6   documents are relevant to the disputes between the parties,

7   and, therefore, what we ask This Court to do is not to open

8   the settlement but, simply, to review the documents, determine

9   if they should have been produced in Discovery, and, then,

10  order that they be produced, if you find that they were

11  material or that they were responsive.

12          THE COURT:  The parties agreed that the -- in

13  Paragraph 4 -- or, Section 4 of the settlement -- term sheet

14  and settlement agreement, that the cities and federal court

15  shall have jurisdiction to enforce this agreement.

16          This is a question over the enforceability of the

17  agreement.

18          The agreement deals with this case, as well as the

19  San Jose case.

20          That's what the breadth of what you've asked for

21  is, so --

22          MR. HORNICK:  May I respond, Your Honor?

23          THE COURT:  You always do.

24          MR. HORNICK:  I want to make sure that it's okay.

25          Paragraph 4 doesn't say that the jurisdiction is

1    exclusive in the California court.

2              THE COURT:  You mean, I have jurisdiction over the

3    California case, too?

4              MR. HORNICK:  You have jurisdiction over your own

5    cases, Your Honor.

6              THE COURT:  Well, that doesn't mean that I have

7    control over the California case, too?

8              That reading?

9              Here is a term sheet and settlement agreement.

10             I mean, let me ask you this:  Are you asking me to

11   deal with the question of whether or not this is an

12   enforceable agreement?

13             MR. HORNICK:  No, Your Honor.

14             THE COURT:  Okay.  I didn't think you would, okay?

15             So the short of it is that we have a dispute that

16   will be resolved in California over whether or not there is a

17   settlement agreement between the parties.

18             I have a vestigial; like, the vermiform appendix,

19   which exists solely to get inflamed and cause some upset, of

20   Discovery dispute in this case, and I keep asking the parties

21   what you want me to do.

22             What I understand from Facebook is that their

23   request is that I instruct Mr. Parmet not to discuss with any

24   other persons his findings.

25             I'm not sure what you're asking me to do.  I know

1 now that you don't want me to enforce this rule on whether or

2 not this is an enforceable settlement agreement.

3                    MR. UNDERHILL:  May I have a short response,

4 Your Honor?

5                    THE COURT:  Well, let me just ask this; I mean, I'm

6 used to tag-team wrestling.

7                    Are you admitted <u>pro hac vice</u>?

8                    MR. UNDERHILL:  I have applied, Your Honor.

9                    My application is on file, as of today.

10                    MR. HORNICK:  Your Honor, we neglected to introduce

11 Mr. Underhill earlier.

12                    THE COURT:  Well, he introduced himself.

13                    (Laughter.)

14                    THE COURT:  Mr. Underhill, as a stranger, but as

15 someone who apparently has some interest in this litigation,

16 of course, I'm hear you.

17                    MR. UNDERHILL:  Thank you, Your Honor.

18                    I appreciate that, and I admittedly have quite a

19 bit of interest in this litigation.

20                    In response to your question, Your Honor, I would

21 like to make sure that The Court understands the nature of the

22 proceedings that are before Judge Ware.

23                    I actually have our briefs without exhibits, that's

24 intended to be merciful, if you would like for me to hand up

25 the briefs.

1          The argument in California is that the term sheet

2     is not an enforceable agreement because it's missing material

3     terms, and I'm happy to go into as much detail as you want,

4     but, probably, you don't want to hear it.

5          THE COURT:  I'd have to be somewhat innocent, if I

6     didn't figure out what it was that you were arguing about in

7     California.  That's fairly obvious.

8          MR. UNDERHILL:  Yes.

9          THE COURT:  The issue is what I'm supposed to do

10    here --

11         MR. UNDERHILL:  Yes.

12         THE COURT:  -- apart from providing a forum for the

13    opportunity to try to pull at the threads of a fabric that was

14    fabricated in California.

15         MR. UNDERHILL:  Your Honor, I'm going to get right

16    to it.

17         The second argument in California is a fraud

18    argument, regarding the valuation of the stocks.

