# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| The Facebook, Inc., et al.,<br><br>           Plaintiffs,<br>   v.<br>ConnectU, Inc., et al.,<br><br>           Defendants. | NO. C 07-01389 JW<br><br>**ORDER GRANTING PLAINTIFFS'<br>CONFIDENTIAL MOTION TO ENFORCE<br>THE SETTLEMENT AGREEMENT** |

## I. INTRODUCTION

Plaintiffs in this lawsuit are The Facebook Inc. and Mark Zuckerberg (collectively, "Facebook"). Plaintiffs bring this action against ConnectU, Inc., Pacific Northwest Software, Inc., Winston Williams, and Wayne Chang (collectively, "Defendants") alleging, *inter alia*, misappropriation of trade secrets, unfair competition, and violations of 18 U.S.C. § 1030, *et seq.* In essence, Facebook alleges that ConnectU gained unauthorized access to Facebook's servers and website and took information for its own unlawful use. The parties are engaged in at least two other lawsuits over these matters; in those cases, ConnectU is the Plaintiff and Facebook is the Defendant.

In the course of this lawsuit, the parties engaged in private mediation. On February 22, 2008, as the result of the mediation, the parties signed a written "Term Sheet & Settlement Agreement." In the Agreement, the parties agreed to resolve all of their disputes and to dismiss the pending lawsuits. The Agreement provides that they "may execute more formal documents but these terms are binding." After signing the Agreement, the parties attempted to draft formal

documents but failed to reach a consensus on certain terms. In the Agreement, the parties stipulate that the federal court in San Jose, California has jurisdiction to enforce it. Based on a belief that a court order is necessary to enforce the February 22, 2008 Agreement, Facebook filed the present motion in this Court.[1]

The question for decision by the Court is whether the February 22, 2008 Agreement contains sufficiently definite and essential terms that it may be enforced. For the reasons stated below, the Court finds that the Agreement is enforceable and orders its enforcement.

## II. BACKGROUND

As stated above, this action is one of three separate actions between the parties in various federal courts.[2] On January 22, 2008, United States Magistrate Judge Richard Seeborg ordered the parties to participate in Alternative Dispute Resolution. (Docket Item No. 270.) The parties elected to participate in private mediation.

On February 22, 2008, the parties engaged in mediation before Antonio Piazza. Both sides were represented by counsel. As the result of the mediation, the parties signed a handwritten document entitled, "Term Sheet & Settlement Agreement" ("Agreement"). (Second Declaration of Evan A. Parke, Ex. A., hereafter, "Parke Decl.," filed under seal.)

With the precise financial terms redacted,[3] the Agreement provides, as follows:[4]

---

[1] (hereafter, "Motion," Docket Item No. 329, filed under seal.)

[2] The other actions are ConnectU LLC v. Zuckerberg, Appeal No. 07-1796 (1st Cir.) and ConnectU, Inc. v. Facebook, Inc., Case No. C 07-10593-DPW (D. Mass.).

[3] The Agreement recites that all of its terms are "confidential." At the hearing on the motion, the Court expressed its need to discuss the Agreement in its Order. The Court now determines that it can protect the confidentiality of the Agreement if references to the amount of consideration which the parties agreed to exchange as a part of the settlement are omitted. Moreover, since neither Facebook nor ConnectU are publicly traded companies at this time, the Court finds good cause to keep the transcript of the proceedings under seal as requested by the parties to protect their financial information.

[4] (Declaration of Theresa A. Sutton in Support of Plaintiffs' Confidential Motion, hereafter, "Sutton Decl.," Ex. A at 1-2, filed under seal.) For authenticity purposes, the Court leaves all typographical errors and strikeouts in the Agreement unchanged.

2

The Term Sheet & Settlement Agreement

1) The following will settle all disputes between ConnectU and its related parties, on the one hand and Facebook and its related parties, on the other hand.

2) All parties get mutual releases as broad as possible and all cases are dismissed with prejudice. Each side bears their own attorneys fees and costs.

3) All terms of agreement are confidential, no party disparages any other parties and no party will comment further publicly related to facts underlying or related to this dispute. The parties will agree on any public statements. A violation of the publicity and confidentiality provision of this paragraph shall be submitted to a binding arbitrator who may award injunctive relief and damages up to [REDACTED] million.

