# EXHIBIT C



ORRICK

ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 MARSH ROAD
MENLO PARK, CALIFORNIA 94025-1015

tel +1-650-614-7400
fax +1-650-614-7401

WWW.ORRICK.COM

January 5, 2010

Monte M.F. Cooper
(650) 614-7375
mcooper@orrick.com

*VIA ELECTRONIC MAIL AND U.S. MAIL*

John F. Hornick
Thomas H. Jenkins
Margaret A. Esquenet
Finnegan, Henderson, Farabow
Garrett & Dunner, LLP
901 New York Avenue NW
Washington, DC 20001

Richard I. Werder, Jr.
Peter Calamari
Adam B. Wolfson
Renée B. Bea
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Ave.
New York, NY 10010-1601

Daniel P. Tighe
Scott McConchie
Greisinger, Tighe & Maffei, L.L.P.
176 Federal St.
Boston, MA 02110

D. Michael Underhill
Evan A. Parke
Boies, Schiller & Flexner LLP
5301 Washington Ave. NW.
Washington D.C. 20015

Steven C. Holtzman
Boies, Schiller & Flexner LLP
1999 Harrison St., Suite 900
Oakland, CA 94612

David A.. Barrett
Boies, Schiller & Flexner LLP
575 Lexington Ave., 7th Floor
New York, NY 10022

Scott R. Mosko
Finnegan, Henderson, Farabow, Garrett
& Dunner, LLP
3300 Hillview Avenue
Palo Alto, California 94304-1203

Sean F. O'Shea
Michael E. Petrella
O'Shea Partners LLP
521 Fifth Avenue, 25th Floor
New York, NY 10175

Lee T. Gesmer
Joseph Laferrera
Gesmer Updergrove LLP
40 Broad St.
Boston, MA 02109

Alan D. Rose
Alan D. Rose, Jr.
Rose, Chintz & Rose
One Beacon Street, Fourth Floor
Boston, MA 02108

Re:     *Facebook and Zuckerberg v. ConnectU, et al*; Case No. 5:07-cv-01389 (N.D. Cal.)
        *ConnectU, Inc. v. Facebook, Inc.*, Case No. 1:07-cv-10593-DPW (D. Mass.)
        *ConnectU LLC v. Zuckerberg*, Case No. 1:04-cv-11923-DPW (D. Mass.)



ORRICK

Dear Counsel:

This letter follows my correspondence of December 22, 2008. Facebook still has not received assurances that counsel will abide by the terms of all confidentiality orders and agreements (including those related to the parties' February 2008 mediation) entered into in the above-referenced matters, as well as all applicable mediation privileges. Such assurances are critical in light of the fact that on December 10, 2009, Michael Petrella provided notice to ConnectU stating that he intends on January 27-29, 2010 to call both John Hornick and Scott Mosko to testify in the ongoing arbitration between the ConnectU Founders and Quinn Emanuel. Specifically, Facebook understands Mssrs. Hornick and Mosko will testify concerning "their recollection of certain events concerning their representation of the Respondents and old ConnectU, including but not limited to the events of a February 22, 2008 mediation involving Facebook."

In light of Mr. Petrella's representation, Facebook again requests that counsel identify every witness that has been or is expected to be called as a witness in the Quinn Emanuel arbitration, provide a description of exhibits the parties used or intend to use, and provide a summary of the topics on which any arbitration witnesses have testified or are expected to testify. As I indicated in my earlier correspondence, Facebook expects the summary to be detailed enough to know if court intervention related to confidentiality is necessary.

In light of the fact that former Defendant Wayne Chang now also has initiated a legal proceeding relating to the February 23, 2008 settlement and may have an interest in the arbitration testimony, I am as a courtesy also adding his counsel to this correspondence. I also am attaching a copy of his Complaint for counsel's reference.

Yours truly,

Monte Cooper

cc:     Steven Bauer
        Jeremy Oczek
        James Towery
        Jonathan Bach

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.
SUPERIOR COURT DEPARTMENT
BUSINESS LITIGATION SESSION
CIVIL ACTION NO. 09-5397

———————————————————————
WAYNE CHANG, and THE I2HUB )
ORGANIZATION, INC., )
)
Plaintiffs, )
)
v. )
)
CAMERON WINKLEVOSS, )
TYLER WINKLEVOSS, DIVYA NARENDRA, )
HOWARD WINKLEVOSS, CONNECTU, INC. )
(f/k/a CONNECTU LLC), SCOTT R. MOSKO, )
and FINNEGAN, HENDERSON, FARABOW, )
GARRETT & DUNNER LLP, )
)
Defendants. )
———————————————————————

RECEIVED
DEC 21 2009
SUPERIOR COURT - CIVIL
MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

## COMPLAINT

Wayne Chang ("Chang") and The i2hub Organization, Inc. ("i2hub") bring this action against Cameron Winklevoss and Tyler Winklevoss (together the "Winklevosses"), Howard Winklevoss, Divya Narendra, ConnectU, Inc. (f/k/a ConnectU LLC) (hereinafter "ConnectU"), Scott R. Mosko and Finnegan, Henderson, Farabow, Garrett & Dunner LLP ("Finnegan LLP"), to recover damages for the defendants' denial of plaintiffs' ownership rights in ConnectU and The Winklevoss Chang Group, and for Mosko and Finnegan LLP's negligence and breach of duty in representing Chang.

## NATURE OF THE ACTION

1.     In November 2004, ConnectU entered into a memorandum of understanding with Chang (the "MOU"). Pursuant to the MOU, Chang obtained a 15%

share of ConnectU upon the completion of the integration of i2hub's peer-to-peer file sharing software and ConnectU's social networking website, ConnectU.com. Chang and the Winklevosses also proceeded to form a partnership that they shortly thereafter named The Winklevoss Chang Group ("WCG"), through which Chang and the Winklevosses co-owned, operated and developed ConnectU and i2hub, as well as several other internet properties and projects. The parties agreed that Chang held a 50% interest in WCG. By February 2005, Chang and i2hub had completed the integration of i2hub's peer-to-peer file sharing software with ConnectU.com and, by March 2005, had released the integrated software, providing ConnectU with i2hub's assets, including thousands of its users, its technology, its publicity and its reputation.

2.     At the time Chang and the Winklevosses joined forces, ConnectU was involved in litigation against Mark Zuckerberg and Facebook, the social networking site Zuckerberg founded, *ConnectU LLC v. Mark Zuckerberg et al.,* United States District Court, District of Massachusetts, Civil Action No. 04-CV-111923 (the "ConnectU Litigation"). The Winklevosses alleged that Zuckerberg misappropriated ConnectU's trade secrets and copyrighted material and used them to start the competing social networking site, Facebook. Chang and the Winklevosses expressly agreed that the litigation between ConnectU and Facebook was an asset of ConnectU and an asset of their partnership, WCG. Chang and the Winklevosses, as WCG, later developed Social Butterfly, a new feature of the ConnectU website that enabled its users to import and consolidate their information located on other social networking sites. On or around September 20, 2005, Facebook brought an action against the Winklevosses, ConnectU, Chang and others, *The Facebook, Inc. v. ConnectU LLC et al.,* Civil Action No. 105-

2

047381 (Cal. Sup. Ct., Santa Clara County) (later removed to Federal Court, Civil Action No. 07-01389-JW)(N.D.Cal.))(the "Facebook Litigation"), alleging that the Winklevosses, Chang and ConnectU used Social Butterfly to misappropriate Facebook's proprietary information and user data.