19         Again, I don't think those are issues with which

20    This Court has familiarity.

21         The issue that we're here on today, is on an issue

22    that is very much within the familiarity of This Court.

23         The idea, Your Honor, is this:  If these documents

24    were withheld and if they are material, This Court is, by far,

25    the much better viewer to understand what would be the

1  relevance of the claims that were being pressed in This Court.

2          With respect to the jurisdictional issues,

3  Your Honor, the forum selection clause only has effect if that

4  agreement is binding.  If it's not binding, the forum

5  selection clause doesn't have effect --

6          THE COURT:  And who makes that --

7          MR. UNDERHILL:  -- immediately.

8          THE COURT:  Who makes that determination?

9          It's the chicken-and-egg problem.

10          MR. UNDERHILL:  It is, indeed, and that's why we

11  did not contest it in front of Judge Ware, but the other side

12  filed a motion in the courts in California.

13          We didn't oppose it.  We didn't understand:  This

14  is the situation.  It's got to start somewhere.

15          With respect to this issue, Your Honor, and as far

16  as the relief we are asking, I would respectfully disagree

17  that it has anything to do with enforcing the settlement

18  agreement or not enforcing the settlement agreement.  That's

19  not what we're asking for.

20          THE COURT:  But what -- what --

21          MR. UNDERHILL:  That's not, at all.

22          THE COURT:  What, precisely, are you asking?

23          MR. UNDERHILL:  We're asking for in camera review.

24          If The Court agrees that these documents are

25  material to the claims in the Massachusetts tapes, that

1  The Court ordered their production, then, you're done; then,

2  we've got to figure out what we're --

3           THE COURT:  Why would I do that, when there is

4  pending in California an issue, as to which both parties have

5  apparently briefed, of whether or not there is a settlement

6  agreement that ends this case, and actually ended this case at

7  the time that the parties called the respective clerks and

8  told them the case was over?

9           Now, ordinarily, I'd, as a matter of course, to

10 deal with, what I'll call, buyer's remorse, issue a thirty-day

11 order of settlement if there isn't a clear stipulation filed

12 or some other document filed, but, from time to time, I have

13 to deal with buyer's remorse, and I deal with buyer's remorse

14 by determining whether or not there was, in fact, an

15 agreement, and somebody else is going to be making that

16 determination.

17          If there was an agreement, then, it is a matter

18 against which you argue on a variety of grounds; then, it is a

19 matter of indifference whether or not there were unresolved

20 Discovery matters in This Court.

21          MR. UNDERHILL:  Your Honor, I would agree with you

22 fifty percent.

23          The fifty percent I agree with is:  If it's a

24 binding agreement, then, as well, I agree 100 percent, if it's

25 a binding agreement, then, yes, this is completely relevant.

1              However --

2              THE COURT:  Right.

3              MR. UNDERHILL:  However -- however, Your Honor, if

4      we get those documents and if they're relevant, that's an

5      additional ground that we would apply to The Court for setting

6      aside the settlement agreement, which is, if there was

7      attorney misconduct, they withheld extremely important

8      documents, and, by the way, I'm only assuming that those are

9      the facts, but we're not going to know that those are the

10     facts, unless Your Honor is willing to look at the documents

11     in camera.

12             I do agree, Your Honor, that this idea of:  Oh, you

13     settle cases.  There is lots of Discovery out there; it's kind

14     of appealing to go there.

15             I think the difference here is that there was a

16     specific, heightened identification of a very small universe

17     of documents that, apparently, inferring from the documents,

18     was the smoking gun that was the difference between victory

19     and loss in the case, or, potentially, the difference between

20     victory and loss.

21             We're never going to know that, unless Your Honor

22     looks at the documents and has some kind of a reaction that we

23     can take to Judge Ware, as to --

24             THE COURT:  Some kind of reaction?

25             Is that what is called an advisory opinion?

1          MR. UNDERHILL:  No.

2          I'm talking about issuing the documents,

3     Your Honor, issue an order that they have to produce the

4     documents.