4) ~~This Agreement is subject to the continuing enforcement of the court in San Jose to the current action.~~[5]

4) The parties stipulate that the San Jose Federal Court shall have jurisdiction to enforce this agreement.

5) The parties agree that they may execute more formal documents but these terms are binding and this document may be submitted into evidence to enforce this agreement.

6) ConnectU founders represent and warrant (1) They have no further right to assert against Facebook (2) They have no further claims against Facebook & its related parties.

7) All ConnectU stock in exchange for [REDACTED] in cash & [REDACTED] common shares in Facebook. The terms of the shares shall include a requirement that all votes related to the shares will be voted in accordance with the Board of Director's recommendations and be subject to the same anti-dilution protections afforded to Series D preferred stock. ~~The form~~[6] Facebook will determine the form & documentation of the acquisition of ConnectU's shares [Consistent with a stock and cash for stock acquisition].[7] Facebook represents that it currently has [REDACTED] fully diluted shares outstanding.

The Agreement was signed by Mark Zuckerberg, individually and on behalf of Facebook, and by Cameron Winklevoss, individually and on behalf of ConnectU. Tyler Winklevoss and Divya Narendra also signed the Agreement. (Sutton Decl., Ex. A at 2.) These individuals are principals of their respective companies.

---

[5] Strikeout in the original.

[6] Strikeout in the original.

[7] Interlineation in original.

Plaintiffs' motion to enforce the Agreement is made on the grounds that the Agreement unambiguously sets forth all material terms of the parties' settlement and Defendants should be ordered to comply with it. (Motion at 6.) Defendants contend that Facebook's motion to enforce the Agreement should be denied because (1) the agreement is missing material terms, (2) the terms which are included were not agreed upon, and (3) Facebook committed fraud in the procurement of the Agreement. (ConnectU's Opposition to Facebook's Confidential Motion at 6, hereafter, "Opposition," filed under seal.) In its reply, Plaintiffs contend that the Agreement was not procured by fraud. (Reply in Support of Confidential Motion at 9, hereafter, "Reply," filed under seal.) The Court considers each issue in turn.

### III. DISCUSSION

#### A. The Court's Jurisdiction

Before considering the motion to enforce the Agreement, the Court considers its jurisdiction to act on such a motion. The Court also considers issues raised at the hearing, namely, whether Plaintiffs are required to file an action to enforce the Agreement, to which Defendants would be allowed to plead their objections to enforcement as affirmative defenses.

"It is well settled that a district court has the equitable power to enforce summarily an agreement to settle a case pending before it." Callie v. Near, 829 F.2d 888, 890 (9th Cir. 1987); Decanay v. Mendoza, 573 F.2d 1075, 1078 (9th Cir. 1978); TNT Mktg., Inc. v. Agresti, 796 F.2d 276, 278 (9th Cir. 1986); In re City Equities Anaheim, Ltd., 22 F.3d 954, 957 (9th Cir. 1994). Once a settlement has been reached in a pending action, any party to the agreement may bring a motion to enforce it. See Doi v. Halekulani Corp., 276 F.3d 1131, 1135 (9th Cir. 2002). Specifically, California law provides:

> If parties to pending litigation stipulate, in a writing signed by the parties outside the presence of the court or orally before the court, for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement.

Cal. Civ. Proc. Code § 664.6. In addition to the statutory power to enter a judgment, the court's enforcement powers include the inherent authority to order a party's specific performance of acts

4

1 required by the settlement agreement and to award damages or other sanctions for noncompliance.
2 TNT Mktg., 796 F.2d at 278.

3      In this case, in addition to its inherent authority and the authority conferred by California
4 law, in Paragraph 4 of the Agreement, the parties explicitly stipulated that the Court has authority to
5 exercise enforcement. Therefore, the Court is satisfied that it has the jurisdiction and authority to
6 enforce the Agreement without requiring additional pleadings.

7      However, the power to enforce a settlement agreement can only be exercised if the terms
8 have been agreed to by the individuals authorized to make decisions behalf of the parties. See
9 Harrop v. W. Airlines, Inc., 550 F.2d 1143, 1145 (9th Cir. 1977). At the hearing, Defendants raised
10 two issues regarding the authority of the Court to enforce the Agreement against the individuals and
11 the corporations.