3.     The Winklevosses retained defendants Mosko and the law firm Finnegan LLP to defend Chang in connection with the Facebook Litigation. Mosko and Finnegan LLP also represented the Winklevosses, Howard Winklevoss, Divya Narendra and ConnectU in that litigation. Without Chang's knowledge of materially relevant events and information, the Winklevosses, with the assistance of Mosko and his law firm, entered into a settlement agreement with Facebook to resolve all of the pending litigation, including claims ConnectU had asserted against Zuckerberg and Facebook. Despite the fact that Chang was a defendant in the Facebook Litigation and that Mosko was Chang's attorney, Mosko did not discuss with Chang relevant information, including the details of the settlement.

4.     Pursuant to the settlement, the Winklevosses, Howard Winklevoss and Divya Narendra transferred 100% of ConnectU's common stock to Facebook, in exchange for the payment of cash and Facebook, Inc. common stock. As a result of Chang's interest in WCG, he is entitled to 50% of the proceeds of the sale of ConnectU. Alternatively, Chang is entitled to 15% of the proceeds pursuant to the parties' MOU. Mosko and Finnegan LLP are liable to Chang for their conspiracy with, and for knowingly and actively providing substantial assistance to, the other defendants in depriving Chang of his rightful interest in the proceeds of the Facebook settlement and for professional negligence in breach of their duty to represent Chang as his counsel.

<u>PARTIES</u>

5.    Plaintiff Wayne Chang resides in Boston, Massachusetts.

6.    Plaintiff i2hub is a Massachusetts Corporation. Chang is the President and sole shareholder of i2hub.

7.    Defendant Cameron Winklevoss is an individual who, on information and belief, is domiciled in Connecticut. On information and belief, Cameron Winklevoss was a co-founder and Managing Member of ConnectU LLC, and was, prior to November 2008, an officer, director and shareholder of ConnectU, Inc.

8.    Defendant Tyler Winklevoss is an individual who, on information and belief, is domiciled in Connecticut. On information and belief, Tyler Winklevoss was a co-founder and Member of ConnectU LLC, and was, prior to November 2008, an officer, director and shareholder of ConnectU, Inc.

9.    Defendant Howard Winklevoss is an individual who, on information and belief, is domiciled in Connecticut. On information and belief, Howard Winklevoss was a Member of ConnectU LLC, and was, prior to November 2008, a director and shareholder of ConnectU, Inc.

10.   Defendant Divya Narendra is an individual who, on information and belief, is domiciled in New York. On information and belief, Divya Narendra was a Member of ConnectU LLC, and was, prior to November 2008, a director and shareholder of ConnectU, Inc.

11.   Defendant ConnectU, Inc. is a Connecticut corporation and the successor in interest to ConnectU LLC. On May 23, 2006, ConnectU LLC, a Delaware limited liability company, merged into ConnectU, Inc. By virtue of the merger, ConnectU, Inc.

4

is the surviving entity, and all assets, rights and liabilities of ConnectU LLC merged into ConnectU, Inc.

12.     Defendant Scott R. Mosko is an attorney who, on information and belief, is domiciled in California. Defendant Mosko is a partner in the law firm Finnegan LLP.

13.     Defendant Finnegan LLP is a law firm and District of Columbia limited liability partnership with an office in Cambridge, Massachusetts. On information and belief, partners of Finnegan LLP are residents of Middlesex County, Massachusetts.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction to hear and determine this action pursuant to M.G.L. c. 212, § 4. The defendants are subject to personal jurisdiction pursuant to M.G.L. c. 223A, §3. Defendant Finnegan LLP is also subject to personal jurisdiction pursuant to M.G.L. c. 223A, §2.

15.     Venue is proper in this Court, pursuant to M.G.L. c. 223, § 1 because the plaintiff, Chang, resides in Boston, Suffolk County, Massachusetts.

## FACTS

### Chang and i2hub

16.     Chang is an accomplished and recognized internet website and software developer. Chang has been profiled in several publications and on television for his abilities, including by Harvard's Current Magazine which, in Spring 2005, proclaimed Chang its "Technology Leader" among its "Top 15 College Students."

17.     In 2003, while a student at the University of Massachusetts, Chang developed a peer-to-peer, file-sharing platform called i2hub. Chang launched i2hub in

March 2004, and it quickly became widely used among college students, ultimately expanding to hundreds of universities with students in many countries using the service.

18.     In August 2004, Chang incorporated The i2hub Organization, Inc. By October 2004, the i2hub platform was becoming a recognized brand name among students on college campuses, and was generating significant publicity, including positive reviews in college papers and numerous articles and interviews published in the mainstream newspaper, television, internet and radio media.

**Chang and the Winklevosses Agree to Integrate
ConnectU and i2hub and to Form a Partnership**

19.     In or around October 2004, ConnectU and its founders, the Winklevosses, contacted Chang, seeking to form a partnership with Chang and i2hub, and to integrate ConnectU's social networking website with i2hub's peer-to-peer file sharing software.

20.     At the time, ConnectU was a social networking site with a limited user base and was trying to compete with the growing popularity of Facebook.

21.     By integrating ConnectU and i2hub, ConnectU would gain access to i2hub's user base and technology, as well as the benefit of i2hub's publicity and Chang's knowledge and experience.

22.     On October 21, 2004, Cameron Winklevoss sent an email to Chang stating that ConnectU and i2hub should operate as a partnership.

23.     Over the next several weeks, Chang and the Winklevosses engaged in a series of discussions concerning the integration of ConnectU and i2hub, and the operation of a partnership through which the Winklevosses and Chang would jointly own and operate several internet-based operating companies, including i2hub and ConnectU.

24.     On November 13, 2004, Chang met with the Winklevosses in Boston to discuss the terms of the integration of i2hub and ConnectU and of a further partnership, including the joint development of an internet-based book exchange and other potential internet properties.

25.     At the November 13, 2004 meeting, Chang and the Winklevosses discussed i2hub's and ConnectU's respective assets.

26.     The Winklevosses stated and Chang understood that the ConnectU Litigation was one of ConnectU's assets.

27.     The Winklevosses and Chang agreed that Chang should take the lead on integrating i2hub and ConnectU and they discussed the integration process, the resources required to complete the integration and the fact that Chang and i2hub would be foregoing opportunities to independently pursue the development of the i2hub software and other projects.

28.     ConnectU would be the primary beneficiary of the integration of i2hub and ConnectU. Therefore, the parties agreed that Chang should, immediately upon integration, have an ownership interest in ConnectU.

29.     Chang and the Winklevosses agreed that, upon completion of the integration, Chang would own 15% of ConnectU.

30.     In addition, the Winklevosses and Chang agreed to form a partnership, later called The Winklevoss Chang Group, to jointly promote the integrated ConnectU-i2hub platform and to jointly develop their other internet-based concepts, including Jungalu.com and StallScribbles.com.

31.     On November 16, 2004, Cameron Winklevoss confirmed, via instant message, that Chang and the Winklevosses would move forward with the integration as soon as possible, with Chang getting a 15% interest in ConnectU upon completion.

32.     Cameron Winklevoss further confirmed that the Winklevosses and Chang would take the necessary steps to form a partnership through which they would co-own and operate i2hub and ConnectU and all of WCG's other assets.