5          THE COURT:  Right; but they don't have to produce

6     the documents if there is settlement; so the short and

7     sufficient answer, I think, is to say:  Judge Ware is entitled

8     to make his determination about the enforceability of this

9     settlement, knowing that there is some sort of dispute about

10    Discovery in Massachusetts, in which you say there is a

11    smoking gun, nobody's indicated there is a smoking gun, but,

12    perhaps reading this in the light most favorable to you, he'll

13    say:  Well, until we resolve that, we can't do anything about

14    it, but that's for him to decide, not for me, and not for me

15    to offer my reactions --

16         MR. UNDERHILL:  Right.

17         THE COURT:   -- to documents; so, if you want me to

18    read them and review them?

19         No.

20         If you want me to have them marked, then, I'll

21    think about that, marked and they're part of the record, and,

22    if Judge Ware thinks that it would be a good idea for somebody

23    in Massachusetts to look at these and decide whether or not

24    there was a failure of some sort of Discovery?

25         Well, I'm think about that.

1          MR. UNDERHILL:  Okay, Your Honor.

2          Obviously, that is our fall-back position, that

3  they be marked.

4          And one last comment, Your Honor, and I understand.

5  I understand that, when a judge rules, a judge rules.

6          I would --

7          THE COURT:  Do you -- do you really?

8          MR. UNDERHILL:  I'm sorry?

9          THE COURT:  Do you really?

10         MR. UNDERHILL:  I know it in my heart and not in my

11  head, or _vice versa_, I guess.

12         (Laughter.)

13         MR. UNDERHILL:  What the witness is going to point

14  out, I would assume, is:  If we are forced into a settlement,

15  which we don't think we will, particularly on the arguments

16  we've already put before Judge Ware, but, if we were, the next

17  step is going to be a fraud claim, and it's going to be a new

18  lawsuit, and we're going to be back in court, and we will get

19  the documents in non-party Discovery, and we're going to have

20  a whole lawsuit over --

21         THE COURT:  Maybe you are.  Maybe some judge is

22  going to look at this and say:  Somebody can't claim fraud

23  when they managed to settle the case when there were things

24  outstanding and they knew were outstanding, so that's,

25  frankly, a matter of indifference to me.

1        The question is step by step; so, you know, you

2  raised the question of fraud.

3        You won't be the first person to say it, you won't

4  be the first person to be disappointed when the acts of your

5  parties, your client, have undermined it, but I'm not making a

6  determination about that, and, if somebody wants to come back,

7  they can come back.

8        MR. UNDERHILL:  Thank you.

9        THE COURT:  Alright.

10       Mr. Chatterjee?

11       MR. CHATTERJEE:  Your Honor, I just wanted to

12  address one point that Your Honor raised associated with the

13  marking of documents.

14       Many of these documents have a lot of very deeply

15  personal information, similar to some of the things that

16  showed up when we had our the hearing at the 02138 hearing.

17       There's a lot of client sensitivity about putting

18  these into a court file anywhere, even if it's sealed.

19       What I would suggest, Your Honor, is, for example,

20  if you do want to mark them, that we put them in the hands of

21  Mr. Bauer, he's an Officer of This Court, he has an office

22  here, and is subject to The Court's jurisdiction, and he holds

23  onto them should the matter be reopened, and the reason for

24  that is just because of the client sensitivities around a lot

25  of confidential information.

1          THE COURT:  Yes.

2          It's a lot of hypersensitivity on the part of the

3   clients, but is there any objection to that, as an

4   alternative, if Mr. Bauer becomes the escrow agent?

5          MR. HORNICK:  Yes, there is, Your Honor, because, I

6   think, there's two reasons:  One is that this whole

7   confidentiality thing has gotten way out of hand, in this

8   case.

9          THE COURT:  Well --

10          MR. HORNICK:  The plaintiffs marked documents as

11  confidential, just --

12          THE COURT:  Alright; so you object to it.

13          I understand.

14          MR. HORNICK:  And I --

15          THE COURT:  Just a moment.

16          MR. HORNICK:  Okay.

17          THE COURT:  If someone objects to it, that's the

18  end of it.