12      First, Defendants question whether there is a bases for the Court to exercise personal
13 jurisdiction over ConnectU's individual shareholders, i.e., the three principals who signed the
14 Agreement.[8] The Court finds that by signing the Agreement with explicit statements such as those
15 in Paragraphs 1, 2, and 4, each of the signatories subjected him or herself to the Court's jurisdiction
16 for the limited purpose of enforcing the Agreement. Second, Defendants question whether
17 ConnectU's individual shareholders received proper notice of the proceedings. The Court finds the
18 three principals of ConnectU have had adequate notice since they are plaintiffs in the Massachusetts
19 action where the parties have vigorously litigated discovery issues relating to the enforcement of this
20 Agreement. (See June 3, 2008, Memorandum and Order, No. 07-10593-DPW, D. Mass.) It is
21 incongruous to argue that these individuals did not receive notice of the motion since Judge

---

[8] Defendants first made these contentions in their sur-reply. (Defendants' Sur-Reply in Opposition to Confidential Motion to Enforce, hereafter, "Sur-Reply," Docket Item No. 438.) The Court grants Defendants' motion for leave to file the sur-reply, and considers the contentions raised in the sur-reply.

5

Woodlocks' June 3, 2008 order in the Massachusetts action specifically addressed the hearing on the motion to enforce the Agreement in this Court.[9]  (Id. at 2.)

**B.    The Material Terms**

The construction and enforcement of settlement agreements are governed by principles of local law that apply to the interpretation of contracts, even if the underlying cause of action is federal. United Commercial Ins. Serv., Inc. v. Paymaster Corp., 962 F.2d 853, 856 (9th Cir. 1992). Thus, challenges to a settlement agreement based on interpretation of ambiguous terms, fraud in the inducement, or indefiniteness of a term all turn on the applicable state law. See White Farm Equip. Co. v. Kupcho, 792 F.2d 526, 529 (5th Cir. 1986); see, e.g., Doi, 276 F.3d at 1135.

California has a strong policy in favor of enforcing settlement agreements. Osumi v. Sutton, 151 Cal. App. 4th 1355, 1357 (2007). Under California law, a settlement agreement "must be interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting." Roden v. Bergen Brunswig Corp., 107 Cal. App. 4th 620, 625 (2003); see Cal. Civ. Code, § 1636. When the agreement is in writing, "the intention . . . is to be ascertained from the writing alone, if possible." Brinton v. Bankers Pension Serv., Inc., 76 Cal. App. 4th 550, 559 (1999); see Cal. Civ. Code § 1639. "[C]ourts will not set aside contracts for mere subjective misinterpretation." Hedging Concepts, Inc. v. First Alliance Mortgage Co., 41 Cal. App. 4th 1410, 1421 (1996). "A settlement agreement, like any other contract, is unenforceable if the parties fail to agree on a material term or if a material term is not reasonably certain." Lindsay v. Lewandowski, 139 Cal. App. 4th 1618, 1622 (2006) (citing Weddington Productions, Inc. v. Flick, 60 Cal. App. 4th 793, 811 (1998)).

First, the Agreement clearly states the consideration for the performance required and how it must be paid. (Sutton Decl., Ex. A at 1-2.) In exchange for a specified amount of cash and stock in

---

[9] At the hearing, counsel for ConnectU's individual shareholders argued that they are not "plaintiffs" in the Massachusetts action. The Court declines to entertain the notion since counsel admitted that the individual shareholders added themselves as plaintiffs to the amended complaint in that action.

6

Facebook, ConnectU founders are required under the Agreement to represent and warrant "they have no further right to assert against Facebook" and "they have no further claims against Facebook and its related parties." (Id.)

Second, the Agreement clearly defines the structure of the transaction. (Sutton Decl., Ex. A at 1-2.) Paragraph 7 recites that all ConnectU stock is to be exchanged for a sum certain amount of cash and a precise number of common shares in Facebook; it is a stock and cash for stock acquisition. Subsequent negotiations might have proposed a different structure for the transaction or other additional terms, but those proposal were, apparently, rejected. (Id., Ex. B.) The Court cannot considered subsequent negotiations as evidence that there was no "meeting of the minds" with the respect to the Agreement. The Court must determine the parties' intent from the four corners of the Agreement, not from the extrinsic evidence. Brinton, 76 Cal. App. 4th at 559; Cal. Civ. Code § 1639.