33.     Cameron Winklevoss' and Chang's November 16, 2004 instant message exchange included the following[1]:

> cwinklevoss:  we both agree that i2[hub] and cu[ConnectU] should get together asap
>
> cwinklevoss:  but we won't really know the outcome of some of the pending i2hub things for a while
>
> cwinklevoss:  would u be interested in a deal structured as follows
>
> cwinklevoss:  CU gives you x part of our company, say 15% for the time being contingent on the completion of a licensing deal and upgrade to decentralized software
>
> cwinklevoss:  we all divulge our stakes in CU....and go with an agreed upon split in the holding company
>
> Chang:  consolidate instead of divulge you mean?
>
> cwinklevoss:  well essentially divulge to the umbrella
>
> cwinklevoss:  cause we will all essentially be giving up individual ownership of whatever stakes we have in the companies once we transition to the umbrella
>
> cwinklevoss:  the temporary percentage in CU will protect u in the event that a) we break away

34.     On November 17, 2004, Cameron Winklevoss and Chang engaged in another instant message exchange, in which Cameron Winklevoss stated "i think we should make up the contract with the 15% stake."

35.     Chang would not have agreed to integrate i2hub with ConnectU without receiving an ownership interest in ConnectU, because ConnectU was the primary

---

[1] Typographical errors appear in original.

beneficiary of the integration and i2hub was giving ConnectU the benefit of i2hub's goodwill, user base and technology.

36.     The Winklevosses repeatedly assured Chang that when the integration of ConnectU.com and the i2hub platform was complete, Chang would obtain a 15% interest in ConnectU, which was designed to protect Chang.

37.     On November 23, 2004, Cameron Winklevoss emailed Chang the Memorandum of Understanding ("MOU"). A true copy of the MOU is attached as Exhibit A.

38.     The MOU states, in relevant part, that "Upon completion of the integration, CU [ConnectU] will give Wayne Chang the option to exercise a 15% stake in CU."

39.     On November 24, 2004, Chang communicated his acceptance of all of the terms of the MOU to the Winklevosses by email.

### Chang and i2hub Work on the
### Integration and Other WCG Projects

40.     Chang, i2hub and the Winklevosses immediately commenced the work necessary to integrate ConnectU and i2hub.

41.     Chang and i2hub devoted substantial time, effort and other resources to complete the integration as the parties agreed.

42.     Chang and i2hub devoted substantial time, effort and other resources to complete the integration in reliance upon, among other things, the promises in the MOU and other promises made by the Winklevosses.

43.     Chang and the Winklevosses also began operating as WCG and held themselves out as partners in the development and operation of i2hub, ConnectU and their other internet properties.

44.     Chang and the Winklevosses discussed and ultimately agreed that Chang would hold a 50% share in the ownership of the combined business.

45.     Chang and the Winklevosses agreed that Chang would contribute i2hub, including the i2hub software, network, users and all of its other assets and goodwill to the business.

46.     Chang and the Winklevosses agreed that the Winklevosses would contribute ConnectU, including the ConnectU.com website and all of ConnectU's other assets and goodwill, to the business, including ConnectU's claims against Facebook.

47.     The parties further agreed that they would contribute their efforts jointly to develop and pursue their business opportunities through WCG.

48.     Chang was directly involved in the management and operation of ConnectU as part of WCG and he expended substantial time and effort to promote and develop ConnectU and other WCG properties.

49.     Chang's efforts on behalf of WCG were undertaken in reliance on the agreements he made with the Winklevosses, including the agreement that he held a 50% interest in WCG.

50.     Chang and the Winklevosses used many assets that were originally owned by i2hub to the benefit of WCG, including i2hub's user base, to expand ConnectU's market, i2hub's computer servers to administer the ConnectU.com website and i2hub's publicity to promote ConnectU.

51. Chang performed WCG work and administrative functions from its office in Amherst, Massachusetts. Chang devoted considerable time and effort, and directed other personnel, to develop and improve ConnectU.

52. After the integration of the i2hub software and ConnectU.com, revenue previously generated by i2hub and received by i2hub was redirected to the ConnectU operating account.

53. Separate and apart from the integration, as part of WCG's business, Chang worked on the development of additional internet websites and projects, including:

   a. Jungalu.com, an internet-based book exchange;

   b. StallScribbles.com, an online "anonymous confessions" board;

   c. Digital Flyers, a portal for purchasing advertisements to be placed on the various WCG websites and on i2hub;

   d. ConnectHi (also known as ConnectHigh and theyearbook.org), an effort to penetrate the high school social networking market, which also went by the name of theyearbook.org;

   e. ConnectGroups, an initiative to provide clubs and organizations with a means for their members to communicate online with each other about their organizations;

   f. The Winklevoss Chang Representative Program, a sales representative program which WCG used to establish a presence on college campuses and to promote ConnectU and the other WCG properties;

   g. The Rep Center, an internet-based portal, accessible through ConnectU.com, providing a centralized location for the representatives of The Winklevoss Chang Representative Program to communicate and earn points (redeemable for prizes) by recruiting and signing up new users for all of WCG's properties; and

   h. Social Butterfly, a feature added to ConnectU to enable users to consolidate their accounts at various social networking sites, such as Facebook, and make that information accessible through ConnectU. A true copy of WCG's design for Social Butterfly, as originally posted on winklevosschang.com, is attached hereto as Exhibit B.

54.     Separate and apart from the integration, Chang, as part of WCG's business, co-invented a method and system for purchasing music files and other digital goods through affinity programs, and assisted in drafting an associated patent application, U.S. Patent Application No. 20060212395.

55.     Some of WCG's websites, including Jungalu.com, were later added to the integrated i2hub-ConnectU.com platform and the ConnectU.com website.

56.     Some of these websites, including Jungalu.com, generated revenue, which was directed to ConnectU's operating account.

57.     In addition to each of the websites and programs Chang developed as part of and on behalf of WCG, Chang also directed the development of the information and technology infrastructure and programming necessary to enable and administer all of WCG's properties.

### Chang and the Winklevosses Operate WCG as Co-Owners and Hold Themselves Out as Partners

58.     The Winklevosses shared in the management of i2hub through their shared control of WCG.

59.     The Winklevosses reviewed and participated in the development and design work performed by Chang on the various WCG websites.

60.     The Winklevosses and Chang often described and held each other out as partners and as co-owners of i2hub and ConnectU, and other properties.

61.     On behalf of WCG and i2hub, the Winklevosses and Chang attended meetings with various potential promotional partners and music companies.

62.     In or around December 2004, Chang and the Winklevosses, holding themselves out as partners and co-owners of i2hub and ConnectU, traveled to New York to meet with digital music providers Sony and Mashboxx, in efforts to secure music licensing deals on behalf of WCG.

63.     On December 20, 2004, Cameron Winklevoss sent an email to Chang, attaching a summary of WCG's strategy for ConnectU and i2hub, and describing i2hub as one of "our commerce sites."

64.     A true copy of Cameron Winklevoss' December 20, 2004 email is attached hereto as Exhibit C.

65.     As part of WCG's business, Chang and the Winklevosses promoted ConnectU, ConnectHi, ConnectGroups, Jungalu.com, StallScribbles.com, Digital Flyers and Social Butterfly, together on websites jointly designed and operated by Chang and the Winklevosses.

66.     As part of WCG's business, Chang and the Winklevosses jointly advertised i2hub.com, ConnectU.com and Jungalu.com in print advertisements, including on the sides of buses operated by the Pioneer Valley Transportation Authority.

67.     In January 2005, Cameron Winklevoss, responding to questions from a reporter for the Harvard Crimson newspaper on behalf of WCG, described, among other things, WCG's operations in Amherst, Massachusetts and the status and basis for the claims against Facebook and Zuckerberg.

68.     Chang, on behalf of WCG, managed and directed the day-to-day operations of the Amherst, Massachusetts office.

69. Prior to November 2004, Chang had developed a successful program, whereby i2hub engaged college students to promote i2hub among their peers. As part of WCG's business, Chang and the Winklevosses adapted i2hub's program to promote the integrated ConnectU and i2hub network, as well as other websites jointly developed by WCG. Chang and the Winklevosses described this program as "The Winklevoss Chang Representative Program."