19          It will be held here.

20          The Court of Appeals had an unhappy experience

21  earlier with sealed documents.  We'll see if we can do better

22  than that, so I'll put them in a safe in my office.

23          I've not decided that they're particularly

24  confidential, at all, but just to satisfy everyone, and I'll

25  await further direction.

1    MR. HORNICK:  May I ask The Court's permission to

2  submit these documents to the California court?

3         They're under seal in This Court.

4         THE COURT:  Only if Judge Ware asks me for them.

5         You can ask him to ask me, if you think that he'll

6  find that compelling.  I'm not sure I would in his position,

7  but they're here, and the way I'm perceiving this now -- and I

8  think the next stage is that I have to go into in camera

9  proceedings with simply Facebook's attorneys and Mr. Parmet's

10  attorneys, just to clarify matters a bit, but the way I see it

11  is -- I will preserve the basis for this issue.

12         You can argue the issue to Judge Ware.  I've made

13  no ruling, with respect to whether or not they're relevant, or

14  not, because I'm not even going to look at them, because I

15  don't think, at this stage, it is necessary for me to look at

16  them, particularly when there is outstanding the question of

17  whether or not there is an enforcement agreement that would

18  obviate that altogether.

19         MR. HORNICK:  Well, Your Honor, these -- the

20  subject of whether there is a settlement, it seems to me, is,

21  obviously, before Judge Ware, but there is still the question

22  of whether the two cases that are in This Court are alive, and

23  there is nothing, at all, to indicate that they're not, and,

24  in fact, all of the communications that have been given to

25  This Court about whether those two cases are alive --

1          THE COURT:  I'll tell you, my view is, if

2    Judge Ware says that this is an enforceable agreement; that

3    is, the term sheet and settlement agreement's enforceable,

4    these cases were dead on the day that this agreement was

5    entered into or the day after.

6          If it's not, then, you're right, they're over, and

7    that's the whole gist of the question, but it seems to me an

8    undue waste of judicial resources, and the parties have their

9    own and have been making their own choices about the

10   expenditure of theirs, to litigate this in a parallel fashion,

11   particularly when nobody's asking me to enforce this

12   agreement.

13         I will take my direction from Judge Ware and his

14   resolution.

15         If this isn't an enforceable agreement, then, the

16   case is still on -- cases are still on.

17         MR. HORNICK:  Your Honor, the way that you've

18   phrased that point several times today makes me wonder whether

19   This Court would entertain a motion to open the settlement,

20   based upon misconduct of the plaintiffs or their counsel in

21   failing to produce documents that they should have produced

22   before; in other words, you've asked me and I'm asking you --

23         THE COURT:  Not, until after Judge Ware -- I'd

24   ask -- not until Judge Ware rules on this.

25         I've asked you in a large fashion, whether you want

1  me to rule on the question of the enforceability of the

2  settlement agreement.

3         I'll tell you that I would do it more or less in

4  the same fashion and proceed in more or less the same fashion

5  Judge Ware is doing it, but I don't even think I have the

6  authority to do that.

7         He has the authority -- first, he has the first cut

8  at this.  Parties wanted him to have jurisdiction to enforce

9  the agreement.

10         It's kind of a fine nuance to say that that's not

11  an exclusive choice of jurisdiction, although I frankly find

12  that meretricious, but the way in which I think this has to be

13  dealt with is to say:  Judge Ware's going to decide it on the

14  basis of the parties' submissions, and he'll decide whether or

15  not it's necessary to -- in order to rule on it, to -- have

16  further proceedings in This Court, and I stand ready to do

17  whatever is necessary, or he can decide that it's not an

18  enforceable agreement, and, then, we're off to the races

19  again.