Third, the principals of each company, who are persons authorized to make decisions for the parties, all signed the handwritten version of the Agreement and none of the signatures are disputed. However, Defendants point out that one stockholder in ConnectU, Howard Winklevoss, was not a party to, and did not sign the Agreement. (Opposition at 10.) Therefore, the issue becomes whether the lack of Howard Winklevoss' signature makes the Agreement unenforceable.

ConnectU is a Connecticut corporation. (Id. at 1.) Under Connecticut law, a share exchange transaction only needs to be approved by majority vote. See Conn. Gen. Stat. § 33-816(a). As of May 23, 2006, Howard Winklevoss owned 1% of the outstanding shares in ConnectU. (Declaration of Neel Chatterjee in Support of Plaintiffs' Reply, Ex. B at 10, filed under seal.) There is no evidence his ownership interest changed as of the date of the Agreement. The shareholders who signed the Agreement own 99% of the outstanding shares. Since a majority of ConnectU's shareholders have agreed to the transaction, the consent of Howard Winklevoss is unnecessary to make the Agreement binding on him. Therefore, the lack of Howard Winklevoss' signature is not an impediment to enforcing the Agreement.

7

Defendants contend that the Agreement was only a starting point for negotiating more formal documentation. (Opposition at 7-9.) However, the Agreement itself provides that the parties "*may* execute more formal documents," but that the Agreement is "binding." (Sutton Decl., Ex. A at 1, emphasis added.) It is significant that the parties used the word "may" in this instance as opposed to "will," which they had readily used in other contexts. (See e.g., Agreement ¶¶ 1, 3, 7.) On the face of the Agreement, it is clear that, had the parties wished to require more formal documents, they could have indicated they *will* or *shall* execute more formal documents. Instead, they elected to use the word, "may," and made clear that the Agreement is binding in and of itself.

In sum, the Court finds that the Agreement reached by the parties does not display on its face a failure to agree or any uncertainty regarding its material terms. Accordingly, the Court finds that the Agreement is enforceable.

**C.     Whether the Agreement Was Procured by Fraud**

Defendants contend that Facebook's motion to enforce the Agreement should be denied because Plaintiffs fraudulently procured the Agreement by misrepresenting Facebook's present value. (Opposition at 14.)

A contract is not enforceable if it was induced by fraud. Jones v. Grieve, 15 Cal. App. 561, 566-67 (1911). To prove fraud in the inducement of a contract, a party must establish the elements of common law fraud. Id. The elements of fraud are (1) misrepresentation; (2) scienter; (3) justifiable reliance; and (4) resulting damage. Buckland v. Threshold Enterprises, Ltd., 155 Cal. App. 4th 798, 806-07 (2007); Wilke v. Coinway, Inc., 257 Cal. App. 2d 126, 136 (1967) (quoting Cortez v. Weymouth, 235 Cal. App. 2d 140 (1965)). These legal principles apply to a contract to settle a lawsuit. See Merced County Mut. Fire Ins. Co. v. The State of California, 233 Cal. App. 3d 765, 771 (1991).

Where a party is represented by counsel, or where the alleged misrepresentation was made by an adversary during the course of negotiations, courts have held that reliance is unjustifiable. See Scognamill v. Credit Suisse First Boston LLC, 2005 WL 2045807 (N.D. Cal. 2005) (holding as a

1 matter of law that reliance on representation of adversary in execution of merger agreement was
2 unjustifiable where parties were represented by counsel during the negotiation process); <u>Wilhelm v.
3 Pray, Price, Williams & Russell</u>, 186 Cal. App. 3d 1324 (1986) (holding that the fraud claim failed
4 because plaintiff was represented by counsel at the time of the allegedly fraudulent statement, and it
5 was not "reasonable for plaintiff to accept defendant's statements without an independent inquiry or
6 investigation").

### 1. ConnectU's Proffer Regarding Facebook's Valuation

8 Defendants contend that they were defrauded during the settlement negotiations because
9 Plaintiffs did not disclose a valuation of Facebook common stock which had been made by the
10 Facebook Board of Directors. (Opposition at 6.)