70. A true copy of WCG's description of The Winklevoss Chang Representative Program is attached hereto as <u>Exhibit D.</u>

71. On March 4, 2005, Tyler Winklevoss sent an email to Chang and Cameron Winklevoss, attaching a proposed draft of "The Winklevoss Chang Group Advertising Information," detailing the rates to be charged to advertisers placing ads on i2hub, ConnectU.com and StallScribbles.com.

72. True copies of Tyler Winklevoss' March 4, 2005 email and draft Winklevoss Chang Group Advertising Information, are attached hereto as <u>Exhibit E.</u>

73. The Winklevoss Chang Group Advertising Information identified ConnectU, i2hub.com and StallScribbles as "Our Properties."

74. On April 12, 2005, Chang and the Winklevosses issued a press release, identifying i2hub.com, ConnectU.com, Jungalu.com and StallScribbles.com as "[s]ome of our products."

75. A true copy of the April 12, 2005 press release is attached hereto as <u>Exhibit F.</u>

76. Chang designed, and WCG implemented, a unified system to automatically monitor outages and other problems with their various website properties.

A true copy of a diagram of WCG's unified administration and monitoring system is attached hereto as Exhibit G.

77.     WCG registered and utilized the website www.winklevosschang.com to host various WCG projects, including the diagrams for Social Butterfly, as well as a fully working and functional unified administration and monitoring system of WCG properties, along with other WCG materials.

## Chang and i2hub Complete the Integration

78.     In or around February 2005, the integration of the i2hub software and ConnectU.com was successfully completed.

79.     In or around March 2005, WCG released the integrated software.

80.     The integrated software directed all i2hub users downloading and registering the new software to register as ConnectU users, and i2hub users were provided with access to ConnectU through the i2hub interface.

81.     Chang and i2hub fully performed all of their obligations concerning the integration in accordance with the MOU.

82.     Pursuant to the MOU, upon completion of the integration, Chang held the right to a 15% interest in ConnectU which the Winklevosses had promised would protect Chang if they did not also form a partnership.

## The Winklevosses Obtained the Benefit
## of Chang's Work on WCG Projects

83.     By April 2005, ConnectU and the Winklevosses had obtained the benefit of the integration and all of the work Chang performed in reliance on the Winklevosses' representations that they were operating WCG as co-owners. Among other things, the Winklevosses and ConnectU obtained the benefit of:

a. the integration of ConnectU.com with i2hub's software;

b. access to all of i2hub's users;

c. all of i2hub's revenue;

d. the creation of Jungalu.com;

e. the integration of Jungalu.com into i2hub's software;

f. the creation of StallScribbles.com;

g. the integration of StallScribbles.com into ConnectU.com;

h. Chang's creation and management of WCG's Amherst, Massachusetts office;

i. the advertising and exposure of ConnectU and the other WCG properties through i2hub's presence and reputation on college campuses and in the media;

j. Chang's involvement in discussions regarding potential licensing and other deals, including with Apple, CareerBuilder, fone2fone, Revenue Science, Snocap, Sony, and Mashboxx;

k. the use of the existing i2hub Representative Program to promote ConnectU and other WCG properties, subsequently named The Winklevoss Chang Group Representative Program;

l. the creation of The Rep Center, enhancing the promotion of ConnectU and WCG properties on college campuses;

m. the creation of a digital advertising platform for WCG properties including i2hub.com, ConnectU.com, StallScribbles.com, and Jungalu.com;

n. the creation of Social Butterfly;

o. the creation of ConnectHi (ConnectHigh), also known as theyearbook.org;

p. the creation of ConnectGroups;

q. the creation of a network monitoring system for all of WCG's properties, that was hosted and accessible via WCG's internet domain, www.winklevosschang.com;

r. the use of i2hub's servers and other technology infrastructure;

s.  Chang's management of and contributions to the ConnectU.com website;

t.  Chang and i2hub's referrals to web developers and other contributors to WCG's websites, including ConnectU's;

u.  the joint advertisement of i2hub, ConnectU.com and Jungalu.com, including print advertisements on Pioneer Valley Transportation Authority buses; and

v.  Chang's review of and contributions to WCG's design of a method and system for purchasing digital goods through affinity programs and an associated patent application. The Winklevosses and Howard Winklevoss filed that patent application, U.S. Patent Application No. 20060212395, on or around March 15, 2005, but did not list Chang as a co-inventor.

84.  Pursuant to the WCG partnership, Chang owns a 50% share in all of WCG's properties, including ConnectU.

### The Winklevosses Terminate Their Relationship with Chang

85.  As an inducement for the integration, the Winklevosses had agreed to contribute an initial $7,500, and additional funding, as needed, for WCG's operations.

86.  In April 2005, a dispute arose regarding the Winklevosses' refusal to provide funding for WCG's operations.

87.  In April 2005, a dispute arose concerning Chang's and the Winklevosses' respective shares in WCG.

88.  On or around April 22, 2005, in an internet chat exchange, Tyler Winklevoss insisted that the Winklevosses' contribution of $7,500 to WCG's operations entitled the Winklevosses to a 5% greater equity share of WCG, or 55%.

89.  That exchange included the following:

| | |
|---|---|
| Tyler Winklevoss: | that 7.5k for 5% was 5% of the parent company not just i2hub |
| Wayne Chang: | that wasnt the agreement |
| Tyler Winklevoss: | yes it was |

17

| Tyler Winklevoss: | we never talked in terms of just i2hub |
| Tyler Winklevoss: | wayne, these are the realities and you know this, or now you do |
| Tyler Winklevoss: | and you also know that 7.5k was for parent company all along |
| Tyler Winklevoss: | so i don't appreciate you trying to make it an i2hub only deal |
| ..... | |
| Tyler Winklevoss: | it was a 50/50 split on parent company originally or that was the ballpark |
| Tyler Winklevoss: | we always worked form the parent company model |
| Tyler Winklevoss: | we never talkeeda bout individual properties |
| Tyler Winklevoss: | so when we talked percentages, we talked in terms o parent company |

90.     In April 2005, after receiving the benefit of the integration of ConnectU.com with i2hub, the revenue generated by i2hub, Jungalu.com and other WCG projects, and Chang's efforts in developing and promoting the ConnectU website and other internet properties, the Winklevosses informed Chang that they were ceasing any further funding and were terminating their relationship with Chang.

91.     At the time of the dissolution, WCG had little or no revenue and few liquid assets.

92.     At the time of the dissolution of WCG, ConnectU's litigation with Facebook was still pending, had not been reduced to a judgment or settlement in favor of ConnectU, and, therefore, the value of ConnectU's claims against Facebook could not yet be determined.

93.     In or around late 2005, the Winklevosses contacted Chang and advised him that he was personally responsible for paying approximately $4,000 owed to the Pioneer Valley Transportation Authority ("PVTA") for advertisements WCG had purchased on PVTA buses promoting i2hub and ConnectU, and which the Winklevosses had previously agreed to fund as part of WCG's expenses. The Winklevosses threatened

to sue Chang for approximately $20,000 if he did not pay WCG's debt to the PVTA, falsely claiming that Chang owed additional money as a result of the Winklevosses' funding of WCG.

### The Facebook Litigation

94.     On or around September 20, 2005, Facebook filed the Facebook Litigation, alleging that ConnectU used Social Butterfly to misappropriate Facebook's proprietary information and user data.

95.     Chang was named as a defendant in the Facebook Litigation, along with the Winklevosses, ConnectU, Divya Narendra, Howard Winklevoss and others.

96.     On information and belief, the Winklevosses and Howard Winklevoss arranged and paid for Chang's counsel in connection with the Facebook Litigation.