20         MR. HORNICK:  Your Honor, the reason that we were

21  asking you to review these documents is because, if Judge Ware

22  does find that it's an enforceable agreement, then, the

23  logical, one of the logical, places to file a new lawsuit and

24  to reopen this matter, under Rule 60 or based upon fraud on

25  the court or based upon fraud on the parties, would be right

1   here, because this is the court that knows about these issues.

2           THE COURT:  Well, you know, always be careful what

3   you ask for.

4           (Laughter.)

5           THE COURT:  So -- but we do that step by step.

6           We don't have a 60B motion, until we have a final

7   judgment.

8           We don't have a final judgment yet, because it is

9   tied up in this issue of the enforceability of this agreement,

10  as to which a variety of issues have been raised here, but I

11  will be bound by whatever Judge Ware decides, concerning

12  enforceability of this agreement, and I'll deal with whatever

13  follow-on that leads to, either that he finds it to be an

14  enforceable agreement or he doesn't.

15          MR. HORNICK:  Well, Your Honor, the risk is that we

16  will ask Judge Ware to order the production of these

17  documents, and he'll say:  They're not relevant to the case

18  that's before him.

19          THE COURT:  Well, you know, you'll just have to --

20          MR. HORNICK:  And that they belong here.

21          THE COURT:  Right.

22          Okay; so, then, we'll go step by step.

23          I suspect he won't do that.  That's my general

24  view.

25          My general view is:  He'll look at all the facts

1  and circumstances surrounding the settlement agreement,

2  including an allegation that there was incomplete disclosure

3  that contained a smoking -- a series of smoking -- guns, and

4  that was not completed at the time that the parties entered

5  into this agreement and make whatever judgments he wants about

6  that, but that's up to him.

7            MR. UNDERHILL:  Your Honor, I have a technical

8  question, with respect to the technical order here?

9            THE COURT:  Mm-hmm.

10           MR. UNDERHILL:  I'm assuming that we're not going

11  to have any issues dealing with anything with Judge Ware on

12  the issues in front of This Court, and, by that, I mean,

13  providing the pleadings in This Court, Mr. Chatterjee's

14  affidavit, those sort of things, to the California court.

15           THE COURT:  Is there any problem with that,

16  Mr. Chatterjee?

17           MR. CHATTERJEE:  No.

18           THE COURT:  It seems to me that those can properly

19  be placed before Judge Ware.

20           MR. CHATTERJEE:  Yeah, I think you're right.

21           Your Honor, we're not going to have an issue with

22  that.

23           THE COURT:  Okay.

24           MR. CHATTERJEE:  We've been doing that throughout

25  this case.

1   THE COURT:  Alright; so there is nothing having to

2   do with protective orders in this case that prevent the

3   submission of these documents to Judge Ware, nor the

4   transcript of this hearing.

5   MR. CHATTERJEE:  Obviously, Your Honor, that is

6   subject to the protective order provisions and all the things

7   you have to do in California to put things under seal.

8   THE COURT:  Right.

9   MR. UNDERHILL:  Thank you, Your Honor, and thank

10  you for your courtesy in this position.

11  THE COURT:  Alright.

12  So what I think I want to do at this stage is:  I

13  do want to hear from Mr. Parmet and his counsel, and I do want

14  to -- I think, my present inclination, and I will tell counsel

15  if that's what happened, is to -- take the documents that he

16  has that he says are relevant, keep them under seal, and we'll

17  keep them under seal in This Court, but, because this deals

18  with the question of whether or not a mechanism for Discovery

19  that was designed to limit disclosure only to that degree

20  necessary is involved, I'm going to close the courtroom, and

21  take this in camera, so I'd ask everyone who is not, either in

22  a representative capacity for Facebook or for Mr. Parmet to

23  leave the courtroom.

24  MR. HORNICK:  Your Honor, would you like ConnectU's

25  counsel to wait?