11 Apparently, in October 2007, Facebook and Microsoft issued a press release stating
12 Microsoft would "take a $240 million stake in Facebook's next round of financing at a $15 billion
13 valuation." (Parke Decl., Ex. J.) Defendants proffer evidence that subsequent to the press release,
14 in the regular course of its operations, Facebook's Board of Directors determined a value of the
15 company's "shares" which was different than the valuation disclosed in the press release.
16 (Declaration of Robert T. Clarkson ¶ 11, filed under seal.)

17 Defendants do not challenge the accuracy of the press release itself. Thus, there is no claim
18 that the statement in the release was not true when it was made. (Declaration of Ted Wang in
19 Support of Plaintiffs' Confidential Motion ¶ 2, filed under seal.) Plaintiffs do not deny that the
20 Facebook Board of Directors made a subsequent valuation of Facebook shares which was a different
21 value from the value Microsoft attributed to the company. However, Plaintiffs did not make any
22 representations or warranties in the Agreement about the value of Facebook common stock.[10]

---

[10] Defendants provide no authority to support their contention that either Facebook or Zuckerberg had a duty to disclose the Board's valuation to Defendants in the context of the settlement or to correct any subjective valuation which Defendants might have made when determining what demand to make in the mediation. It is clear that generally one has a duty to correct a disclosure which is misleading when made, but usually, there is no duty to a correct statement which is true at the time it is made. See <u>Brody v. Transitional Hospitals Corp.</u>, 280 F.3d 997, 1006 (9th Cir. 2002); <u>Backman v. Polaroid Corp.</u>, 910 F.2d 10, 17 (1st Cir. 1990). Intentional

9

Morever, it is undisputed that the shares the parties agreed to exchange in the Agreement and the shares involved in the Microsoft's transaction are of different classes. Accordingly, the failure to disclose the difference in the valuations cannot be fraudulent as a matter of law.

Further, the Agreement does not attribute a specific value to the outstanding shares of Facebook's stock; there is no admissible evidence that Plaintiffs made any such representation while negotiating the settlement.[11] Rather, the only representation evident from the Agreement is the number of fully diluted shares which Facebook currently has outstanding. (Parke Decl., Ex. A.) Defendants have failed to show that this representation was false or that there were any other misrepresentations made by Plaintiffs upon which Defendants could have justifiably relied.

In sum, the Court finds Defendants have failed to establish that Plaintiffs made a misrepresentation during the negotiation. The individual signatories to the Agreement are sophisticated business parties who were represented by reputable counsel at the mediation. Either party could have chosen to condition the financial exchange being negotiated on representations and warranties of the value of the stock involved or to conduct their own due diligence with respect to Facebook's valuation. Neither party chose these courses of conduct. Notably, in his June 3, 2008 order denying ConnectU's motion to compel production of documents, Judge Woodlock stated:

> From all that appears, the parties were prepared to settle their disputes then, despite the fact that aspects of discovery in this case—most pertinently for present purposes, document production—had not been completed and unresolved discovery issues remained outstanding.

(See June 3, 2008, Memorandum and Order at 2, No. 07-10593-DPW, D. Mass.) Thus, the parties elected to proceed with their settlement negotiations knowing they lacked potentially relevant

---

concealment exists only "when a party to a transaction, who is under no duty to speak, nevertheless does speak and suppresses facts which materially qualify the facts stated." Persson v. Smart Inventions, Inc., 125 Cal. App. 4th 1141, 1164 (2005).

[11] Defendants proffer evidence of statements made during mediation that resulted in the Agreement. Under ADR Local Rule 6-11, "anything that happened or was said, any position taken, and any view of the merits of the case formed by any participant in connection with any mediation . . . shall not be . . . (2) disclosed to the assigned judge; or (3) used for any purpose, including impeachment, in any pending or future proceeding in this court." Pursuant to this privilege, the Court declines to conduct a hearing or consider evidence regarding the details of the parties' negotiations in their mediation.

information. Without a showing by Defendants of a material misrepresentation or omission in the negotiations, the Court finds no basis to decline enforcement.