97.     Chang was represented by Scott R. Mosko and the law firm Finnegan LLP. Mosko was assisted in his representation of Chang by other attorneys of Finnegan LLP.

98.     Mosko and Finnegan LLP simultaneously represented ConnectU, the Winklevosses, Howard Winklevoss and Divya Narendra.

99.     Mosko and other attorneys at Finnegan LLP were aware of the MOU between Chang and the Winklevosses entitling Chang to an interest in ConnectU.

100.     Mosko and other attorneys at Finnegan LLP were aware of the existence of WCG and that Chang and the Winklevosses had operated as partners and co-owners of i2hub and ConnectU, and had jointly developed Social Butterfly.

101.     Mosko never discussed with or advised Chang regarding his rights and interests in ConnectU or in WCG.

102. Despite Mosko's knowledge of critical facts, documents and information, Mosko never even discussed or advised Chang of his potential claims against the Winklevosses or ConnectU.

103. Mosko never discussed with or advised Chang regarding any other claims, counterclaims or crossclaims he might have in the litigation.

104. Mosko never advised Chang that Mosko and Finnegan LLP would not act completely in Chang's best interests.

105. On January 29, 2008, Mosko informed Chang that Facebook had requested a mediation of all of the pending disputes and claims and advised Chang that "whether you [Chang] need to participate will be decided later."

106. At no time after his January 29, 2008 email did Mosko ever inform or discuss with Chang when the mediation was going to take place, whether Chang should attend, what his settlement position was or should be, or what Chang's rights were to any proceeds of a settlement of the litigation.

107. On February 22, 2008, without Chang's knowledge, Mosko attended a mediation and engaged in settlement discussions with Zuckerberg's and Facebook's counsel.

108. On information and belief, at the February 22, 2008 mediation Mosko negotiated a settlement of all of the pending litigation, including the Facebook Litigation and the ConnectU Litigation.

109. On information and belief, pursuant to the settlement agreement, Facebook received 100% of ConnectU's common stock, in exchange for the payment of $20,000,000 in cash and approximately 1,253,326 shares of Facebook common stock.

110.     Mosko and Finnegan LLP knew or, if they had exercised due care in representing Chang's interests, should have known, that as a result of the settlement, Chang would receive nothing, despite his interest in ConnectU and WCG.

111.     Neither Mosko nor any other attorney at Finnegan LLP ever discussed the settlement terms with Chang before entering into the settlement agreement.

112.     Without Chang's knowledge, Mosko agreed to provide Facebook and Zuckerberg with a release of all claims by Chang, in consideration of, among other things, the payments that ultimately benefited the Winklevosses, Divya Narendra and Howard Winklevoss – not Chang.

113.     Neither Mosko nor any attorney at Finnegan LLP ever advised Chang that they would not be representing his interests at the February 22, 2008 settlement conference with Facebook, or that they would be offering to release Chang's claims.

114.     On February 25, 2008, Mosko sent Chang an email advising him that ConnectU and Facebook had reached a settlement of all claims in the pending cases.

115.     Mosko never advised Chang that a settlement valued at $65 million had been achieved for the benefit of Mosko's other clients.

116.     Mosko never advised or discussed with Chang that 100% of ConnectU's stock would be transferred to Facebook pursuant to the settlement agreement, despite the fact that Mosko knew that Chang held an interest in ConnectU.

117.     On information and belief, Mosko excluded Chang from the Facebook settlement discussions at the request of the Winklevosses, and encouraged Chang to "sit on the sidelines," thereby depriving Chang of relevant information.

118. On or around November 4, 2008, pursuant to a Court order enforcing the settlement agreement between ConnectU and Facebook, the Winklevosses transferred 100% of the stock of ConnectU to the Special Master in the Facebook Litigation.

119. On information and belief, on or around November 4, 2008, pursuant to the Court's order enforcing the settlement agreement, Facebook transferred $20,000,000 and approximately 1,253,326 shares of Facebook common stock estimated at $45,000,000 in value, to the Special Master.

120. On information and belief, on or around December 15, 2008, the Special Master released the ConnectU stock to Facebook, and released Facebook's payment of cash and Facebook stock to ConnectU's counsel, Boies, Schiller & Flexner LLP.

121. The settlement proceeds and Facebook stock paid by Facebook are assets of ConnectU and WCG.

122. Chang has not received his share of the proceeds from the disposition of ConnectU's stock.

123. The Winklevosses and the other ConnectU members, Divya Narendra and Howard Winklevoss, have retained and intend to retain all of the settlement proceeds for their own benefit, in violation of Chang's agreements with ConnectU and the Winklevosses acting on behalf of ConnectU.

### COUNT I
### Breach of Contract
(Against Cameron Winklevoss,
Tyler Winklevoss, and ConnectU)

124. Plaintiffs restate and incorporate each of the foregoing allegations as if fully alleged herein.

125.    On November 24, 2004, Chang and the Winklevosses, on behalf of ConnectU, entered into the MOU.

126.    Pursuant to the MOU, Chang and i2hub agreed to perform the work necessary to integrate the ConnectU.com website into the i2hub software.

127.    Pursuant to the MOU, the Winklevosses, on behalf of ConnectU, agreed that upon completion of the integration, Chang would hold a 15% interest in ConnectU.

128.    Chang and i2hub fully performed all of their obligations concerning the integration in accordance with the parties' agreement and all modifications thereto.

129.    In breach of the MOU, the Winklevosses and ConnectU have refused to honor Chang's ownership interests in ConnectU, including by refusing to provide Chang with his share of the proceeds of the sale of ConnectU to Facebook.

130.    Chang is entitled to damages, in an amount to be determined at trial.

## COUNT II
### Breach of Partnership and/or Joint Venture Agreement
(Against Cameron Winklevoss, Tyler Winklevoss,
Howard Winklevoss, and ConnectU)

131.    Plaintiffs restate and incorporate each of the foregoing allegations as if fully alleged herein.

132.    By their agreement and by their actions, Chang and the Winklevosses entered into an express or *de facto* partnership and/or joint venture.

133.    Chang and the Winklevosses agreed to and did in fact contribute all of the property and assets of i2hub, Inc. and ConnectU, respectively, to their partnership and/or joint venture.

134.    At all times relevant hereto, the Winklevosses were acting with the full authority of ConnectU and as managers, agents and/or officers of ConnectU.

135. Chang and the Winklevosses operated i2hub and ConnectU as co-owners under the name WCG, with Chang owning 50%.

136. As set forth above, the defendants have breached the parties' agreement to operate as partners and/or joint venturers.

137. Chang is entitled to damages, in an amount to be determined at trial.

**COUNT III**
**<u>Breach of Covenant of Good Faith and Fair Dealing</u>**
(Against Cameron Winklevoss, Tyler Winklevoss,
Howard Winklevoss, and ConnectU)

138. Plaintiffs restate and incorporate each of the foregoing allegations as if fully alleged herein.

139. Pursuant to the parties' contractual agreements, the defendants owed Chang and i2hub a duty of good faith and fair dealing. This duty included, among other things, the obligation not to do anything that deprived Chang and i2hub of the benefits of the agreements they made with the defendants.

140. As set forth above, the Winklevosses, Howard Winklevoss and ConnectU breached the implied covenant of good faith and fair dealing.

141. Chang and i2hub are entitled to damages on account of defendants' breaches of the implied covenant of good faith and fair dealing, in an amount to be determined at trial.