1    THE COURT:  I think so; I mean, I don't want to
2  interfere with your schedules, or anything.
3    MR. HORNICK:  We're prepared.
4    THE COURT:  I'll dictate whatever I do.
5    My intention is to reconvene The Court after this
6  hearing and simply report what I've done.
7    MR. HORNICK:  We'll -- we'll be -- we're prepared
8  to wait, Your Honor.
9    THE COURT:  Okay; so we'll take, maybe, a
10 five-minute break, at this point.
11   Is that sufficient for you?
12   THE COURT REPORTER:  Yes.
13   THE COURT:  And, then, we'll hear from the Facebook
14 and Mr. Parmet's counsel.
15   THE DEPUTY CLERK:  All rise.
16   (The judge exited the courtroom.)
17   (The parties were sequestered, subject to
18 The Court's order.)
19   (A short recess was taken.)
20   (A SEALED, in camera hearing was held.)
21   (The proceedings were continued onto the next
22 page.)
23                   -   -   -
24
25

1          (All parties returned to the courtroom.)

2          THE DEPUTY CLERK:  All rise.

3          This Honorable Court is back in session.

4          You may be seated.

5          THE COURT:  Well, having completed in camera

6  hearing with Mr. Parmet and his counsel and counsel for

7  Facebook, I think I should report what I've chosen to do here,

8  which I indicated ahead of time.

9          At the outset, however, let me just say that it

10  seems to me that it is appropriate to keep the transcript of

11  the in camera proceeding in camera, because, necessarily,

12  there was a discussion, to some degree, of the substance of

13  the -- at least, Mr. Parmet's view of the substance of -- the

14  documents that he believes are at issue here.

15          By keeping it in camera, I do not mean to suggest

16  that it's not available to Judge Ware, if he chooses to review

17  it; otherwise, the transcript of the proceedings is open, as

18  is customary in This Court.

19          Mr. Parmet has passed up to me, now, incorporated

20  in this single, three-ring binder, a collection of documents

21  that are at issue in the dispute between parties and have been

22  the focus of the dispute between the parties, and I intend to

23  have them docketed as a sealed exhibit.

24          (A sealed exhibit will be docketed.)

25          THE COURT:  I will keep them in the safe, in the

1  control of the court, pending resolution of other matters by

2  the parties, and, more particularly, by Judge Ware.

3         During the course of the proceeding, I found that

4  Mr. Parmet did not engage in any knowing violation of the

5  provisions of the order for Discovery of computer-memory

6  devices that was entered by Judge Collings on

7  September 13, 2007.

8         I did, however, indicate -- and I'll make

9  explicit -- that my view is even to have discussed the

10 existence of documents that he reviewed that did not involve,

11 what we call, code is a transgression of the order.

12        The order, I think, is quite explicit on the issue

13 of what kind of disclosure to others Mr. Parmet could make;

14 more specifically, in Section 3, on Page 7, the order directs

15 that Parmet and Associates may not discuss with ConnectU's

16 counsel or with anyone else any information obtained from the

17 Facebook hard drives, except, with respect to the produced

18 program code, and, in the course of my discussions with

19 Mr. Parmet, I emphasized, again, to him the view that I have,

20 that that means he may not have any discussions, direct or

21 indirect, with ConnectU's counsel or with anyone else --

22 obviously, with the exception of The Court, direction from me

23 or from Judge Ware, for example -- of any information obtained

24 from the Facebook hard drives, except with respect to the

25 produced program code, and I'm satisfied that Mr. Parmet is

1   fully familiar and fully prepared to comply with this

2   provision.

3          My own role in this, I think, is to do no more than

4   simply preserve evidence which may or may not become relevant

5   in the decision-making process, with respect to settlement,

6   which is now ongoing before Judge Ware in California.

7          This seems to me the orderly way to proceed, and my

8   expectation, as I expressed to counsel, is that, if being

9   aware of the universe of potential disputes between the

10  parties, Judge Ware, nevertheless, chooses to enforce the

11  settlement term agreement, that will be the end of the two

12  cases pending before me.

13         Whether there's follow-on litigation or some other

14  initiatives that are undertaken is far too speculative for me

15  to address at this point.