### 2. Securities Fraud

In their opposition and sur-reply, Defendants contend that the Agreement is not enforceable because Plaintiffs committed securities fraud, making the Agreement voidable. (Opposition at 14; Sur-Reply at 7.)

Neither Plaintiffs nor Defendants have cited authority that an agreement to exchange shares of closely held corporations pursuant to settlement of litigation between the companies is voidable by showing securities fraud. The cases which Defendants cite in their sur-reply regarding a duty to disclose "material non-public information" all fall within the context of insider trading, which is not an issue in this case. (Sur-Reply at 10.)

On June 24, 2008, the day after the hearing, Defendants requested leave to file additional authority to provide precedent for voiding a purported settlement agreement on the basis of securities fraud.[12] While Defendants cite one case where a settlement was found void under § 29 of the Securities Exchange Act, that case involved an agreement which violated the margin requirements of Regulation T because the defendant failed to recover capital after the settlement. Pearlstein v. Scudder and German, 429 F.2d 1136, 1142-43 (2d Cir. 1970). Contrary to Pearlstein, the Ninth Circuit has held that a broad release in a signed settlement agreement operates to prevent a party from collaterally attacking the agreement by alleging it violates the securities laws under § 29. Petro-Ventures, Inc. v. Takessian, 967 F.2d 1337 (9th Cir. 1992). Specifically, the Ninth Circuit noted:

> [w]hen, as here, a release is signed in a commercial context by parties in a roughly equivalent bargaining position and with ready access to counsel, the general rule is that, if 'the language of the release is clear, . . . the intent of the parties [is] indicated by the language employed.'

---

[12] (See Docket Item No. 454.) While Plaintiffs have not had an opportunity to respond, the Court finds good cause to grant Defendants leave and considers the authority presented in Defendants' papers.

11

Id. at 1342 (quoting Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc., 558 F.2d 1113, 1115 (2d Cir. 1977)). Thus, in Petro-Ventures, the Ninth Circuit effectuated the parties' intent to bring about "general peace" by finding that their settlement agreement cannot be voided under § 29. Id.

As in Petro-Ventures, this case involves a settlement agreement reached by the parties, who were represented by counsel, in which they intended to undertake to give mutual releases that were "as broad as possible." (Agreement ¶ 2.) There is no doubt that the language of the release in Paragraph 2 of the Agreement conveys the intent of the parties to release all claims. Thus, the Agreement cannot be collaterally attacked using § 29.

Accordingly, the Court finds that Defendants have failed to tender sufficient evidence of fraud in the circumstances proffered to the Court to create a genuine dispute as to whether the Agreement was fraudulently induced.

## V. CONCLUSION

The Court GRANTS Plaintiffs' Motion to Enforce the Parties' Settlement Agreement. The parties are ordered to appear on **July 2, 2008 at 10 a.m.** to show cause why a judgment should not be entered ordering the parties to take the actions required of them by the Settlement Agreement. On or before **June 30, 2008**, the parties are directed to submit a proposed form of judgment consistent with this Order.

Dated: June 25, 2008

JAMES WARE
United States District Judge

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Chester Wren-Ming Day cday@orrick.com
D. Michael Underhill MUnderhill@BSFLLP.com
David A. Barrett dbarrett@bsfllp.com
Evan A. Parke eparke@bsfllp.com
George Hopkins Guy hopguy@orrick.com
I. Neel Chatterjee nchatterjee@orrick.com
Jonathan M. Shaw jshaw@bsfllp.com
Kalama M. Lui-Kwan klui-kwan@fenwick.com
Monte M.F. Cooper mcooper@orrick.com
Scott Richard Mosko scott.mosko@finnegan.com
Sean Alan Lincoln slincoln@orrick.com
Steven Christopher Holtzman sholtzman@bsfllp.com
Theresa Ann Sutton tsutton@orrick.com
Tyler Alexander Baker Tbaker@fenwick.com
Valerie Margo Wagner valerie.wagner@dechert.com
Yvonne Penas Greer ygreer@orrick.com

**Dated:  June 25, 2008**                              **Richard W. Wieking, Clerk**

                                                       **By:  /s/ JW Chambers**
                                                            **Elizabeth Garcia**
                                                            **Courtroom Deputy**

**United States District Court**
For the Northern District of California