**COUNT IV**
**<u>Breach of Fiduciary Duty</u>**
(Against Cameron Winklevoss, Tyler Winklevoss,
Howard Winklevoss, Divya Narendra and ConnectU)

142. Plaintiffs restate and incorporate each of the foregoing allegations as if fully alleged herein.

143. As partners and/or joint venturers, the Winklevosses owed Chang a fiduciary duty. This duty included, among other things, the obligation to share with Chang all material information, to act honestly, and to provide Chang the compensation, and share of the profits, to which he was entitled by virtue of the parties' agreements.

144. By conveying partnership property and by retaining the proceeds of the sale of partnership property for their own benefit, the defendants have breached their fiduciary duties to Chang.

145. By entering into settlement negotiations on behalf of the partnership in the Facebook Litigation and ConnectU Litigation, with the intent to exclude Chang from any proceeds thereof, and by excluding Chang from his rightful share of the proceeds of the settlement, the defendants breached their fiduciary duty to Chang.

146. Chang is entitled to damages on account of defendants' breaches of fiduciary duty, in an amount to be determined at trial.

**COUNT V**
**Unjust Enrichment**
(Against Cameron Winklevoss, Tyler Winklevoss,
Howard Winklevoss, Divya Narendra and ConnectU)

147. Plaintiffs restate and incorporate each of the foregoing allegations as if fully alleged herein.

148. As a result of the unlawful conduct of the defendants as alleged herein, the defendants have been unjustly enriched to the detriment of Chang and i2hub.

149. The defendants have taken and received the benefit of, among other things, Chang and i2hub's ideas, technology, goodwill and user base, as well as the value of their work on the integration and on the joint development of other properties.

150. Without justification, the defendants have refused to pay Chang and i2hub for their share of the value ConnectU obtained as a result of having and using Chang's and i2hub's assets and property.

151. If no contract is found to be enforceable between the parties, the plaintiffs are without an adequate remedy at law to recover for the defendants' unjust enrichment.

152. The defendants are liable to Chang and i2hub and should be required to disgorge their unjust gains, in an amount to be determined at trial.

### COUNT VI
### Quantum Meruit
(Against Cameron Winklevoss, Tyler Winklevoss,
Howard Winklevoss, Divya Narendra and ConnectU)

153. Plaintiffs restate and incorporate each of the foregoing allegations as if fully alleged herein.

154. Chang and i2hub provided valuable services and substantial benefit to the defendants. The defendants have thus been enriched without providing adequate compensation to Chang and/or to i2hub.

155. Chang and i2hub devoted substantial efforts and resources to advance and promote ConnectU and other internet properties with the expectation that they would be compensated by ConnectU and the Winklevosses for those services pursuant to their agreements. ConnectU and the Winklevosses accepted Chang's and i2hub's services with the understanding that they would compensate them.

156. Chang is entitled to damages, in an amount to be determined at trial.

## COUNT VII
### Conversion
(Against Cameron Winklevoss, Tyler Winklevoss,
Howard Winklevoss, Divya Narendra and ConnectU)

157.     Plaintiffs restate and incorporate each of the foregoing allegations as if fully alleged herein.

158.     Pursuant to the parties' agreements, upon the sale of all of ConnectU's assets in settlement of litigation between ConnectU and Facebook, Chang had a present right to his share of the proceeds of that settlement.

159.     Defendants' retention of the proceeds of the settlement, including the portion comprising Chang's interest therein, constitutes wrongful conversion of Chang's property.

160.     Chang is entitled to payment of damages on account of defendants' unauthorized retention of, and their refusal to return, Chang's property, in an amount to be determined at trial.

## COUNT VIII
### Accounting
(Against Cameron Winklevoss, Tyler Winklevoss,
Howard Winklevoss, Divya Narendra and ConnectU)

161.     Plaintiffs restate and incorporate each of the foregoing allegations as if fully alleged herein.

162.     Pursuant to the parties' agreements, Chang and the Winklevosses formed a partnership and/or joint venture, known as WCG.

163.     Pursuant to the parties' agreements, Chang obtained an ownership interest in WCG and in ConnectU.

164.    Chang is entitled to an accounting of the income, expenses, earnings, benefits, profits, and distributions or disbursements by the defendants, ConnectU and WCG.

165.    Chang is entitled to receive his share of the aforesaid net income, earnings, benefits, profits, and distributions or disbursements from the defendants.

## COUNT IX
### Constructive Trust
(Against Cameron Winklevoss, Tyler Winklevoss,
Howard Winklevoss, Divya Narendra and ConnectU)

166.    Plaintiffs restate and incorporate each of the foregoing allegations as if fully alleged herein.

167.    Pursuant to the parties' agreements, Chang is entitled to an interest in the proceeds of the sale of ConnectU and of ConnectU's settlement of the Facebook Litigation and the ConnectU Litigation.

168.    On information and belief, the defendants or their agents currently hold the cash and Facebook stock representing the proceeds of the sale of ConnectU.

169.    The defendants hold such cash and Facebook stock representing proceeds of the sale of ConnectU, up to an amount equal to Chang's interest in WCG partnership property, in constructive trust for the benefit of Chang, and have a duty to convey such property to Chang forthwith.

170.    The defendants, for the reasons alleged herein, are constructive trustees of Chang's share of all income, proceeds, earnings, benefits, profits and distributions or disbursements of ConnectU, with all attendant fiduciary responsibilities and obligations thereof.

171.    Chang is entitled to receive his share of the aforesaid net income, proceeds, earnings, benefits, profits, and distributions or disbursements from the defendants.

## COUNT X
### Professional Negligence
(Against Scott R. Mosko and Finnegan,
Henderson, Farabow, Garrett & Dunner LLP)

172.    Plaintiffs restate and incorporate each of the foregoing allegations as if fully alleged herein.

173.    Mosko and Finnegan LLP represented Chang and owed Chang a duty of care as his attorneys.

174.    As alleged herein, Mosko and Finnegan LLP breached that duty by, among other things, ignoring Chang's interests in entering into settlement discussions in favor of the interests of their other clients, failing to provide Chang with relevant information, failing to meet with or interview Chang about his interests, failing to provide Chang with material and relevant information, failing to disclose that they were negotiating on behalf of their other clients in direct conflict with Chang's interests, offering to release Chang's claims without Chang's authorization, and actively excluding Chang from settlement discussions in which he had a direct and substantial interest.

175.    Mosko's and Finnegan LLP's breaches directly and proximately caused Chang damages, including depriving Chang of his rightful share of the proceeds of the Facebook settlement.

## COUNT XI
### Civil Conspiracy
(Against Scott R. Mosko and Finnegan,
Henderson, Farabow, Garrett & Dunner LLP)

176.    Plaintiffs restate and incorporate each of the foregoing allegations as if fully alleged herein.

177.    Mosko and Finnegan LLP knew that Chang held an ownership interest in ConnectU and WCG and that he therefore had an interest in the outcome of the claims against Facebook and in a share of any settlement proceeds.

178.    Mosko and Finnegan LLP knew that the Winklevosses' exclusion of Chang from the settlement discussions with Zuckerberg and Facebook and their intention to exclude Chang from any settlement proceeds constituted a breach of their duties to and agreements with Chang.

179.    Mosko and Finnegan LLP, acting in concert with the Winklevosses and against Chang's interests, excluded Chang from the settlement discussions in order to deprive, or with the natural and probable effect of depriving, Chang of any proceeds of the Facebook settlement.

180.    Mosko and Finnegan LLP knowingly and actively participated in and provided substantial assistance to the other defendants in furthering their breaches of duty to and agreements with Chang.

181.    As a result of Mosko's and Finnegan LLP's conspiracy with the other defendants, Chang suffered direct harm, including being deprived of his rightful share of the settlement proceeds.