16         If he finds that the settlement agreement expressed

17  in the settlement term sheet is not enforceable, then, we will

18  re-ignite this case -- or, these cases, I should say -- and

19  continue the litigation to some other resolution, but the

20  short of it is that the core of the case is, I think, and the

21  core of the question of whether or not the case is continued

22  is before Judge Ware, and, until he's made those

23  determinations, I do nothing, other than to ensure that there

24  is available such evidence as may become relevant at some

25  point in the process.

1          Is there anything further from counsel?

2          MR. HORNICK:  Just one question, Your Honor.

3          I do have occasion to deal with Mr. Parmet --

4          THE COURT:  Mm-hmm.

5          MR. HORNICK:  -- in other cases, and, also, there

6    may even be situations in this case, and I just want to go on

7    the record, that there are no surprises, and I understand that

8    the order is limited to anything under protocol.

9          THE COURT:  It is.

10         MR. HORNICK:  Yes.

11         THE COURT:  I mean, the order is as the order

12   states.

13         With respect to his exposure to any materials in

14   this case through the hard drives, he is bound not to discuss

15   it with you, except as it is code.

16         Now, I say one other thing, based on all that I

17   know, which in this and in other ways is sometimes less than I

18   think I know, it seems to me that counsel have -- and

19   Mr. Parmet have -- proceeded properly.

20         I said so in open court, with respect to

21   Mr. Hornick bringing it to my attention, and I said so in

22   in camera proceedings with Mr. Parmet.

23         There are sometimes these very difficult issues

24   that the parties have to struggle with, and I made the

25   analogy, I think in open court, but, also with Mr. Parmet,

1   that the priest or the attorney who has disclosed to him

2   information which he is obligated not to disclose to others,

3   that frequently creates tension.

4          I'm not suggesting that's what's involved here,

5   because I don't know, not having reviewed it, it rises or

6   falls to that level, but, when there are these competing

7   considerations, it creates tensions for the parties.

8          They did, I think, what is proper to do in this

9   setting, and I hope I've clarified; at least, provisionally,

10  while we await the resolution from Judge Ware, what their

11  respective responsibilities are.

12         If there's nothing further, then, we'll be in

13  recess.

14         Thank you.

15         MR. HORNICK:  Thank you, Your Honor.

16         THE DEPUTY CLERK:  All rise.

17         (The proceedings were concluded.)

18                    -   -   -

19         (Court was adjourned.)

20                    -   -   -

21

22

23

24

25

I N D E X

|                    | PAGE | DIRECT | CROSS | RED |
|--------------------|------|--------|-------|-----|
| UNSEALED HEARING   | 5    |        |       |     |
| SEALED HEARING     | 71   |        |       |     |
| Jeffrey Parmet     |      |        |       |     |
|   By The Court |  | 72     |       |     |
|   By Mr. Chatterjee |  |   | 78    |     |
|   By The Court |  |        |       | 84  |
| UNSEALED HEARING   | 91   |        |       |     |

-   -   -

                    I N D E X
                   (CONTINUED)


                  E X H I B I T S

                                              DOCKETED

(A sealed exhibit)                               91




                    -   -   -

# C E R T I F I C A T I O N

I, DIANE M. MOLAS, a Registered Professional Reporter (RPR), a Certified Shorthand Reporter (CSR) in the State of Delaware, a Certified Court Reporter (CCR) in the State of New Jersey, and a Notary Public in the Commonwealth of Pennsylvania, do hereby certify that the foregoing is a true and accurate transcript of the proceedings reported by me, on June 2, 2008, and that I am neither counsel, nor kin, to any party or participant in said action, nor am I interested in the outcome thereof.

_/s/Diane M. Molas_____
Diane M. Molas, RPR, DE CSR, and NJ CCR
DE Certification Number 208-RPR
NJ Certification Number 30XI00228400
7/23/09

- - -

*(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the DIRECT CONTROL AND/OR SUPERVISION of the Certifying Court Reporter herself. THE COURT REPORTER'S CERTIFICATION* <u>*NEVER*</u> *APPEARS AS A PHOTOCOPIED SIGNATURE.)*

- - -