## COUNT XII
### Aiding and Abetting
(Against Scott R. Mosko and Finnegan,
Henderson, Farabow, Garrett & Dunner LLP)

182.    Plaintiffs restate and incorporate each of the foregoing allegations as if fully alleged herein.

183.    Mosko and Finnegan LLP knew that Chang held an ownership interest in ConnectU and WCG and that he therefore had an interest in the outcome of the claims against Facebook and in a share of any settlement proceeds.

184.    Mosko and Finnegan LLP knew that the Winklevosses' exclusion of Chang from the settlement discussion with Zuckerberg and Facebook and their intention to exclude Chang from any settlement proceeds, constituted a breach of Winklevosses' duties to and agreements with Chang.

185.    Mosko and Finnegan LLP knowingly and actively participated in and provided substantial assistance to the other defendants in furthering their breaches of duty to and agreements with Chang.

186.    As a result of Mosko's and Finnegan LLP's aiding and abetting the other defendants' breaches, Chang suffered direct harm, including being deprived of his rightful share of the settlement proceeds.

187.    Mosko and Finnegan LLP are jointly and severally liable for the damages caused by the other defendants' breaches of duty to and agreements with Chang.

**COUNT XIII**
**Tortious Interference with Contractual**
**and/or Advantageous Business Relations**
(Against Scott R. Mosko and Finnegan,
Henderson, Farabow, Garrett & Dunner LLP)

188.    Plaintiffs restate and incorporate each of the foregoing allegations as if fully alleged herein.

189.    As alleged herein, Chang had a business relationship with the Winklevosses, ConnectU, Divya Narendra and Howard Winklevoss pursuant to the MOU and the WCG partnership.

190.    Mosko and Finnegan LLP were aware of that relationship.

191.    Mosko and Finnegan LLP interfered with that relationship by improper means and/or motive, as described above, including by using the trust and confidence Chang placed in them as his attorneys to intentionally exclude Chang from asserting his rights in ConnectU, WCG and, thereby, from asserting his rights in the settlement proceeds.

192.    Chang was deprived of the advantage of his relationship with the other defendants as a direct result of Mosko's and Finnegan LLP's conduct.

**WHEREFORE,** plaintiffs pray that this Court grant the following relief:

    (a)    judgment in their favor against the defendants on Counts I through XIII;

    (b)    an order that defendants Cameron Winklevoss, Tyler Winklevoss, Howard Winklevoss, Divya Narendra and ConnectU account to plaintiffs for their interest in the assets of ConnectU and the WCG, including the proceeds of the settlement of the Facebook Litigation and the ConnectU Litigation, and all other net income, earnings, benefits, profits, distributions and disbursements; and

    (c)    compensatory damages on plaintiffs' claims, together with interest and costs;

(d)    such other and further relief as may be deemed fair and equitable by the Court.

## JURY DEMAND

Plaintiffs demand a trial by jury on all counts so triable.

Respectfully submitted,

WAYNE CHANG and
THE I2HUB ORGANIZATION, INC.

By their attorneys,

Alan D. Rose (BBO No. 427280)
Alan D. Rose, Jr. (BBO No. 628871)
Nicholas J. Rosenberg (BBO No. 657887)
ROSE, CHINITZ & ROSE
One Beacon Street, Fourth Floor
Boston, Massachusetts 02108
Tel.: (617) 536-0040
Fax: (617) 536-4400

# EXHIBIT A

Okay, this is good

Wayne


On Tue, 23 Nov 2004 17:54:47 -0500, Cameron Winklevoss
<cameron@winklevoss.com> wrote:
> Wayne,
>
> Per our meetings and correspondence I am writing up a Memorandum of Understanding (MOU) between ConnectU LLC (CU) and
i2hub.

>
> CU and i2hub have entered into an integration agreement, whereby i2hub and CU will leverage each other's assets (technology, user
base, etc.) to improve their respective products via this synergy. Upon completion of the integration, CU will give Wayne Chang the
option to exercise a 15% stake in CU.

>
> This option can be exercised if and only if one of the following conditions occurs:
· >
> 1.    CU terminates its relationship with i2hub after integration
> 2.    CU does not enter into a holding company with i2hub
>
> This option will be nullified if and only if both of the following requirements are satisfied:
>
> 1.    i2hub secures a license with a major record label
> 2.    i2hub decentralizes its software in accordance with the Induce Act
>
> In the case of nullification, CU and i2hub will proceed to enter into a holding company at which point negotiations will occur
regarding the value of each member's respective share.

>
> Wayne, if you agree to these terms we can proceed to writing up a formal contract.
>
> -Cameron
>
> This transmission, including any attachments, is for the sole use of the intended recipient(s) or entity named above and may contain
confidential and privileged information. If you received this and are not the intended recipient(s), you are hereby notified that any
disclosure, copying, unauthorized distribution or the taking of any action in reliance on the contents of this information is prohibited.
If you have received this transmission in error, please immediately contact the sender as indicated above to arrange the proper
handling of the information.

>
>

# EXHIBIT B

# ConnectU Profile Importer



Copyright 2005. Winklevoss Chang
Confidential

# EXHIBIT C

| From: | Cameron Winklevoss <Cameron@winklevoss.com> |
| --- | --- |
| Sent: | Monday, December 20, 2004 9:32 AM |
| To: | drttol@gmail.com |
| Subject: | plan |
| Attach: | gapatners.doc;gapatners.doc |

**ConnectU-I2hub-ConnectHi**

<u>Background</u>
Connectu-ConnectU a college based social-network. It is the most complete social-network currently on the market, offering multiple photographs per profile, personal photo galleries, blogs, a forum, groups, live chat, and more. In addition, ConnectU is in the process of integrating with i2hub, the premier college file-sharing network. User of the i2hub client will be able to access and use connectu while on i2hub.

I2hub-I2hub is a college based file-sharing network. It is currently open at over 300 schools across the country. I2hub is currently in the process of securing licenses from record companies in order to sell downloadable content.

Connecthi-Connecthi is a social-network aimed at high school and junior high students. Its tentative launch date is on January 5th.

<u>Strategy</u>
Strategy-We are currently making moves to secure as many aspects of the college market as possible. We don't want a one-stop place for college students; we want an array of brands that students recognize and use. Our biggest competitor right now is the facebook.com. We are currently in a federal lawsuit against them. While we are confident in the merits of the suit and our ability to win, we do not rely on it as a strategic measure. ConnectU has been and will continue to gain back ground from Facebook's first-mover advantage, assisted by i2hub and the other sites in our network.

The high school market is the fastest growing segment of internet users. It is estimated that over 12 million high school students use AOL instant messenger. If we can grab users at this level, arguably the starting-point of real internet usage among individuals, then these are potentially name-brand users for life. This is part of the overall strategy to a) increase users, b) create a large engine to feed growth to other sites, and c) undercut the facebook.com (these users will transfer automatically to connectu.com, when they reach college age).

While social-networking can generate considerable revenue via advertising, we believe that the most substantial revenue-generating sites are those based around e-commerce. ConnectU and ConnectHi will be the main feeders into our commerce sites such as i2hub. As i2hub transitions into selling downloadable content, we are searching for ways to alleviate the cost of purchasing of music, content which was at one point easily procured at no cost to the user. We believe that an affinity program is one such way to help facilitate the purchasing of content.

# EXHIBIT D

**The Winklevoss Chang Representative Program**

Representative Responsibilities:
- Have an i2hub account as well as a ConnectU account
- Have at least one book listed on Jungalu
- Meet quotas (must increase number of campus users by set increments)
- Advertise ("word of mouth", host parties, flier, sticker, etc.)
- Be very knowledgeable with all products (not necessarily technically inclined, but that is a plus for the community)
- Introduce new products and be familiar with them (Jungalu, Stallscribbles, etc.)
- Be a strong presence in the on line communities (great profiles on ConnectU, frequent the i2hub chat)
- Constantly check The Rep Center (more information on that later)
- Be enthusiastic about the products and have FUN!!

Representative Rewards:
- Point compensation for new users (to be redeemed in The Rep Store), EXTRA points allotted for outstanding performances!
- Access to The Rep Store (redeem points for money and prizes - iPods, LCD TVs, etc.)
- First access to new products
- Free promotional gear (t-shirts, hats, posters, etc.)
- Personalized business cards to symbolize your official partnership with the i2hub Program

*Each representative must complete a one month trial period. Once he/she has proved themselves to be a dedicated part of the Winklevoss Chang organization, they are entitled to the many benefits listed above!*

# EXHIBIT E

| From: | Tyler Winklevoss <tyler@winklevoss.com> |
|--------|-------------------------------------------|
| Sent: | Friday, March 4, 2005 7:52 PM |
| To: | 'Wayne Chang' <wayne.chang@i2hub.com> |
| Subject: | RE: |
| Attach: | the winklevoss chang group ad specs2.doc |

Wayne can you save this as PDF and send it back thanks

From: Wayne Chang [mailto:wayne.chang@i2hub.com]
Sent: Friday, March 04, 2005 6:21 PM
To: 'Cameron Winklevoss'; 'Tyler Winklevoss'; howard@winklevoss.com
Subject:

I2hub doc with header (cut and paste if you need to)

This transmission, including any attachments, is for the sole use of the intended recipient(s) or entity named above and may contain confidential and privileged information. If you received this and are not the intended recipient(s), you are hereby notified that any disclosure, copying, unauthorized distribution or the taking of any action in reliance on the contents of this information is prohibited. If you have received this transmission in error, please immediately contact the sender as indicated above to arrange the proper handling of the information.

## OUR METHOD:

The Winklevoss Chang Group uses CPM (cost-per-thousand impressions) to measure advertisement performance.

Advertising rates are calculated by the number of impressions multiplied by the dollar amount per CPM. The CPM rate can vary depending on the targeted-properties/universities/audience.

Example:
CPM units x CPM rate = Cost of advertising
1000 CPM units (1,000,000 impressions) x $10 CPM rate = $10,000 cost for advertising
CPM rate/ 1000 = cost per impression
$10 CPM rate / 1000 = $.01 cost per impression

## OUR PROPERTIES:

# ConnectU

| | |
|---|---|
| Info: | Social network targeted to college students at 400+ universities. |
| Hits per day: | 50,000+ |
| Membership: | 30,000+ |
| Text-Ad Rate: | 1-5 schools ($1/CPM), All universities ($3/CPM) |

# i2hub.com

| | |
|---|---|
| Info: | World's largest online student collaboration network. |
| Hits per day: | 30,000+ |
| Membership: | 100,000+ |
| Interesting Fact: | Students spent 5.3 million hours on i2hub in Febuary |
| Text-Ad Rate: | 1-5 schools ($1/CPM), All universities ($3/CPM) |

# StallScribbles

| | |
|---|---|
| Info: | Anonymous college confessions site |
| Hits per day: | 15,000+ |
| Interesting Fact: | Extremely popular with the female demographic |
| Text-Ad Rate: | 1-5 schools ($1/CPM), All universities ($3/CPM) |

**TEXT-AD RATE NOTES:**

| | | |
|---|---|---|
| 1-5 schools | $5 minimum | Additional properties, $2 |
| All universities | $100 minimum | |

# EXHIBIT F



April 12, 2005

AMHERST, MA - The i2hub Organization (i2hub) does not condone activities and actions that breach the rights of copyright owners. Our companies are focused on bringing together students and connecting them in ways never before achieved.

Students across the globe utilize i2hub for many reasons – help on homework, exam reviews, sharing ideas, and some have even found their significant other through the network. We are a company focused on the college market with products and services that cater to that market.

Some of our products include:

- **i2hub.com**, the first online collaboration network for college students connecting students across the globe with over 8 million hours spent on i2hub in March by students.

- **ConnectU.com**, the first social networking website designed specifically for the college market to bring together students. Being the first to add blogs, photo glarries, and real-time chat, ConnectU will continue to innovate in the Social Networking sphere.

- **Jungalu.com**, a localized ecommerce website designed utilizing P2P to help students transact on their campuses: Students sell items for more than the local stores buy them for; students buy items for less; and there is no shipping fee if the students are on the same campus. Recognizing the needs of students, Jungalu.com will continue to find ways in which students can benefit.

- **StallScribbles.com**, an anonymous confessions site where students can help each other out through troubling times.

Technology innovators at heart, the founders are interested in pursuing high impact technology projects. We will be releasing new products and services every semester that allows students to collaborate, network, transact, and socialize through digital means.



**About i2hub**

i2hub (www.i2hub.com) is an organization by students for students. The organization delivers a platform for students from colleges, universities, and institutions globally providing instant access to an academic community built on collaboration. Our organization is made up of over 80 dedicated and talented individuals. Through our system, i2hub offers the most advanced and innovative solutions for online collaboration to the students worldwide. With the inevitable meshing of university cultures and networks, the organization is poised to emerge as the world leader.

**About Wayne Chang**

Wayne Chang is the Chief Executive Officer of The i2hub Organization. Previously, Mr. Chang was the Project Lead of Dorm2Dorm in Japan, where he assembled and coordinated a team of developers based in the US. Prior to Dorm2Dorm, he was a security consultant at AllAdvantage Corporation. He designed and created software, "MyAdvantage", that was downloaded by millions. In 2001, Mr. Chang held the position of General Manager at NapsterHelp where he came up with a network protocol that was published worldwide.

In 1999, Mr. Chang was Forum Administrator at Napster Inc. At that position, Mr. Chang helped create and foster the largest online community that continues to thrive to this day. Before joining Napster Inc, Mr. Chang created and sold The Scene Review News Network. Alexa Data Services ranked The Scene Review News Network on it's Top 1000 Most Popular Sites list at 367, with Boston Globe's Boston.com at 365. Wayne Chang is 21 years old.

**About Cameron and Tyler Winklevoss**

Cameron and Tyler are on the forefront of the college-oriented social networking revolution with their founding of ConnectU.com. ConnectU.com has been featured in numerous media sources such as USA Today, The Boston Globe, and NPR.

Both Cameron and Tyler are Harvard University graduates of the class of 2004. While at Harvard, in addition to creating and launching ConnectU.com, they majored in economics, and rowed in the undefeated 2004 NCAA National Championship Men's Heavyweight Crew. In addition to their entrepreneurial endeavors, they are currently training in preparation for the 2008 Beijing Olympics, and last summer were picked off the street in New York City to model in the 2004 Fall Fashion issue of New York Magazine.

The identical mirror-image twins (Cameron's lefty, Tyler's righty) are no strangers to entrepreneurship. Their father, Howard Winklevoss, who they describe as a "serial-entrepreneur," has had much to do with their love for creation and innovation. Mr. Winklevoss was recently featured in the Wallstreet Journal for the creation of his Donor Managed Investment Account Program, described as "The first new vehicle for organized giving by individuals directly to a charity since the Tax Reform Act of 1969." The twins were fanatical Lego builders as children, they self-taught themselves web development at the age of 12, and created their own web design company at age 13. At 15, they started the crew program at the Brunswick School in Greenwich, CT, which soon became a full-fledged varsity sport. Cameron and Tyler are both 23 years old.

# EXHIBIT G

Untitled Document



Paging System



Copyright 2005. Winklevoss Chang
Confidential